**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| PLANNED PARENTHOOD OF WISCONSIN, INC., PLANNED PARENTHOOD OF GREATER OHIO, PLANNED PARENTHOOD ASSOCIATION OF UTAH, and NATIONAL FAMILY PLANNING & REPRODUCTIVE HEALTH ASSOCIATION, | No. 18 Civ. 1035-TNM (con) |
| Plaintiffs, | |
| v. | **ORAL ARGUMENT REQUESTED** |
| ALEX M. AZAR II, in his official capacity as United States Secretary of Health and Human Services, and VALERIE HUBER, in her official capacity as Acting Deputy Assistant Secretary for the Office of Population Affairs, | |
| Defendants. | |

**MOTION FOR A PRELIMINARY INJUNCTION**

Pursuant to Federal Rule of Civil Procedure 65 and Local Civil Rule 65.1(c), Plaintiffs Planned Parenthood of Wisconsin, Inc., Planned Parenthood of Greater Ohio, Planned Parenthood Association of Utah, and National Family Planning & Reproductive Health Association, respectfully move for preliminary injunctive relief requiring that the Department of Health and Human Services ("HHS") (1) be enjoined from reviewing Title X grant applications pursuant to the Fiscal Year 2018 Funding Opportunity Announcement ("FOA"); and (2) provide any continuation funding necessary to ensure that Title X projects remain funded until HHS issues new Title X grants pursuant to a lawful FOA.

This motion is supported by the attached Memorandum of Law in Support of Plaintiffs' Motion for a Preliminary Injunction and related declarations and exhibits filed herewith.

Pursuant to Local Civil Rule 7(m), Plaintiffs' counsel have conferred with counsel for

Defendants regarding the relief sought in this motion.  Defendants will oppose the motion.  The parties will provide the Court with a joint proposed scheduling order regarding briefing on this motion.

May 8, 2018

HELENE T. KRASNOFF (DC BAR NO. 460177)
CARRIE Y. FLAXMAN (DC BAR NO. 458681)
PLANNED PARENTHOOD FEDERATION OF
AMERICA
1110 Vermont Avenue NW, Suite 300
Washington, DC 20005
(202) 973-4800

Respectfully submitted,

By /s/ Paul R. Q. Wolfson
PAUL R.Q. WOLFSON (DC BAR NO. 414759)
KIMBERLY A. PARKER (DC BAR NO. 462495)
ARI J. SAVITZKY (*pro hac vice*)
LEON T. KENWORTHY (*pro hac vice*)
SARA SCHAUMBURG (*pro hac vice*)
WILMER CUTLER PICKERING HALE
     AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
(202) 663-6000
paul.wolfson@wilmerhale.com

ALAN SCHOENFELD (*pro hac vice*)
EMILY NIX (*pro hac vice*)
WILMER CUTLER PICKERING HALE
     AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007

*Attorneys for Plaintiffs Planned Parenthood of Wisconsin, Inc., Planned Parenthood of Greater Ohio, and Planned Parenthood Association of Utah*

RUTH E. HARLOW
JENNIFER DALVEN
ELIZABETH WATSON
LINDSEY KALEY
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2633

ARTHUR B. SPITZER (DC BAR NO. 235960)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF THE DISTRICT OF COLUMBIA
915 15th Street NW, Second Floor
Washington, D.C. 20005
(202) 457-0800

*Attorneys for Plaintiff National Family Planning & Reproductive Health Association*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

| | |
|---|---|
| PLANNED PARENTHOOD OF WISCONSIN, INC., PLANNED PARENTHOOD OF GREATER OHIO, PLANNED PARENTHOOD ASSOCIATION OF UTAH, and NATIONAL FAMILY PLANNING & REPRODUCTIVE HEALTH ASSOCIATION, | |
| Plaintiffs, | No. 18 Civ. 1035-TNM (con) |
| v. | **<u>ORAL ARGUMENT REQUESTED</u>** |
| ALEX M. AZAR II, in his official capacity as United States Secretary of Health and Human Services, and VALERIE HUBER, in her official capacity as Acting Deputy Assistant Secretary for the Office of Population Affairs, | |
| Defendants. | |

**<u>MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'</u>**
**<u>MOTION FOR A PRELIMINARY INJUNCTION</u>**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................... ii

INTRODUCTION .............................................................................................................1

STATEMENT OF FACTS .................................................................................................2

      A.     Congress Enacts Title X To Support Comprehensive Family Planning .................2

      B.     HHS Awards Title X Funds Based On Longstanding Regulations ........................6

      C.     Plaintiffs Fulfill Title X's Mission .......................................................................8

      D.     HHS Alters The Criteria For Receiving Title X Funds .......................................11

SUMMARY OF ARGUMENT .........................................................................................14

ARGUMENT ...................................................................................................................16

I.      PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ...................................16

      A.     The Revisions In The FOA Are Contrary To The Statute And Controlling Regulations, Which Specify The Grantmaking Criteria .........................................17

            1.     The FOA impermissibly adds to the exclusive set of criteria the agency has long considered in awarding Title X funds. ...........................17

            2.     If HHS wished to change its practice, it was required to engage in rulemaking. ...................................................................................................21

      B.     The FOA Contradicts Specific Programmatic Requirements For Title X Projects And Undermines The Title X Program's Fundamental Purposes ............24

            1.     HHS's "Program Priorities" and "Key Issues" contradict Title X's requirements. ................................................................................................25

            2.     The FOA fundamentally undermines the Title X program ........................30

      C.     The New FOA Is Arbitrary And Capricious .........................................................32

II.     PLAINTIFFS FACE IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF .........35

      A.     Plaintiffs Will Be Unlawfully Forced To Alter Their Programs And Subjected To A Tainted Review Process .............................................................36

      B.     Plaintiffs Face Financial, Operational, And Programmatic Harms That Cannot Be Remediated .......................................................................................37

      C.     Plaintiffs' Reputations Among Patients Will Be Tarnished .................................41

III.    THE EQUITIES AND THE PUBLIC INTEREST WEIGH IN FAVOR OF A PRELIMINARY INJUNCTION .........................................................................................42

CONCLUSION ................................................................................................................44

i

# TABLE OF AUTHORITIES

**Page(s)**

*Aamer v. Obama,*
    742 F.3d 1023 (D.C. Cir. 2014) ..................................................................16

*Arizona v. Shalala,*
    121 F. Supp. 2d 40 (D.D.C. 2000) ............................................................24

*Beacon Associates, Inc. v. Apprio, Inc.,*
    No. 1:18-CV-00576 (TNM), 2018 WL 1784281 (D.D.C. Apr. 13, 2018) .................38, 41

*Burlington Truck Lines v. United States*, 371 U.S. 156 (1962) ....................................32

*Catholic Health Initiatives v. Sebelius,*
    617 F.3d 490 (D.C. Cir. 2010) ..................................................................23

*\* Chevron USA, Inc. v. NRDC,*
    467 U.S. 837 (1984) ............................................................................30

*Christopher v. SmithKline Beecham Corp.,*
    567 U.S. 142 (2012) ........................................................................20, 21

*Clarian Health West, LLC v. Hargan,*
    878 F.3d 346 (D.C. Cir. 2017) ..................................................................24

*Cleveland Construction, Inc. v. NLRB,*
    44 F.3d 1010 (D.C. Cir. 1995) ..............................................................15, 33

*Electronic Privacy Information Center v. U.S. Department of Homeland Security,*
    653 F.3d 1 (D.C. Cir. 2011) ................................................................22, 23

*Encino Motorcars, LLC v. Navarro,*
    136 S. Ct. 2117 (2016) ..........................................................................33

*Gilbert v. Wilson,*
    2018 WL 1073163 (D.D.C. Feb. 27, 2018) ....................................................35

*Holiday CVS, L.L.C. v. Holder,*
    2012 WL 10973832 (D.D.C. Feb. 7, 2012) ..............................................38, 41

*Judulang v. Holder,*
    565 U.S. 42 (2011) ..............................................................................32

*\* League of Women Voters of the United States v. Newby,*
    838 F.3d 1 (D.C. Cir. 2016) ............................................................ *passim*

*Longview Fibre Co. v. Rasmussen,*
  980 F.2d 1307 (9th Cir. 1992) .......................................................................19

*Mendoza v. Perez,*
  754 F.3d 1002 (D.C. Cir. 2014) ..............................................................22, 23

*Morgan Stanley DW Inc. v. Rothe,*
  150 F. Supp. 2d 67 (D.D.C. 2001) .................................................................41

\* *Motor Vehicle Manufacturers Association of the United States, Inc. v. State*
  *Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983) ....................32, 33

*National Environmental Development Association's Clean Air Project  v.*
  *EPA*, 752 F.3d 999 (D.C. Cir. 2014)..............................................................20

\* *National Family Planning and Reproductive Health Association, Inc. v.*
  *Sullivan*, 979 F.2d 227 (D.C. Cir. 1992)................................................. *passim*

*National Treasury Employees Union v. United States,*
  101 F.3d 1423 (D.C. Cir. 1996) ....................................................................36

*Natural Resources Defense Council v. EPA,*
  777 F.3d 456 (D.C. Cir. 2014) ......................................................................19

*Northern Mariana Islands v. United States,*
  686 F. Supp. 2d 7 (D.D.C. 2009) ..................................................................44

*Original Honey Baked Ham Co. of Georgia, Inc. v. Glickman,*
  172 F.3d 885 (D.C. Cir. 1999) ......................................................................19

*Orloski v. FEC,*
  795 F.2d 156 (D.C. Cir. 1986) ................................................................15, 30

*Overstreet Electric Co. v. United States,*
  47 Fed. Cl. 728 (2000) .................................................................................37

*Patriot, Inc. v. HUD,*
  963 F. Supp. 1 (D.D.C. 1997) .......................................................................41

\* *Planned Parenthood Federation of America, Inc. v. Heckler,*
  712 F.2d 650 (D.C. Cir. 1983).............................................................20, 29, 31

\* *Planned Parenthood Federation of America, Inc. v. Schweiker* 559 F. Supp. 658
  (D.D.C.), *aff'd*, 712 F.2d 650 (D.C. Cir. 1983) .....................................38, 40, 42

*Planned Parenthood of Indiana, Inc. v. Commissioner of Indiana State*
  *Department of Health*, 699 F.3d 962 (7th Cir. 2012) ...........................16, 38, 42

*Ross University School of Medicine, School of Veterinary Medicine (St. Kitts) Ltd.*
    *v. Cavazos*, 716 F. Supp. 638 (D.D.C. 1989).....................................................40

*Rust v. Sullivan*,
    500 U.S. 173 (1991).............................................................................................19

*Sabino Canyon Tours, Inc. v. USDA Forest Service*,
    2018 WL 784061 (D.D.C. Feb. 8, 2018).........................................................37

*Select Specialty Hospital-Bloomington, Inc. v. Burwell*,
    757 F.3d 308 (D.C. Cir. 2014)...........................................................................34

*Serono Laboratories, Inc. v. Shalala*,
    158 F.3d 1313 (D.C. Cir. 1998).........................................................................44

*Shays v. FEC*,
    337 F. Supp. 2d 28 (D.D.C. 2004), *aff'd*, 414 F.3d 76 (D.C. Cir. 2005).........................30

*Smoking Everywhere, Inc. v. FDA*, 680 F. Supp. 2d 62 (D.D.C. 2010), *aff'd sub*
    *nom. Sottera, Inc. v. FDA*, 627 F.3d 891 (D.C. Cir. 2010).................................41

*Sprint Corp. v. FCC*,
    315 F.3d 369 (D.C. Cir. 2003)...........................................................................23

*Texas Children's Hospital v. Burwell*,
    76 F. Supp. 3d 224 (D.D.C. 2014).....................................................................44

*Texas v. EPA*,
    829 F.3d 405 (5th Cir. 2016) .............................................................................38

*Texas v. United States*,
    809 F.3d 134 (5th Cir. 2015) .............................................................................24

*United States Telecom Ass'n v. FCC*,
    825 F.3d 674 (D.C. Cir. 2016) ...........................................................................21

*United Student Aid Funds, Inc. v. Devos*,
    237 F. Supp. 3d 1 (D.D.C. 2017).......................................................................21

*Virginia Department of Education v. Riley*,
    23 F.3d 80 (4th Cir. 1994) .................................................................................39

# STATUTES AND REGULATIONS

5 U.S.C.

    § 553(a) ..........................................................................................24

    § 553(b) ..........................................................................21, 22, 23

    § 553(c) ..........................................................................................22

    § 702 ...............................................................................................41

    § 706 ...............................................................................................32

20 U.S.C. § 10006(b) ....................................................................................20

42 U.S.C.

    § 201 *et seq.* ..................................................................................28

    § 254b(b)(1) ...................................................................................28

    § 300(a) ................................................................................ *passim*

    § 300(b) ................................................................................ *passim*

    § 300a-5 ............................................................................... *passim*

Pub. L. No. 91-572, § 2 (1970) ................................................................3, 33

Public Health Service Act, Pub. L. No. 78-410, 58 Stat. 682 (1944), codified at 42
    U.S.C. § 201 *et seq.* ......................................................................28

