## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

PLANNED PARENTHOOD OF WISCONSIN,
INC., PLANNED PARENTHOOD OF GREATER
OHIO, PLANNED PARENTHOOD ASSOCIATION
OF UTAH, and NATIONAL FAMILY PLANNING
& REPRODUCTIVE HEALTH ASSOCIATION,

No. 18 Civ. 1035-TNM (con)

Plaintiffs,

Oral Argument
June 21, 2018 at 10 a.m.

v.

ALEX M. AZAR II, in his official capacity as United
States Secretary of Health and Human Services, and
VALERIE HUBER, in her official capacity as Acting
Deputy Assistant Secretary for the Office of
Population Affairs,

Defendants.

## DEFENDANTS' MOTION TO DISMISS OR FOR SUMMARY JUDGMENT

Defendants respectfully move under Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 56 to dismiss the Complaints, or, in the alternative, for summary judgment in favor of Defendants. In support of this Motion, Defendants refer the Court to the attached Memorandum of Points and Authorities. A proposed order is submitted herewith.

Dated:  May 24, 2018                           Respectfully submitted,

ROBERT P. CHARROW                              CHAD A. READLER
General Counsel                                Acting Assistant Attorney General
Department of Health and Human Services
200 Independence Ave., SW
Washington, D.C. 20201                         JESSIE K. LIU
Tel: (202) 690-7741                            United States Attorney

BRIAN R. STIMSON                               RUTH A. HARVEY
Principal Deputy General Counsel               Director
Department of Health and Human Services
200 Independence Ave., SW
Washington, D.C. 20201                         MICHAEL J. QUINN
Tel: (202) 690-7741                            Senior Litigation Counsel

MATTHEW S. BOWMAN                              JOEL McELVAIN
Deputy General Counsel                         Assistant Branch Director
Department of Health and Human Services
200 Independence Ave., SW                      /s/ *Alicia M. Hunt*
Washington, D.C. 20201                         ALICIA M. HUNT (DC Bar No. 484620)
Tel: (202) 690-7741                            JONATHAN E. JACOBSON
                                               Trial Attorneys
                                               United States Department of Justice
                                               Civil Division
                                               Commercial Litigation Branch
                                               1100 L St. NW, 7th floor
                                               Washington, D.C. 20005
                                               Tel: (202) 307-3548
                                               Fax: (202) 514-9163
                                               E-mail: alicia.m.hunt@usdoj.gov

                                               /s/ *Gary D. Feldon*
                                               GARY D. FELDON
                                               Trial Attorney
                                               United States Department of Justice
                                               Civil Division, Federal Programs Branch
                                               20 Massachusetts Ave. NW, Room 7128
                                               Washington, D.C. 20530
                                               Tel: (202) 514-4686
                                               Fax: (202) 616-8460
                                               E-mail: gary.d.feldon@usdoj.gov

                                               *Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| PLANNED PARENTHOOD OF WISCONSIN, INC., PLANNED PARENTHOOD OF GREATER OHIO, PLANNED PARENTHOOD ASSOCIATION OF UTAH, and NATIONAL FAMILY PLANNING & REPRODUCTIVE HEALTH ASSOCIATION, | No. 18 Civ. 1035-TNM (con) |
| Plaintiffs, | <u>Oral Argument</u><br>June 21, 2018 at 10 a.m. |
| v. | |
| ALEX M. AZAR II, in his official capacity as United States Secretary of Health and Human Services, and VALERIE HUBER, in her official capacity as Acting Deputy Assistant Secretary for the Office of Population Affairs, | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS OR FOR SUMMARY JUDGMENT AND IN OPPOSITION TO <u>PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION</u>**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................1

STATEMENT OF FACTS ..........................................................................................4

    I.    Statutory and Regulatory Criteria for Title X Grants .......................................4

    II.   The Title X Grant Application and Review Process..........................................5

    III.  HHS's Issuance of the 2018 Funding Announcement......................................8

PROCEDURAL HISTORY.......................................................................................10

ARGUMENT .............................................................................................................11

    I.    This Court Should Grant Defendants' Motion to Dismiss or For Summary
        Judgment .......................................................................................................11

        A.    The Administrative Procedure Act Precludes Judicial Review of
               HHS's Revisions to the Funding Announcement ................................11

               1.    HHS's Revisions to the Funding Announcement Are Not
                      Reviewable Because They Reflect Grant Making Policy
                      Preferences Committed to Agency Discretion by Law............12

               2.    The Funding Announcement Is Not Reviewable Final Agency
                      Action.....................................................................................15

        B.    Even If Revisions to the Funding Announcement Were Reviewable,
               Plaintiffs' Administrative Procedure Act Claims Fail on the Merits...17

               1.    Title X and HHS Regulations Authorize Consideration of
                      Additional Grant Making Criteria...........................................17

                 2.    HHS Is Not Required to Promulgate Procedural Rules,
                      Including the 2018 Funding Announcement, by Notice and
                      Comment Rulemaking .............................................................26

                 3.    The Funding Announcement Is Not Arbitrary, Capricious, or
                      Otherwise Not in Accordance with Law..................................29

                 4.    Plaintiffs' Demand for Continuation Funding Is Barred by
                      Sovereign Immunity.................................................................39

    II.   Plaintiffs Are Not Entitled to a Preliminary Injunction .................................39

        A.    Plaintiffs Fail to Establish Irreparable Harm .......................................40

        B.    The Balance of the Equities and the Public Interest Weigh Against
                Granting a Preliminary Injunction .......................................................44

CONCLUSION..........................................................................................................45

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*AARP v. U.S. EEOC,*
   226 F. Supp. 3d 7 (D.D.C. 2016) ............................................................................ 41

*Advocate Health Care Network v. Stapleton,*
   137 S. Ct. 1652 (2017) ........................................................................................... 21

*Ala. Pub. Sch. & Coll. Auth. v. JPMorgan Chase Bank,*
   No. 08-CV-863, 2009 WL 2171896 (M.D. Ala. July 21, 2009) ............................ 20

*Alliance for Bio-Integrity v. Shalala,*
   116 F. Supp. 2d 166 (D.D.C. 2000) ...................................................................... 28

*Am. Bank & Trust Co. v. Dallas Cnty.,*
   463 U.S. 855 (1983) ............................................................................................... 20

*Am. Hosp. Ass'n v. Bowen,*
   834 F.2d 1037 (D.C. Cir. 1987) ............................................................................ 27

*Apter v. Richardson,*
   510 F.2d 351 (7th Cir. 1975) ................................................................................. 14

*Armstrong v. Exceptional Child Center, Inc.,*
   135 S. Ct. 1378 (2015) ........................................................................................... 14

*Ass'n of Bituminous Contractors, Inc. v. Apfel,*
   156 F.3d 1246 (D.C. Cir. 1998) ............................................................................ 26

*Ass'n of Private Sector Colls. & Univs. v. Duncan,*
   110 F. Supp. 3d 176 (D.D.C. 2015) ...................................................................... 44

*Ass'n of Private Sector Colls. & Univs. v. Duncan,*
   681 F.3d 427 (D.C. Cir. 2012) .............................................................................. 25

*\*Auer v. Robbins,*
   519 U.S. 452 (1997) ...................................................................................... 18, 24

*Ayala v. Dist. 60 Sch. Bd. of Pueblo, Colo.,*
   327 F. Supp. 980 (D. Colo. 1971) ........................................................................ 19

*Baltimore Gas & Elec. Co. v. NRDC,*
   462 U.S. 87 (1983) ................................................................................................. 29

*Barnhart v. Walton,*
    535 U.S. 212 (2002) ........................................................................................ 23

*Batterton v. Francis,*
    432 U.S. 416 (1977) ........................................................................................ 18

*Bennett v. Spear,*
    520 U.S. 154 (1997) ............................................................ 15, 17, 36, 37

*Block v. Cmty. Nutrition Inst.,*
    467 U.S. 340 (1984) ........................................................................................ 12

*Cal. Human Dev. Corp. v. Brock,*
    762 F.2d 1044 (D.C. Cir. 1985) .................................................................. 14

*California ex rel. Becerra v. Sessions,*
    284 F. Supp. 3d 1015 (N.D. Cal. 2018) .................................................... 15

*Chaplaincy of Full Gospel Churches v. England,*
    454 F.3d 290 (D.C. Cir. 2006) ............................................................ 40, 45

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,*
    467 U.S. 837 (1984) ........................................................................................ 17

*Christopher v. SmithKline Beecham Corp.,*
    567 U.S. 142 (2012) ........................................................................................ 25

*Citizens Alert Regarding Env't v. EPA,*
    102 F. App'x 167 (D.C. Cir. 2004) ............................................................ 15

*City of Philadelphia v. Sessions,*
    280 F. Supp. 3d 579 (E.D. Pa. 2017) ........................................................ 15

*Clarian Health W., LLC v. Hargan,*
    878 F.3d 346 (D.C. Cir. 2017) .................................................................... 27

*Cleveland Construction Inc. v. NLRB,*
    44 F.3d 1010 (D.C. Cir. 1995) .................................................................... 32

*Cmty. Action of Laramie Cnty., Inc. v. Bowen,*
    866 F.2d 347 (10th Cir. 1989) .................................................................... 14

*Coal. For Common Sense in Gov't Procurement v. United States,*
    576 F.Supp. 2d 162 (D.D.C. 2008) ............................................................ 42

iii

*Crop Life Am. v. EPA*,
    329 F.3d 876 (D.C. Cir. 2003) ............................................................................... 28

*Ctr. for Auto Safety, Inc. v. Nat'l Highway Traffic Safety Admin.*,
    452 F.3d 798 (D.C. Cir. 2006) ....................................................................... 27, 28

*Custis v. United States*,
    511 U.S. 485 (1994) .............................................................................................. 20

*Davis v. Pension Ben. Guar. Corp.*,
    571 F.3d 1288 (D.C. Cir. 2009) ......................................................................... 40

*Decker v. Nw. Envtl. Def. Ctr.*,
    568 U.S. 597 (2013) .............................................................................................. 25

*Dep't of Army v. Blue Fox, Inc.*,
    525 U.S. 255 (1999) .............................................................................................. 39

*Dep't of Treasury, IRS v. Fed. Labor Relations Auth.*,
    494 U.S. 922 (1990) .............................................................................................. 22

*Elk Assocs. Funding Corp. v. U.S. SBA*,
    858 F. Supp. 2d 1 (D.D.C. 2012) ....................................................................... 44

*Experience Works, Inc. v. Chao*,
    267 F. Supp. 2d 93 (D.D.C. 2003) ..................................................................... 43

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) ................................................................................. 29, 30, 35

*FDIC v. Meyer*,
    510 U.S. 471 (1994) .............................................................................................. 39

*Fla. Power & Light Co. v. Lorion*,
    470 U.S. 729 (1985) .............................................................................................. 39

*\*Fund for Animals v. Frizzell*,
    530 F.2d 982 (D.C. Cir. 1975) ........................................................................... 41

*Geronimo v. Obama*,
    725 F. Supp. 2d 182 (D.D.C. 2010) ................................................................... 11

*Gonzales v. Oregon*,
    546 U.S. 243 (2006) .............................................................................................. 25

*Grassetti v. Weinberger*,
   408 F. Supp. 142 (N.D. Cal. 1976) ........................................................ 14

*Heckler v. Chaney*,
   470 U.S. 821 (1985) ............................................................... 12, 13, 14

*In re Navy Chaplaincy*,
   534 F.3d 756 (D.C. Cir. 2008) ............................................................. 40

*James V. Hurson Assocs. Inc. v. Glickman*,
   229 F.3d 277 (D.C. Cir. 2000) ............................................................. 27

*JEM Broad. Co. v. FCC*,
   22 F.3d 320 (D.C. Cir. 1994) ............................................................... 27

*Karst Envtl. Educ. & Prot., Inc. v. EPA*,
   403 F. Supp. 2d 74 (D.D.C. 2005) ........................................................ 16

*Kletschka v. Driver*,
   411 F.2d 436 (2nd Cir. 1969) ............................................................... 14

*League of Women Voters of United States v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016) ............................................................ 40, 42

*\*Lincoln v. Vigil*,
   508 U.S. 182 (1993) ...................................................................... 12, 13

*Marlowe v. Bottarelli*,
   938 F.2d 807 (7th Cir. 1991) .............................................................. 24

*Martin v. Occupational Safety & Health Review Comm'n*,
   499 U.S. 144 (1991) ......................................................................... 30

*Mazurek v. Armstrong*,
   520 U.S. 968 (1997) ......................................................................... 40

*Md. Dep't of Human Res. v. Sullivan*,
   738 F. Supp. 555 (D.D.C. 1990) .......................................................... 29

*Menkes v. U.S. Dep't of Homeland*,
   *Sec'y*, 637 F. 3d 319 (D.C. Cir. 2011) .................................................. 23

*\*Milk Train, Inc. v. Veneman*,
   310 F.3d 747 (D.C. Cir. 2002) ......................................................... 12, 14

*Molycorp, Inc. v. EPA*,
    197 F.3d 543 (D.C. Cir. 1999) .............................................................. 28

*Moreau v. Klevenhagen*,
    508 U.S. 22 (1993) ................................................................................ 24

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) .......................................................................... 29, 30

*Mylan Pharm., Inc. v. Shalala*,
    81 F. Supp. 2d 30 (D.D.C. 2000) .......................................................... 41