Public Health Service Act Title X, 42 U.S.C. § 300 *et seq.* ....................2, 28

42 C.F.R.

    § 59.1 ....................................................................................3, 27, 29

    § 59.3 .........................................................................................4, 15

    § 59.5 ................................................................................... *passim*

    § 59.7 ................................................................................... *passim*

    § 59.10 .............................................................................................4

    § 59.11 ...........................................................................................29

# LEGISLATIVE AND ADMINISTRATIVE MATERIALS

S. 2108, 91st Cong. (2d Sess. 1970) ............................................................27

S. Rep. No. 91-1004 (1970) ...............................................................3, 31, 32

36 Fed. Reg. 18,465 (Sept. 15, 1971) ........................................................4, 5

36 Fed. Reg. 2532 (Feb. 5, 1971) ................................................................24

45 Fed. Reg. 37,433 (June 3, 1980) ...............................................................4

# OTHER AUTHORITIES

Bailey, Martha J., *Reexamining the Impact of Family Planning Programs on US
  Fertility: Evidence from the War on Poverty and the Early Years of Title
  X*, 4 Am. Econ. J.: Applied Econ. 62 (2012), https://www.aeaweb.org/
  articles?id=10.1257/app.4.2.62 ...................................................................................3

Boyer, Jesseca, *New Name, Same Harm: Rebranding of Federal Abstinence-Only
  Programs*, The Guttmacher Institute (Feb. 18, 2018), https://www.gutt
  macher.org/gpr/2018/02/new-name-same-harm-rebranding-federal-
  abstinence-only-programs ...............................................................................13

Carter, Marion W. et al., *Four aspects of the scope and quality of family planning
  services in U.S. health centers: Results from a survey of health center
  administrators*, 94 J. Contraception 340 (2016), http://dx.doi.org/10.1016/
  j.contraception.2016.04.009...........................................................................10

CDC Fact Sheet, *Effectiveness of Family Planning Methods*,
  https://www.cdc.gov/reproductivehealth/contraception/unintendedpregnan
  cy/pdf/Contraceptive_methods_508.pdf .........................................................10

Frost, Jennifer J. et al., *Publicly Funded Contraceptive Services at U.S. Clinics,
  2015*, at 10, The Guttmacher Institute (2017), https://www.guttmacher.org/
  report/publicly-funded-contraceptive-services-us-clinics-2015 .........................6

Frost, Jennifer J. et al., *Publicly Funded Family Planning Clinics in 2015*:
  *Patterns and Trends in Service Delivery Practices and Protocols,* The
  Guttmacher Institute (2016),
  https://guttmacher.org/sites/default/files/report_pdf/publicly-funded-family-
  planning-clinic-survey-2015_1.pdf ..............................................................9, 10

Frost, Jennifer J. et al., *Return on Investment: A Fuller Assessment of the Benefits
  and Cost Savings of the US Publicly Funded Family Planning Program*,
  92 The Milbank Q. 667 (2014), https://www.guttmacher.org/sites/default/
  files/article_files/frost_et_al-2014-milbank_quarterly.pdf .................................6

Frost, Jennifer J. et al., *Specialized Family Planning Clinics in the United States:
  Why Women Choose Them and Their Role in Meeting Women's Health
  Care Needs*, 22 Women's Health Issues 519 (2012),
  https://doi.org/10.1016/j.whi.2012.09.002.....................................................28

Harper, Cynthia C. et al., *Abstinence and Teenagers: Prevention Counseling
  Practices of Health Care Providers Serving High-Risk Patients in the
  United States*, 42 Persp. on Sexual and Reprod. Health 125 (2010) ...............35

Health Resources & Service Administration, *Federally Qualified Health Centers*,
  https://www.hrsa.gov/opa/eligibility-and-registration/health-
  centers/fqhc/index.html.................................................................................10

Hasstedt, Kinsey, *Understanding Planned Parenthood's Critical Role in the
    Nation's Family Planning Safety Net*, 20 Guttmacher Pol'y Rev. 12 (2017),
    https://www.guttmacher.org/gpr/2017/01/understanding-planned-
    parenthoods-critical-role-nations-family-planning-safety-net ..............................................9

HHS, *Providing Quality Family Planning Services: Recommendations of CDC
    and the U.S. Office of Population Affairs,* https://www.cdc.gov/mmwr/
    preview/mmwrhtml/rr6304a1.htm ..........................................................................5, 6, 13

HHS Office of Population Affairs, *Program Requirements for Title X Funded
    Family Planning Projects* (April 2014), https://www.hhs.gov/opa/
    sites/default/files/ogc-cleared-final-april.pdf ....................................................5, 18, 22, 31

Kaestle, Christine E. et al., *Young Age at First Sexual Intercourse and Sexually
    Transmitted Infections in Adolescents and Young Adults*, 161 Am. J.
    Epidemiology 774 (2005) ...................................................................................................35

Nixon, Richard, *Statement on Signing the Family Planning Services and
    Population Research Act of 1970* (Dec. 26, 1970), The American
    Presidency Project, http://www.presidency.ucsb.edu/ws/?pid=2865 .................................3

Ott, Mary A. et al., *Counseling Adolescents about Abstinence in the Office
    Setting*, 20 J. Pediatric Adolescent Gynecology 39 (2007) ........................................26, 35

Santelli, John S. et al., *Abstinence-Only-Until-Marriage: An Updated Review of
    U.S. Policies and Programs and Their Impact*, 61 J. Adolescent Health
    273 (2017), https://www.jahonline.org/article/S1054-139X(17)30260-
    4/pdf ..................................................................................................................................26

Thiel de Bocanegra, Heike et al., Onsite Provision of Specialized Contraceptive
    Services: Does Title X Funding Enhance Access?, 23 J. Women's Health
    428 (May 2014), https://www.liebertpub.com/doi/full/10.1089/
    jwh.2013.4511 ....................................................................................................................10

White, Kari et al, *The Impact of Reproductive Health Legislation on Family
    Planning Clinic Services in Texas*, 105 Am. J. Pub. Health 851 (2015),
    http://sites.utexas.edu/txpep/files/2017/04/White-et-al-Impact-of-
    Reproductive-Health-Legislation-AJPH-pre-print-2015.pdf......................................40, 43

## INTRODUCTION

Congress established the Title X program a half century ago to fund comprehensive family planning care for all, and to ensure, in particular, that lower-income people would have access to a broad range of acceptable and effective family planning methods and services, including contraception.  For decades, unchanging Department of Health and Human Services ("HHS") regulations have implemented that mission.  Plaintiffs, who include family-planning providers across the Nation who have long participated in the Title X program, deliver essential, indeed lifesaving Title X services to millions of patients without regard to their ability to pay.

But now, without notice-and-comment rulemaking or any explanation, HHS has dramatically changed course and significantly revised the criteria by which it will review applications for Title X grant funds.  Those new criteria stray far from the statutory and regulatory mandates that have long governed the Title X grant-review process and would convert Title X from a program designed to ensure broad access to effective contraception, into one that emphasizes policy priorities that were never part of the grantmaking criteria, like abstinence until marriage.  The changes also threaten to exclude Plaintiffs and their members from the Title X program, depriving hundreds of thousands of people of the program's benefits.  Indeed, the new grantmaking criteria put Plaintiffs in a no-win situation.  Some, unable to meet HHS's new dictates, will have to close health centers, turn away patients, and lay off staff.  Others, to remain eligible for funding, will have to compromise their missions and tailor their grant applications to meet HHS's new criteria, curtailing relationships with well-qualified providers and evidence-based practices developed over years.

This Court should enjoin HHS from using its FY2018 Title X Funding Opportunity Announcement ("FOA") to review applications and award grants.  Plaintiffs are likely to prevail on the merits of their Administrative Procedure Act claims.  HHS's new Title X grantmaking

criteria in the FOA are contrary to law because those criteria depart from the considerations governing grant funding expressly set forth in the statute and regulations.  The new criteria also conflict with Title X's requirements that grantees provide comprehensive and nondirective family planning services.  And the new criteria are arbitrary and capricious:  HHS has offered no cogent explanation for them, and they represent a sharp departure from longstanding HHS practice on which Plaintiffs and their patients have long relied.

Plaintiffs face irreparable harm from the FOA.  Unless Defendants are enjoined from using the new grantmaking criteria to evaluate the Title X grant applications, Plaintiffs will be forced to compete for Title X funds at an unlawful disadvantage and stand to lose millions in federal funds.  Such losses would require Plaintiffs to shutter health centers and turn away patients with nowhere else to go to receive free or low-cost family planning services.

The equities and the public interest strongly support maintaining the status quo while this case is litigated.  Millions of women, men, and teens rely on the Title X program and experienced Title X providers like Plaintiffs for essential family planning services and related care.  By contrast, an injunction will impose no burden on the government beyond complying with the requirements of the Title X statute and regulations that have remained unchanged for nearly half a century.  HHS should be enjoined from using the FOA.

## STATEMENT OF FACTS

### A.    Congress Enacts Title X To Support Comprehensive Family Planning

Title X of the Public Health Service Act, 42 U.S.C. § 300 *et seq.* ("Title X"), was enacted in 1970 to provide all people, and especially low-income women, with access to high quality, comprehensive family planning services.  Congress declared that Title X's purpose was "making comprehensive voluntary family planning services readily available to all persons desiring such

services." Pub. L. No. 91-572, § 2(1) (1970); *see* S. Rep. No. 91-1004, at 2 (1970). The statute reflects Congress's dual recognition that unintended childbearing has negative effects on poverty levels, educational attainment, and health outcomes, and that the family planning services necessary for people to control the number and spacing of their children, such as medical contraception, are often inaccessible to lower-income people. Declaration of Clare Coleman ("Coleman Decl.") ¶¶ 15-18.[1] Title X was designed to combat that problem by providing affordable family planning services—most importantly, modern contraception like the contraceptive pill—to all who want them. *Id.* Title X passed with overwhelming bipartisan support and was signed into law by President Nixon.[2]

HHS administers the Title X program, and awards funding to support "family planning projects" that provide reproductive health and family planning care, primarily to low-income people. *See* 42 U.S.C. § 300(a); Coleman Decl. ¶¶ 29, 32. The statute requires *comprehensive* family planning care that is effective and acceptable to their patients: Grantees' projects "shall offer a broad range of acceptable and effective family planning methods and services (including natural family planning methods, infertility services, and services for adolescents)." 42 U.S.C. § 300(a). HHS regulations further specify that funded projects must "consist of the educational, comprehensive medical, and social services necessary to aid individuals to determine freely the number and spacing of their children." 42 C.F.R. § 59.1. The regulations further require Title X projects to "[p]rovide a broad range of acceptable and effective medically approved family

---

[1]     *See* Bailey, *Reexamining the Impact of Family Planning Programs on US Fertility: Evidence from the War on Poverty and the Early Years of Title X*, 4 Am. Econ. J.: Applied Econ. 62 (2012).

[2]     *See, e.g.*, Nixon, *Statement on Signing the Family Planning Services and Population Research Act of 1970* (Dec. 26, 1970), The American Presidency Project.

planning methods," *id.* § 59.5(a)(1), and that, absent good cause, they must provide "medical services related to family planning (including … contraceptive supplies) … , and provide for the effective usage of contraceptive devices and practices," *id.* § 59.5(b)(1).  All of those requirements have remained unchanged since 1971.  *See* 45 Fed. Reg. 37,433, 37,436-37,437 (June 3, 1980) (setting forth current regulation); *compare* 36 Fed. Reg. 18,465, 18,466-18,467 (Sept. 15, 1971) (setting forth above terms at former 42 C.F.R. §§ 59.3, 59.5(d), (f), (g)).

The statute and regulations also require Title X projects to deliver comprehensive care in a manner that is *non-directive*.  All family planning services provided under the program must be "voluntary."  42 U.S.C. § 300a-5; *see id.* § 300(a).  Consistent with that statutory text, Title X regulations require that services must be provided "without subjecting individuals to any coercion to accept services or to employ or not employ any particular methods of family planning."  42 C.F.R. § 59.5(a)(2).  Acceptance of any particular services "may not be made a prerequisite to eligibility for, or receipt of, any other services" provided by a Title X project.  *Id.* Moreover, Title X projects must "[p]rovide services in a manner which protects the dignity of the individual," *id.* § 59.5(a)(3), and "without regard to religion, race, color, national origin, handicapping condition, age, sex, number of pregnancies, or marital status," *id.* § 59.5(a)(4). Again, those regulations have remained unchanged for decades.  *See* 45 Fed. Reg. at 37,437-37,438; *compare* 36 Fed. Reg. at 18,466-18,467 (former 42 C.F.R. §§59.5(a)(3), 59.10).

The statute and regulations also establish *specific grantmaking criteria* to be used to determine who will receive Title X funds.  The statute provides that "[i]n making grants and contracts under this section the Secretary shall take into account the number of patients to be served, the extent to which family planning services are needed locally, the relative need of the applicant, and its capacity to make rapid and effective use of such assistance."  42 U.S.C.