*Nat'l Family Planning & Reprod. Health Ass'n, Inc. v. Gonzales*,
    468 F.3d 826 (D.C. Cir. 2006) .............................................................. 22

*Navajo Nation v. Azar*,
    292 F. Supp. 3d 508 (D.D.C. 2018) ...................................................... 43

*Nken v. Holder*,
    556 U.S. 418 (2009) .............................................................................. 44

*Ohio Head Start Ass'n, Inc. v. U.S. De't of Health & Human Servs.*,
    902 F. Supp. 2d 61 (D.D.C. 2012) ........................................................ 42

*Open Top Sightseeing USA v. Mr. Sightseeing, LLC*,
    48 F. Supp. 3d 87 (D.D.C. 2014) .................................................... 40, 41

*Oryszak v. Sullivan*,
    576 F.3d 522 (D.C. Cir. 2009) .............................................................. 12

*Panhandle Producers & Royalty Owners Ass'n v. Econ. Regulatory Admin.*,
    822 F.2d 1105 (D.C. Cir. 1987) ...................................................... 27, 29

*Perez v. Mortgage Bankers Ass'n*,
    135 S. Ct. 1199 (2015) .......................................................................... 24

*\*Planned Parenthood Fed'n of Am., Inc. v. Heckler*,
    712 F.2d 650 (D.C. Cir. 1983) ......................................... 18, 20, 31, 38

*Planned Parenthood of Kansas & Mid-Missouri v. Moser*,
    747 F.3d 814 (10th Cir. 2014) .............................................................. 14

*Policy & Research, LLC v. U.S. Dep't of Health & Human Servs.*,
    No. 18-cv-00346, 2018 WL 2184449 (D.D.C. May 11, 2018) .............. 12

*Pursuing Am.'s Greatness v. FEC*,
   831 F.3d 500 (D.C. Cir. 2016) ............................................................ 44

*Rattlesnake Coal. v. EPA*,
   509 F.3d 1095 (9th Cir. 2007) ............................................................ 15

*Rochon v. Lynch*,
   139 F. Supp. 3d 394 (D.D.C. 2015) .................................................... 11

*Rocky Mountain Wild v. Walsh*,
   216 F. Supp. 3d 1234 (D. Colo. 2016) ............................................... 20

*Rust v. Sullivan*,
   500 U.S. 173 (1991) ........................................................... 17, 22, 23, 38

*Sabino Canyon Tours, Inc. v. USDA Forest Serv.*,
   No. 17-CV-2758, 2018 WL 784061 (D.D.C. Feb. 8, 2018) ................. 44

*Sierra Club v. U.S. Army Corps of Eng'rs*,
   990 F. Supp. 2d 9 (D.D.C. 2013) ........................................................ 42

*Skidmore v. Swift & Co.*,
   323 U.S. 134 (1944) ............................................................................ 24

*Small Refiner Lead Phase-Down Task Force v. EPA*,
   705 F.2d 506 (D.C. Cir. 1983) ............................................................ 19

*Teton Historic Aviation Found. v. U.S. Dep't of Def.*,
   686 F. Supp. 2d 75 (D.D.C. 2010) ...................................................... 11

*Thomas Jefferson Univ. v. Shalala*,
   512 U.S. 504 (1994) ............................................................................ 26

*UC Health v. NLRB*,
   803 F.3d 669 (D.C. Cir. 2015) ............................................................ 22

*United States v. Mead Corp.*,
   533 U.S. 218 (2001) ............................................................................ 24

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ......................................................... 39, 42, 43, 44

*Wis. Gas Co. v. FERC*,
   758 F.2d 669 (D.C. Cir. 1985) ............................................................ 40

## Statutes

5 U.S.C. § 551 .......................................................................................................... 15

5 U.S.C. § 701 .......................................................................................................... 11

5 U.S.C. § 704 .......................................................................................................... 15

5 U.S.C. § 706 .......................................................................................................... 29

42 U.S.C. § 300 .................................................................................................. passim

42 U.S.C. § 300a ....................................................................................................... 20

42 U.S.C. § 300a-4 .................................................................................................... 18

42 U.S.C. § 300a-6 .................................................................................................... 23

Pub. L. No. 115-141, 132 Stat. 348 .......................................................................... 31

## Rules

Fed. R. Civ. P. 12 ..................................................................................................... 11

Fed. R. Civ. P. 56(a) ................................................................................................. 11

## Regulations

42 C.F.R. § 59.5 ............................................................................................. 34, 35, 36

42 C.F.R. § 59.6 .......................................................................................................... 5

42 C.F.R. § 59.7 ................................................................................................. passim

42 C.F.R. § 59.12 ...................................................................................................... 13

45 C.F.R. § 75.203 ...................................................................................................... 5

## Other Authorities

S. Rep. No. 91-1004 (1970) ................................................................................ 32, 36

S. Rep. No. 94-29 (1975) .......................................................................................... 36

H.R. Rep. No. 97-208 (1981) .................................................................................... 31

36 Fed. Reg. 18465 ................................................................................................ 5, 21

43 Fed. Reg. 42020 ............................................................................................ 21, 25

81 Fed. Reg. 91852-01 ............................................................................................ 36

**INTRODUCTION**

Plaintiffs are asking this Court to write a new Title X statute.  Longstanding statutory text provides the government authority to award family planning grants and simply states that the government "shall take into account" certain factors when doing so.  42 U.S.C. § 300(b).  Current regulations say the same.  *See* 42 C.F.R. § 59.7(a).  Plaintiffs ask this Court to amend the agency's criteria for competing discretionary grants and, in the meantime, to award them non-competitive grant funding until the government accepts Plaintiffs' desired criteria.  The Court should resist Plaintiffs' attempt to wrest control of the Title X program from the government and rewrite the terms of the competition.  Plaintiffs identify no case where a court has dictated the terms of an agency's funding opportunity announcement, nor where an agency has been required to use notice-and-comment rulemaking to revise one.  This case should not be the first.

Plaintiffs are family planning service providers and organizations[1] including current grant recipients under Title X of the Public Health Service Act.  They challenge the authority and discretion vested by Congress in the Secretary of Health and Human Services (HHS)[2] to expand criteria used to evaluate Title X grant applications for fiscal year 2018.  Plaintiffs allege the changes violate the Administrative Procedure Act (APA) and have moved for preliminary relief, seeking to block implementation of the criteria.  Not only is preliminary injunctive relief improper here, but Plaintiffs' substantive claims are readily amenable to summary dismissal or

---

[1]  Plaintiffs include Planned Parenthood of Wisconsin, Inc., Planned Parenthood of Greater Ohio, and Planned Parenthood Association of Utah (collectively, Planned Parenthood or PP) and Plaintiff National Family Planning and Reproductive Health Association (NFPRHA).  Defendants accept the facts alleged in the Complaints as true solely for purposes of this motion.

[2]  Previously, Title X delegated responsibilities to the Secretary of Health, Education and Welfare (HEW), until the creation of HHS.  For brevity, references to HHS in discussing Title X's history include actions taken by its predecessor, HEW, unless otherwise noted.

summary judgment.  For this reason, Defendants have combined their arguments supporting their cross-motion with their opposition to Plaintiffs' request for a preliminary injunction.

In February 2018, HHS issued a Funding Opportunity Announcement (Funding Announcement and cited as FOA) soliciting applications for fiscal year 2018 grants.  In keeping with twenty-five years of practice, the Funding Announcement lists agency priorities (Program Priorities) and key issues (Key Issues).  Two months later, Plaintiffs initiated these now-consolidated actions claiming that a small number of HHS's Program Priorities and Key Issues are inconsistent with Title X and violate the APA.  Plaintiffs' claims fail for multiple independent reasons, summarized below.

As a threshold matter, HHS's Funding Announcement is only one step in an exercise of the agency's discretion over grant making under Title X.  The changes to the Funding Announcement therefore represent an action committed to agency discretion by law and not subject to judicial review.  Further, to be reviewable under the APA, agency action must be final, and the Funding Announcement is not a final decision in any sense.  The Funding Announcement does no more than solicit applications.  No final "decision" exists until the designated HHS decision maker has decided which applicants will be awarded Title X grants.  No Plaintiff has been denied a grant in the current round, and all Plaintiffs remain in the running for an award.

Even if substantive review of the Funding Announcement were available, Plaintiffs' challenges would fail on the merits.  Under the Title X statute and regulations, HHS is not tethered to a rigid list of criteria, as Plaintiffs claim, and no rulemaking is necessary for HHS to expand the criteria considered.  That authority plainly is recognized in both the governing statute and regulations, and—to the extent ambiguity could possibly exist—HHS's interpretation of its

2

authority is entitled to deference.  In short, although HHS must consider enumerated criteria in the statute and its regulations, HHS retains discretion to consider additional factors, which is all that HHS has done here.

HHS's added priorities and issues are lawful, rational, and justified by the agency. Plaintiffs challenge only a small number of considerations stated in the Funding Announcement, most of which also appeared in prior years' announcements.  Out of sixteen agency Program Priorities and Key Issues identified in the Funding Announcement, Plaintiffs contest *portions* of only six.  Some are required by Title X.  And each challenged priority and issue is not only consistent with Title X, but carries out Congress's express purpose of providing a broad range of family planning methods and services.  HHS contemporaneously explained the challenged priorities and issues, including references to academic and scientific publications.  Indeed, Plaintiffs admit that they have for years *implemented most of these priorities and issues* by, for example, partnering with community- and faith-based organizations, encouraging adolescents to delay sexual activity, and referring clients to primary care providers.  As demonstrated below, all these reasons compel the conclusion that the Funding Announcement has a rational basis under the APA.

Plaintiffs also fail to establish irreparable harm warranting injunctive relief.  Their delay in bringing this action and the speculative nature of the alleged harm are both grounds for denial of their motion.  Plaintiffs' public interest argument is also wanting and self-serving.  They essentially argue that an injunction serves the public interest because they alone—and no one else—can adequately provide Title X services.  Their presumption is mistaken, and, in any event, that decision is reserved to HHS to make.

Congress did not delegate authority for implementing Title X to Plaintiffs, and Plaintiffs have no legal entitlement to future funding under the program. Only HHS is entrusted with administering Title X, and for decades it has exercised that authority to run a successful and effective public health program. Neither Plaintiffs nor the Court should supplant HHS's depth of experience with Title X and its robust expertise in the area of family planning. Consequently, the Court should grant Defendants' motion to dismiss or, alternatively, enter judgment in HHS's favor on Plaintiffs' claims and deny Plaintiffs' motion for a preliminary injunction.

## STATEMENT OF FACTS[3]

### I.    Statutory and Regulatory Criteria for Title X Grants

Under Title X of the Public Health Service Act, 42 U.S.C. § 300 *et seq.*,[4] the Secretary of HHS is authorized "to make grants to and enter into contracts with public or nonprofit private entities to assist in the establishment and operation of voluntary family planning projects." 42 U.S.C. § 300(a). The statute also contains four criteria, providing that "[i]n making grants and contracts . . . the Secretary [of HHS] shall take into account the number of patients to be served, the extent to which family planning services are needed locally, the relative need of the applicant, and its capacity to make rapid and effective use of such assistance." *Id.* § 300(b).

Congress delegated to HHS broad discretion to implement regulations regarding grant making. Section 300a-4 specifies that "[g]rants and contracts made under this subchapter shall be made in accordance with such regulations as the Secretary may promulgate." The first regulation implementing the statute by providing grant making criteria was adopted in 1971. *See*

---

[3] As an APA action, summary judgment is determined based on the administrative record, which renders the requirement of a statement of undisputed material facts inapplicable here. *See* D.D.C. L.R. 7(h)(2).

[4] Title X is also referred to as "Section 1001 of the Public Health Service Act."

4

Grants for Family Planning Services, 36 Fed. Reg. 18465, 18467 (Sept. 15, 1971) (then codified

at 42 C.F.R. § 59.6(a) and currently codified at 42 C.F.R. § 59.7(a)).  That regulation has

remained substantively the same ever since.  *Compare* 42 C.F.R. § 59.6(a) (1971), *with* 42

C.F.R. § 59.7(a) (2016).  In its current form, the regulation provides:

> What criteria will [HHS] use to decide which family planning
> services projects to fund and in what amount?
>
> Within the limits of funds available for these purposes, the Secretary
> may award grants for the establishment and operation of those
> projects which will in the Department's judgment best promote the
> purposes of section [300], taking into account:
>
> (1) The number of patients, and, in particular, the number of low-
> income patients to be served;
>
> (2) The extent to which family planning services are needed locally;
>
> (3) The relative need of the applicant;
>
> (4) The capacity of the applicant to make rapid and effective use of the
> federal assistance;
>
> (5) The adequacy of the applicant's facilities and staff;
>
> (6) The relative availability of non-federal resources within the
> community to be served and the degree to which those resources are
> committed to the project; and
>
> (7) The degree to which the project plan adequately provides for the
> requirements set forth in these regulations.