4

§ 300(b).  HHS's regulations further specify that HHS will take into account seven factors when

determining whether to award a Title X grant:

> (1) The number of patients, and, in particular, the number of low-income patients to be served;
>
> (2) The extent to which family planning services are needed locally;
>
> (3) The relative need of the applicant;
>
> (4) The capacity of the applicant to make rapid and effective use of the federal assistance;
>
> (5) The adequacy of the applicant's facilities and staff;
>
> (6) The relative availability of non-federal resources within the community to be served and the degree to which those resources are committed to the project; and
>
> (7) The degree to which the project plan adequately provides for the requirements set forth in these regulations.

42 C.F.R. § 59.7.  Those seven factors too have remained unchanged since the dawn of the Title

X program.  *See* 36 Fed. Reg. at 18466-18,467 (nearly identical criteria in 1971 regulations).

They are, as HHS has stated, "the criteria HHS uses to determine which family planning projects

to fund and in what amount."  Declaration of Ari Savitzky ("Savitzky Decl.") Ex. A (HHS Office

of Population Affairs, *Program Requirements for Title X Funded Family Planning Projects*

(April 2014) ("Program Requirements")) at 9.

      HHS has published guidance documents with which all Title X grantees are expected to

comply.  Coleman Decl. ¶¶ 38, 40.  They include *Providing Quality Family Planning Services:*

*Recommendations of CDC and the U.S. Office of Population Affairs*, Savitzky Decl. Ex. B

("QFP"), which sets forth nationally recognized standards for family planning care developed by

HHS's Office of Population Affairs ("OPA") and the Centers for Disease Control and Prevention

("CDC"), as well as the Program Requirements, a guidance document for the Title X program

developed by HHS to assist grantees in applying for and implementing Title X grants.  Coleman

Decl. ¶¶ 38-45; QFP at 1; Program Requirements at 5-6.  The QFP emphasizes a patient-centered

approach that respects the client's reasons for seeking care, highlights the importance of confidentiality, and focuses on effective clinical care that offers the full range of Food and Drug Administration ("FDA")-approved contraceptives.  QFP at 2, 4.

Grantees and sub-grantees primarily use Title X funding as a payer of last resort, covering project costs that cannot be reimbursed by Medicaid or a private insurer and that patients cannot afford to pay themselves.  *See* Coleman Decl. ¶ 50; Declaration of Tanya Atkinson ("Atkinson Decl.") ¶ 29; Declaration of Iris Harvey ("Harvey Decl.") ¶ 27; Declaration of Karrie Galloway ("Galloway Decl.") ¶¶ 32, 34.  By filling that financial gap, Title X funds services to patients for free or a very low cost, usually on a sliding-fee schedule based on ability to pay.  Atkinson Decl. ¶¶ 9, 29; Harvey Decl. ¶ 27; Galloway Decl. ¶ 34.

Title X has been extraordinarily effective in improving the reproductive health of lower-income women and men.  Title X-funded centers served 4 million people in 2016, 88% of whom were low-income, and almost two-thirds of whom lived in poverty.  Savitzky Decl. Ex. C (Title X Family Planning Annual Report 2016 Summary ("FPAR")) at 1.  In 2015, Title X health centers provided birth control that helped women prevent approximately 820,000 unintended pregnancies.[3]  Title X also saves the public billions of dollars in health care costs.[4]

## B.   HHS Awards Title X Funds Based On Longstanding Regulations

Title X grants are awarded through a competitive application process that is governed by the criteria set out in 42 C.F.R. § 59.7.  Since at least 1990, HHS, through OPA, has annually

---

[3]     *See* Frost et al., *Publicly Funded Contraceptive Services at U.S. Clinics, 2015*, at 10, The Guttmacher Institute (2017) (cited at Coleman Decl. ¶ 22 n.3).

[4]     *See* Frost et al., *Return on Investment: A Fuller Assessment of the Benefits and Cost Savings of the US Publicly Funded Family Planning Program*, 92 The Milbank Q. 667, 703 (2014) (cited at Coleman Decl. ¶ 25 n.8).

issued an FOA that solicits grant applications and lays out requirements for applicants.  *See*

Coleman Decl. ¶¶ 54-56.[5]

FOAs set forth "application review criteria" that HHS uses to evaluate applications and

make funding determinations.  For a quarter century, since HHS first began issuing FOAs, those

application review criteria have closely tracked the seven criteria enumerated in HHS

regulations, repeating them almost verbatim.  *Compare, e.g.*, Savitzky Decl. Ex. G ("FY2010

FOA") at 28 *with* 42 C.F.R. § 59.7.  Although HHS has over time added some explanatory text

to the FOA, the substance of the criteria themselves has been nearly identical in every FOA ever

issued.  *Compare* Savitzky Decl. Ex. D ("FY1991 FOA") at 4 *with* Savitzky Decl. Ex. H

("FY2017 FOA") at 41-42 (assigning point values and adding explanatory detail).  Around 2001,

HHS began assigning point values to each of the seven criteria.  *See* Coleman Decl. ¶ 57.

FOAs have also sometimes contained sections describing the "program priorities" and

"key issues" for HHS in a given year.  *See id.* ¶ 59; *see, e.g.*, FY2017 FOA at 8-11.  Although

those sections have sometimes articulated the agency's policy initiatives or goals, they have

never been incorporated into the Title X application review criteria, been assigned a point value,

or contributed to an application's score.  *See* Coleman Decl. ¶ 59; *see also, e.g.*, FY2017 FOA at

8-11; FY2010 FOA at 5-8; Savitzky Decl. Ex. F ("FY2005 FOA") at 6-7; Savitzky Decl. Ex. E

("FY1998 FOA") at 2-3.

After a short period in which applications are reviewed for form, grant applications are

forwarded to merits review panels, which evaluate and score the applications against the

application review criteria.  Coleman Decl. ¶ 58; *see also, e.g.*, FY2017 FOA at 13-15, 42-43

---

[5]      Defendant Azar is the official in charge of HHS, and Defendant Huber is the official in
charge of OPA.

(describing this process).  HHS decisionmakers use those scores to make final grant determinations.  Coleman Decl. ¶¶ 56-57; *see* 42 C.F.R. § 59.7.

### C.     Plaintiffs Fulfill Title X's Mission

Plaintiffs have always played a central role in carrying out Title X's mission.  Plaintiff National Family Planning & Reproductive Health Association ("NFPRHA") is a non-profit membership organization whose members include more than 850 health care organizations. Coleman Decl. ¶ 4.  NFPRHA members account for 84% of all Title X grantees, in 46 states and the District of Columbia; NFPRHA members operate or fund over 3,500 Title X project health centers and provide family planning services to more than 3.7 million patients annually.  *See id.* ¶ 5.  For example, the Arizona Family Health Partnership ("AFHP"), a NFPRHA member, runs a Title X program that includes 27 health centers in Arizona operated by six sub-grantees, and seven health centers in the Navajo Nation run by two sub-grantees, together serving more than 36,000 patients.  Declaration of Brenda Thomas ("Thomas Decl.") ¶¶ 7-9.  The Women's Health and Family Planning Association of Texas ("WHFPT"), another NFPRHA member, uses Title X funding to support 28 sub-grantees and 94 health center sites across the State, serving close to 200,000 clients.  Declaration of Kami Geoffray ("Geoffray Decl.") ¶ 7.[6]

Plaintiffs Planned Parenthood of Wisconsin, Inc. ("PPWI"), Planned Parenthood of Greater Ohio ("PPGOH"), and Planned Parenthood Association of Utah ("PPAU") (together, "Planned Parenthood Plaintiffs") are member-affiliates of Planned Parenthood Federation of America ("PPFA") that operate a total of 48 health centers in Wisconsin, Ohio, and Utah,

---

[6]     NFPRHA sues here as an associational plaintiff on behalf of its members.  All references to Plaintiffs herein include NFPRHA member-grantees and, where applicable, its member-sub-grantees.  NFPRHA member-grantees include both Title X grantees that operate health centers directly and grantees that oversee Title X projects in which all health centers are operated by sub-grantees.  Coleman Decl. ¶¶ 3-6, 27.

including 33 Title X-funded sites.  *See* Atkinson Decl. ¶¶ 16, 31; Harvey Decl. ¶¶ 7, 27;

Galloway Decl. ¶ 14.  The Planned Parenthood Plaintiffs deliver care to more than 162,000

patients each year, more than 125,000 of them at Title X health centers.  *See* Atkinson Decl. ¶¶

16, 31; Harvey Decl. ¶ 9, 27; Galloway Decl. ¶ 13.

Plaintiffs' health centers provide a wide range of reproductive health and family planning

services, including contraceptive methods and counseling, cancer screenings, and testing and

treatment for sexually transmitted infections ("STIs").  Atkinson Decl. ¶ 3; Harvey Decl. ¶¶ 5,

27; Galloway Decl. ¶¶ 15-16; Geoffray Decl. ¶ 9; Coleman Decl. ¶ 29.  Plaintiffs' health centers

make family planning care broadly accessible—a critical concern for their low-income patients

who often face barriers to care.  Plaintiffs' health centers offer shorter wait times and longer

hours than other providers.[7]  Many offer evening and weekend hours, accommodate walk-in

appointments, and allow online booking, and their patients can obtain contraception onsite

without burdensome wait times or multiple visits.  *See* Atkinson Decl. ¶ 19; Harvey Decl. ¶¶ 17-

18; Galloway Decl. ¶ 17; Coleman Decl. ¶ 52.

This accessibility is essential for Plaintiffs' patients to receive services; in many areas,

Plaintiffs' health centers are their patients' only affordable option for family planning care.  *E.g.*,

Atkinson Decl. ¶¶ 52-54; Harvey Decl. ¶¶ 10-15.  PPWI, PPAU, AFHP, and WHFPT are each

the sole Title X grantee in their States.  Atkinson Decl. ¶ 4; Galloway Decl. ¶ 7; Thomas Decl.

¶ 3; Geoffray Decl. ¶ 6.  PPGOH serves more than 60% of Title X patients in Ohio, even though

the state health department receives more Title X funding.  Harvey Decl. ¶ 16.

---

[7]     Frost et al., *Publicly Funded Family Planning Clinics in 2015*: *Patterns and Trends in
Service Delivery Practices and Protocols,* at 9, The Guttmacher Institute (2016) (cited at Coleman
Decl. ¶ 24 n.6); *see also* Hasstedt, *Understanding Planned Parenthood's Critical Role in the
Nation's Family Planning Safety Net*, 20 Guttmacher Pol'y Rev. 12, 12-13 (2017) (cited at
Coleman Decl. ¶ 53 n.16).

Unlike some public health departments and all federally qualified health centers ("FQHCs")[8] that focus on general primary care, Plaintiffs' health centers typically specialize in reproductive health care.  *See, e.g.*, Coleman Decl. ¶ 52; Atkinson Decl. ¶ 27.  This specialization has enabled them to develop expertise that benefits their patients in essential ways. Specialized providers like Plaintiffs are significantly more likely to provide onsite the full range of FDA-approved contraceptives including intra-uterine devices ("IUDs") and contraceptive implants.[9]  Those contraceptive methods, often called long-acting reversible contraceptives ("LARCs"), are by far the most effective contraceptive methods.  *See, e.g.*, Coleman Decl. ¶ 24.[10]  A joint HHS-CDC study also showed that Title X centers consistently outperform other publicly funded providers like FQHCs in their compliance with best practices for family planning care.  *Id.* ¶ 53.[11]  Plaintiffs' staff adhere to rigorous standards and best practices for clinical care based on up-to-date medical evidence, including the standards set out in the QFP. *See* Atkinson Decl. ¶ 35; Galloway Decl. ¶ 20; Thomas Decl. ¶ 25; *see also* Harvey Decl. ¶ 53.

Patients know they can count on Plaintiffs to offer accessible, affordable, evidence-based care that—consistent with Title X's directives—is free from judgment and responsive to their individual needs.  *See* Atkinson Decl. ¶¶ 14, 43; Harvey Decl. ¶¶ 20-21; Galloway Decl. ¶¶ 21,

---

[8]     FQHCs are "community-based health care providers" that receive federal funds "to provide primary care services in underserved areas."  *See* Health Resources & Service Admin., *Federally Qualified Health Centers*.

[9]     *See, e.g.*, Thiel de Bocanegra et al., *Onsite Provision of Specialized Contraceptive Services: Does Title X Funding Enhance Access?*, 23 J. Women's Health 428, 431-32 (May 2014) (cited at Coleman Decl. ¶ 52 n.13); *see also* Frost et al., *Publicly Funded Family Planning Clinics in 2015: Patterns and Trends in Service Delivery Practices and Protocols, supra* n.7.

[10]     *See, e.g.*, CDC Fact Sheet, *Effectiveness of Family Planning Methods* (cited at Coleman Decl. ¶ 52 n.14).

[11]     Carter et al., *Four aspects of the scope and quality of family planning services in U.S. publicly funded health centers: Results from a survey of health center administrators*, 94 J. Contraception 340, 345 (2016) (cited at Coleman Decl. ¶ 53 n.17).