42 C.F.R. § 59.7(a) (2016).

## II.     The Title X Grant Application and Review Process

The annual Title X grant application process begins with a Funding Announcement.  *See*

45 C.F.R. § 75.203. [5]  The Funding Announcement sets out procedural requirements and

---

[5]  Plaintiffs filed the 1991 and 1998 Funding Announcements (among others).  *See* ECF Nos. 18-
11, 18-12.  Defendants have included, in the Krestschmaier Declaration associated with this
motion, Funding Announcements between 2003 and 2016.  *See* Kretschmaier Decl., Exs. A-N.
The 2017 and 2018 Funding Announcements, which are part of the Administrative Record in this
case, appear respectively at Administrative Record 000001-000060 (2018) and Administrative
Record 000061-000118 (2017).  All Funding Announcements are cited throughout this
memorandum as "FOA" along with their year (e.g., 1991 FOA, 1998 FOA).

substantive criteria for applications and describes the process by which the applications are reviewed.  *See id.*  Funding Announcements also describe HHS's Title X Program Priorities, Key Issues, and other policy prerogatives for the upcoming year.  *See, e.g.*, 1998 FOA, at 10726 (listing "[p]riorities that represent overarching goals for the Title X program" in 1998).  Defendants have identified no instance where notice-and-comment rulemaking was necessary to craft a Title X Funding Announcement.

As the annual Funding Announcements reflect, HHS has made grant decisions using a three-step process for at least the past fourteen years.  *Compare* 2004 FOA, *with* 2018 FOA.  In the first step, HHS reviews the application packages for compliance with application requirements.  2018 FOA, at 16-17.  This step checks to be sure that the applications contain the necessary information for evaluation on the merits and assures compliance with procedural requirements, such as page limits and the method of submission.  *Id.*  Applications that fail this step do not proceed to merits consideration.  *Id.*

The second step involves independent review panels, composed of outside experts, who use the criteria in the annual Funding Announcement to score the applications.  *Id.* at 43-44.  Over the years, the scoring criteria have largely tracked the seven factors required by the regulations, but exceptions exist.  *See, e.g.*, 2017 FOA, at 41-42.  The descriptions of the criteria in the Funding Announcements have regularly expanded on the regulatory language.  *Compare id.*, *with* 42 C.F.R. § 59.7(a).[6]  From time to time, HHS has also reallocated points between

---

[6]  For example, the 2017 Funding Announcement expanded on 42 C.F.R. § 59.7(a)(5)'s consideration of the "adequacy of the applicant's facilities and staff."  The 2017 Announcement provides that, for purposes of that criteria, HHS evaluated whether (1) the applicant showed "evidence of an infrastructure that is sustainable in ensuring continued access to services for the target population" and (2) "[f]or applicants that will not provide all services directly, the extent to which the applicant has documented the process and selection criteria it will use for providing an opportunity to receive subawards to qualified entities eligible to receive federal funds in

6

criteria without going through rulemaking. *Compare* 2007 FOA, at 37987, *with* 2006 FOA, at 24268-69. The independent review panels' scores, however, have never determined funding. *E.g.*, 2018 FOA, at 44.

Grant awards are determined in the third step, which involves deciding which Title X grant applications to fund and the amount of each grant. *Id.* The Secretary or his designee makes an independent determination regarding where to direct grant funds. *Id.* As has been the case in prior years, the Deputy Assistant Secretary for Population Affairs (Deputy Assistant Secretary, or DASPA), is the Secretary's designee for awarding Title X grants under the 2018 Funding Announcement. *Id.* at 44-45. As such, the Deputy Assistant Secretary (or her designee) "make[s] final award selections." *Id.* at 44.

Funding Announcements since at least 2003 have explicitly granted the final decision maker authority to award grants based on his or her independent judgment as to which projects would best achieve Title X's goals within the limits of available funding. *See* 2003 FOA, at 45016.[7] By 2014, the Funding Announcements included additional factors for the final decision maker to consider. Those factors—none of which are listed in the statue or regulations—have varied since. *Compare* 2013 FOA, at 32 (not including additional factors), *with* 2014 FOA, at 31 (adding geographic distribution as a factor), *and* 2016 FOA, at 32 (adding two new factors). These factors are considered in the third step but are not specifically included in the scoring criteria. *Compare* 2018 FOA, at 44-45, *with id.*, at 43.

---

providing services throughout the service area to meet the needs of project beneficiaries." 2017 FOA, at 41.

[7] *See also* 2017 FOA, at 43; 2016 FOA, at 32; 2015 FOA, at 31; 2014 FOA, at 31; 2013 FOA, at 32; 2012 FOA, at 27; 2011 FOA, at 28-29; 2010 FOA, at 29; 2009 FOA, at 27; 2008 FOA, at 32115; 2007 FOA, at 37987; 2006 FOA, at 11; 2005 FOA, at 41117; 2004 FOA, at 36807.

## III.   **HHS's Issuance of the 2018 Funding Announcement**

HHS issued its 2018 Funding Announcement on February 23, 2018, and set the grant

application deadline for May 24, 2018.  *Id*. at 1, 60.  HHS's sixteen total Program Priorities and

Key Issues in the 2018 Funding Announcement include, among other agency prerogatives,

statements regarding the availability of natural family planning methods, emphasizing the

benefits of avoiding sexual risks especially for adolescents, and cooperating with community-

and faith-based organizations.  *Id*. at 9-11.  These priorities and issues are not new; similar

(sometimes identical) ones have been included in Funding Announcements since at least 2003.[8]

For this Funding Announcement, HHS assigned points to all the scoring criteria required by

regulation and also assigned points to an additional criterion: "[t]he degree to which the project

---

[8]  *See, e.g.*, 2011 FOA, at 6 (listing "adolescent abstinence counseling" as a Program Priority,
and requesting proposals that "encourage family participation" in adolescent reproductive
decision making); 2010 FOA, at 6 (listing "adolescent abstinence counseling" and "encouraging
participation of families" in minors' family planning decisions as Program Priorities); 2009
FOA, at 6 (listing "adolescent abstinence counseling" and "encouraging participation of
families" in minors' family planning decisions as Program Priorities); 2008 FOA, at 32110
(listing "adolescent abstinence counseling" as a Program Priority and listing "linkages and
partnerships with . . . faith-based organizations" and "incorporating . . . extramarital abstinence"
into "HIV prevention counseling" as Key Issues); 2007 FOA, at 37982-83 (listing "extramarital
abstinence education and counseling" as a Program Priority; listing "linkages and partnerships
with . . . faith-based organizations" and "integrat[ing] . . . extramarital abstinence" into "HIV
prevention counseling" as Key Issues); 2006 FOA, at 3-4 (listing "extramarital abstinence
education and counseling" and "partnering with . . . faith-based organizations" as Program
Priorities and listing educating "adolescents and unmarried individuals [that] . . . abstinence" is
the appropriate means of HIV/AIDS prevention as Key Issues); 2005 FOA, at 41116-17 (listing
"extramarital abstinence education and counseling" and "partnering with . . . faith-based
organizations" as Program Priorities and listing "providing adolescents with information, skills
and support to encourage delay of sexual activity" and educating "adolescents and unmarried
individuals [that] . . . abstinence" is the appropriate means of HIV/AIDS prevention as Key
Issues); 2004 FOA, at 36806 (listing "extramarital abstinence education and counseling" and
"partnering with . . . faith-based organizations" as Program Priorities and listing "providing
adolescents with information, skills and support to encourage delay of sexual activity" and
educating "adolescents and unmarried individuals [that] . . . abstinence" is the appropriate means
of HIV/AIDS prevention as Key Issues); 2003 FOA, at 45016 (listing "abstinence education" as
a Program Priority and a Key Issue).

plan adequately provides for the effective and efficient implementation of requirements set forth in the priorities and key issues outlined" in the Funding Announcement.  *Id*. at 44.

The 2018 Funding Announcement also provides that the Deputy Assistant Secretary "will take into consideration the following additional factor(s)":

> a.  The geographic distribution of services within the identified service area;
>
> b.  The extent to which funds requested for a project maximize access for the population in need within the entire service area as announced in Table 1;
>
> c.  Whether the project, including subrecipients and documented partners, provides the area to be served with a variety and breadth of effective family planning methods that are readily available and best serve individuals in need throughout the area to be served; and
>
> d.  The extent to which projects best promote the purposes of Section [300], within the limits of funds available for such projects.

*Id.* at 44-45; *see also* 2017 FOA, at 43 (including substantially similar criteria); 2016 FOA, at 32 (same).

In conjunction with the 2018 Funding Announcement, HHS issued a press release as well as a set of answers to anticipated frequently asked questions (FAQs).[9]  The press release introduced the 2018 Funding Announcement and noted that, due to delay in the expected publication of the Funding Announcement, current Title X grantees could apply for extensions to ensure continuity of family planning and reproductive health services.  February 23 Press Release, AR 000129-30.  The FAQs, in addition to a Webinar presented by the agency, provided the public and potential applicants with information about the 2018 Funding Announcement,

---

[9]  Title X Family Planning Services Opportunity Announcement: Questions and Answers (Feb. 27, 2018) (February 27 FAQ), AR 000119-21; Title X Family Planning Services Opportunity Announcement:  Questions and Answers (Apr. 2, 2018) (April 2 FAQ), AR 000122-127; Dep't of Health & Human Servs., References (April 10, 2018) (April 10 FAQ), AR 000128 (updating the references in the April 2 FAQ); Press Release, Dep't of Health & Human Servs., HHS Announces the Availability of $260 Million to Fund the Title X Family Planning Program (Feb. 23, 2018) (February 23 Press Release), AR 000129-30.

9

including further explanations of the terms used in the Program Priorities and Key Issues, and identified research HHS relied upon to correlate its priorities and issues with positive health outcomes.  February 27 FAQ, AR 000119-21; April 2 FAQ, AR 000122-28; Dep't of Health & Human Servs., FY 18 Announcement of Anticipated Availability of Funds for Family Planning Services Grants: Technical Assistance Webinar (Mar. 22, 2018) (Webinar), AR 000131-191. The DASPA then provided additional guidance on a technical assistance conference call. Transcript, Technical Assistance Conference Call with Valerie Huber (Mar. 22, 2018) (Transcript), AR 000192-220.

## PROCEDURAL HISTORY

More than two months after HHS issued the 2018 Funding Announcement, on May 2, 2018, Plaintiffs filed separate but virtually identical lawsuits challenging the Funding Announcement under the APA.  ECF No. 1 (PP Compl.); *NFPRHA v. Azar*, No. 18-cv-10306 (D.D.C.), ECF No. 1 (NFPRHA Compl.).  Both complaints allege that the 2018 Funding Announcement violated the APA because changes made to the independent review panels' scoring criteria (1) are contrary to law, (2) are arbitrary and capricious, and (3) could be accomplished, if at all, only through notice and comment rulemaking.  PP Compl. ¶¶ 109-22; NFPRHA Compl. ¶¶ 109-25.  Plaintiffs contend that HHS may only consider criteria explicitly enumerated in the Title X statute and associated regulations and that the Funding Announcement contradicts specific programmatic requirements for Title X and undermines the statute's purpose.

The Court consolidated the cases on May 7, 2018, and Plaintiffs filed their Motion for a Preliminary Injunction on May 8, 2018.  ECF No. 18 (Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for a Preliminary Injunction (Pls.' Br.)).  They urge the Court to prohibit HHS from awarding Title X grants under the 2018 Funding Announcement and to require HHS to continue funding grantees at their current levels until a new Funding

10

Announcement is issued.  *Id.* at 44 & n.23.  Defendants now oppose that motion and cross-move to dismiss or for summary judgment.

## ARGUMENT

**I.    This Court Should Grant Defendants' Motion to Dismiss or For Summary Judgment**

APA review is not available because the Funding Announcement's priorities and issues are committed to agency discretion by law and the Funding Announcement is not a final agency action.  Furthermore, even if the Court were to review in substance the Funding Announcement (which it should not), no APA violation exists.

Dismissal under Rules 12(b)(1) or 12(b)(6) is appropriate if, assuming the truth of all well-pleaded factual allegations, Plaintiffs have failed either to establish this Court's jurisdiction or to state a claim upon which relief can be granted.  "Where, as here, a defendant maintains that the case should be terminated *either* for defective pleadings *or* because there is no genuine issue of material fact to be presented to a jury, the court may review the parties' arguments with respect to both of those grounds to determine the extent to which the motion can be sustained." *Rochon v. Lynch*, 139 F. Supp. 3d 394, 400 (D.D.C. 2015), *aff'd,* 664 F. App'x 8 (D.C. Cir. 2016) (per curiam).  Summary judgment is proper if a movant "shows that there is no genuine dispute as to any material fact and [that it] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Such is the case here.

**A.    The Administrative Procedure Act Precludes Judicial Review of HHS's Revisions to the Funding Announcement**

The APA provides only "a limited waiver of sovereign immunity."  *Geronimo v. Obama*, 725 F. Supp. 2d 182, 186 (D.D.C. 2010) (quoting *Teton Historic Aviation Found. v. U.S. Dep't of Def.*, 686 F. Supp. 2d 75, 78 (D.D.C. 2010)).  A plaintiff has no cause of action under the APA if the challenged agency action is committed to the agency's discretion as a matter of law, 5

U.S.C. § 701(a)(2), or if the challenged agency action is not "final," *id.* § 704; *see also Oryszak v. Sullivan*, 576 F.3d 522, 524, 525 n.2 (D.C. Cir. 2009).  These limitations provide two independent bases for dismissal here.