41; Thomas Decl. ¶¶ 25, 28; Geoffray Decl. ¶¶ 14, 18.  But Title X funding is essential to Plaintiffs' ability to do so.  Title X funding makes up a significant portion of their budgets, and their operations cannot be sustained on reimbursements from public and private insurance providers alone.  Atkinson Decl. ¶ 48; Harvey Decl. ¶ 38; Galloway Decl. ¶ 46; Geoffray Decl. ¶ 34.  Indeed, for many of Plaintiffs' health centers, public funding like Title X is "literally keeping the lights on."  Atkinson Decl. ¶ 48.

### D.    HHS Alters The Criteria For Receiving Title X Funds

In February 2018, HHS announced an unexpected change in the way it would assess applications for Title X grant funds.  The FY2018 FOA significantly alters the "application review criteria" that HHS has long used to evaluate Title X grant applications, adding one new criterion and revising another.  The FY2018 FOA directs reviewers to take into account:

    a.  The number of patients, and, in particular, the number of low-income patients to be served (10 points);

    b.  The extent to which the applicant's family planning services are needed locally (10 points);

    c.  The relative need of the applicant (15 points);

    d.  The capacity of the applicant to make rapid and effective use of the Federal assistance (10 points);

    e.  The adequacy of the applicant's facilities and staff, demonstrating that the staff are adequately trained to carry out the program requirements, *as well as the priorities and key issues outlined in this announcement*. …. (10 points);

    f.  The relative availability of non-federal resources within the community to be served and the degree to which those resources are committed to the project (10 points);

    g.  The degree to which the project plan adequately provides for the requirements set forth in the Title X regulations, subpart A (10 points); and

> h.   *The degree to which the project plan adequately provides for the effective and efficient implementation of requirements set forth in the priorities and key issues outlined on pages 9-11 [sic] this funding announcement* (25 points).

Compl., ECF No. 1, Ex. A ("FOA") at 43-44 (emphases added).  As in years past (with one change discussed below), the first seven criteria continue to mirror those listed in HHS regulations.  *Compare* 42 C.F.R. § 59.7.  But the FY2018 FOA adds an eighth criterion to this list, "criterion (h)."  Criterion (h) directs reviewers to award an application up to 25 points based on "[t]he degree to which the project plan adequately provides for the effective and efficient implementation of requirements set forth in the priorities and key issues outlined [in] this funding announcement."  FOA at 44.  In addition, HHS added language to criterion (e), which now requires reviewers to consider "[t]he adequacy of the applicant's facilities and staff, demonstrating that the staff are adequately trained to carry out the program requirements, *as well as the priorities and key issues outlined in this announcement*."  *Id.* at 43 (addition in italics).  Reviewers may award up to 10 points for criterion (e).  *Id.*  Thus, up to 35 out of 100 points of an applicant's score now rest on the applicant's ability to "implement[]" the "requirements set forth in the priorities and key issues" sections of the FOA.  *Id.* at 43-44.

The criteria added by HHS, which incorporate the agency's new "priorities and key issues," significantly shift the Title X program away from its half-century-long emphasis on methods of family planning that are effective and acceptable to patients—in particular, contraception—towards the agency's new desire to promote policy preferences that have no grounding in the statute or regulations, such as reliance on abstinence alone and emphasizing the benefits of marriage.  FOA at 9-11.  For example, the FOA's "program priorities" and "key issues" repeatedly stress the importance of education and counseling focused on "avoiding sexual risk" and "returning to a sexually risk-free status," *id.* at 44, which are terms used for

abstinence-only or abstinence-focused sex education.  *See* Coleman Decl. ¶¶ 74-76.[12]  The FOA directs applicants to place "[a] meaningful emphasis on" abstinence when communicating with adults as well as adolescents.  FOA at 10-11.  The "program priorities" and "key issues" also emphasize family participation in reproductive health decision-making, particularly for minors but for adults as well, *see id.*, and direct applicants to place "meaningful emphasis" on "committed, safe, stable, healthy marriages," *id.* at 11.  In addition, the FOA's "program priorities" express a preference for applicants who provide onsite "comprehensive primary health care," *id.* at 10, and who formally partner with faith-based organizations, *id.* at 11.

The FOA also places a new emphasis on "natural family planning methods" (also known as "fertility awareness" or the "rhythm method").  Whereas the FY2017 FOA mentioned those methods just once, FY2017 FOA at 6, the new FOA mentions them six times, including in the "program priorities" section, on the ground that they ensure "breadth and variety" in the Title X program.  FOA at 9.  HHS classifies these methods as "less effective" in preventing pregnancy. Coleman Decl. ¶ 33; *see also* QFP at 47.  The FOA also eliminates any mention of contraception and cuts all citations to the Program Requirements and the QFP.  *Compare* FY2017 FOA at 7-10, 18-20, 58 (nine mentions of contraceptives or LARCs and eight references to the QFP).  It also adds language calling for applicants who promote "historically underrepresented" methods of family planning.  FOA at 7.

The new criteria for reviewing and scoring Title X grant applications were not promulgated through notice-and-comment rulemaking, even though they significantly depart from the seven criteria that have appeared unchanged in HHS regulations for almost a half

---

[12]     *See also, e.g.*, Boyer, *New Name, Same Harm: Rebranding of Federal Abstinence-Only Programs*, The Guttmacher Institute (Feb. 28, 2018) (cited at Coleman Decl. ¶ 76 n.19).

century.  Nor did HHS provide any explanation for adding the new criteria or for departing from its longstanding practice, on which Plaintiffs have long relied in setting up Title X projects.

Applications for Title X grant funding under the FY2018 FOA are due on May 24, 2018. FOA at 1.  The new, unlawful criteria place Plaintiffs at a significant disadvantage in the competitive grant application process.  Some NFPRHA members have already begun to expend significant resources to mitigate that disadvantage, including by establishing entirely new sub-grantee relationships and new partnerships with faith-based groups that they would not have made but for the FOA.  *See* Geoffray Decl. ¶¶ 28-31; Coleman Decl. ¶¶ 92, 96.  At least some NFPRHA members and the Planned Parenthood Plaintiffs will face competition from state health departments, which are in some cases required by law to compete for Title X funds and which are likely to tailor their applications to meet the new criteria in the FOA.  *See* Atkinson Decl. ¶ 7; Harvey Decl. ¶¶ 35-36; Thomas Decl. ¶¶ 36-37; Geoffray Decl. ¶ 27.  Plaintiffs intend to apply for funding, but they remain committed to following evidence-based best practices for providing comprehensive family planning services consistent with the fundamental purpose of Title X, which now puts them at a disadvantage in the competitive grant process.  Atkinson Decl. ¶ 46; Harvey Decl. ¶ 33; Galloway Decl. ¶¶ 6, 40-45; Thomas Decl. ¶¶ 20, 28, 44.

## SUMMARY OF ARGUMENT

The FOA is contrary to law in numerous respects, and Plaintiffs are already beginning to experience harm.  Because the preliminary injunction factors are met in this case, the Court should enjoin the FOA and require HHS to preserve the Title X program as it was intended.

**I.**      Plaintiffs are likely to succeed on the merits on at least three theories.  *First*, the FOA is contrary to law because it adds new grantmaking criteria that are outside of the factors set forth in HHS's regulations and the Title X statute itself.  For decades, HHS has relied

exclusively on a list of seven grantmaking criteria to allocate funds under the Title X program. *See* 42 C.F.R. § 59.7. Those seven factors in turn conform closely to criteria set forth in 42 U.S.C. § 300(b). Every FOA until now has used the seven regulatory factors as the application review criteria. If HHS wished to add to the criteria governing grant application review, it was required to amend the Section 59.7 factors through notice-and-comment rulemaking, rather than rewrite the factors by fiat with an FOA. *See National Family Planning and Reproductive Health Association, Inc. v. Sullivan*, 979 F.2d 227 (D.C. Cir. 1992) ("*NFPRHA*").

*Second*, the FOA is contrary to law because the new criteria conflict with the substantive requirements of the Title X statute and regulations. For example, the new FOA requires Title X projects to place a "meaningful emphasis" on promoting abstinence. FOA at 10-11. But promoting abstinence, especially to sexually active adults who constitute the vast majority of Title X center patients, would contravene the requirement that Title X services be "voluntary" and noncoercive, *see* 42 U.S.C. §§ 300(a), 300a-5; 42 C.F.R. § 59.5(a)(2); that projects provide "effective" and "acceptable" forms of family planning, *see* 42 U.S.C. § 300(a); 42 C.F.R. § 59.5(a)(1); and that providers respect patients' dignity, *see* 42 C.F.R. § 59.3(a)(3). And the net effect of HHS's changes to the FOA is to shift Title X funding *away* from providers of evidence-based, comprehensive family planning services, and towards those who meet policy goals that are either irrelevant or contrary to Title X. The FOA is contrary to law because it undermines the Title X program in this way. *See, e.g.*, *Orloski v. FEC*, 795 F.2d 156, 164 (D.C. Cir. 1986).

*Third*, the FOA is arbitrary and capricious. HHS provided no reason for its "silent departure from precedent," *Cleveland Construction, Inc. v. NLRB*, 44 F.3d 1010, 1016 (D.C. Cir. 1995), and in fact, its decision is irrational and untethered to the goals of Title X.

**II.**     The unlawful FOA is already beginning to cause Plaintiffs irremediable harm, and

these harms will continue unless the FOA is enjoined.  Even now, the FOA's new criteria are impairing Plaintiffs' missions and causing some Title X grantees to change their programs or divert resources.  As soon as HHS begins evaluating Plaintiffs' grant applications, they will suffer further competitive harms for being judged under unlawful criteria.  And if HHS is allowed to complete its application review, Plaintiffs are highly likely to lose funding and be forced to close health centers, turn away patients, and lay off staff, which will in turn threaten the health of women and men throughout the country.  *See, e.g.*, *Planned Parenthood of Indiana, Inc. v. Comm'r of Indiana State Dept. of Health*, 699 F.3d 962, 980 (7th Cir. 2012).  Moreover, Plaintiffs' reputations and relationships will be tarnished.

**III.**     Finally, the equities favor injunctive relief.  There is a "substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations."  *League of Women Voters of the United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).  That is especially true where failure to abide by those laws would put the health of millions of people at risk.

## ARGUMENT

"A plaintiff seeking a preliminary injunction must establish (1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest."  *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014).  In lawsuits against the government, the last two factors merge.  *Id.*  That standard is met here.

## I.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

The FY2018 FOA is invalid for three reasons, each of which establishes a likelihood of success on the merits of Plaintiffs' APA claims.  *First*, HHS's changes to the FOA are contrary

16

to law because they add grantmaking criteria that Congress never intended HHS to consider and that HHS has in fact never considered under controlling regulations that have been in place for almost 50 years.  At a minimum, if HHS wished to add new application review criteria, it was required to amend its regulations through notice-and-comment rulemaking.  *Second*, the FOA contradicts several legal requirements for Title X projects and in doing so undermines the program's fundamental purpose as established by Congress.  *Third*, the FOA is arbitrary and capricious because it was issued with no rationale for the new requirements, and no justification for HHS's abrupt shift away from a settled regime on which grantees and millions of patients have relied for decades.

### A.    The Revisions In The FOA Are Contrary To The Statute And Controlling Regulations, Which Specify The Grantmaking Criteria

The FOA dramatically alters the "application review criteria" from the seven considerations set forth in the Title X regulations and in every prior FOA.  New criterion (h) and modified criterion (e) together mean that up to 35% of a Title X grant applicant's score will now be based on an entirely new consideration:  whether applicants comply with policy preferences articulated in the FOA's "program priorities" and "key issues" sections.  Adding those new criteria is contrary to law because the Title X statute and regulations both circumscribe what HHS may consider in making Title X grant decisions.

### 1.    The FOA impermissibly adds to the exclusive set of criteria the agency has long considered in awarding Title X funds.

The Title X statute sets forth the factors that HHS must consider in awarding Title X funds.  Title X provides, in a subsection titled "factors determining awards," that "in making grants … [HHS] *shall* take into account the number of patients to be served, the extent to which family planning services are needed locally, the relative need of the applicant, and its capacity to make rapid and effective use of such assistance."  42 U.S.C. § 300(b) (emphasis added).

In implementing that statutory mandate, HHS has long adhered to seven specific factors—drawn closely from the text of the statute—that it has consistently recognized as the *exclusive* factors governing the grant process.  *See* 42 C.F.R. § 59.7.  The criteria in Section 59.7 appear under the heading, "What criteria will the Department of Health and Human Services use to decide which family planning services projects to fund … ?"  Section 59.7 provides that HHS will, in awarding grants, take into account:

(1) the number of patients, and, in particular, the number of low-income patients to be served;
(2) the extent to which family planning services are needed locally;
(3) the relative need of the applicant;
(4) the capacity of the applicant to make rapid and effective use of the federal assistance;
(5) the adequacy of the applicant's facilities and staff;
(6) the relative availability of non-federal resources within the community to be served and the degree to which those resources are committed to the project; and
(7) the degree to which the project plan adequately provides for the requirements set forth in regulations.