      1.    <u>HHS's Revisions to the Funding Announcement Are Not Reviewable Because They Reflect Grant Making Policy Preferences Committed to Agency Discretion by Law</u>

The challenged changes to the Funding Announcement are not subject to judicial review because the decision to award Title X grants is committed to HHS's discretion.  Section 701(a)(2) provides that agency actions fall outside APA review when "committed to agency discretion by law."  Grant making is an area of policy that is classically and presumptively committed to agency discretion by law.  Although the APA presumes that agency action can be judicially reviewed, "[t]his is 'just' a presumption." *Lincoln v. Vigil*, 508 U.S. 182, 190-91 (1993) (citing *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984)).  Courts have held that section 701(a)(2) precludes review where "'a court would have no meaningful standard against which to judge the agency's exercise of discretion,'" *Lincoln*, 508 U.S. at 191 (quoting *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)), including situations where the agency decision "'involves a complicated balancing of a number of factors which are peculiarly within its expertise.'" *Lincoln*, 508 U.S. at 191 (quoting *Heckler*, 470 U.S. at 831).

An agency's allocation of appropriated funding is typically committed to agency discretion by law because "the very point" "is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Lincoln*, 508 U.S. at 192; *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 748-51 (D.C. Cir. 2002) (applying *Lincoln* to funding beyond lump-sum appropriations, and finding agency regulations unreviewable when Congress has delegated broad discretion to an agency in how to manage funds for a particular program); *see also Policy & Research, LLC v.*

*U.S. Dep't of Health & Human Servs.*, No. 18-cv-00346, 2018 WL 2184449, at *7 (D.D.C. May 11, 2018).  As a result, an agency's decision making about grant funding is presumptively *unreviewable*, regardless of whether the agency decides to fund a discretionary program or to discontinue funding for that program.  *Lincoln,* 508 U.S. at 193-94.

Plaintiffs' challenge cannot overcome this presumption of non-reviewability.  In Title X, Congress set out a mandatory but non-exhaustive list of criteria for "the Secretary to take into account," 42 U.S.C. § 300(b), but it did not circumscribe HHS's ultimate discretion to award grants "in what it sees as the most effective or desirable way" to achieve the statute's goals. *Lincoln*, 508 U.S. at 192.  *See infra*, § I.B.1.  A decision is committed to agency discretion when "in a given case there is no law to apply."  *Heckler*, 470 U.S. at 830 (internal quotation marks and citation omitted).  As demonstrated below, no source of law limits the Secretary's discretion to consider factors beyond those required by the statute or regulations.  Plaintiffs' challenge here goes only to HHS's consideration of a few factors not required by statute or regulation and their inclusion in the review panels' scoring criteria.  PP Compl. ¶¶ 113, 117-118, 124; NFPRHA Compl. ¶¶ 111, 115-116, 121.  But how the Secretary weighs *unenumerated* factors is, by definition, a situation in which there is "no law to apply," and is thus committed to agency discretion.  *See Heckler*, 470 U.S. at 830.[10]

---

[10]  HHS's discretion over the Title X grant program is also confirmed by its own regulations. *See* 42 C.F.R. § 59.7 ("[T]he Secretary may award grants for the establishment and operation of those projects which will in the *Department's judgment best promote the purposes of section [300]*." (emphasis added)); 42 C.F.R. § 59.12 ("The Secretary may, with respect to any grant, impose additional conditions prior to or at the time of any award, when in the Department's judgment these conditions are necessary to assure or protect advancement of the approved program, the interest of the public health, or the proper use of health funds.").

This discretion is both sensible and necessary because the selection of grantees requires "a complicated balancing of a number of factors which are peculiarly within the Secretary's expertise." *Milk Train*, 310 F.3d at 751-52 (internal quotation marks and citation omitted). *Cf. Cmty. Action of Laramie Cnty., Inc. v. Bowen*, 866 F.2d 347, 354 (10th Cir. 1989) ("Funding determinations are notoriously unsuitable for judicial review, for they involve the inherently subjective weighing of large numbers of varied priorities which combine to dictate the wisest dissemination of an agency's limited budget."); *Cal. Human Dev. Corp. v. Brock*, 762 F.2d 1044, 1052 (D.C. Cir. 1985) (Scalia, J., concurring) (quoting *Heckler*, 470 U.S. at 823) ("[T]he allocation of grant funds among various eligible recipients, none of which has any statutory entitlement to them, is traditionally a matter 'committed to agency discretion by law'" because it "shares with agency decision not to prosecute what the Supreme Court has called in the latter context a 'general unsuitability for judicial review.'"").[11] HHS also has "deep experience and expertise in administering Title X, and the great breadth of the statutory language suggests a congressional intent to leave the details to the agency." *Planned Parenthood of Kansas & Mid-Missouri v. Moser*, 747 F.3d 814, 824 (10th Cir. 2014), *abrogated on other grounds by Armstrong v. Exceptional Child Center, Inc.*, 135 S. Ct. 1378 (2015). The APA, therefore, does

---

[11]  Grants decisions in the medical field have been readily recognized as being committed to agency discretion. *See, e.g., Apter v. Richardson*, 510 F.2d 351, 355 (7th Cir. 1975) ("medical merits of NIH decisions on training grants may be committed to the unreviewable discretion of the agency"); *Kletschka v. Driver*, 411 F.2d 436, 443 (2nd Cir. 1969) (not "feasible" to review agency decisions "awarding or refusing to award research grants," which "involves a determination . . . [on] the relative merits of the many proposed research projects for which funds are sought"); *Grassetti v. Weinberger*, 408 F. Supp. 142, 150 (N.D. Cal. 1976) ("[I]t is probable that the medical merits of  agency decisions on research grant applications are committed to the unreviewable discretion of the agency, subject to judicial scrutiny only where it is alleged that the agency has transgressed a constitutional guarantee or violated an express statutory or procedural directive.").

not entitle Plaintiffs to judicial review of the agency's consideration of unenumerated criteria as used in the 2018 Funding Announcement.

### 2.   The Funding Announcement Is Not Reviewable Final Agency Action

The Funding Announcement is also unreviewable because it is not a final agency action. The APA generally authorizes judicial review only of final agency actions.  5 U.S.C. § 704.  The APA defines final "'agency action' [as] includ[ing] the whole or a part of . . . relief, or the equivalent or denial thereof."  *Id.* § 551(13).  In turn, "'relief' includes the whole or a part of an agency['s] . . . grant of money."  *Id.* § 551(11)(A).  For agency action to be final, it must meet two conditions:  "First, the action must mark the 'consummation' of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature.  And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'  *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal citations omitted).

Whether a change to an agency's grant application process is a final agency action depends, in part, on whether that change alone is outcome determinative.  When the change involves some exercise of agency discretion, until the agency "completes its review and reaches a decision [on the grant award], there has been no final agency action . . . and the matter is not ripe for judicial review."[12]  *Citizens Alert Regarding Env't v. EPA*, 102 F. App'x 167, 168 (D.C. Cir. 2004); *see also Rattlesnake Coal. v. EPA*, 509 F.3d 1095, 1103-04 (9th Cir. 2007) (holding that there was no "final agency action . . . until the [agency] ha[d] reviewed a grant application

---

[12]  An exception, not applicable here, exists when the agency lacks discretion in awarding grant funds, such as in mandatory grants, or when there is a change to a grant's threshold eligibility criteria.  *See, e.g.*, *California ex rel. Becerra v. Sessions*, 284 F. Supp. 3d 1015, 1031-32 (N.D. Cal. 2018) (holding the addition of criteria to a mandatory grant program was final agency action); *City of Philadelphia v. Sessions*, 280 F. Supp. 3d 579, 593-594, 614-15 (E.D. Pa. 2017) (same).

and decided to disburse the funds"); *Karst Envtl. Educ. & Prot., Inc. v. EPA*, 403 F. Supp. 2d 74, 81 (D.D.C. 2005) (holding that there was no final agency action when the agency "ha[d] not yet decided whether to award the grant"), *aff'd* 475 F.3d 1291, 1295 (D.C. Cir. 2007).

Here, changing some criteria used by the review panels to score Title X grant applications is not a final agency action, because neither the changes nor the panels' scores alone determine whether an applicant will receive funding or in what amount. Independent review panels use the Funding Announcement's scoring criteria to provide their assessments of which grants "best promote the purposes of section [300]." 2018 FOA, at 43. The panels, however, do not decide what grants are awarded; instead they merely rate the applications to assist the agency's decision maker in selecting which proposals appear best-suited to meet the program's mission. "The [Deputy Assistant Secretary] or [her] designee will make final award selections to be recommended to the Grants Management Officer for risk analysis." *Id.* at 44. In making those selections, the Deputy Assistant Secretary considers anew "[t]he extent to which projects best promote the purposes of Section [300], within the limits of funding available for such projects" as well as additional factors that the review panels do not consider at all. *Id.* at 44-45. In other words, the Deputy Assistant Secretary is not bound by the review panels' scoring and has authority to make grant decisions based on an independent consideration of factors that are broader than those the review panels take into account.

Plaintiffs do not challenge the Deputy Assistant Secretary's authority or her independent evaluation of the extent to which a grant applicant would promote the purposes of Title X. *See generally* PP Compl. ¶¶ 109-122; NFPRHA Compl. ¶¶ 109-125. Because the Deputy Assistant Secretary has ultimate authority to decide which Title X grants to fund and in what amounts, a challenge to review panel scoring is not a challenge to a final agency action. The panels' scores

16

are merely interlocutory determinations from which no legal consequences flow.  *See Bennett*, 520 U.S. at 117-18.  *A fortiori*, the criteria given to those panels to generate the scores have no legal effect and cannot be final agency action.  Plaintiffs' legal challenge to the criteria, therefore, fails for lack of final agency action.

### B.      Even If Revisions to the Funding Announcement Were Reviewable, Plaintiffs' Administrative Procedure Act Claims Fail on the Merits

Even if judicial review were appropriate here, Plaintiffs' APA claims fail on the merits for at least four reasons, and their requested remedy is barred by law.  First, Title X and the associated regulations authorize HHS to conduct a wide-ranging evaluation of grant applications in its review process.  This longstanding agency interpretation of statutory and regulatory authority is entitled to *Chevron* and *Auer* deference.  Second, no rulemaking was required for the agency simply to produce a Funding Announcement.  Third, the agency's limited consideration of its annual priorities and issues is consistent with Title X and well-reasoned.  Finally, sovereign immunity bars Plaintiffs' prayer for continuation funding.

### 1.      Title X and HHS Regulations Authorize Consideration of Additional Grant Making Criteria

Both the statute and regulations require HHS to "take into account" certain enumerated factors in making grant decisions, but, although the factors listed in section 300(b) of the Act and section 59.7 of the regulations are mandatory, they are not exhaustive.  The agency *must* consider the enumerated factors, but *may* in its exercise of discretion consider others.  The plain meaning of "take into account," which appears both in section 300(b) and section 59.7, indicates that the agency is not limited to considering *only* the enumerated criteria in grant making.  Additionally, if uncertainty remained as to what "take into account" means, the agency's interpretation of section 300(b) to authorize consideration of additional criteria is entitled to deference under *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 866 (1984) and *Rust v.*

*Sullivan*, 500 U.S. 173, 184 (1991).  Finally, the agency's interpretation of section 59.7 to

authorize evaluation of criteria beyond those in the regulation is entitled to deference under *Auer*

*v. Robbins*, 519 U.S. 452, 461 (1997).

> **i.      The Plain Language of the Statute and Regulations Provide
> HHS Substantial Discretion in Making Grants**

The plain language of the statute and regulations vest HHS with substantial discretion in

selecting family planning projects to fund.  Section 300a-4 provides that "[g]rants and contracts

made under this subchapter shall be made in accordance with such regulations as the Secretary

may promulgate."  This particular delegation of authority is recognized in this Circuit as

"sweeping" and "broad."  *Planned Parenthood Fed'n of Am., Inc. v. Heckler*, 712 F.2d 650, 655

(D.C. Cir. 1983).  "In a situation of this kind, Congress entrusts to the Secretary, rather than to

the courts, the primary responsibility for interpreting" the statutory mandate.  *Batterton v.*

*Francis*, 432 U.S. 416, 425 (1977) (finding broad delegation of authority where statute provided

that the term "unemployment" shall be "determined in accordance with standards prescribed by

the Secretary" of HEW).  Congress conferred expansive authority on HHS to select grantees who

fulfill the broad statutory mission: funding public and private entities to "establish[] and

operat[e] voluntary family planning projects which shall offer a broad range of acceptable and

effective family planning methods and services."  42 U.S.C. § 300(a).

To guide the exercise of that discretion, Congress provided a *non-exclusive* list of factors

for the agency to consider in making grants for family planning projects.  Section 300(b)

provides:

> In making grants and contracts under this section the Secretary
> shall *take into account* the number of patients to be served, the
> extent to which family planning services are needed locally, the
> relative need of the applicant, and its capacity to make rapid and
> effective use of such assistance.