42 C.F.R. § 59.7(a).  HHS's formal program guidance confirms that the Section 59.7 factors "are the criteria HHS uses to determine which family planning projects to fund and in what amount."  *See* Program Requirements at 9.  And since the early 2000s, FOAs have divided a total of 100 points among those seven criteria, underscoring that they constitute the exhaustive list of considerations on which Title X funding decisions will be determined.  *See* Coleman Decl. ¶ 57.

The seven criteria set forth in 42 C.F.R. § 59.7 are drawn directly from the Title X statute.  The first four track the text of 42 U.S.C. § 300(b) nearly verbatim.  *See* 42 C.F.R. §§ 59.7(a)(1)-(4).  The remaining three criteria merely elaborate on the four statutory factors: The "relative availability of non-federal resources," 42 C.F.R. § 59.7(a)(6), is one consideration in determining "the relative need of the applicant" and the local need for services, 42 U.S.C. § 300(b).  And the "adequacy of the applicant's facilities and staff" and the degree to which the applicant's project plan meet the regulatory requirements for comprehensive family planning, 42

C.F.R. §§ 59.7(a)(5), (7), are both directly relevant to the applicant's "capacity … to make rapid and effective use of the federal assistance," 42 U.S.C. § 300(b).  All seven Section 59.7 factors directly address either an applicant's ability to deliver comprehensive family planning care or the level of need for Title X funds to provide such care.

The FOA's new criteria, by contrast, do not flow from the considerations set forth in Section 300(b), nor do they have any grounding in the agency's longstanding regulations.  They relate instead to a series of new policy preferences, nowhere found in the statute or the regulations, such as agreeing to counsel adult patients on the virtues of abstaining from sex outside marriage and providing primary care services onsite.

The new application review criteria are beyond any permissible construction of the factors set forth in Section 300(b) and are contrary to law for that reason.  *See Nat. Res. Def. Council v. EPA*, 777 F.3d 456, 469 (D.C. Cir. 2014) (agency action was "untethered to Congress's approach" and therefore impermissible reading of statute).[13]  Congress would not speak "so narrowly and precisely of particular [criteria], while meaning to imply a more general and broad" universe of considerations.  *Longview Fibre Co. v. Rasmussen*, 980 F.2d 1307, 1313 (9th Cir. 1992); *see also Original Honey Baked Ham Co. of Georgia, Inc. v. Glickman*, 172 F.3d 885, 887 (D.C. Cir. 1999) ("A statute listing the things it does cover exempts, by omission, the things it does not list.  As to the items omitted, … Congress has spoken—these are matters

---

[13]     The grant of general Title X rulemaking authority to HHS elsewhere in the statute, *see* 42 U.S.C. § 300(a)-4(a), is not to the contrary.  Such general authority does not overcome Congress's use of specific terms in Section 300(b) to impose limits on the grantee selection process.  *Cf. Rust v. Sullivan*, 500 U.S. 173, 178 (1991) (Section 300a-4(a)'s grant of rulemaking authority was limited by a more specific statutory provision that grant funds cannot be used to provide abortions).

outside the scope of the statute.").[14]  That is particularly true here, where the limitations imposed by Section 300(b) on the Title X grantmaking criteria ensure that Title X funds remain tied to Congress's fundamental objective:  providing a broad range of acceptable and effective family planning options to low-income people.  *See Planned Parenthood Fed'n of Am., Inc. v. Heckler*, 712 F.2d 650, 655 (D.C. Cir. 1983) (explaining, in Title X context, that "[a]gency action must be found to be consistent with the congressional purposes underlying the authorizing statute").

And in any event, the new application review criteria contravene HHS's own regulations. Almost five decades ago, and nearly contemporaneous with the enactment of Title X, HHS promulgated an exclusive list of seven criteria that it will consider in deciding which projects to fund under Title X.  *See* 42 C.F.R. § 59.7.  The FOA allows HHS to consider factors well outside those seven criteria.  Because the new FOA contradicts HHS's own regulations, it is contrary to law.  *See Nat'l Envtl. Dev. Assoc.'s Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) ("[A]n agency is not free to ignore or violate its regulations while they remain in effect. Thus, an agency action may be set aside … if the agency fails to comply with its own regulations.") (internal quotation marks omitted).

Using the FOA's new application review criteria (h) and modified (e)—indeed, making them the most important factor by weight in HHS's grantmaking decision—would be flatly inconsistent with Section 59.7's mandate to "take into account" a closed list of seven factors.  42 C.F.R. § 59.7; *see Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012) ("[D]eference to an agency's interpretation of its own regulation" is "undoubtedly inappropriate … when the agency's interpretation is 'plainly erroneous or inconsistent with the regulation'").

---

[14]     *Compare, e.g.*, 20 U.S.C. § 10006(b) ("The Secretary shall determine which states receive grants ... on the basis of information provided in State applications ... *and such other criteria as the Secretary determines appropriate*[.]") (emphasis added).

Doing so would also conflict with HHS's longstanding interpretation of its own regulations as expressed in the Program Requirements and decades of previous FOAs.  *See id.* (deference "is likewise unwarranted …. when the agency's interpretation conflicts with a prior interpretation"); *see also United Student Aid Funds, Inc. v. Devos*, 237 F. Supp. 3d 1, 5 (D.D.C. 2017) (an agency "'must at least display awareness that it is changing position and show that there are good reasons for the new policy,' … [and] must also be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account").  Because the FOA adds application criteria outside the limited factors that HHS can consider in awarding grants under both the Title X statute and HHS regulations, it is contrary to law.

### 2. If HHS wished to change its practice, it was required to engage in rulemaking.

Because the new criteria added by the FOA are contrary to the statute as well as the controlling regulation, the FOA is unlawful and should be set aside.  Even if the statute allowed room for ambiguity on the point (and it does not), the binding regulation is crystal clear.  Accordingly, if HHS wished to introduce its new policy preferences into the factors it will consider when reviewing grant applications, it was at a minimum required to give the public fair notice of its intention to do so by engaging in notice-and-comment rulemaking to amend its regulations, thus allowing the public to respond to and test the validity of the assumptions underlying the FOA—assumptions that, as explained below, are profoundly flawed.

With few exceptions, the APA requires agencies to publish a notice of proposed rulemaking ("NPRM") in the Federal Register—including "sufficient factual detail and rationale for the rule to permit interested parties to comment meaningfully," *United States Telecom Ass'n v. FCC*, 825 F.3d 674, 700 (D.C. Cir. 2016)—and to consider public comments on its proposed rule before it goes into effect.  5 U.S.C. §§ 553(b)-(c).  HHS did not publish a NPRM in the

Federal Register before issuing the FOA and made no other effort to notify the public about its

planned changes to the application review criteria, much less allow an opportunity to submit

comments for the Department's consideration.  Unless an exception to Section 553's notice-and-

comment requirement applies—and none does—the FOA must be set aside.

The changes to the application review criteria for Title X grants do not qualify for the

exception for "interpretative" rules.  *See* 5 U.S.C. § 553(b)(3)(A).  Rather, the addition of the

new criteria for evaluating grant applications is a substantive change and is thus "legislative" in

nature.  *See, e.g.*, *Mendoza v. Perez*, 754 F.3d 1002, 1021 (D.C. Cir. 2014) (rule is legislative

when it "supplements a statute, adopts a new position inconsistent with existing regulations, or

… effects a substantive change in existing law or policy"); *see also Elec. Privacy Info. Ctr. v.*

*U.S. Dep't of Homeland Sec.*, 653 F.3d 1, 6-7 (D.C. Cir. 2011) ("The practical question inherent

in the distinction between legislative and interpretive regulations is whether the new rule effects

a substantive regulatory change to the statutory or regulatory regime.") (internal quotation marks

omitted).

HHS's Title X regulations governing grantmaking decisions have remained virtually

unchanged since 1971.  As discussed above, Section 59.7, entitled "What criteria will [HHS] use

to decide which family planning services projects to fund and in what amount?", requires HHS to

consider seven factors in making grant awards.  *See* 42 C.F.R. § 59.7(a).  HHS's own program

guidance states that the seven factors "are the criteria HHS uses to determine which family

planning projects to fund."  Program Requirements at 9.  Every prior FOA has recited the same

seven criteria, with only minor, non-substantive variations.  *See* Savitzky Decl. Exs. D-H

(selected FOAs as far back as FY1991).[15]

---

[15]     Prior FOAs in recent years have included some additional, genuinely interpretive

The new FOA is a major departure from this longstanding regime.  It is the first FOA ever to add a wholly new criterion to the seven set forth in the regulation.  And it does not merely elaborate on or explicate an existing factor from the seven in the regulation.  *Cf. Catholic Health Initiatives v. Sebelius*, 617 F.3d 490, 494 (D.C. Cir. 2010) (interpretive rules "derive a proposition from an existing document whose meaning compels or logically justifies the proposition"); *Mendoza*, 754 F.3d at 1022 (interpretive rules "clarify or remind" applicants of "preexisting duties").  Instead, the FOA injects a conceptually novel consideration, relating to an applicant's ability to accomplish specific programmatic goals (which actually *conflict* with those laid out in the Title X statute and regulations, as explained below) into the Title X funding application process.  Highlighting the magnitude of the change, the new considerations embodied by the FOA's criterion (h) and modified criterion (e) are worth *35 percent* of a Title X applicant's application score.  For Title X grantees who have long applied for funds under the application review criteria set forth in 42 C.F.R. § 59.7, the new FOA "change[d] the rules of the game," and thus constituted a legislative rule.  *Sprint Corp. v. FCC*, 315 F.3d 369, 374 (D.C. Cir. 2003).[16]

---

language, which has merely elaborated on the seven criteria listed in Section 59.7.  For instance, after repeating the statute and regulation's requirement that HHS evaluate applicant's "capacity … to make rapid and effective use of the Federal assistance," the FY2017 FOA noted that "[a]pplicants must demonstrate/explain how they propose to use the federal assistance to provide high quality family planning services to the patient populations proposed to be served in the application."  FY2017 FOA at 42.  Such a modification, which "simply explain[s] something the statute already required," *National Family Planning and Reproductive Health Association, Inc. v. Sullivan*, 979 F.2d 227, 237 (D.C. Cir. 1992), does not require notice and comment.

[16]    Nor are these changes exempt from notice and comment requirements as a general statement of policy or a rule of "agency organization, procedure, or practice."  *See* 5 U.S.C. § 553(b)(3)(A).  The new application review criteria are binding on all applicants and thus are not a mere general statement of HHS policy.  *See Elec. Privacy Info. Ctr.*, 653 F.3d at 7.  Nor are they agency procedural rules, because they "alter the rights or interests of parties" by imposing a "new substantive burden."  *Id.* at 5-6.

The D.C. Circuit's decision in *National Family Planning and Reproductive Health Association, Inc. v. Sullivan ("NFPRHA")*, 979 F.2d 227 (D.C. Cir. 1992), is directly on point. There, the court of appeals enjoined an effort by HHS to informally alter the Title X regulations without notice-and-comment rulemaking. *Id.* at 242. Rejecting the Department's attempt to alter its existing regulations by means of informal "directives," the Court explained that HHS "d[id] not simply explain or clarify the … regulation or confirm requirements under that regulation. Instead, … *HHS is substantially amending and even repudiating part of its original regulation*." *Id.* at 240 (emphasis added). Here, too, the addition of criterion (h) and modified criterion (e) to the FOA's application review criteria purport to "supplement" Section 59.7's exclusive evaluation criteria without notice-and-comment rulemaking. *See id.* at 236-237. But as the D.C. Circuit explained, "[i]f a second rule repudiates or is irreconcilable with a prior legislative rule, the second rule must be an amendment of the first; and, of course, an amendment to a legislative rule must itself be legislative." *Id.* at 235 (internal quotation marks and brackets omitted).[17] Because the FOA implements a substantive change to 42 C.F.R. § 59.7 without notice-and-comment rulemaking, it is invalid.

### B. The FOA Contradicts Specific Programmatic Requirements For Title X Projects And Undermines The Title X Program's Fundamental Purposes

The legal flaws in the FOA's new application review criteria are not merely procedural. Those changes also contradict several substantive requirements of Title X that ensure the provision of comprehensive and nondirective care. The cumulative effect of these conflicts is to

---

[17]     Nor does the public-grants exception to the notice-and-comment requirement, 5 U.S.C. § 553(a)(2), apply, because HHS has expressly waived application of that exception. *See Clarian Health W., LLC v. Hargan*, 878 F.3d 346, 356-57 (D.C. Cir. 2017) (citing 36 Fed. Reg. 2532 (Feb. 5, 1971)); *Texas v. United States*, 809 F.3d 134, 177 n.125 (5th Cir. 2015); *Arizona v. Shalala*, 121 F. Supp. 2d 40, 50 n.7 (D.D.C. 2000).

warp the Title X program, shifting services away from Congress's objective of ensuring medically effective family planning for low-income people.