42 U.S.C. § 300(b) (emphasis added); *see also* 42 C.F.R. § 59.7 (listing similar criteria that the

Secretary "tak[es] into account" in grant making decisions).  This provision merely requires the

agency to evaluate and give meaningful consideration to the enumerated criteria.  In S*mall*

*Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506 (D.C. Cir. 1983), the D.C. Circuit

concluded similarly when faced with a statute authorizing the Environmental Protection Agency

to promulgate regulations to reduce lead content in gasoline produced by small refineries,

"taking into account the [agency's] experience under" a sliding-scale standard linking

permissible lead content to refinery size.  *Id.* at 512.  The D.C. Circuit held that the "taking into

account" condition "is a mild one" that "merely require[d] EPA in good faith to *consider* past

experience" with the sliding scale standard in promulgating regulations.  *Id.* at 515-16

(characterizing the phrase "take into account" as "weak[]"); *see also Ayala v. Dist. 60 Sch. Bd. of*

*Pueblo, Colo.*, 327 F. Supp. 980, 985 (D. Colo. 1971) (recognizing that "taking into account

need and attendance" imposes "the rather modest requirement that states make their selections

with need and attendance in mind" and holding that "states are free to consider other factors

which would make selection on a different basis reasonable").  Title X's requirement that the

agency "take into account" certain criteria therefore requires only that the agency "consider"

those criteria "in good faith."

But the statutory mandate to "take into account" certain criteria cannot reasonably be

read to *disallow* consideration of other criteria, as Plaintiffs suggest.  *See* Pls.' Br. at 16-24.  A

list following the phrase "take into account," is not restrictive, because the phrase "take into

account" means "to take into consideration, esp[ecially] *as a contributory factor*."  Oxford

English Dictionary (2018) (emphasis added); *see also* Cambridge Dictionary (2018) ("take[] into

account" means "to consider or remember something when judging a situation").  Courts

construing similar language have thus held that a statutory command to "take into account" certain factors does not preclude consideration of others. *See Rocky Mountain Wild v. Walsh*, 216 F. Supp. 3d 1234, 1249 (D. Colo. 2016) (finding that statute directing an agency to "'tak[e] into account those efforts, if any, being made by any State . . . to protect [a] species' seems much more likely to have been intended as an explicit charge to [the agency] not to overlook or discount state and international efforts affecting the status of the species. . . . To say that it was meant to exclude consideration of federal non-regulatory efforts makes little sense."); *Ala. Pub. Sch. & Coll. Auth. v. JPMorgan Chase Bank*, No. 08-CV-863, 2009 WL 2171896, at *19 (M.D. Ala. July 21, 2009) ("[T]he phrase 'taking into account,' as used in the 2001 Act and 2004 Act, does not include any limiting commands, such as 'solely' or 'only,' or otherwise purport to be exclusive."); *see also Am. Bank & Trust Co. v. Dallas Cnty.*, 463 U.S. 855, 862 (1983) ("[T]he word 'considered' means taken into account, or included in the accounting . . . .").

A restrictive reading of section 300(b) would also run counter to the statutory scheme. Such a narrow interpretation is wholly contrary to Congress's delegation of "sweeping" discretion in making Title X grants and contracts under section 300a-4. *See Heckler*, 712 F.2d at 655. Moreover, it fails to give effect to Congress's choice to use restrictive language in other parts of Title X,[13] but not in section 300(b). *See Custis v. United States*, 511 U.S. 485, 492 (1994) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and

---

[13] In 42 U.S.C. § 300a—which immediately follows section 300 and authorizes formula grants to states for family planning services—Congress provided that such funds "shall be allotted to the States by the Secretary *on the basis of the population and the financial need of the respective States*." *Id.* (emphasis added).

purposely in the disparate inclusion or exclusion." (internal quotation marks, citation, and alterations omitted)).

Consistent with the discretion conferred by statute, HHS regulations have long allowed the agency broad flexibility in making grant awards. Under section 59.7(a), the "Secretary may award grants for the establishment and operation of those projects *which will in the Department's judgment best promote the purposes of section [300]*, taking into account" seven enumerated factors. For the same reasons outlined above with regard to the factors listed in the statute, the "tak[e] into account" language in this regulation lists factors for the agency's consideration, but does not bar consideration of other factors.

Indeed, far from supporting Plaintiffs' claims, this regulation forecloses them. Since the first set of regulations in 1971, the agency has retained flexibility to consider more than just the four factors in the statute. The original version of section 59.7 contained *seven* criteria to consider in grant making decisions. 36 Fed. Reg. at 18467. This provision remains substantially unchanged today. Those *seven* section 59.7(a) criteria go beyond the *four* section 300(b) criteria. *See* Grants for Family Planning Services, 43 Fed. Reg. 42020 (proposed Sept. 19, 1978) (to be codified at 42 C.F.R. pt. 59) (noting that the then-"six review criteria set forth in the regulation *include* four contained in the statute" (emphasis added)). For example, section 59.7(a)(5) has always directed the agency to consider the "adequacy of the applicant's facilities and staff," a specific criteria nowhere mentioned in section 300(b).[14] And the additional language in the

---

[14] Plaintiffs contend that the *seven* section 59.7(a) criteria are in fact the same as the *four* section 300(b) criteria, Pls.' Br. at 18-19, but neither Plaintiffs' counting nor their logic holds water. Plainly, section 59.7(a)(7) directs a broader evaluation of the application than section 59.7(a)(4), which addresses the *specific* issue of how quickly and effectively a grantee can make use of Title X funding. Moreover, Plaintiffs' theory would render sections 59.7(a)(5)-(7) irrelevant surplusage, contrary to accepted canons of construction. *See Advocate Health Care Network v.*

regulation about making grants that "will in the Department's judgment best promote the purposes of section [300]" further supports HHS's decision here to consider its priorities and issues in effectuating the purposes of Title X in the 2018 Funding Announcement.  *See* 2018 FOA, at 9 ("[HHS] establishes program priorities that represent overarching goals for the Title X program.").  In sum, both the statute and the regulations allow HHS to consider additional criteria beyond the enumerated required factors.

### ii.      Even if There Were Ambiguity, HHS's Construction of Its Authority is Entitled to Deference

Because the meaning of the phrase "take into account" is clear on its face, the Court need go no further.  But in any event, the agency's interpretation of the statute is, at the very least, permissible, and therefore entitled to *Chevron* deference.  *See UC Health v. NLRB*, 803 F.3d 669, 674 (D.C. Cir. 2015) ("If the statute is ambiguous, we move to *Chevron*'s second step and ask whether the Board's interpretation is a 'permissible construction of the statute' to which we must defer.").  *Chevron* emphasizes that "when an agency is charged with administering a statute, part of the authority it receives is the power to give reasonable content to the statute's textual ambiguities."  *Dep't of Treasury, IRS v. Fed. Labor Relations Auth.*, 494 U.S. 922, 933 (1990). The Secretary has properly exercised such judgment and discretion here.

HHS's entitlement to *Chevron* deference in interpreting Title X is well established.  *See Rust v. Sullivan*, 500 U.S. 173, 184 (1991) ("The broad language of Title X plainly allows the Secretary's construction of the statute.").[15]  For nearly a half century, the agency administering

---

*Stapleton*, 137 S. Ct. 1652, 1659 (2017) (recognizing that surplusage canon requires courts to "give effect, if possible, to every clause and word").

[15]  *Accord Nat'l Family Planning & Reprod. Health Ass'n, Inc. v. Gonzales*, 468 F.3d 826, 831 (D.C. Cir. 2006).

Title X has consistently applied and interpreted section 300(b) as authorizing consideration of additional factors in evaluating grant applications.  From the very beginning, its regulations have included three additional nonstatutory factors, along with the instruction that the Secretary will issue grants in accordance with the Department's judgment about what will best effectuate the purposes of the program.  This longstanding and reasonable interpretation is owed deference. *See, e.g.*, *Menkes v. U.S. Dep't of Homeland Sec'y*, 637 F. 3d 319, 332 (D.C. Cir. 2011) (deferring to "long standing" Coast Guard interpretation (quoting *Barnhart v. Walton*, 535 U.S. 212, 221 (2002)).

The Supreme Court's analysis in *Rust* is on point.  In *Rust*, the Court considered HHS regulations promulgated under 42 U.S.C. § 300a-6, which provides that no Title X funds "shall be used in programs where abortion is a method of family planning."  Those regulations prohibited Title X clinics from providing abortion counseling, referring for abortion, or engaging in activities that advocate abortion, and also required Title X projects to be "physically and financially separate" from prohibited abortion activities.  500 U.S. at 179-81.  The plaintiffs claimed the regulations were not entitled to *Chevron* deference because they reversed longstanding agency policy and frustrated Congress's intent that Title X programs be part of a "broader, comprehensive, health-care system."  *Id.* at 186.  The Court disagreed, concluding that based "on the broad directives provided by Congress in Title X in general and [section 300a-6] in particular, we are unable to say that the Secretary's construction of the prohibition in [section 300a-6] to require a ban on counseling, referral, and advocacy within the Title X project is impermissible."  *Id.* at 187-88 (deferring also to the agency's "permissible" physical and financial separation requirement).  Just as HHS was owed deference in *Rust*, it is owed deference here.

Plaintiffs seem to concede that the four factors the agency must "take into account" under section 300(b) are non-exclusive.  They do not forcefully argue that the *statute* precludes consideration of criteria outside of section 300(b).  Instead, they contend that HHS may only add new grant making criteria by amending its *regulations* through rulemaking.  *See* Pls.' Br. at 15. But if the statute allows HHS to "take into account" additional "unlisted" factors, then the same "tak[e] into account" language in section 59.7(a) must also permit consideration of additional unlisted factors.  *See Moreau v. Klevenhagen*, 508 U.S. 22, 33-34 (1993) (recognizing significance of interpreting "statutory text [] consistent . . . with the [applicable] regulations"); *Marlowe v. Bottarelli*, 938 F.2d 807, 813 (7th Cir. 1991) ("[W]henever possible courts construe statutes and regulations in *pari materia*.").[16]  HHS has thus reasonably interpreted its broad authority to issue Title X grants under section 300 to require it to consider the statutory factors listed in that section, but also to consider Program Priorities and Key Issues.  And because that interpretation is fully consistent with both the statute and its own regulations, HHS had no need to go through rulemaking to issue the Funding Announcement.  *See Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199, 1206–09 (2015).

Even if section 59.7(a) were ambiguous, HHS's construction of the regulation to authorize it to consider criteria not explicitly enumerated in section 59.7(a) is "controlling" because it is neither "plainly erroneous [n]or inconsistent with the regulation."  *Auer*, 519 U.S. at

---

[16] Even if the statute were ambiguous and HHS were not entitled to *Chevron* deference, the agency's interpretation would still be entitled to deference under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944).  *See United States v. Mead Corp.*, 533 U.S. 218, 234 (2001) ("*Chevron* did nothing to eliminate *Skidmore*'s holding that an agency's interpretation may merit some deference whatever its form, given the 'specialized experience and broader investigations and information' available to the agency and given the value of uniformity in its administrative and judicial understandings of what a national law requires." (internal citations omitted)).

461 (internal quotation marks and citation omitted); *see also Ass'n of Private Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 442 (D.C. Cir. 2012) (recognizing that under *Auer*, courts generally defer to an agency's "*permissible* interpretation of its own regulation" (emphasis added)); *Decker v. Nw. Envtl. Def. Ctr.*, 568 U.S. 597, 613 (2013) ("[A]n agency's interpretation need not be the only possible reading of a regulation—or even the best one—to prevail."). Indeed, the entire clause preceding the "take into account" language in section 59.7(a) emphasizes the discretionary, policy-driven nature of HHS's grant making decisions. *See* § 59.7(a) (authorizing the Secretary to "award grants for the establishment and operation of those projects which will *in the Department's judgment* best promote the purposes" of section 300 (emphasis added)).[17]

HHS's interpretation reflects "the agency's fair and considered judgment," and neither "conflicts with a prior interpretation" nor represents merely a "convenient litigating position." *See Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012) (internal quotation marks and citation omitted). Since the early years of Title X, the agency has interpreted its regulations to provide it with significant grant making discretion.[18] The final grant making decisions have consistently allowed the final decision maker to consider factors well beyond the

---

[17] The Supreme Court has held that when an agency merely parrots the words of a statute in a regulation without elaboration on a particular point, the agency's interpretation of that regulation is entitled to the same deference the agency would have in construing the underlying statute. *See Gonzales v. Oregon*, 546 U.S. 243, 257 (2006). Although the phrase "take into account" appears in both sections 300(b) and 59.7(a), the prefatory "best judgment" language and the longer list of factors in section 59.7(a) materially differentiate the regulation from the statute and render *Gonzales* inapplicable.

[18] In 1978, for example, a commenter in a proposed rulemaking sought "more detailed grant review and evaluation criteria." 43 Fed. Reg. at 42020. The agency demurred, explaining that the Secretary must remain free to "utilize his experience and expertise in making discretionary judgments based on varying and competing circumstances and interests." *Id.* at 42021.

section 59.7 criteria.  Since 2003, Funding Announcements have generally provided that the final

decision maker "will fund those projects which will, in his judgment, best promote the purposes

of Section [300], within the limits of funds available for such projects."  *See supra*, § I.A.2.

Funding Announcements, for at least the last five years as well, have explicitly taken geographic

distribution of grantees into account.  *See* 2017 FOA, at 43; 2016 FOA, at 32; 2015 FOA, at 31;

2014 FOA, at 31.  The exercise of such judgment is fully consistent with the regulations and with

the context of a regulatory program, like Title X, "in which the identification and classification

of relevant criteria necessarily require significant expertise and entail the exercise of judgment

grounded in policy concerns."  *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994)

(internal quotation marks omitted) (deferring to HHS in the context of the agency's interpretation

of Medicare regulations).  Plaintiffs' rigid interpretation, however, would preclude HHS's

exercise of its judgment and reduce it to a captive of the scoring scheme, unable to exercise

judgment in shaping agency priorities.[19]

> 2.   HHS Is Not Required to Promulgate Procedural Rules, Including the 2018 Funding Announcement, by Notice and Comment Rulemaking

Plaintiffs contend that the APA requires HHS to go through notice-and-comment

rulemaking before adding unenumerated factors for the agency's independent review panels to

consider when scoring Title X grant applications.  PP Compl. ¶¶ 117-122; NFPRHA Compl.