### 1. HHS's "Program Priorities" and "Key Issues" contradict Title X's requirements.

Under the FOA, compliance with the "program priorities" and "key issues" sections of that document now constitutes more than a third of an applicant's formal review score. The result is a litany of conflicts between the requirements imposed by the FOA and the substantive requirements of the Title X legal regime, which are designed to support evidence-based family planning health care. Each of these conflicts requires that the FOA be set aside.

### a. <u>Emphasis on abstinence even when inappropriate.</u> HHS's new "program priorities" and "key issues" require grantees to place a "meaningful emphasis on" abstinence-based sex education and counseling, using terms like "avoiding sexual risk," "returning to a sexually risk-free status," and "optimal health," FOA at 10-11, which are well known terms used to suggest an abstinence-based approach to family planning. *See* Coleman Decl. ¶¶ 73-77. Plaintiffs do discuss abstinence with their patients when appropriate and medically effective to do so, particularly as one out of many strategies, and particularly for younger adolescents. *See* Atkinson Decl. ¶ 40; Harvey Decl. ¶¶ 31-32; Galloway Decl. ¶ 41; Thomas Decl. ¶ 28. But singling out abstinence for favored treatment conflicts with the Title X statute and regulations.

Emphasizing abstinence over other family planning methods conflicts with the requirement that Title X projects provide noncoercive, "effective," "acceptable," and "medically approved" forms of family planning. *See* 42 U.S.C. § 300(a); 42 C.F.R. §§ 59.5(a)(1)-(2). Although abstinence, when perfectly adhered to, prevents pregnancy and STIs, it has extremely high rates of user failure: People often have sex even when they intend to abstain. Even for adolescents, the "typical use efficacy rate of sexual abstinence" is "quite low." Savitzky Decl.

25

Ex. I (Ott et al., *Counseling Adolescents about Abstinence in the Office Setting*, 20 J. Pediatric Adolescent Gynecology 39 (2007) ("*Counseling Adolescents*")) at 39.[18]

Moreover, an abstinence-only "emphasis" contravenes the statutory requirement that Title X offer family planning methods that are "acceptable" to the patient and "voluntary." *See* 42 U.S.C. §§ 300(a), 300a-5; 42 C.F.R. § 59.5(a)(2). For many patients seeking family planning assistance at a Title X project—such as adults who wish to remain sexually active but who wish to avoid pregnancy and STIs—abstinence is neither acceptable nor voluntary; it is irrelevant. Indeed, only a "tiny percentage" of Title X patients choose abstinence as an approach to avoiding pregnancy and STIs. Coleman Decl. ¶ 80; *see also* Atkinson Decl. ¶ 39 (1.5%); Galloway Decl. ¶ 41 (1%); Thomas ¶ 26. Pressing a patient (especially a sexually active adult patient) to consider abstinence despite its unpopularity, as HHS would require, would violate Title X's rule against coercing any decision to employ a particular family planning method or requiring the acceptance of a service (here, abstinence counseling) as a condition for other services. *E.g.*, 42 U.S.C. § 300a-5; 42 C.F.R. § 59.5(a)(2).

The FOA's requirement that Title X projects place a "meaningful emphasis" on abstinence even in the context of treating healthy, sexually active adults violates other Title X regulatory requirements as well. Title X prohibits discrimination based on marital status, 42 C.F.R. § 59.5(a)(4), and requires providers to respect patients' dignity as individuals, 42 C.F.R. § 59.5(a)(3).[19] Both provisions would be violated if a Title X provider advised an unmarried,

---

[18] Indeed, one study concluded that abstinence-only programs "have little demonstrated efficacy," often fail to prevent unwanted pregnancies and STIs, and "censor lifesaving information about prevention of pregnancy, HIV, and other STIs." Santelli et al., *Abstinence-Only-Until-Marriage: An Updated Review of U.S. Policies and Programs and Their Impact*, 61 J. Adolescent Health 273, 278 (2017) (referenced in Atkinson Decl. ¶ 40).

[19] This and other conflicts with Title X's programmatic regulations also cannot be altered without notice-and-comment rulemaking for the reasons stated already. *See supra* Section I.A.2.

healthy adult woman who wished to be sexually active and who had come to the health center for contraception that she should instead consider abstaining from sex until marriage.

      **b.**     **<u>Improper emphasis on providing primary care.</u>**  HHS's new "program priorities" and "key issues" provide a "prefer[ence]" for onsite primary care. FOA at 10. But Title X is specifically designed to support projects that "provide a broad range of acceptable and effective *family planning* methods … and services," 42 U.S.C. § 300(a) (emphasis added), not primary care. The Title X regulations emphasize repeatedly that Title X funding is meant to support family planning projects, not general medical care, and the regulations describe in detail what that means: "medical services related to family planning (including physician's consultation, examination prescription, and continuing supervision, laboratory examination, contraceptive supplies)," "the effective usage of contraceptive devices and practices," "social services related to family planning," and "informational and educational programs" regarding family planning. *See* 42 C.F.R. §§ 59.5(b)(1)-(3). Title X projects must "consist of the educational, comprehensive medical, and social services necessary to aid individuals to determine freely the number and spacing of their children." *Id.* § 59.1; *accord* S. 2108, 91st Cong. (2d Sess. 1970), at 2. They must provide a "broad range of effective and acceptable family planning methods and services." 42 U.S.C. § 300(a).

      That mandate to provide comprehensive family planning care is most effectively met by family planning specialists. Experience has shown that Title X health centers like Plaintiffs' that specialize in reproductive health provide more comprehensive and accessible care than generalist, primary-care focused facilities like FQHCs. *See, e.g.*, Atkinson Decl. ¶ 56; Harvey Decl. ¶ 18; Galloway Decl. ¶ 27; Geoffray Decl. ¶ 30; Thomas Decl. ¶ 39. Plaintiffs' specialized centers deliver a broader range of family planning options than generalist facilities. *E.g.*,

Coleman Decl. ¶¶ 52-53, 100.  And they are more acceptable to patients, who affirmatively seek providers at specialized health centers because those providers are both knowledgeable about and sensitive to issues relating to sexual and reproductive health.  *See id.* ¶ 52.[20]

Giving an advantage to primary care providers in the application process for Title X funds cannot be squared with the fact that specialized providers are demonstrably better able to meet the program requirements set forth in the Title X statute and regulations.  *See also* 42 C.F.R. § 59.7(a)(7).  Congress clearly understood the distinction between family planning services, provided under Title X, and primary health care, which it supported elsewhere.  Title X is an amendment of the Public Health Service Act, Pub. L. No. 78-410, 58 Stat. 682, codified at 42 U.S.C. § 201 *et seq.*  Within the larger statute, Congress created a *separate program* to ensure low-income patients have access, principally through FQHCs, to primary medical care such as laboratory and radiology services, cholesterol screening, emergency medical services, and pediatric eye, ear, and dental examinations.  *See* 42 U.S.C. § 254b(b)(1); *see generally id.* § 254b *et seq.*  Consistent with that separation, HHS's regulations have long recognized that Title X family planning providers should *refer patients elsewhere* for necessary primary health care.  *See* 42 C.F.R. § 59.5(b)(8).

    **c.**      <u>**Improper emphasis on family participation.**</u>  The new "program priorities" and "key issues" emphasize "increasing family participation in family planning," both for minors and apparently for adults as well.  *See* FOA at 10-11.  The FOA also expressly speaks of treating "couples" rather than individuals.  *Id.* at 10.  And the FOA states that this new interest in family

---

[20]     *See also* Frost et al., *Specialized Family Planning Clinics in the United States: Why Women Choose Them and Their Role in Meeting Women's Health Care Needs*, 22 Women's Health Issues 519, 523-525 (2012) (referenced in Coleman Decl. ¶ 52 n.15).

participation "*applies throughout the program, extending to all individuals, couples and families seeking Title X services*." *Id.* at 8 (emphasis in original); *see also id.* at 22.

Consistent with best practices, Plaintiffs do encourage patients under the age of 18 in particular to speak with a parent or trusted adult about family planning decisions. *See, e.g.*, Atkinson Decl. ¶ 41. But at the same time, Title X regulations prohibit coercing any decision "to employ or not to employ any particular methods of family planning," 42 C.F.R. § 59.5(a)(2), and Plaintiffs cannot push unwanted family involvement on patients without risking stigma and coercive pressure. Moreover, Title X regulations require that all patient information be kept confidential, including from family members if so directed by the patient. *See id.* § 59.11. Awarding points to entities that prioritize "family involvement" over nondirective and confidential care, as the FOA contemplates, would transgress those Title X regulations. It would also countermand the repeated emphasis in the Title X regulations on treating Title X patients as *individuals*. *See id.* § 59.1 (projects must "aid individuals to determine freely the number and spacing of their children"); *id.* § 59.5(a)(3) (projects must "[p]rovide services in a manner which protects the dignity of the individual").[21]

**d.**    **Improper emphasis on partnerships with faith-based groups.**   The new "program priorities" and "key issues" also emphasize partnerships with faith-based groups. *See* FOA at 11. Plaintiffs frequently work with community-based groups of all kinds, including faith-based groups like local churches, youth groups, and others, including by providing age-

---

[21]    Although Title X requires grantees to "*encourage* familiy [sic] participation in projects" "[t]o the extent practical," 42 U.S.C. § 300(a) (emphasis added), that clause relates to Congress's concern that *teenagers*, not adult women, should be encouraged to involve their parents in decision-making about family planning. *See Heckler*, 712 F.2d at 659. That provision does not displace other requirements under the statute, including that participation in programs be voluntary. *See* 42 U.S.C. § 300a-5.

appropriate education on topics like sexuality and family planning.  But some faith-based groups oppose comprehensive family planning care and specifically oppose any medical forms of contraception.  *E.g.*, Galloway Decl. ¶ 44.  Advantaging applicants based on their partnerships with groups that oppose Title X's basic mission—for example, by condemning the use of contraception, a core aspect of Title X, *see* 42 C.F.R. § 59.5(b)(1)—would again conflict with Title X's longstanding program rules.

## 2.     The FOA fundamentally undermines the Title X program

The cumulative effect of these conflicts between the requirements of the FOA and the requirements of the Title X statute and regulations is to frustrate Title X's basic purpose.  Under the FOA, HHS may base up to 35 percent of an applicant's score on impermissible and unlawful new program requirements and may divert Title X funds that are meant to support comprehensive, effective, acceptable, and non-directive family planning programs towards projects that focus on narrow, ineffective, unacceptable, and coercive approaches to family planning.  In light of that conflict, the FOA cannot stand.  *See, e.g.*, *Shays v. FEC*, 337 F. Supp. 2d 28, 70 (D.D.C. 2004) (regulation excluding the internet from the ambit of campaign finance rules "severely undermines FECA's purposes and therefore violates … *Chevron*"), *aff'd*, 414 F.3d 76 (D.C. Cir. 2005); *see also Orloski v. FEC*, 795 F.2d 156, 164 (D.C. Cir. 1986) (regulations that "unduly compromise[] the Act's purposes" are invalid); *see generally Chevron USA, Inc. v. NRDC*, 467 U.S. 837, 844 (1984) (agency rule or action that is "manifestly contrary to the statute" is invalid).

HHS's other changes to the FOA make plain that it seeks to deviate from Congress's core objective of ensuring that effective and modern methods of contraception are available for all, including low-income people.  HHS has stripped the FOA of all references to contraception or LARCs (there were nine in the FY2017 FOA).  *See* Coleman Decl. ¶ 69; *see* FY2017 FOA at 9-

10, 19-20, 58.  It has removed all references to "the QFP," the authoritative clinical

recommendations and standards for reproductive health care developed by HHS and the CDC

(there were eight in the FY2017 FOA).  Coleman Decl. ¶ 70; *see* FY2017 FOA at 7-10, 18-19.

And the FOA also eliminates all references to the Title X Program Requirements, HHS's official

program guidance, which incorporates the QFP and states that Title X "is designed to provide

contraceptive supplies and information to all who want and need them."  Program Requirements

at 5.  In place of those subjects, the new FOA mentions "sexual risk avoidance" at least four

times, and natural family planning methods six times.  *See* FOA at 6-7, 9, 11, 16, 21.  The FOA

also encourages applications for projects that use birth control methods that are "historically

underrepresented in the Title X program," *id.* at 7—as if "underrepresentation" of outdated

family planning methods that patients do not use or want were somehow a problem.

      But HHS has no authority to diminish Title X support for contraception, because doing so

would contravene Congress's basic aims in enacting Title X.  Congress created Title X "with the

express purpose of making 'comprehensive family planning services readily available to all

persons desiring such services.'" *Heckler*, 712 F.2d at 651-52 (quoting S. Rep. No. 91-1004, at 2

(1970)).  The "broad range" of family planning methods that Title X-funded projects must offer

under the statute must "include[e] the provision of prescription and nonprescription

contraceptive drugs and devices." *Id.* at 651-52; *accord* 42 C.F.R. § 59.5(b)(1).  Title X's

legislative history is replete with references to the centrality of contraceptive care to the program.