---

[19]  Even if the agency failed to explain adequately the precise mechanism by which it considered criteria beyond section 59.7(a) in grant making, *Auer* deference would *still* be appropriate.  *See Ass'n of Bituminous Contractors, Inc. v. Apfel*, 156 F.3d 1246, 1252 (D.C. Cir. 1998) ("[T]he Commissioner had not, prior to this litigation, carefully explained why he believes that coal contractors may be assigned responsibility under the statute. Yet the Commissioner has consistently made assignments to coal construction companies under the Coal Act, and in doing so must have interpreted the Coal Act to allow that. This litigation offers the Commissioner his first opportunity to explain his decision. We defer to counsel's explanation because it represents the agency's fair and considered judgment." (internal quotation marks and citation omitted)).

¶¶ 120-125.  The 2018 Funding Announcement, however, changes only the procedure that applies to intermediate steps in the application process that culminates in the Deputy Assistant Secretary's decision.  Those non-legislative rules are not subject to a notice and comment requirement.  *See Clarian Health W., LLC v. Hargan*, 878 F.3d 346, 358 (D.C. Cir. 2017) (notice-and-comment rulemaking not required when stated criteria do not bind agency); *Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1057 (D.C. Cir. 1987).

"Although federal agencies ordinarily must provide the public with notice of a proposed rule and the opportunity to submit comments on it, the APA makes an exception for, among others, 'rules of agency organization, procedure, or practice.'"  *James V. Hurson Assocs. Inc. v. Glickman*, 229 F.3d 277, 280 (D.C. Cir. 2000) (internal citations omitted) (quoting 5 U.S.C. § 553(b)(3)(A)).  A rule is procedural if "'it covers agency actions that do not themselves alter the rights or interests of parties, although it may alter the manner in which the parties present themselves or their viewpoints to the agency.'"  *Id.* (quoting *JEM Broad. Co. v. FCC*, 22 F.3d 320, 326 (D.C. Cir. 1994)).  "An agency pronouncement is not deemed a binding regulation merely because it may have some substantive impact, as long as it leave[s] the [agency decision maker] free to exercise his informed discretion."  *Panhandle Producers & Royalty Owners Ass'n v. Econ. Regulatory Admin.*, 822 F.2d 1105, 1110 (D.C. Cir. 1987) (internal quotation marks and citation omitted).  When deciding whether a rule is substantive—and thus requires notice and comment—courts look to both "the effects of an agency's action" and "to the agency's expressed intentions."  *Ctr. for Auto Safety, Inc. v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 806 (D.C. Cir. 2006).  Both considerations support the conclusion that the criteria added for review panels to score Title X grant applications are procedural.

The effects of the agency action at issue here are not substantive in nature.  When evaluating an agency action based on its effects, the distinction between substantive rules and non-substantive rules is "whether the agency has '(1) impose[d] any rights and obligations, or (2) genuinely [left] the agency and its decisionmakers free to exercise discretion.'"  *Id.* (alterations in original) (quoting *Crop Life Am. v. EPA*, 329 F.3d 876, 883 (D.C. Cir. 2003)).  The scoring criteria used by the review panels do not alter Title X grant applicants' rights or obligations.  The review panel's score does not guarantee an applicant priority in funding over other applicants with lower scores.  *See* 2018 FOA, at 43-45.  Instead, the Deputy Assistant Secretary retains discretion to fund applications based on criteria not challenged in this case.  *See id.* at 44-45.  Thus, the changes made in the 2018 Funding Announcement and challenged by Plaintiffs are not substantive and not a proper subject of rulemaking.

HHS's stated intentions also demonstrate the non-substantive nature of the changes.  Under this analysis, courts evaluate "three factors: '(1) the [a]gency's own characterization of the action; (2) whether the action was published in the Federal Register or the Code of Federal Regulations; and (3) whether the action has binding effects on private parties or on the agency.'"  *Ctr. for Auto Safety*, 452 F.3d at 806-07 (alterations in original) (quoting *Molycorp, Inc. v. EPA*, 197 F.3d 543, 545 (D.C. Cir. 1999)).  All these factors weigh against a finding that the review panels' criteria are substantive rules.  HHS did not announce the change to the criteria as a substantive rule and did not publish it in the Federal Register or the Code of Federal Regulations.  And, as discussed above, the criteria do not bind the decision maker.  *See* 2018 FOA, at 44-45.[20]

---

[20]  The scoring rubric used by the review panels does no more than offer HHS a way to discern which applications are presumably better or which might be recommended for a grant.  But a rebuttable presumption—even when applied by the ultimate decision maker, which is not the case here—is not a substantive rule because it does "not constrain the [agency]'s ability to exercise its discretion."  *See Alliance for Bio-Integrity v. Shalala*, 116 F. Supp. 2d 166, 173

3.     The Funding Announcement Is Not Arbitrary, Capricious, or Otherwise
       Not in Accordance with Law

Even if the Court were to reach the merits of the APA claim, Plaintiffs cannot

demonstrate that the modifications made by the Funding Announcement were "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with the law."  5 U.S.C.

§ 706(2)(A).  The arbitrary and capricious standard is very deferential, requiring only a "rational

connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State

Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  "'[A] court is not to substitute its judgment

for that of the agency,' and should 'uphold a decision of less than ideal clarity if the agency's

path may reasonably be discerned.'"  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513–14

(2009) (internal citation omitted).  When, as here, a case involves a policy decision, the agency

"need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than

the reasons for the old one; it suffices that the new policy is permissible under the statute, that

there are good reasons for it, and that the agency *believes* it to be better, which the conscious

change of course adequately indicates."  *Id.* at 515.

The record robustly establishes that the Funding Announcement is "within the bounds of

reasoned decisionmaking."  *Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 105 (1983).  The

Funding Announcement itself, as well as the FAQs issued contemporaneously by HHS, provide

---

(D.D.C. 2000) (citing *Panhandle Producers*, 822 F.2d at 1110).  Similarly, when an agency
creates "only a recommendation for a final decision" that "instruction is an interpretive rule" not
subject to notice and comment.  *Md. Dep't of Human Res. v. Sullivan*, 738 F. Supp. 555, 561
(D.D.C. 1990).  In this case, the review panels' scores do not limit the Deputy Assistant
Secretary's discretion at all.

ample explanation.[21]   And the agency's path can certainly be "discerned" from the record.   *FCC*,

556 U.S. at 513–14.

The 2018 Funding Announcement contains sixteen total Program Priorities and Key

Issues.  2018 FOA, at 9-11.  Plaintiffs challenge only *portions* of six of these as inconsistent with

Title X.  Principally, they challenge:

(1) <u>Program Priority 2</u>: "Assuring activities that promote positive family relationships for the purpose of increasing family participation in family planning."

(2) <u>Program Priority 4</u>: "Promoting provision of comprehensive primary health care services."

(3) <u>Program Priority 6</u>: "Encouraging participation of families . . . in the decisions of minors to seek family planning services."

(4) <u>Key Issue 3</u>: "Cooperation with community-based and faith-based organizations."

(5) <u>Key Issue 5</u>: "A meaningful emphasis on education and counseling that communicates . . . the benefits of avoiding sexual risk."

(6) <u>Key Issue 6</u>: "Activities for adolescents that do not normalize sexual risk behaviors."

*Id.*  Each of the challenged priorities and issues is lawful and reasonable.

<u>Family Participation</u>.  Plaintiffs' contention that promoting family involvement in *family*

planning decisions is somehow contrary to Title X, *see* Pls.' Br. at 28-29, is belied by common

sense and by the statute itself.  Section 300(a) provides that to "the extent practical, entities

which receive grants or contracts under this subsection shall encourage famil[y] participation in

projects assisted under this subsection."  Family participation, in other words, is a statutory

---

[21]   The portions of the administrative record that post-date the Funding Announcement, such as the February 27, April 2, and April 10, 2018 FAQs, are entitled to deference because they are not "'litigating positions' that . . . are merely [counsel's] '*post hoc* rationalizations' for agency action, advanced for the first time in a reviewing court."  *Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 156 (1991).  "It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself."  *State Farm Mut.*, 463 U.S. at 50.  Here, the agency generated the FAQs, and other related information, shortly after the Funding Announcement issued and before litigation.

mandate, and it is not limited to the context of adolescent patients.  If HHS failed to prioritize

family participation, the agency would violate section 300(a).  *See* Consolidated Appropriations

Act, 2018, Pub. L. No. 115-141, 132 Stat. 348, 736 (no Title X funds may be paid unless the

applicant "certifies to the Secretary that it encourages family participation in the decision of

minors to seek family planning services").  The legislative history is also clear about Congress's

choice to stress family involvement, even outside the context of adolescent patients.  When the

"family participation" proviso in section 300(a) was added in the 1981 amendments to Title X,

Congress explained that "it is important that *families* participate in the activities authorized by

this title as much as possible" and that it "is the intent of the conferees that grantees will

encourage participants in Title X programs to include their families in counseling and involve

them in decisions about services."  H.R. Rep. No. 97-208, at 799 (1981) (Conf. Rep.) (emphasis

added); *Heckler*, 712 F.2d at 657 (Title X projects should encourage "those seeking services to

make their contraceptive choices with the assistance of their families").[22]

    Sexual Risk Avoidance.  The Funding Announcement's inclusion of counseling sexual

risk avoidance especially, but not only, to adolescents is lawful.[23]  Section 300(a) calls for a

---

[22]  Plaintiffs argue that encouraging family participation is coercive, violates confidentiality, and
fails to treat Title X patients as individuals, in violation of Title X regulations.  *See* Pls.' Br. at 29
(citing §§ 59.5(a)(2), 59.11, & 59.1).  But nothing in the Funding Announcement even so much
as suggests that patients would be *required* to involve their family in reproductive decision
making.  *Cf. Heckler*, 712 F.2d at 657 (striking down regulations mandating family participation
by, *inter alia*, *requiring* parental notification when contraceptives are prescribed to a minor).
HHS merely recommends that applicants "encourage[e]" family participation and "promote
positive family relationships."  2018 FOA, at 10.

[23]  Plaintiffs claim that the Funding Announcement would require "encouraging patients to
remain sexually abstinent without regard to a patient's own request or circumstances," Pls.' Br.
at 34, but the criteria are targeted largely to adolescents.  *See* 2018 FOA, at 11.  Key Issue 6 is
applicable *only* to adolescents ("activities for adolescents that do not normalize sexual risk
behavior"), while Key Issue 5 (counseling that includes benefits of avoiding sexual risk) is
addressed "especially (but not only) when communicating with adolescents."  *Id.*  Accordingly,

"broad range" of family planning methods and services, and the agency's modest prioritization

of sexual risk avoidance (principally for adolescents) fits squarely within that statutory mandate.

Congress expressly contemplated that Title X services "should consist of much more than the

dispensation of contraceptive devices." S. Rep. No. 91-1004, at 10 (1970). And the agency's

consideration of sexual risk avoidance is not a "silent departure from precedent." Pls.' Br. at 15

(citing *Cleveland Construction Inc. v. NLRB*, 44 F.3d 1010, 1016 (D.C. Cir. 1995)). Nearly ten

years' worth of Funding Announcements mention sexual risk avoidance preferences.[24]

Plaintiffs do not meaningfully dispute that sexual risk avoidance education is appropriate

for youth and, in any event, HHS's emphasis on such education is rational because of the health

benefits relating to sexual risk avoidance and sexual delay for adolescents.[25] And HHS has

correspondingly explained its reasoning on the benefits to adolescents of exercising caution in

engaging in sexual activities. *See, e.g.*, April 2 FAQ at 4-5 ¶ 20, ("Avoiding sex *at an early age*

---

Plaintiffs' sexual-risk-avoidance challenge is principally directed to three words ("but not only") in Key Issue 6.

[24] Plaintiffs further argue that HHS's modification of the criteria "shift the Title X program away from its half-century-long emphasis on" contraception, Pls.' Br. at 12, but Plaintiffs' historical view is not supported by the facts. Abstinence is mentioned in the Program Priorities and Key Issues from 2003 to 2011. *See supra* n. 8.

[25] *See, e.g.*, Jonathan G. Tubman et al., *The Onset and Cross-Temporal Patterning of Sexual Intercourse in Middle Adolescence: Prospective Relations with Behavioral and Emotional Problems*, 67 Child Dev. 327, 340-41 (1996) (the earlier a teen's onset of sexual activity, the more likely they are to have depressive symptoms, alcohol problems, delinquent behavior, and a lower GPA), AR 001007-08; Madeline Y. Sutton et al., *Impact of Parent-Child Communication Interventions on Sex Behaviors and Cognitive Outcomes for Black/African-American and Hispanic/Latino Youth: A Systematic Review, 1988-2012*, 54 J. Adolescent Health 369, 377-79, 382-83 (2014) (parental involvement in communicating the risks of sexual activity decreased sex-related behavioral and cognitive risks), AR 000974-76, 000979-80.

and the related reduction in the number of lifetime partners are protective factors for sexual

health.") (emphasis added) & 5 ¶ 21, AR 000125-26.