For instance, the Senate committee report described oral contraceptives and the IUD as "the two

major innovations in contraceptive methods of the last decade," and framed Title X's purpose as

serving the "medically indigent[,]" who were forced to do without such contraception "or to rely

heavily on the least effective nonmedical techniques for fertility control." S. Rep. No. 91-1004, at 9-11 (1970).

HHS now seeks to change that. Its new FOA, particularly in its dramatic alteration of the Title X grantmaking criteria, would divert Title X funds to projects that reject Congress's emphasis on comprehensive family planning care, and would thus subvert the Title X program as Congress originally intended it. For that reason, the FOA is contrary to law.

### C.    The New FOA Is Arbitrary And Capricious

HHS's issuance of the FY2018 FOA should also be set aside as unlawful for a separate reason: It is arbitrary and capricious. 5 U.S.C. § 706(2)(A). HHS has made scant effort to explain its additions to the application review criteria in the new FOA or justify its deviation from past practice, and what explanation it has given has been *post hoc* and nonsensical.

In reviewing an agency action, courts must "ensur[e] that agencies have engaged in reasoned decisionmaking." *Judulang v. Holder*, 565 U.S. 42, 53 (2011). An agency "must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made,'" and must base its decision "on a consideration of the relevant factors." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). In *State Farm*, the Court explained that

> Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id.* (internal quotation marks omitted); *see also NFPRHA*, 979 F.2d at 230-31.

Here, HHS never attempted to explain the basis for its changes to the FOA or provide reasoning for why the considerations listed in the "program priorities" and "key issues" sections of the FOA should now count for up to 35 percent of a Title X applicant's formal application score.  No previous FOA has incorporated those policy considerations or anything like them into the application review criteria.  Just the opposite; until now, the application review criteria have remained substantively identical for decades and no single criterion had ever been worth more than 20 points.  *See, e.g.,* Savitzky Decl. Exs. D-H (selected FOAs as far back as FY1991).  Despite the unprecedented nature of the change to this year's FOA, HHS was silent on its decision to depart from every prior Title X grant application process.  That "silent departure from precedent" was arbitrary and capricious, *Cleveland Construction, Inc.*, 44 F.3d at 1016, especially given Plaintiffs' decades of reliance on HHS's consistent prior position, *e.g.*, *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016).

Nor has HHS made an effort to explain how the considerations in the FOA's "program priorities" and "key issues" sections bear on Title X's goals.  As noted already, Congress intended Title X to ensure "a broad range of *acceptable and effective* family planning methods and services," 42 U.S.C. § 300(a) (emphasis added), and directed HHS to "mak[e] comprehensive voluntary family planning services readily available to all persons desiring such services," Pub. L. No. 91-572, § 2(1).  Yet HHS reoriented its Title X FOA so that the single largest factor bearing on applicants' scores would be based on such considerations as whether applicants emphasize abstinence-focused education and counseling, provide primary care services onsite, include family members in decisionmaking, and cooperate with faith-based groups in delivering family planning care.  HHS has pointed to no evidence that any of those factors would promote access to "a broad range" of "comprehensive" family planning services—

33

much less established a "rational connection between the facts found and the choice made."
*State Farm*, 463 U.S. at 43.

Moreover, HHS could not have provided a reasoned explanation for its changes to the
FOA because, at least in some cases, those changes were plainly unreasonable.  "'There are cases
where an agency's failure to state its reasoning or to adopt an intelligible decisional standard is
so glaring that [a Court] can declare with confidence that the agency action was arbitrary and
capricious.'"  *Select Specialty Hosp.-Bloomington, Inc. v. Burwell*, 757 F.3d 308, 312 (D.C. Cir.
2014).  This is such a case.

Most obviously, it is unreasonable for HHS to favor abstinence-based education and
counseling as a means of aiding individuals in freely planning the spacing of their children.  As
mentioned already, encouraging patients to remain sexually abstinent without regard to a
patient's own requests or circumstances is an ineffective approach to preventing unintended
pregnancies or STIs, because the vast majority of patients seeking care at Title X centers will not
adopt that approach and, even for those who intend to do so, abstinence has an extremely high
rate of "user failure."  *See* Coleman Decl. ¶¶ 79-80; *supra* n.18 and accompanying text.
Emphasizing abstinence to sexually active people—including adults—who come to Title X
centers seeking contraception would also discourage patients from seeking Title X services, and
in doing so would undermine Congress's fundamental objective of encouraging access to family
planning assistance.  *See, e.g.*, Harvey Decl. ¶ 32; *see also* Coleman Decl. ¶¶ 80, 84-85.

HHS's post hoc attempt to marshal support for abstinence-based counseling only proves
the point.  After the FOA issued, HHS revised the Frequently Asked Questions section of its
Title X website, stating that "[i]ncluding a focus in the [FOA] on avoiding sex at an early age
places a meaningful emphasis on the holistic and optimal health outcomes of every client."

Savitzky Decl. Ex. J (FY2018 FOA Q&A) at Q&A #20.  That statement in turn cites various studies that purportedly support the conclusions.  But the statement itself concerns only youth-focused abstinence counseling, and the studies it cites demonstrate that there are *no public health benefits* to promoting abstinence among healthy, sexually active adults, as the FOA requires. One such study indicated that discussing abstinence with most adults would be inappropriate and ineffective.  Savitzky Decl., Ex. K (Harper et al., *Abstinence and Teenagers: Prevention Counseling Practices of Health Care Providers Serving High-Risk Patients in the United States*, 42 Persp. on Sexual and Reprod. Health 125 (2010)) at 127-29.  Another concluded that, by age 23, the timing of an individual's first sexual intercourse has "no significant influence" on STI prevalence.  Savitzky Decl., Ex. L (Kaestle et al., *Young Age at First Sexual Intercourse and Sexually Transmitted Infections in Adolescents and Young Adults*, 161 Am. J. Epidemiology, 774 (2005)) at 777.  Even regarding adolescents, HHS's own studies conclude that "prevention efforts designed to have a long-term impact [on adolescent health] should emphasize other factors," *id.*, and that abstinence promotion and pledges among adolescents are highly ineffective.  *Counseling Adolescents* at 39 (cited in FY2018 FOA Q&A, Q&A #21).  Where, as here, evidence the agency cites "belies the agency's conclusion," the agency action is arbitrary and capricious.  *Gilbert v. Wilson*, 2018 WL 1073163, at *5 (D.D.C. Feb. 27, 2018).

## II.    PLAINTIFFS FACE IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF

Unless HHS is enjoined from using the new FOA to review Title X grant applications—which, as noted, are due on May 24—Plaintiffs, including both NFPRHA members and the Planned Parenthood Plaintiffs, are likely to face an array of injuries: unfair terms of competition for Title X funds, a crippling loss of federal funding, health center closures and staff layoffs, and the erosion of their reputations as accessible, affordable providers of high-quality family planning care.  Even now, the FOA is inflicting harm on Plaintiffs by forcing them to choose

between changing their clinical programs to meet the FOA's unlawful requirements or hewing to their current best practices and risking a massive and unjustified loss of Title X funds.

To demonstrate irreparable harm, a party must show three things.  The harm must be "actual and not theoretical," and it must be "so imminent that there is a clear and present need for equitable relief to prevent irreparable harm."  *League of Women Voters of the United States v. Newby*, 838 F.3d 1, 7-8 (D.C. Cir. 2016) (quotations and alterations omitted).  The harm must also be "beyond remediation."  *Id.* (internal quotation marks omitted).  That standard is met here.

### A.     Plaintiffs Will Be Unlawfully Forced To Alter Their Programs And Subjected To A Tainted Review Process

Applying for Title X funds under the FOA has already begun to injure Plaintiffs.  The FOA's new requirement to favor primary care providers, for example, is causing NFPRHA member WHFPT to reshape its sub-grantee network in an attempt to include more primary-care oriented providers at the expense of family planning specialists.  *E.g.*, Geoffray Decl. ¶¶ 28-31.  That change and others to comply with the FOA will negatively impact access to care, a result that interferes with WHFPT's mission.  *Id.* at ¶¶ 30-31.  Meanwhile, NFPHRA member AFHP is similarly diverting resources to develop formal partnerships with faith-based groups and to develop new counseling training and materials that it would otherwise be using to support family planning services.  *E.g.*, Thomas Decl. ¶¶ 29, 45-48.  In this manner, the FOA has already begun to "perceptively impair" Plaintiffs' organizational objectives and to reshape their Title X projects in ways they would not have chosen.  *E.g.*, *id.* ¶¶ 4, 28-29, 44-45; Geoffray Decl. ¶¶ 14, 32, 63; Coleman ¶¶ 92-96; *see Newby*, 838 F.3d at 8-9; *see also Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996) (injury where "a defendant's conduct has made the organization's *activities* more difficult" and "direct[ly] conflict[s]" with its mission).

36

Meanwhile, as soon as HHS begins considering applications based on improper criteria, Plaintiffs will be irreparably injured by being forced to compete for federal funding under an unfair evaluation process.  *See Overstreet Elec. Co. v. United States*, 47 Fed. Cl. 728, 744 (2000) (holding that the "potential loss" of revenue derived from a "lost opportunity to compete in a fair competitive bidding process" constituted irreparable harm); *see also Sabino Canyon Tours, Inc. v. USDA Forest Serv.*, 2018 WL 784061, at *11 (D.D.C. Feb. 8, 2018) ("Having to undergo a tainted bidding process is surely an injury.").  The date for the commencement of the competition is rapidly approaching.  Once HHS impanels reviewers and scores any applicants on these improper criteria—a process that Plaintiffs understand will be underway by June, and over by the end of the summer—Plaintiffs' ability to compete on fair terms for FY2018 Title X funds will have been lost.

### B.   Plaintiffs Face Financial, Operational, And Programmatic Harms That Cannot Be Remediated

Under the new FOA, Plaintiffs face the very real prospect of losing the federal funding that their health centers depend on to serve tens of thousands of low-income patients.  PPWI's Title X centers, for example, depend on Title X funding for 25% to 70% of their budgets.  *See* Atkinson Decl. ¶ 33.  Title X funds comprise 19% of PPGOH's budget and over 18% of PPAU's budget.  *See* Harvey Decl. ¶ 38; Galloway Decl. ¶ 46.  Title X is "literally keeping the lights on" at four clinics in rural Wisconsin and three urban clinics in the Milwaukee region.  Atkinson Decl. ¶ 48.  A loss of Title X funding would mean those lights would be turned off.  In all, 16 of the Planned Parenthood Plaintiffs' health centers would close, and they would need to lay off approximately 50 staff, including at least six clinicians.  *See, e.g.*, *id.* ¶¶ 48-49 (25 clinicians and staff will lose their jobs in Wisconsin alone); *see also* Harvey Decl. ¶¶ 38-39 (loss of 19 staff in health services, education, and administrative positions); Galloway Decl. ¶¶ 47-48 (loss of 9

37

health center staff); Coleman Decl. ¶ 98; Thomas Decl. ¶ 50.  Many of Plaintiffs' rural clinics are

at particularly high risk as they already operate at a significant loss and could not withstand even

a short-term or partial reduction in Title X funds.  *See, e.g.*, Atkinson Decl. ¶ 48; *see also* Harvey

Decl. ¶¶ 40-41.  These closures would begin within months of losing Title X funding.  *See*

Atkinson Decl. ¶ 8.

   Courts in this Circuit have repeatedly recognized that harms such as grant losses, office

closures, and layoffs warrant injunctive relief.  In *Planned Parenthood Federation of America,*

*Inc. v. Schweiker*, for example, Planned Parenthood and NFPRHA argued that they would be

injured financially if they were forced to reject Title X funds rather than comply with parental

notification requirements they believed to be unlawful.  *See* 559 F. Supp. 658, 667 (D.D.C.),

*aff'd*, 712 F.2d 650 (D.C. Cir. 1983).  The court agreed: "Such threatened financial loss is serious

and direct, and constitutes sufficient injury to meet the first requirement for a grant of a

preliminary injunction."  *Id.*; *see also Beacon Assocs., Inc. v. Apprio, Inc.*, No. 1:18-CV-00576

(TNM), 2018 WL 1784281, at *6 (D.D.C. Apr. 13, 2018) (finding irreparable harm where

plaintiff was likely to suffer "consequential damages resulting from [the] inability to effectively

compete" for contract renewal); *Holiday CVS, L.L.C. v. Holder*, 2012 WL 10973832, at *2

(D.D.C. Feb. 7, 2012) (recognizing irreparable injury where a pharmacy was likely to lose

revenue if the federal government revoked its license).  Courts in other circuits have reached the

same conclusion, especially where layoffs and office closures are involved.  *See, e.g., Planned*

*Parenthood of Indiana, Inc. v. Comm'r of Indiana State Dept. of Health*, 699 F.3d 962, 980 (7th

Cir. 2012) (loss of Medicaid funding would cause irreparable harm where provider would have

to lay off dozens of employees, close multiple clinics, and stop serving many patients); *see also,*

*e.g., Texas v. EPA*, 829 F.3d 405, 434 (5th Cir. 2016) (closures and layoffs were "threatened

harms ... that are great in magnitude" and warranted injunctive relief); *Virginia Dept. of Educ. v. Riley*, 23 F.3d 80, 84 (4th Cir. 1994) (denial of $50 million in federal funding would cause irreparable harm where it would force schools to lay off teachers and discontinue primary education services).  The operational consequences of losing Title X funds, including severe cutbacks in services in rural communities, would also hamper Plaintiffs' mission to serve the low-income communities that Title X is meant to benefit.  *E.g.*, *Newby*, 838 F.3d at 8.