Although a small part of the Funding Announcement overall, HHS also reasonably

included sexual risk avoidance counseling in a manner that may extend to adults.  HHS

explained that "returning to a sexually risk-free status" means "avoiding sexual activities that put

an individual at risk for unwanted pregnancy, sexually transmitted infections or other associated

risks."  *Id.* at 4 ¶ 19, AR 000125.  Sexual risk avoidance is thus one of many options for family

planning methods, including contraception.  Indeed, the Funding Announcement links to a guide

from the Centers for Disease Control and Prevention (CDC) that discusses counseling abstinence

for any patients concerned with sexually transmitted infections (STIs or STDs) as part of a

"sexual health assessment."  2018 FOA, at 5-6.  The guide provides, "For patients at risk for

STDs, . . . [e]xplain that STD prevention methods (or strategies) can include *abstinence,*

monogamy, i.e., being faithful to a single sex partner, or using condoms consistently and

correctly. *These approaches can avoid risk (abstinence)* or effectively reduce risk for getting

STD (monogamy, consistent and correct condom use)."  CDC Publication 99-8845, *A Guide To*

*Taking A Sexual History*, *available at* https://www.cdc.gov/std/treatment/SexualHistory.pdf

(emphasis added), AR 000472.  Another CDC resource cited in the Funding Announcement,

2018 FOA, at 6, similarly provides: "Abstinence (not having sex) is the best protection from

STIs."  CDC, CS238162-B, *Show Your Love! Steps to a Healthier me and baby-to-be!*, AR

000486.

Plaintiffs complain that the HHS did not reference the CDC's publication addressing

quality family planning (QFP), PP Compl. ¶ 71, but that document also discusses abstinence.  In

the QFP, which HHS did include as a resource in its FAQs, April 2018 FAQ at 5 ¶ 23 & p.6, AR

000126-27, the CDC explains that providers should clarify for adolescents that "avoiding sex (i.e., abstinence) is an effective way to prevent pregnancy and STDs."  Loretta Gavin et al., *Providing Quality Family Planning Services:  Recommendations of CDC and U.S. Office of Population Affairs* (April 25, 2014), AR 000560.  The QFP likewise contemplates discussion of abstinence with adults.  *Id.*, AR 000578 (when discussing STDs, "[t]opics such as monogamy and abstinence can also be discussed").  As a result, the CDC reports confirm that sexual risk education is appropriate when counseling in the area of STIs, and such a conclusion fits neatly with HHS's explanation that sexual risk avoidance counseling means education to avoid STIs or unwanted pregnancy.

Moreover, contrary to Plaintiffs' suggestions, nothing in the Funding Announcement would require an applicant to provide sexual risk avoidance counseling if it is not voluntary, appropriate, or part of a broad range of family planning methods.  In the Program Priorities, HHS explains that the applicant should, at a minimum, "provide core family planning services" and assure that "projects offer a broad range of family planning and heath related services that are tailored to the unique needs of the individual."  2018 FOA, at 9.  The Program Priorities continue to explain that all clients should be provided "voluntary, client-centered and non-coercive care," *id.* at 10, and Key Issue 7 further states that the applicant should have an "emphasis on the *voluntary nature* of family planning services," *id.* at 11 (emphasis added).  HHS also explains *six times* that Title X projects "must be in compliance with the Title X statute, as well as the program regulations and legislative mandates," which require providing contraception, *see* 42 C.F.R. § 59.5(b)(1).  *See* 2018 FOA, at 4, 6-7, 9, 20, 24, 48; *see also* February 27 FAQ at 2 ¶ 10, AR 000120 (requiring "Title X projects to offer . . . contraception.").

Plaintiffs hypothesize that they may be compelled to provide abstinence counseling to an unmarried woman that might be inappropriate, Pls.' Br. at 26-27, but "marriages" are mentioned in the context of counseling on healthy relationships, not sexual risk avoidance.  As such, Plaintiffs' objection that the Funding Announcement discriminates based on marital status or denies patients' dignity as individuals, *see* Pls.' Br. at 26 (citing 42 C.F.R. §§ 59.5(a)(3) & 59.5(a)(4)), is meritless.

Plaintiffs' other contentions likewise fail.  Plaintiffs note one source that states that sexual delay education is not effective after age 23, Pls.' Br. at 35, but the Funding Announcement addresses sexual delay for adolescents, not young adults.  2018 FOA, at 11. Plaintiffs also contend that sexual risk avoidance education does not work for adults, but the report in question focuses on counseling methods for teenagers.  *See* Cynthia C. Harper et al., *Abstinence and Teenagers:  Prevention Counseling Practices of Health Care Providers Serving High-Risk Patients in the United States*, 42 Persp. on Sexual & Reprod. Health 125 (2010), Savitzky Decl., Ex. K, at 125, 130-31.  This year's Funding Announcement, like many before it, includes sexual risk avoidance counseling—mainly for adolescents—based on policy preferences for which HHS has "good reasons."  *FCC*, 556 U.S. at 515.

Primary Care.  One of the sixteen priorities/issues incentivizes individuals to choose a Title X provider by encouraging grantees to offer primary health care services onsite "or through nearby referral providers."  Plaintiffs contend that this gives "an advantage to primary care providers."  Pls.' Br. at 28.  Not so.  The language in the relevant Program Priority gives preference to applicants who offer primary care either (1) onsite *or* (2) "through nearby referral providers."  2018 FOA, at 10; *see also* Fiscal Year 2018 Webinar Transcript (March 22, 2018),

AR 000199-200.  Plaintiffs' own declarants recognize that points accrue to an applicant under either scenario.  *See, e.g.*, ECF No. 18-6, Geoffray Decl. ¶ 30.[26]

Congress has long recognized that reproductive care and primary care can coexist under Title X.  A Senate report on the original Title X legislation explained that family planning is not "merely a euphemism for birth control.  It is properly a part of comprehensive health care and should consist of much more than the dispensation of contraceptive devices."  S. Rep. No. 91-1004, at 10 (1970).  A Senate Committee report addressing the 1975 amendments to Title X noted that in "addition to being of specific utility in dealing with the medical aspects of family planning, the medical services provided [under Title X] are of major value as a source of preventive health care for women of childbearing age."  S. Rep. No. 94-29, at 55 (1975).[27]

HHS's preference for access to primary care is rational and intended to benefit patients.  The Funding Announcement explains HHS's reasoning:  to "make it easier for individuals to receive both primary health care and family planning services" and to "increase incentive for those individuals in need of care choosing a Title X provider."  2018 FOA, at 10 ¶ 4.  A preference for access to primary care is not arbitrary.  It benefits Title X patients.  Indeed, given

---

[26]  Plaintiffs' declarations reveal that many already refer for primary health care to nearby providers.  *See* ECF No. 18-1, Atkinson Decl. ¶ 21; ECF No. 18-2, Harvey Decl. ¶ 20 ("We routinely refer patients for primary or specialty care . . . ."); ECF No. 18-3, Galloway Decl. ¶ 19; ECF No. 18-5, Thomas Decl. ¶ 32.  Under their own theory, these Plaintiffs would score *higher* on this factor and therefore lack standing to challenge its inclusion as a funding criteria.  *See Bennett*, 520 U.S. at 167.

[27]  HHS has also previously explained that its "efforts to ensure widespread access to quality family planning services [are] consistent with efforts to provide comprehensive care."  Compliance With Title X Requirements by Project Recipients in Selecting Subrecipients, 81 Fed. Reg. 91852-01, 91855 (Dec. 19, 2016).  The agency also noted that family planning service providers can "serve as entry points for their clients to other essential health care services."  *Id.*; *see also* 42 C.F.R. § 59.5(b)(1) (noting projects must provide referrals to other facilities if medically indicated) & 59.5(b)(8) (also discussing referral arrangements).

those benefits, it should come as no surprise that from 2007 to 2017, the Funding Announcement sought "evidence" that an applicant had plans to facilitate access to primary care.[28]  The 2018 Funding Announcement aligns with this policy.

Cooperation with Community- and Faith-Based Organizations.  Plaintiffs lack standing to challenge the criterion supporting cooperation with community- and faith-based organizations. Even though many of Plaintiffs' entities already partner with faith-based organizations, Pls.' Br. at 29-30,[29] they argue that promoting "cooperation with community-based and faith-based organizations" through Key Issue 3 violates Title X.  But Plaintiffs do not complain about cooperation with "community-based" groups, which also may entitle them to "points" based on this particular criteria.  Plaintiffs do not even complain about working with faith-based organizations generally; they simply do not wish to partner with faith-based groups that are "opposed to comprehensive family planning care."  *E.g.*, PP Compl. ¶ 82; Pls.' Br. at 30.  Yet nothing in the Funding Announcement encourages, or requires, Plaintiffs to work with any *specific* faith-based organization, let alone an organization "that oppose[s] Title X's basic mission."  *Id.*  Any asserted injury from inclusion of this criterion is thus conjectural and insufficiently concrete.  *See Bennett*, 520 U.S. at 167.  And for those Plaintiffs who already partner with faith-based organizations, there is no injury at all, as those Plaintiffs will *benefit* from application scoring that considers this factor.

---

[28]  *See* 2007 FOA, at 37984; 2008 FOA, at 32112; 2009 FOA, at 15; 2010 FOA, at 16; 2011 FOA, at 16; 2012 FOA, at 18; 2013 FOA, at 9, 24; 2014 FOA, at 9, 24; 2015 FOA, at 9-10, 23-24; 2016 FOA, at 9-10, 20; *see also* 2017 FOA, 8-10, 22.

[29]  *E.g.*, ECF No. 18-1, Atkinson Decl. ¶ 42 ("We certainly do partner with faith-based organizations to the extent such partnerships advance our mission."); ECF No. 18-3, Galloway Decl. ¶ 44 ("PPAU routinely works with faith-based groups throughout Utah."); ECF No. 18-5, Thomas Decl. ¶ 30 ("AFHP and our sub-recipients have always worked extensively with community-based and some faith-based organizations").

In any event, HHS did not act arbitrarily or contrary to law by including faith-based groups. First, as HHS explained above, cooperation with community and faith based organizations is merely "encouraged" and not "required." February 27 FAQ, AR 000119 ¶ 2. Second, the Funding Announcement's reference to faith-based organizations is not unprecedented. At least six prior Funding Announcements have included partnerships with faith-based organizations in the Program Priorities or Key Issues. *See, e.g.*, 2009 FOA, at 7 ¶ 4 ("Linkages and partnerships with community-based and faith-based organizations"). And, third, Plaintiffs themselves recognize that such partnerships are valuable in Title X as a form of community partnership. "Plaintiffs frequently work with *community-based groups of all kinds, including faith-based groups* like local churches." PP Compl. ¶ 82; Pls.' Br. at 29-30 (emphasis added). HHS's simple reference to faith-based organizations is not arbitrary or capricious.

<u>Funding Announcement Taken Collectively</u>. For the same reason that each challenged priority and issue is permissible individually, they are permissible collectively. The Supreme Court's decision in *Rust* mandates deference to the agency in administering Title X. As here, the plaintiffs in *Rust* contended that certain agency regulations violated the broad purposes of Title X. *See* 500 U.S. at 187-188. The Court rejected the challenge, and deferred to the Secretary's determination that the regulations permissibly carried out Title X. *Id.* at 188-90. For much the same reason, HHS is owed deference here. Plaintiffs' attempt to dictate specific language for the Funding Announcement must be rejected. Pls.' Br. at 30-32. HHS's priorities and issues are consistent with Title X's fundamental purpose of making "comprehensive family planning services readily available to all persons desiring such services." *Heckler*, 712 F.2d at 661

(internal quotation marks and citation omitted).  Its priorities and issues are likewise rational and discernible from the record.[30]

    4.    <u>Plaintiffs' Demand for Continuation Funding Is Barred by Sovereign Immunity</u>

This Court lacks jurisdiction for Plaintiffs' request for continuation funding.  PP Compl. at 39; NFPRHA Compl. at 34.  Plaintiffs' claims arise under the APA and challenge the lawfulness of the Funding Announcement.  If Plaintiffs were to prevail on those claims, the only appropriate relief would be remand to the agency.  *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985).  Plaintiffs have no right to Title X funding beyond their existing awards, and the Court has no authority to compel HHS to fund grants after their expiration dates.  As sovereign, the United States is immune from suit absent consent as expressed by Congress, *see FDIC v. Meyer*, 510 U.S. 471, 475 (1994), and no consent exists for any form of continuation funding.  Plaintiffs cite no source of law for such relief, and none exists.  Their claim for relief should be dismissed with prejudice.  *Cf.  Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255, 263 (1999) (claim for equitable lien falls outside "§ 702's waiver of sovereign immunity").

## II.    <u>Plaintiffs Are Not Entitled to a Preliminary Injunction</u>

No grounds exist for a preliminary injunction.  To obtain a preliminary relief, Plaintiffs must demonstrate they are (1) likely to succeed on the merits, (2) likely to suffer irreparable harm in the absence of relief, (3) that the balance of equities tips in their favor, and (4) that the injunction is in the public interest.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

---

[30]  Plaintiffs challenge criterion (h) on the ground that 25 points are awarded based on the Program Priorities and Key Issues, but not all 25 points are really at issue here.  The 25 points are available for 16 Program Priorities and Key Issues, so each criterion is roughly worth only one-and-a-half points.  Plaintiffs' challenged adjustments cover only a fraction of all Program Priorities and Key Issues, and so may only be worth a handful of points overall.  Reviewers must make these fine-line and discretionary judgments when scoring applications, but Plaintiffs' calculations unreasonably overstate the impact of HHS's adjustments at issue.