Plaintiffs are highly likely to suffer these financial, operational, and programmatic harms unless HHS is enjoined from enforcing the FOA.  The FOA's dramatic shift in the application review criteria for Title X funds will put Plaintiffs at a severe competitive disadvantage relative to certain other applicants by awarding points based on requirements that Plaintiffs cannot meet.  To name just a few:  The FOA prioritizes providers that offer general primary care, "optimally … onsite," at the expense of providers who specialize in reproductive care.  *See* FOA at 7-8, 10.  It rewards providers that emphasize abstaining from sex at the expense of providers who are committed to offering nondirective, evidence-based care.  *See* FOA at 11.  And it repeatedly highlights natural family planning without once acknowledging contraceptives, disadvantaging providers who are committed to providing a comprehensive array of family planning services, including oral contraceptives and LARCs.  *See* FOA at 6, 7, 9, 16.  Unless Plaintiffs change their clinical practices (and at least some Plaintiffs will not, *see, e.g.*, Harvey Decl. ¶¶ 28-33), the FOA places up to one third of the total points out of Plaintiffs' reach.

These harms are not merely speculative because Plaintiffs are either guaranteed or highly likely to face competition for Title X funds.  In Wisconsin and Arizona, competition is virtually assured because of state laws *requiring* the state health department to compete against PPWI and AFHP for Title X grants.  *See* Atkinson Decl. ¶ 7; Thomas Decl. ¶¶ 17, 36.  In Ohio, the state

health department applies for Title X funding as a matter of course, and has long been a competing Title X grantee. Harvey Decl. ¶ 36. And Texas has already announced its intention to compete for Title X funding. Geoffray Decl. ¶ 27. Those state health departments lack the same capabilities as PPWI, AFHP, PPGOH, and WHFPT to provide comprehensive family planning care to low-income communities, but under this FOA, that is not as important as the fact that the state health departments will offer onsite primary care and will be likely to partner with organizations that promote abstinence. *See, e.g.*, Atkinson Decl. ¶¶ 27, 54, 56; Thomas Decl. ¶ 37. In addition, for *all* Plaintiffs, the FOA's invitation for general primary care providers and other "historically unrepresented" entities to apply, FOA at 7-8, makes it likely that Plaintiffs will face increased competition. In this competitive environment, Plaintiffs will be vying for Title X funding at an up-to-35-point handicap. It is highly likely they will lose some or all of their Title X funds. *E.g.*, *Newby*, 838 F.3d at 9 ("Damocles's sword does not have to actually fall on all appellants before the court will issue an injunction.").

Recent history in Wisconsin and Texas reveals the genuinely grave threat that the FOA poses to the survival of Plaintiffs' health centers. In 2011, the Wisconsin legislature cut PPWI's state funding. PPWI was forced to shutter five rural health centers and lay off clinicians and support staff. *See* Atkinson Decl. ¶ 58. A similar incident in Texas led to the closure of a quarter of reproductive health clinics statewide. *See* Geoffray Decl. ¶¶ 45-50.[22]

The financial, operational, and programmatic harms that Plaintiffs face could not be remedied absent an injunction. *See Schweiker*, 559 F. Supp. at 667; *Ross Univ. Sch. of Med. Ltd. v. Cavazos*, 716 F. Supp. 638, 644 (D.D.C. 1989). Even if funding were later restored, many

---

[22]    White et al, *The Impact of Reproductive Health Legislation on Family Planning Clinic Services in Texas*, 105 Am. J. Pub. Health 851, 851 (2015) (cited at Geoffray Decl. ¶ 41).

health centers could not be re-opened, and patients would not return.  As PPWI's CEO explains, Planned Parenthood's health centers require constant maintenance and monitoring, which would cease in the wake of closures.  *See* Atkinson Decl. ¶ 51.  Medications would expire.  *Id.*  Leases would end.  *Id.*  The clinicians and support staff who were laid off would move on to other jobs. *Id.*  And patients would lose trust in their former providers, given their inability to provide consistent and continuous care.  *See id.*

Plaintiffs' ability to accomplish their mission would also be irreparably harmed.  Even if shuttered centers were later to reopen, "there can be no do over and no redress" for the missed opportunities to serve patients that would occur every day they were closed.  *See Newby*, 838 F.3d at 9 (irreparable injury to voter registration groups from failure to follow voter registration rules in advance of upcoming Election Day).  And it is highly doubtful that Plaintiffs could recover financially from the government for their injuries.  The APA waives sovereign immunity for federal agencies but only in actions "seeking relief other than money damages."  5 U.S.C. § 702.  *Cf. Holiday CVS*, 2012 WL 10973832, at *2 (irretrievable economic loss can constitute irreparable harm); *Smoking Everywhere, Inc. v. FDA*, 680 F. Supp. 2d 62, 76-77 (D.D.C. 2010) (same), *aff'd sub nom. Sottera, Inc. v. FDA*, 627 F.3d 891 (D.C. Cir. 2010).

### C.       Plaintiffs' Reputations Among Patients Will Be Tarnished

The new FOA will also diminish Plaintiffs' hard-earned reputations as accessible and affordable providers of reproductive health care to all, regardless of ability to pay.  Such reputational harm by itself warrants injunctive relief.  *See Beacon Assocs.*, 2018 WL 1784281, at *7; *Patriot, Inc. v. HUD*, 963 F. Supp. 1, 5 (D.D.C. 1997); *see also, e.g.*, *Smoking Everywhere*, 680 F. Supp. 2d at 76 (recognizing "potential ... loss of good will" as irreparable harm); *Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67, 77-78 (D.D.C. 2001) (loss of "customer trust and goodwill" constituted irreparable harm).

41

Because of the nature of the FOA, Plaintiffs will suffer reputational harm no matter what they do in response.  If Plaintiffs were to change their operations to satisfy the FOA's requirements, they would lose credibility with patients.  Promoting abstinence or the rhythm method to a healthy and sexually active adult woman who makes an appointment to obtain a refill of oral contraceptives or to discuss switching to an IUD is guaranteed to undermine the patient's trust in her provider and lead her to question other information and advice the provider offers.  *See*, *e.g.*, Harvey Decl. ¶ 32; Coleman Decl. ¶¶ 83-85; Thomas Decl. ¶¶ 24-25.  It would certainly tarnish Plaintiffs' reputation for providing medically accurate, evidence-based, nonjudgmental care.  But if Plaintiffs hold fast to their mission of offering nonjudgmental, evidence-based family planning services, then they will likely fail to satisfy the new HHS criteria, will lose funding, and will have to close clinics and turn away patients.  That will gravely compromise Plaintiffs' reputation in the community for providing high-quality, accessible care.

The Hobson's Choice that the FOA imposes on Plaintiffs—comply with unlawful agency directives that will hamper their mission, or else lose funding—is irreparable harm.  *See, e.g.*, *Schweiker*, 559 F. Supp. at 667.

## III.   THE EQUITIES AND THE PUBLIC INTEREST WEIGH IN FAVOR OF A PRELIMINARY INJUNCTION

Injunctive relief is particularly appropriate in this case because it would protect the health and well-being of millions of low-income patients who rely on Plaintiffs and the Title X program to obtain essential, life-saving services.  *See Planned Parenthood of Indiana*, 699 F.3d at 981.  If Plaintiffs were compelled to close health center doors, eliminate services, and turn away patients, alternative providers could not offer the public the same family planning services that Plaintiffs

are currently providing.  *See, e.g.*, Atkinson Decl. ¶ 27; Harvey Decl. ¶¶ 43-45; Galloway Decl.

¶¶ 43, 50; Thomas Decl. ¶¶ 40-42; Geoffray Decl. ¶ 63.

In particular, studies and Plaintiffs' experiences have repeatedly demonstrated that

FQHCs and some public health agencies do not offer the same depth and breadth of

comprehensive and effective family planning services.  *See* Atkinson Decl. ¶ 56; Galloway Decl.

¶¶ 43, 50.  Further, public health departments and the FQHC networks are overburdened already

and would not be able to handle a massive influx of patients if Plaintiffs were forced to close

centers and their patients were forced to turn elsewhere for their care—assuming that they do so,

which is highly uncertain, given that the low-income patients that Plaintiffs serve face serious

barriers to care.  *See* Atkinson Decl. ¶ 55-56.  As a result, many patients will lose access to high-

quality family planning and reproductive health care.  The public health effects are likely to be

devastating, as demonstrated by the consequences of 2011 legislation in Wisconsin, which

compelled Plaintiff PPWI to close multiple rural health centers and forced patients to go without

care, leading to spikes in cases of gonorrhea and chlamydia.  *See* Atkinson Decl. ¶ 59.  After a

similar incident in Texas, public health scholars concluded that "when specialized family

planning providers are marginalized or systematically excluded from public programs … women

will lose access to essential preventive services."  *See* White et al, *The Impact of Reproductive

Health Legislation on Family Planning Clinic Services in Texas*, *supra* n.22; *see also* Geoffray

Dec. ¶¶ 38-50.

These center closures and service cuts are a matter of life and death.  Christy Miceli, a

longtime PPWI client, was just 24 years old when PPWI clinicians found cancerous cells on her

cervix during a routine Pap test—a test she could not have afforded without Title X.  *See*

Atkinson Decl. ¶ 53.  She is now cancer-free but requires frequent follow-ups and Pap tests—all covered by Title X.  She is alive because of PPWI and Title X.  *Id.*

One the other side of the ledger, the burden of an injunction on HHS would be minimal. The Title X program has been administered using the same seven grantmaking criteria for decades, and HHS would suffer no harm from merely continuing Title X funding that was awarded under those criteria as this litigation moves forward.  There is also a "substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations."  *Newby*, 838 F.3d at 12 (internal quotation marks omitted); *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1326-27 (D.C. Cir. 1998) (when an agency failed to adhere to a statute's standards, the "public interest balance plainly would weigh in favor of an injunction"); *Texas Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 246 (D.D.C. 2014) (recognizing an independent and compelling public interest in ensuring the Secretary of HHS complies with the applicable statute).  In the context of the APA, "[t]he public interest is served when administrative agencies comply with their obligations."  *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009).  An injunction would require nothing more.

## CONCLUSION

The Court should enter a preliminary injunction preventing HHS from relying on the FY2018 FOA to evaluate Title X grant applications.[23]

---

[23]     As set forth in Plaintiffs' prayer for relief, *see* Compl. at 39, and in the Proposed Order accompanying this motion, the Court should also require that HHS provide continuation funding of the Title X program until the issuance of new Title X grants pursuant to a lawful FOA.

May 8, 2018

Respectfully submitted,

By  /s/ Paul R. Q. Wolfson

HELENE T. KRASNOFF (DC BAR NO. 460177)
CARRIE Y. FLAXMAN (DC BAR NO. 458681)
PLANNED PARENTHOOD FEDERATION OF
AMERICA
1110 Vermont Avenue NW, Suite 300
Washington, DC  20005
(202) 973-4800

PAUL R.Q. WOLFSON (DC BAR NO. 414759)
KIMBERLY A. PARKER (DC BAR NO. 462495)
ARI J. SAVITZKY (*pro hac vice*)
LEON T. KENWORTHY (*pro hac vice*)
SARA SCHAUMBURG (*pro hac vice*)
WILMER CUTLER PICKERING HALE
    AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC  20006
(202) 663-6000
paul.wolfson@wilmerhale.com

ALAN SCHOENFELD (*pro hac vice*)
EMILY NIX (*pro hac vice*)
WILMER CUTLER PICKERING HALE
    AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY  10007

*Attorneys for Plaintiffs Planned Parenthood
of Wisconsin, Inc., Planned Parenthood of
Greater Ohio, and Planned Parenthood
Association of Utah*

RUTH E. HARLOW
JENNIFER DALVEN
ELIZABETH WATSON
LINDSEY KALEY
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2633

ARTHUR B. SPITZER (DC BAR NO. 235960)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF THE DISTRICT OF COLUMBIA
915 15th Street NW, Second Floor
Washington, D.C. 20005
(202) 457-0800

*Attorneys for Plaintiff National Family
Planning & Reproductive Health Association*

## CERTIFICATE OF SERVICE

I, Paul R.Q. Wolfson, hereby certify that on May 8, 2018, a true and correct copy of the foregoing PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION, and the supporting memorandum of law and declarations and exhibits in support thereof, were filed electronically with the United States District Court for the District of Columbia.  Notice of this filing has been sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt and served on Defendants via email.  Parties may access this filing through the Court's ECF system.

/s/  Paul R.Q. Wolfson
PAUL R.Q. WOLFSON