These factors are typically "evaluated on a 'sliding scale,'" and the movant must show that "all four factors, taken together, weigh in favor of the injunction." *Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288, 1291–92 (D.C. Cir. 2009) (internal quotation omitted).  A preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam).  As demonstrated above, Plaintiffs are not likely to succeed on the merits.  The remaining factors also weigh strongly against Plaintiffs.

### A.      Plaintiffs Fail to Establish Irreparable Harm

Plaintiffs have not demonstrated that they will suffer irreparable injury absent preliminary relief.  The D.C. Circuit "has set a high standard for irreparable injury." *In re Navy Chaplaincy*, 534 F.3d 756, 766 (D.C. Cir. 2008) (citation omitted).  It is a "well known and indisputable principle[]" that an "unsubstantiated and speculative" harm cannot constitute an irreparable injury for purposes of injunctive relief. *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam).  The harm must be "certain and great, actual and not theoretical, and so imminent that there is a clear and present need for equitable relief to prevent irreparable harm." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 7–8 (D.C. Cir. 2016) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)) (internal quotations omitted).

Plaintiffs' delay in seeking relief belies their claim of irreparable harm and is itself a sufficient basis on which to deny the relief.  "Courts have found that '[a]n unexcused delay in seeking extraordinary injunctive relief may be grounds for denial because such delay implies a lack of urgency and irreparable harm." *Open Top Sightseeing USA v. Mr. Sightseeing, LLC*, 48 F. Supp. 3d 87, 90 (D.D.C. 2014) (internal citation omitted).  Here, HHS issued the Funding Announcement on February 23, 2018, with grant applications due three months later.  *See* 2018

FOA, at 1, 60; Kretschmaier Decl. ¶¶ 2-3.  Plaintiffs waited to file their facial challenge to the

Funding Announcement for over two months and then moved for a preliminary injunction just

sixteen days before the application deadline.  *See, e.g.*, PP Compl.; NFPRHA Compl.; Pls.' Br.;

2018 FOA, at 1.  This delay—which they make no attempt to explain, *see generally* Pls.' Br.—

should be fatal to their motion.  "The D.C. Circuit has found that a delay of forty-four days

before bringing an action for injunctive relief was 'inexcusable,' and 'bolstered' the 'conclusion

that an injunction should not issue,' particularly where the party seeking an injunction had

knowledge of the pending nature of the alleged irreparable harm."  *Open Top Sightseeing USA*,

48 F. Supp. 3d at 90 (quoting *Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975));

*see also AARP v. U.S. EEOC*, 226 F. Supp. 3d 7, 22 (D.D.C. 2016); *Mylan Pharm., Inc. v.

Shalala*, 81 F. Supp. 2d 30, 44 (D.D.C. 2000) (two-month delay undermined claims).

Moreover, even if Plaintiffs had acted promptly, they have failed to show irreparable

injury.  They argue irreparable injury arises because:  (1) some of Plaintiffs' sub-grantees and

members have begun to adapt to the Funding Announcement's Program Priorities and Key

Issues, Pls.' Br. at 35; (2) Plaintiffs might receive less funding under the Funding

Announcement, which could result in closures or layoffs "within months," *id.* at 37–41; and

(3) the changes and potential closures would tarnish Plaintiffs' reputations, *id.* at 41–42.  None of

these purported harms, however, amounts to an irreparable injury.

> 1.   Voluntary Changes in Anticipation of Future Government Actions Do Not
>      Automatically Constitute an Irreparable Harm

Plaintiffs argue that they will be irreparably harmed because sub-grantees and

members—but not Plaintiffs themselves—are making changes to be better positioned to secure a

Title X grant under the new Funding Announcement.  *Id.* at 35.  But every government action

may stimulate some voluntary change in response, and not all changes involve irreparable harm.

41

If it were otherwise, the irreparable harm element would be satisfied whenever the government announces a change with some prospective effect.  That cannot be.  "The irreparable injury requirement erects a very high bar for a movant."  *Coal. For Common Sense in Gov't Procurement v. United States*, 576 F. Supp. 2d 162, 168 (D.D.C. 2008).  Irreparable harm is "perhaps the single most important prerequisite for the issuance of a preliminary injunction," *Sierra Club v. U.S. Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 38 (D.D.C. 2013) (quoting 11A Charles Alan Wright *et al.*, Federal Practice and Procedure § 2948.1 (2d ed 2013)), and a preliminary injunction is an "extraordinary remedy," *Winter*, 555 U.S. at 22.  Plaintiffs' low threshold for irreparable harm would convert it into an "ordinary" remedy.

2.    <u>Potential Future Disruption of Services Resulting from Possible Decreases in Future Funding Is Too Speculative to Constitute Irreparable Harm</u>

Plaintiffs' allegation that they will have to close facilities or lay off personnel within months of a funding decision likewise does not establish an irreparable injury for three reasons.  First, this injury is speculative.  Plaintiffs admit that they have only a "*prospect* of losing . . . federal funding" from Title X grants.  Pls.' Br. at 37 (emphasis added).  The application deadline is May 24, so the grant decision is months away, and Plaintiffs could win a new award.  Kretschmaier Decl. ¶¶ 3-4.  Speculation about a future outcome does not justify a preliminary injunction.  *See Ohio Head Start Ass'n, Inc. v. U.S. De't of Health & Human Servs.*, 902 F. Supp. 2d 61, 69–70 (D.D.C. 2012).  Plaintiffs cannot base irreparable injury upon purported harms that are not "actual" or "certain."  *League of Women Voters*, 838 F.3d at 7–8.

Second, a loss of grant funding, even if it results in disruption to services, is also not an irreparable harm.  Plaintiffs aver they may receive less money than in past years and that Title X funds comprise a significant minority of their budgets.  *E.g.*, Pls.' Br. at 37-38 (Title X funds comprise 18% of one Planned Parenthood affiliate's budget and 19% of the budget of another).

Even though a decrease in grant funding may be "a very serious financial blow to Plaintiff[s]," "the reality is that all applicants for federal funds run this kind of risk. . . . Plaintiff[s] ha[ve] not suggested that this particular loss in funds, significant as it is, [will] so devastate[] [their] ability to carry out [their] mission that [they] will be unable to accept and implement [any] grant [they do] receive." *Experience Works, Inc. v. Chao*, 267 F. Supp. 2d 93, 96 (D.D.C. 2003).

Third, any operational harm Plaintiffs may suffer from loss of grant funding would not, by Plaintiffs' own admission, occur until "months" after the grant decision. Pls.' Br. at 38. In *Navajo Nation v. Azar*, 292 F. Supp. 3d 508 (D.D.C. 2018) (Friedrich, J.), a case also concerning HHS grant funds, the court found no irreparable harm when personnel layoffs and facility closures would not begin for "a couple weeks" after the funding decision because they would "not arise immediately" and could "be mitigated by resolving th[e] case on the merits according to an expedited litigation schedule." *Id.* at 513 (internal quotation marks omitted). Here, Defendants have already agreed to an expedited briefing schedule, and HHS does not expect to make funding decisions until mid-August 2018. Kretschmaier Decl. ¶4.

### 3.    Speculation Regarding Reputational Injury is Not Irreparable Harm

Plaintiffs' final basis for claiming irreparable harm is that they face a "Hobson's Choice," whereby any decision they make will injure their reputations, Pls.' Br. at 42, but that assertion is likewise wholly speculative. Plaintiffs argue their reputations would suffer if they either (1) have disruptions in services from decreased funding or (2) adapt their operations to comply with the challenged Program Priorities and Key Issues. *Id.* at 41–42.

As discussed above, however, the effect of the Funding Announcement on Plaintiffs' receipt of grants is inherently uncertain, as no Title X funding decisions have been made for 2018. *See supra*, § I.A.2; Kretschmaier Decl. ¶ 4. Any speculation about reputational injury due to the possibility of a loss in funding only compounds that uncertainty. And Plaintiffs'

conclusory statements and conjecture about the reputational effects of any changes to their

operations, *see* Pls.' Br. at 42 (citing ECF No. 18-2, Harvey Decl. ¶ 32; ECF No. 18-4, Coleman

Decl. ¶¶ 83-85; ECF No. 18-5, Thomas Decl. ¶¶ 24-25), is insufficient to meet their burden.[31]

**B.      The Balance of the Equities and the Public Interest Weigh Against Granting a Preliminary Injunction**

A party seeking a preliminary injunction must demonstrate "that the balance of equities

tips in [its] favor, and that an injunction is in the public interest."  *Winter*, 555 U.S. at 20.  "These

factors merge when the Government is the opposing party."  *Nken v. Holder*, 556 U.S. 418, 435

(2009).  Here, they weigh decidedly against a preliminary injunction.

The balance of equities and public interest favor Defendants precisely because Congress

has entrusted HHS to make nearly $300 million in grants, drawing on decades of expertise to

judge which applicants will best use the grant funds.  *See* 42 U.S.C. § 300(b).  A preliminary

injunction here would immediately interfere with HHS's evaluation of grant applications and its

funding allocations under Title X.  *See* Kretschmaier Decl. ¶ 5; *see also Pursuing Am.'s*

*Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) (stating that an agency's "harm and the

public interest are one and the same, because the government's interest *is* the public interest.").

Plaintiffs cannot substitute their judgments for that of the federal agency responsible for

administering Title X, nor should this Court.  *See Ass'n of Private Sector Colls. & Univs. v.*

*Duncan*, 110 F. Supp. 3d 176, 196 (D.D.C. 2015).  That would be contrary to the public interest.

---

[31]  Plaintiffs also argue that their grant applications will be considered "under an unfair evaluation process," Pls.' Br. at 37, but that sort of procedural injury, even if true, is not irreparable harm.  Plaintiffs rely on *Sabino Canyon Tours, Inc. v. USDA Forest Serv.*, No. 17-CV-2758, 2018 WL 784061 (D.D.C. Feb. 8, 2018), but that case "doubts that having to participate in a tainted bidding process automatically constitutes an irreparable harm," *id.* at *11. Indeed, "courts generally will not base a finding of 'irreparable injury' on a procedural violation standing alone."  *Elk Assocs. Funding Corp. v. U.S. SBA*, 858 F. Supp. 2d 1, 31 (D.D.C. 2012).

Plaintiffs' assertion to the contrary is ultimately based on the inappropriate presumption that they are uniquely qualified to provide Title X services.  It is true that they have provided the public with reproductive health services under Title X, *see* Pls.' Br. at 43-44, but a preliminary injunction in favor of funding these Plaintiffs is not necessary for the public to receive those services.  Assuming Plaintiffs do not receive as much funding as in past years—which remains speculative on Plaintiffs' part—other Title X grant recipients will receive the funds to provide the same types of services.  *See* 42 U.S.C. § 300(b) (requiring HHS to "take into account . . . [the applicant's] capacity to make rapid and effective use of [Title X] assistance").  Plaintiffs have offered no explanation as to why the public interest would be harmed by that result, beyond their inappropriate presumption that they are uniquely qualified to provide such services.

Finally, the preliminary injunction Plaintiffs seek is disfavored because it would "inflict untoward detriment on persons not party to the case."  *Chaplaincy*, 454 F.3d at 304.  An indefinite delay in considering Title X grant applications will create uncertainty among applicants, and a program-wide cessation or delay in grant funding will deprive all family planning consumers of assistance Congress intended HHS to deliver.  Kretschmaier Decl. ¶ 5.

## CONCLUSION

For the foregoing reasons, the Court should grant the Defendants' motion to dismiss or for judgment, and deny Plaintiffs' motion for a preliminary injunction.

Dated:  May 24, 2018

ROBERT P. CHARROW
General Counsel
Department of Health and Human Services
200 Independence Avenue, SW
Washington, D.C. 20201
Tel: (202) 690-7741

BRIAN R. STIMSON
Principal Deputy General Counsel
Department of Health and Human Services
200 Independence Avenue, SW
Washington, D.C. 20201
Tel: (202) 690-7741

MATTHEW S. BOWMAN
Deputy General Counsel
Department of Health and Human Services
200 Independence Avenue, SW
Washington, D.C. 20201
Tel: (202) 690-7741

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

JESSIE K. LIU
United States Attorney

RUTH A. HARVEY
Director

MICHAEL J. QUINN
Senior Litigation Counsel

JOEL McELVAIN
Assistant Branch Director

/s/ *Alicia M. Hunt*
ALICIA M. HUNT (DC Bar No. 484620)
JONATHAN E. JACOBSON
Trial Attorneys
United States Department of Justice
Civil Division
Commercial Litigation Branch
1100 L St. NW, 7th floor
Washington, D.C. 20005
Tel: (202) 307-3548
Fax: (202) 514-9163
E-mail: alicia.m.hunt@usdoj.gov

/s/ *Gary D. Feldon*
GARY D. FELDON
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW, Room 7128
Washington, D.C. 20530
Tel: (202) 514-4686
Fax: (202) 616-8460
E-mail: gary.d.feldon@usdoj.gov

*Attorneys for Defendants*

46

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on May 24, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

<u>/s/ *Alicia M. Hunt*</u>
ALICIA M. HUNT