| | |
|---|---|
| **PLANNED PARENTOOD OF WISCONSIN, INC.** *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> **ALEX M. AZAR II, in his official capacity as United States Secretary of Health and Human Services,** *et al.*, <br><br> Defendants. | Case No. 1:18-cv-01035 (TNM) |

## <u>MEMORANDUM OPINION</u>

Under Title X of the Public Health Service Act, the Secretary of the U.S. Department of Health and Human Services (HHS) can award federal grants for "voluntary family planning projects" around the country, "which shall offer a broad range of acceptable and effective family planning methods and services." 42 U.S.C. § 300(a). HHS annually releases a funding opportunity announcement for the program, explaining how it will evaluate grant applications, a process that has historically included scoring based on seven criteria. The Plaintiffs—three Planned Parenthood affiliates and the National Family Planning and Reproductive Health Association—challenge the 2018 Announcement's addition of an eighth criterion to proposal scoring. This new factor evaluates proposals based on their ability to address the agency's program priorities and key issues enumerated in the Announcement. The Plaintiffs particularly object to the Announcement's focus on "[a] meaningful emphasis on . . . the benefits of avoiding sexual risk," easier access to primary health care, "increasing family participation," and "[c]ooperation with . . . faith based organizations." Compl. Ex. A at 9-11. They argue that the

challenged language required notice-and-comment rulemaking, violates the Title X statutory scheme, and is arbitrary and capricious.

The Government claims that the Announcement language is not subject to judicial review—except about whether rulemaking was required—because the Announcement is not "final agency action" under 5 U.S.C. § 704, and consideration of extra factors in Title X grant-making is "committed to agency discretion" under 5 U.S.C. § 701(a)(2). On the merits, the Government argues that the eighth criterion is only a rule of agency procedure exempt from notice-and-comment rulemaking, and that the agency's substantive priorities are consistent with Title X's design, and not arbitrary and capricious.

Both parties seek summary judgment on the undisputed administrative record. I conclude that the language in this Announcement, which does not bind the final decisionmaker, is not a "final agency action" reviewable under the Administrative Procedure Act (APA). Although the Plaintiffs' notice-and-comment claim is reviewable, the eighth factor is a procedural rather than legislative rule, and it is not arbitrary and capricious. The substantive tweaks to the program priorities and key issues are neither new nor incompatible with Title X, instead they rephrase similar priorities and issues that appeared in prior funding announcements without objection or notice-and-comment rulemaking. I will therefore grant summary judgment for the Government.

## I.    BACKGROUND

In 1970, Congress added Title X to the Public Health Service Act to "assist in making comprehensive voluntary family planning services readily available to all persons desiring such services." Pub. L. No. 91-572, § 2(1) (1970). The statute authorizes the Secretary to:

> [M]ake grants to . . . assist in the establishment and operation of
> voluntary family planning projects which shall offer a broad range

of acceptable and effective family planning methods and services (including natural family planning methods, infertility services, and services for adolescents). To the extent practical, entities which receive grants or contracts under this subsection shall encourage familiy [sic] participation in projects assisted under this subsection.

42 U.S.C. § 300(a). The statute lists four factors that "the Secretary shall take into account" in making grant awards: "the number of patients to be served, the extent to which family planning services are needed locally, the relative need of the applicant, and its capacity to make rapid and effective use of such assistance." *Id*. § 300(b). The statute also gives the Secretary authority to promulgate grant-making regulations. *Id*. § 300a-4.

An HHS regulation details the agency's grant-making evaluation criteria:

What criteria will the Department of Health and Human Services use to decide which family planning services projects to fund and in what amount?

(a) Within the limits of funds available for these purposes, the Secretary may award grants for the establishment and operation of those projects which will in the Department's judgment best promote the purposes of section 1001 of the Act, taking into account:
(1) The number of patients, and, in particular, the number of low-income patients to be served;
(2) The extent to which family planning services are needed locally;
(3) The relative need of the applicant;
(4) The capacity of the applicant to make rapid and effective use of the federal assistance;
(5) The adequacy of the applicant's facilities and staff;
(6) The relative availability of non-federal resources within the community to be served and the degree to which those resources are committed to the project; and
(7) The degree to which the project plan adequately provides for the requirements set forth in these regulations.

42 C.F.R. § 59.7 (2016). This regulation has remained substantially the same since the Title X program began. *Compare* 36 Fed. Reg. 18467 (Sept. 15, 1971) *with* 42 C.F.R. § 59.7 (2016).

The Title X grant application process begins with a funding opportunity announcement, which describes the program and provides eligibility and evaluation criteria. 45 C.F.R. § 75.203. Each announcement recounts the statutory and regulatory requirements for Title X programs and also describes program priorities and key issues that set "overarching goals for the Title X program." *See, e.g.*, 1998 Funding Opportunity Announcement (FOA) at *10726, Pls.' Mot. Summ. J. Ex. E, ECF No. 18-12.[1] The agency used the announcement to introduce a scoring system in 2001, with 100 points allocated across seven criteria that correspond to the seven criteria listed in 42 C.F.R. § 59.7. Decl. of Clare Coleman, Pls.' Mot. Summ. J., ECF No. 18-4 (Coleman Decl.) ¶¶ 54-56. The announcements have often instructed applicants to develop "[p]roject plans . . . that address [that year's] Title X program priorities," and to "provide evidence of the project's capacity to address program priorities as they evolve in future years." *See, e.g.,* 2010 FOA at 5, Mot. Dismiss Ex. 11, ECF No. 25-10.

HHS issued the 2018 Funding Opportunity Announcement (Announcement or 2018 Announcement) in February 2018. Compl. Ex. A, ECF No. 1-1. The Announcement added an eighth scored criterion under which "[f]ederal staff and an independent review panel will assess all eligible applications." *Id*. at 43. The eighth factor awards up to 25 out of 100 points for the project plan's ability to implement the "requirements set forth in the priorities and key issues outlined [in] this funding announcement." *Id*. at 44. The Announcement also added language to the fifth criterion, for which up to 10 points can be awarded, saying that the "adequacy of the applicant's facilities and staff" would depend, in part, on whether staff are "adequately trained to

---

[1] I granted the parties' joint motion to construe their cross-motions as motions for summary judgment, so I cite their cross-motions—the Plaintiffs' Motion for a Preliminary Injunction, and the Government's Motion to Dismiss or for Summary Judgment—as Motions for Summary Judgment.

carry out the program requirements, as well as the priorities and key issues outlined in this announcement." *Id*. at 43. The Announcement set eight program priorities and eight key issues. *Id*. at 9-11. This resulted in 16 total program priorities and key issues, tied to 35 potential points. The Plaintiffs object to only some of the language in these priorities and key issues:

> *Program Priorities:* Each year the OPA [Office of Population Affairs] establishes program priorities that represent overarching goals for the Title X program. . . . Applicants should provide evidence of their capacity to address program priorities. . . .
>
> 1. Assuring innovative high quality family planning and related health services that will improve the overall health of individuals, couples and families, with priority for services to those of low-income families, offering, at a minimum, core family planning services enumerated earlier in this Funding Announcement. Assuring that projects offer a broad range of family planning and related health services that are tailored to the unique needs of the individual, that include natural family planning methods (also known as fertility awareness based methods) which ensure breadth and variety among family planning methods offered, infertility services, and services for adolescents; breast and cervical cancer screening and prevention of STDs as well as HIV prevention education, counseling, testing, and referrals;
>
> 2. Assuring activities that promote positive family relationships for the purpose of increasing family participation in family planning and healthy decision-making; education and counseling that prioritize optimal health and life outcomes for every individual and couple; and other related health services, contextualizing Title X services within a model that promotes optimal health outcomes for the client.
>
> . . .
>
> 4. Promoting provision of comprehensive primary health care services to make it easier for individuals to receive both primary health care and family planning services preferably in the same location, or through nearby referral providers, and increase incentive for those individuals in need of care choosing a Title X provider.
>
> . . .

6. Encouraging participation of families, parents, and/or legal guardians in the decision of minors to seek family planning services; and providing counseling to minors on how to resist attempts to coerce minors into engaging in sexual activities;

. . .

***Key Issues:*** In addition to program priorities, the following key issues should be considered in developing the project plan:

. . .

3. Cooperation with community-based and faith-based organizations;

. . .

5. A meaningful emphasis on education and counseling that communicates the social science research and practical application of topics related to healthy relationships, to committed, safe, stable, healthy marriages, and the benefits of avoiding sexual risk or returning to a sexually risk-free status, especially (but not only) when communicating with adolescents;

6. Activities for adolescents that do not normalize sexual risk behaviors, but instead clearly communicate the research informed benefits of delaying sex or returning to a sexually risk-free status.

Compl. Ex. A at 9-11.

Prior announcements have contained similar priorities. For example, from 2003 to 2011, the announcements emphasized that funding applicants should provide access to abstinence counseling. *See, e.g.,* 2003 FOA at 4, Mot. Dismiss Ex. A, ECF No. 25-10, 2011 FOA at 7, Mot. Dismiss Ex. I, ECF No. 25-10; *see also* 2015 FOA at 8, Mot. Dismiss Ex. M, ECF No. 25-10 (emphasizing natural family planning methods). From 2003 to 2015, the announcements focused on providing "related preventative health services" that improve "the overall health of individuals" rather than merely attending to reproductive health. *See, e.g.,* 2003 FOA at 4; 2015 FOA at 8. The previous announcements have also urged applicants to encourage family

participation in the delivery of family planning services.  *See, e.g.,* 2004 FOA at 4, Mot. Dismiss Ex. B, ECF No. 25-10; 2010 FOA at 7, Mot. Dismiss Ex. H, ECF No. 25-10.  Finally, from 2004 to 2009, the funding announcements encouraged applicants to partner with community-based and faith-based organizations.  *See, e.g.* 2004 FOA at 4; 2009 FOA at 7, Mot. Dismiss Ex. G, ECF No. 25-10.

The Plaintiffs filed two suits that the parties agreed to consolidate.[2]  The Plaintiffs moved for a preliminary injunction, and the Government moved for dismissal or summary judgment.  I granted the parties' joint motion to consolidate the Plaintiffs' Motion for a Preliminary Injunction with the merits and to construe the parties' cross motions as motions for summary judgment.  Minute Order of June 21, 2018.

## II.       LEGAL STANDARDS

To prevail on a motion for summary judgment, a movant must show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp v. Catrett*, 477 U.S. 317, 322 (1986).  "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex*, 477 U.S. at 323.  Once this showing has occurred, the non-moving party bears the burden of setting forth "specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 250.

---

[2]  Planned Parenthood of Wisconsin, Inc., Planned Parenthood of Greater Ohio, and Planned Parenthood Association of Utah brought one suit, and the National Family Planning and Reproductive Health Association brought the other.

### III. THE PLAINTIFFS' SUBSTANTIVE OBJECTIONS ARE NOT REVIEWABLE

The parties agree on the facts in the record, but disagree on their import. The Plaintiffs argue that the 2018 Announcement conflicts with Title X and its governing regulations, required notice-and-comment rulemaking before release, and is invalid as "arbitrary and capricious" under 5 U.S.C. § 706. Pls.' Mot. Summ. J. 17-35. The Government asserts that substantive objections to the Announcement are unreviewable, because it is not a "final agency action" under 5 U.S.C. § 704, and considering extra grant-making criteria is a decision "committed to agency discretion by law," 5 U.S.C. § 701(a)(2). Gov. Mot. Summ. J. 11-26. For the reasons that follow, I conclude that the Plaintiffs' substantive objections are not reviewable.

### A. Review Criteria Are Not Wholly "Committed to Agency Discretion"

The APA does not apply to "agency action . . . committed to agency discretion by law." 5 U.S.C. § 701(a)(2). This exception applies only when "a court would have no meaningful standard against which to judge the agency's exercise of discretion," and thus there is "no law to apply." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). "In such a case, the statute . . . can be taken to have 'committed' the decisionmaking to the agency's judgment absolutely." *Id*. The Government argues that there is no law to apply, because the requirement that the Secretary "shall take into account" four statutory factors, 42 U.S.C.A. § 300(b), and seven related regulatory factors, 42 C.F.R. § 59.7, places no restraints on *more* factors that the Secretary may choose to consider. Gov. Mot. Summ. J. 17-19. But this argument ignores the significant body of law that the statute and regulations together create, and the fact that the Plaintiffs here claim that the Announcement violates existing law.

8

Under the APA, there is a "strong presumption that Congress intends judicial review of administrative action," and so "each category of non-reviewability must be construed narrowly." *Amador Cty. v. Salazar*, 640 F.3d 373, 379 (D.C. Cir. 2011). The Government acknowledges this, but contends that because this case is about grant-making, "a rebuttable presumption of nonreviewability arises." Gov. Reply. 3. For this proposition, the Government points to *Lincoln v. Vigil*, which held that the Indian Health Service's decision to re-allocate funds that Congress appropriated "for the benefit, care, and assistance of the Indians," was unreviewable, 508 U.S. 182, 184-85 (1993) (citations omitted), because "an agency's allocation of funds from a lump-sum appropriation requires a complicated balancing of a number of factors which are peculiarly within its expertise." *Id.* at 193 (quoting *Heckler*, 470 U.S. at 831); Gov. Mot. Summ. J. 12-13. The Supreme Court noted in *Lincoln* that "Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes," but that "as long as the agency allocates funds from a lump-sum appropriation to meet permissible statutory objectives," the decision "is committed to agency discretion by law." 508 U.S. at 193 (citations omitted).

The D.C. Circuit later applied *Lincoln*'s logic to a case in which Congress appropriated money to compensate dairy producers for economic losses "in a manner determined appropriate by the Secretary [of Agriculture]," and the Secretary set a cap on the amount of milk production for which each producer could be compensated. *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751-52 (D.C. Cir. 2002) (citation omitted). *Milk Train* held that the production cap was unreviewable, because "[t]he statute . . . provides no relevant 'statutory reference point' for the court other than the decisionmaker's own views of what is an 'appropriate' manner of distribution to compensate for 1999 losses." *Id.* at 751 (citations omitted). That said, *Milk Train* allowed review of claims challenging the Secretary's decision to use "1997 and 1998 production

data for calculating 1999 losses," reasoning that Congress had explicitly appropriated the money for "economic losses incurred during 1999," and so courts had a "statutory reference point" to guide review. *Id.* at 752 (quoting *Drake v. F.A.A.*, 291 F.3d 59, 72 (D.C. Cir. 2002)).

Here, the statute and regulations provide ample law to apply to the Plaintiffs' claims. Congress clearly laid out the purpose of Title X grants, describing in detail the family planning services that the Secretary was to fund. 42 U.S.C. § 300(a) ("family planning projects . . . shall offer a broad range of acceptable and effective family planning methods and services . . . . To the extent practical, entities which receive grants or contracts under this subsection shall encourage famil[]y participation."); *see also* Pub. L. No. 91-572, § 2 (1970) (listing eight purposes for the Family Planning Services and Population Research Act of 1970, which created Title X). The statute further "circumscribe[s] agency discretion," in the grantmaking process, *see Lincoln*, 508 U.S. at 193, by instructing the Secretary to consider "the number of patients to be served, the extent to which family planning services are needed locally, the relative need of the applicant, and its capacity to make rapid and effective use of such assistance." 42 U.S.C. § 300(b). The statute authorizes grantmaking regulations, *id.* § 300a-4, and those regulations prescribe seven factors that also guide the Secretary's discretion in "award[ing] grants which will in the Department's judgment best promote the purposes of section 1001 of the Act." 42 C.F.R. § 59.7.

Thus, applicable law exists to examine the Plaintiffs' claims that the 2018 Announcement conflicts with Title X and its governing regulations, and is invalid as "arbitrary and capricious" under 5 U.S.C. § 706. Pls.' Mot. Summ. J. 17-21, 24-35.[3] This case is comparable to a review

---

[3] The Plaintiffs contend that their arbitrary and capricious challenge under the APA has a built-in standard: whether "the agency provided an adequate justification . . . and whether it

of the Government's compliance with a statute that appropriated funds for "economic losses incurred during 1999." *Milk Train,* 310 F.3d at 752.  It is also like *Delta Air Lines, Inc. v. Exp.-Imp. Bank of the U.S.,* in which the D.C. Circuit found that it was "standard judicial fare" to review the Export-Import Bank's compliance with a statutory requirement that the Bank "shall take into account any serious adverse effect" a loan or loan guarantee might have on American industries or jobs.  718 F.3d 974, 977 (D.C. Cir. 2013).  Although the Plaintiffs are not claiming that HHS failed to consider mandatory criteria, but that new criteria violate existing criteria, courts can still apply existing law to review such a challenge.  *See Ramah Navajo Sch. Bd., Inc. v. Babbitt*, 87 F.3d 1338, 1348 (D.C. Cir. 1996) (finding that there was law to apply when the Government failed to distribute insufficient funds *pro rata* based on the underlying appropriation statutes, and invalidating a 50% penalty that an agency imposed on the plaintiffs for missing a filing deadline).

### B.  Announcing Intermediate Review Criteria is Not "Final Agency Action"

The Government's next objection to the Plaintiffs' suit, that the 2018 Announcement was not a final agency action ready for judicial review, strikes home.  "An agency action is final only if it is *both* 'the consummation of the agency's decisionmaking process' *and* a decision by which 'rights or obligations have been determined' or from which 'legal consequences will flow.'" *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 250 (D.C. Cir. 2014) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)) (emphasis in original).  The 2018 Announcement fails both prongs of

---

adequately considered the effect of [the] change."  Pls.' Opp. 6 (citing *Foster v. Mabus*, 895 F. Supp. 2d 135, 145 (D.D.C. 2012); *Policy & Research, LLC v. HHS*, 2018 WL 2184449, at *6 (D.D.C. May 11, 2018).  But the Plaintiffs are mistaken: the applicable law must come from the "relevant statute" or regulation that the agency is applying, not from the APA itself.  *See, e.g. Cody v. Cox*, 509 F.3d 606, 610 (D.C. Cir. 2007).

the test. Although practically consequential, the Announcement describes how an agency decision *will be* made, and is not a final agency action itself. Three facts confirm this: (1) no grants have yet issued under the 2018 Announcement, (2) Title X grant applicants are not legally required to do anything in response to the announced criteria, and (3) the challenged language only governs an intermediate stage in the review process, with results that do not bind the Deputy Assistant Secretary for Population Affairs, who makes the final award decision.

*First*, no Title X grants have yet issued under the challenged review criteria. Instead, the Plaintiffs are challenging intermediate criteria by which applications will be evaluated, as described in an announcement of available grant funds. With no decision yet made on who wins Title X grant money, there has been no final agency action. *See Dalton v. Specter*, 511 U.S. 462, 465, 469-70 (1994) (finding no final agency action where the Department of Defense transmitted a military base closure recommendation to the President for all-or-nothing approval, because the President retained authority to make the final decision).

The Plaintiffs frame the agency decision at issue as the altered scoring criteria. Pls.' Opp. 9-10. They contend that because the Announcement's language is not going to change, and it governs how review panels will score applicants, the Announcement marks the consummation of the agency's decisionmaking process, and is final. *Id*. at 10. There is some support for the proposition that an agency decision is "sufficiently final" when it will not be "subject to further agency consideration or possible modification," *Reckitt Benckiser Inc. v. EPA*, 613 F.3d 1131, 1138 (D.C. Cir. 2010), since the agency has "definitively stated its position," and is "at rest in this respect." *Ciba-Geigy Corp. v. EPA,* 801 F.2d 430, 437-38 (D.C. Cir. 1986). But *Reckitt* and *Ciba-Geigy* are ripeness cases, not "final agency action" cases. *Reckitt*, 613 F.3d at 1136; *Ciba-Geigy,* 801 F.2d at 435. Though they apply a "complementary analysis" to the finality question

that I must answer, *John Doe, Inc. v. Drug Enf't Admin.*, 484 F.3d 561, 566 (D.C. Cir. 2007), "whether the agency's action is sufficiently final" is only one of many factors involved in a ripeness inquiry. *Ciba-Geigy,* 801 F.2d at 434.

Furthermore, neither of the cases referenced above involved grant applications, a context in which courts usually recognize final agency action only after grant awards issue. *See Citizens Alert Regarding Env't v. EPA*, 102 F. App'x 167, 168 (D.C. Cir. 2004); *Rattlesnake Coal. v. EPA*, 509 F.3d 1095, 1103-04 (9th Cir. 2007) ("appropriation to the EPA of funds for a particular project does not constitute a final agency action by the EPA until the EPA has reviewed a grant application and decided to disburse the funds."); *Karst Envtl. Educ. & Prot., Inc. v. EPA*, 403 F. Supp. 2d 74, 81 (D.D.C. 2005) ("Because at this point in time, the federal money is but an expectancy that has not yet materialized, the court determines that HUD's action on the grant application for appropriated funds does not constitute a judicially reviewable final agency action.") (citations and internal quotation marks omitted), *aff'd*, 475 F.3d 1291 (D.C. Cir. 2007). Although one case has recognized a final agency action before grant awards issued, the reasoning in that case turned on definitive language telling applicants that their proposals "must comply" with the directive, or else they "must be resubmitted." *Arizona v. Shalala*, 121 F. Supp. 2d 40, 48-49 (D.D.C. 2000), *rev'd on other grounds*, 281 F.3d 248, 253 n.6 (D.C. Cir. 2002). This case involves scoring criteria, not eligibility criteria.

*Second*, instead of setting eligibility requirements, or binding the final decisionmaker, the challenged Announcement lays out the criteria for an intermediate stage in the grant review process. In the initial stage, the agency screens applications using baseline eligibility criteria. 2018 FOA 15-17. The Plaintiffs do not challenge this stage. In the next, "[f]ederal staff and an independent review panel . . . assess all eligible applications according to the [eight review]

criteria." *Id*. at 43. During this stage, the independent review panel—composed of "experts in their fields . . . drawn from academic institutions, non-profit organizations, state and local government, and Federal government agencies"—will "comment on and score the applications, focusing . . . on the identified criteria." *Id*. at 44. Furthermore, "[f]ederal staff . . . review each application for programmatic, budgetary, and grants-management compliance." *Id*. In the ultimate stage, "[t]he Deputy Assistant Secretary for Population Affairs [] or designee will make final award selections," subject only to later risk analysis, *id*. at 44-47, considering four additional factors:

> a. The geographic distribution of services within the identified service area;
> b. The extent to which funds requested for a project maximize access for the population in need within the entire service area . . . ;
> c. Whether the project, including subrecipients and documented partners, provides the area to be served with a variety and breadth of effective family planning methods that are ready available and best serve individuals in need throughout the area to be served; and
> d. The extent to which projects best promote the purposes of [Title X], within the limits of funds available.

*Id*. at 43-45. Thus, the Deputy Assistant Secretary makes the final decision, using different criteria from the independent review panels.[4] The Plaintiffs do not challenge these four factors,

---

[4] At oral argument, the Plaintiffs briefly suggested that the "federal staff" bound by the Announcement includes the Deputy Assistant Secretary. Transcript of Motions Hearing (Tr.) at 10-11, 30. But the Announcement draws a clear contrast between the two, explaining in one sentence that "federal staff" reviews for various "compliance" concerns, and in the very next that the Deputy Assistant Secretary makes "final award selections." 2018 FOA 44. In any event, the Deputy Assistant Secretary is a senior executive political appointee, who sits above and directs the Office of Population Affairs. *See* Senate Committee on Homeland Security and Government Affairs, United States Government Policy and Supporting Positions 62 (2012) ("Plum Book"), *available at* https://www.govinfo.gov/content/pkg/GPO-PLUMBOOK-2012/pdf/GPO-PLUMBOOK-2012.pdf (last visited July 13, 2018). The term "staff" usually refers to those who assist a principal, not the principal herself. Merriam-Webster's Third New International

and contend that the fourth one merely refers to the seven factors that the panels score. Pls.'
Opp. 14 n.8. But Title X's "purposes" are broader than 42 C.F.R. § 59.7, and in any event, the
regulation reinforces the Deputy Assistant Secretary's discretion in making final awards. 42
C.F.R. § 59.7 ("the Secretary may award grants for the establishment and operation of those
projects which will *in the Department's judgment* best promote the purposes of section 1001 of
the Act [Title X], taking into account [seven listed factors].") (emphasis added).

In response, the Plaintiffs contend that as a practical matter, the scores generated by
independent review panels are dispositive. Pls.' Opp. 10-11 (the eighth scored factor has "direct
and appreciable legal consequences," *Bennett*, 520 U.S. at 178, because "higher-scoring
applications get Title X funds, virtually without exception."). They rely on an affidavit from a
former HHS regional administrator, who asserted that in her experience, "no HHS administrator,
including the [Regional Health Administrator] or the [Deputy Assistant Secretary for Population
Affairs], overrode the scoring of a Title X merits review panel. . . . Higher scoring without fail
led to an applicant winning the grant against a competitor." Decl. of Kathleen Desilets ¶ 25,
ECF No. 28-1.

But even if the highest-scoring applications win the grant awards practically every time,
the scoring criteria does not legally bind the Deputy Assistant Secretary's final decision. 2018
FOA 43-45. In fact, the Government provides four examples of HHS awarding Title X grant
funds to organizations that did not receive the highest score. Decl. of Susan Moskosky ¶¶ 9-14
("the Office of Population Affairs . . . seriously consider[s] the recommendations . . . including

Dictionary 2219 (1993) (defining "staff" as "[t]he personnel responsible for the functioning of an
institution or the establishment or the carrying out of an assigned task under an overall director
or head."). The Plaintiffs' argument is unsupported by the normal meaning of the terms or the
usage of the terms in the Announcement.

scores, in making final award decisions. There have however, been instances in which applications have been funded out of rank order.") The Plaintiffs do not dispute the factual accuracy of this evidence, Tr. 4, contending only that the Government's examples are not the same type of Title X grant at issue here. Be that as it may, the point remains: "[t]he Deputy Assistant Secretary for Population Affairs [] or designee will make final award selections," using four open-ended additional factors that the scoring panels do not consider. 2018 FOA at 44-47. And a prior Deputy Assistant Secretary's decision to defer to the review panels' scoring recommendations does not mean that the new Deputy Assistant Secretary will also defer in the future.

When intermediate agency action does not bind the final decisionmaker, no final agency action has occurred. *Dalton*, 511 U.S. at 469-70. In *Dalton*, the Supreme Court held that the Defense Base Closure and Realignment Commission's base closure recommendation did not constitute a final agency action, even though the President had to reject or approve the Commission's recommendation in toto. 511 U.S. at 469-70. The "crucial" point for the Court was "the fact that the President, not the Commission, takes the final action that affects the military installations." *Id*. at 470 (citations, internal quotation marks, and alterations omitted).

The Plaintiffs try to distinguish *Dalton* by arguing that the Announcement here does bind the agency, unlike the statute in *Dalton,* which did not bind the President. But I have already rejected that argument: the Deputy Assistant Secretary for Population Affairs is not a "federal staff" member bound to review applications based only on the eight factors, but is the final decisionmaker, clothed with significant power and discretion. 2018 FOA 43-45. The Plaintiffs also argue that Ms. Desilets' declaration makes this a different case, implying that the Deputy Assistant Secretary is more likely than the President to rubber-stamp recommendations from her

16

subordinates.  Yet *Dalton* did not turn on factual likelihoods, but on the "core question" of "whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties."  511 U.S. at 470; *see also Franklin v. Massachusetts*, 505 U.S. 788, 796-99 (1992) (finding no final agency action when the Secretary of Commerce sent a census report to the President for transmittal to Congress, since "[t]he President, not the Secretary, takes the final action that affects the States.").  Just as the President made the final decision in *Dalton* and *Franklin*, the Deputy Assistant Secretary makes the final decision here.  That fact is legally determinative.

*Finally*, the challenged criteria do not legally bind Title X grant applicants.  "By accepting Title X funds, a recipient voluntarily consents to any restrictions placed on any matching funds or grant-related income.  Potential grant recipients can choose between accepting Title X funds . . . or declining the subsidy and financing their own unsubsidized program." *Rust v. Sullivan*, 500 U.S. 173, 199 n.5 (1991).  This observation has even more force when a court reviews a funding opportunity announcement for the next fiscal year, rather than regulations applicable to every future Title X family planning program.  In contract terms, this Announcement was simply a solicitation of offers, kicking off an application process that will result in legally binding contracts only after offers are accepted and grants are awarded.  *See Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1053 (D.C. Cir. 1987) (reasoning that an HHS request for proposals "binds neither the agency nor the [parties] to whom it is sent.").  The Plaintiffs are not legally obligated to apply for these funds, because "Title X subsidies are just that, subsidies.  The recipient is in no way compelled to operate a Title X project . . . it can simply decline the subsidy." *Id.*  The Plaintiffs emphasize that the Announcement refers to the program priorities and key issues as "requirements."  2018 FOA at 44; *see also id*. at 9-11 ("Applicants should

provide evidence of their capacity to address program priorities"). They insist that they must act now to prepare for the upcoming grant competition, "emphasizing primary care and new partnerships with faith-based groups in their planned FY2018 projects." Pls.' Mot. Summ. J. 14. No doubt it is prudent for grant applicants to consider the Title X program objectives if they wish to submit a successful grant application. But practical necessity, if such exists here, still does not equal legal obligation.

In *Rust*, the Supreme Court upheld HHS regulations restricting the ability of Title X grant recipients to engage in activities supporting abortion. 500 U.S. at 177-78. The Court emphasized the voluntary nature of participating in the Title X program and repeatedly explained that the Government is free to fund some activities, to the exclusion of others. *See id*. at 99 n.5. Although *Rust* turned on substantive questions of statutory interpretation and constitutional law, its reasoning is relevant to whether the Announcement language challenged here is a "final agency action" and thus reviewable under the APA. *See* 5 U.S.C. § 704. Because this is a voluntary program, and the description of intermediate review criteria has no legal effects, the Announcement is not a final agency action.

As it stands, no grants have been awarded. "The question is not whether judicial review will be available but rather whether judicial review is available *now*." *Nat'l Min. Ass'n*, 758 F.3d at 253 (emphasis in original); 5 U.S.C. § 704 ("A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action."). The challenged Announcement language applies only to an intermediate stage in the review process, not the Deputy Assistant Secretary's final decision, and the Plaintiffs are not currently bound to do anything. On these facts, the 2018 Announcement is neither "the consummation of the agency's decisionmaking process," nor "a decision by which 'rights or

obligations have been determined' or from which 'legal consequences will flow.'" *Id.* at 250

(quoting *Bennett*, 520 U.S. at 177-78). Without a final agency action, the Plaintiffs' substantive

objections are unreviewable.

## IV.    THE ANNOUNCEMENT DID NOT REQUIRE NOTICE-AND-COMMENT, BECAUSE IT IS NOT A LEGISLATIVE RULE

A similar analysis applies to the Plaintiffs' procedural claim that the 2018 Announcement

required notice-and-comment rulemaking.[5] The APA mandates that agencies promulgate rules

only after giving the public notice of the proposed rulemaking and an opportunity to comment,

but excepts "interpretive rules, general statements of policy, or rules of agency organization,

procedure, or practice." 5 U.S.C. § 553(b)-(c). The statute thus separates legislative rules, which

"have the force and effect of law," *Nat'l Min. Ass'n*, 758 F.3d at 250, from three types of rules

that do not: interpretive rules, general statements of policy, and procedural rules. *Id.* at 251;

*Mendoza v. Perez*, 754 F.3d 1002, 1023 (D.C. Cir. 2014) (using "procedural rules" as "the

---

[5] The APA's rulemaking requirements do not apply to "public . . . grants." 5 U.S.C. § 553(a)(2). But in 1971, the Secretary of the Department of Health, Education, and Welfare (the predecessor agency to HHS) announced as a "statement of policy" that the agency would follow notice and comment procedures "in certain cases where not required by law," including for rules related to public grants. 36 Fed. Reg. 2532 (Feb. 5, 1971). The D.C. Circuit has applied this waiver as binding against HHS. *Samaritan Health Serv. v. Bowen*, 811 F.2d 1524, 1529 n.14 (D.C. Cir. 1987); *see also Clarian Health W., LLC v. Hargan*, 878 F.3d 346, 356–57 (D.C. Cir. 2017) (holding "to the extent that, and in whatever form the APA's procedural rulemaking requirements bind HHS," they did not require notice-and-comment); *Service v. Dulles*, 354 U.S. 363, 388 (1957) (reasoning that where a *regulation* incorporated an inapplicable statute's standards, the agency must comply with the regulation). It may seem *ultra vires*, where Congress did not intend a statute to apply, for the Judiciary to construe the Executive Branch's voluntary application of the statute as a grant of judicial authority to enforce the statute or agency policy. But I am bound by this Circuit's precedent, and the Government concedes that this claim is reviewable. Tr. 21-22.

general label" for "rules of agency organization, procedure, or practice.").  Placing agency action into one of these four categories is a frequent but confounding judicial task.[6]  Here, the Government claims that the challenged Announcement is a procedural rule, not a legislative one.  Gov. Mot. Summ. J. 27.  "The 'critical feature' of a procedural rule 'is that it covers agency actions that do not themselves alter the rights or interests of parties, although it may alter the manner in which the parties present themselves or their viewpoints to the agency.'"  *Nat'l Min. Ass'n*, 758 F.3d at 250 (quoting *James V. Hurson Associates, Inc. v. Glickman*, 229 F.3d 277, 280 (D.C. Cir. 2000)).  That description aptly fits the Announcement here and its effect on the Plaintiffs.

The exception for procedural rules "may be the hardest to define," because it exists "to ensure that agencies retain latitude in organizing their internal operations," but "many . . . internal agency practices affect parties outside the agency—often in significant ways."  *Batterton v. Marshall*, 648 F.2d 694, 707 (D.C. Cir. 1980).  If a rule of agency procedure has enough of a substantive effect, it does not fall within the exception, which must be "narrowly construed."  *Mendoza*, 754 F.3d at 1023.  The D.C. Circuit's case law describes the standard as a "matter of degree" with an inflection point:

---

[6]  *See Batterton v. Marshall*, 648 F.2d 694, 700 (D.C. Cir. 1980) ("Our task is . . . a familiar one . . . characterizing the product of agency action to determine its legal status and effect."); *Nat'l Min. Ass'n*, 758 F.3d at 251 ("[W]e need to know how to classify an agency action as a legislative rule, interpretive rule, or general statement of policy.  That inquiry turns out to be quite difficult and confused.  It should not be that way.  Rather, given all of the consequences that flow, all relevant parties should instantly be able to tell whether an agency action is a legislative rule, an interpretive rule, or a general statement of policy—and thus immediately know the procedural and substantive requirements and consequences.  An important continuing project for the Executive Branch, the courts, the administrative law bar, and the legal academy— and perhaps for Congress—will be to get the law into such a place of clarity and predictability.").

> The distinction between substantive and procedural rules is one of degree depending upon whether the substantive effect is sufficiently grave so that notice and comment are needed to safeguard the policies underlying the APA. Those policies are 'to serve the need for public participation in agency decisionmaking and to ensure the agency has all pertinent information before it when making a decision.'

*Mendoza*, 754 F.3d at 1023 (internal citations omitted).

On one side of the inflection point, "[l]egislative rules . . . effectuate statutory purposes. In so doing, they grant rights, impose obligations, or produce other significant effects on private interests. They also narrowly constrict the discretion of agency officials by largely determining the issue addressed. Finally, legislative rules have substantive legal effect." *Batterton*, 648 F.2d at 701-02. Such actions "trench[] on substantial private rights and interests," *id.*, and so warrant notice-and-comment procedures. *Mendoza*, 754 F.3d at 1023. On the other side of the inflection point, a rule is procedural when notice-and-comment is not warranted by the APA's purposes, "as for example, when the action in fact does not conclusively bind the agency, the court, or affected private parties," *Batterton*, 648 F.2d at 704, and only "alter[s] the manner in which the parties present themselves or their viewpoints to the agency." *Nat'l Min. Ass'n*, 758 F.3d at 250 (citation omitted). Even if a rule has a "substantial impact" on those outside the agency, that need not mean that it is substantive. *EPIC v. U.S. Dep't of Homeland Security*, 653 F.3d 1, 5 (D.C. Cir. 2011); *Hurson Assocs.*, 229 F.3d at 281.

Here, the 2018 Announcement does not "conclusively bind the agency, the court, or affected private parties." *Batterton*, 648 F.2d at 704. As explained above in Section III(B), the Announcement language imposes no rights or obligations, and has left the Deputy Assistant Secretary free to exercise discretion about who ultimately wins Title X grants. To be sure, a wise grant applicant will closely examine the intermediate review panel's scoring criteria, and

will aim to score as high as possible under the Announcement's challenged terms. As the Plaintiffs have explained, laying the groundwork for an excellent application may have practical costs, even before submission. Pls.' Mot. Summ. J. 14. But the Announcement has no binding *legal* effects, only practical ones. And "an otherwise-procedural rule does not become a substantive one . . . simply because it imposes a burden on regulated parties." *Hurson Assocs.*, 229 F.3d at 281.

Furthermore, the agency's 2018 substantive priorities are recycled, not new, and the previous changes to these priorities issued without notice-and-comment.[7] HHS emphasized abstinence from 2003-2011 and natural family planning from 2006-2015. *Compare* 2011 FOA at 7 (emphasizing "abstinence counseling"), *and* 2015 FOA at 8 (including "natural family planning methods" as an "acceptable and effective family planning method"), *with* 2018 FOA at 9 (encouraging "natural family planning methods"), *and id.* at 11 (discussing "avoiding sexual risk" and "returning to a sexually risk-free status"). The agency encouraged holistic family participation in family planning decisions from 2004-2010. *Compare* 2010 FOA at 7 ("encouraging participation of families"), *with* 2018 FOA at 10 ("increasing family participation in family planning"). HHS promoted partnerships with community and faith-based organizations in its Announcements from 2004-2009. *Compare* 2009 FOA at 7 (encouraging "partnerships with community-based and faith-based organizations"), *with* 2018 FOA at 11 (highlighting "cooperation with community-based and faith-based organizations"). Finally, HHS encouraged access to comprehensive primary care from 2003-2015. *Compare* 2015 FOA at 8 (advancing the delivery of "related preventative health services" which "lead to improvement in the overall

---

[7] The Plaintiffs do not allege that any of these announcements, including the one that created the scoring system in the first place in 2001, required notice-and-comment. *See* Tr. 34-35.

health of individuals"), *with* 2018 FOA at 9 (assuring "related health services that will improve the overall health of individuals"). If these priorities could change without notice-and-comment in the past, it is difficult to see why they must be subject to that procedure now.

In reaching this conclusion, I am not ignoring the real interests at stake. *Cf. EPIC*, 653 F.3d at 6 (criticizing the Transportation Security Administration for characterizing a change to body-imaging scans as a procedural rule, using an "overly abstract account of the change in procedure" to "elide[]" the public's privacy interests). The Plaintiffs contend that the scoring system's heavy emphasis on the revised program priorities and key issues forces them to alter their programs in ways that undermine Title X's focus on voluntary and effective family planning services. While it is true that the revised program priorities and key issues are now the highest scored factor, grant applicants always knew that their proposals needed to "address [that year's] Title X program priorities," and to "provide evidence of the project's capacity to address program priorities as they evolve in future years." *See, e.g.,* 2010 FOA at 5.[8] The 2018 Announcement largely makes explicit what has been implicit for years. And above all, the scoring system remains a mere tool by which an HHS panel will create an award recommendation for the final decisionmaker, putting it beyond the scope of the APA.

After all, the APA's core charge in this context is to "separate administrative rules that carry the force of law from those that do not," on the facts of each individual case. *Batterton*, 648 F.2d at 701. This Announcement bears the "critical feature" of a procedural rule: it does not "alter the rights or interests of parties," but merely changes "the manner in which the parties present themselves or their viewpoints to the agency." *Nat'l Min. Ass'n*, 758 F.3d at 250

---

[8] It beggars belief that the Plaintiffs and other applicants in years past ignored the program priorities and key issues simply because they were not explicitly scored.

(citation omitted). Announcing this award competition, along with the decision to score applications based on the agency's program priorities and key issues, was not the type of agency action that warranted rulemaking.

Notice-and-comment jurisprudence bears this out. In *Clarian Health*, the D.C. Circuit held that HHS instructions—which set enforcement priorities for when hospitals must reconcile and return excess funding from the agency—did not require notice-and-comment. 878 F.3d at 357-58. Because the regulation imposed no binding legal effect on a party and the agency retained discretion to deviate from the stated policy, notice-and-comment was not required. *Id*. Although *Clarian Health* focused on distinguishing between a legislative rule and a policy (not procedural) rule, the factual similarities are instructive. Like the challenged policy in *Clarian Health*, the Announcement's revised scoring system imposes no legal obligations or prohibitions on the Plaintiffs, and is not outcome determinative: the Deputy Assistant Secretary retains final decision-making authority, just as before. *See Alliance for Bio-Integrity v. Shalala*, 116 F. Supp. 2d 166, 173 (D.D.C. 2012) (language creating a rebuttable presumption left the agency free to exercise its discretion, and so did not require notice-and-comment).[9]

---

[9] The test *Clarian Health* applied is also instructive, although it applies mainly to alleged policy statements:

> [T]wo lines of inquiry [] guide the determination of whether an action constitutes a legislative rule or a general statement of policy. One line of analysis considers the effects of an agency's action, inquiring whether the agency has (1) impose[d] any rights and obligations, or (2) genuinely [left] the agency and its decisionmakers free to exercise discretion. The second looks to the agency's expressed intentions, including "consideration of three factors: (1) the [a]gency's own characterization of the action; (2) whether the action was published in the Federal Register or the Code of Federal Regulations; and (3) whether the action has binding effects on private parties or on the agency. . . . [T]he two lines of analysis overlap at the inquiry into whether the action has binding effect, and we have consistently emphasized that this factor is the most important.

The Plaintiffs rely on two cases for the proposition that the Announcement is a legislative rule, because it "effect[s] a substantive change in existing . . . policy." Pls.' Opp. 13 (quoting *Mendoza*, 754 F.3d at 1024-25) (brackets omitted). The first one, *Mendoza,* alludes to this standard in the context of a rule that had obvious legal effects. The challenged Department of Labor procedures in *Mendoza* allowed employers to dodge minimum wage standards that they would have otherwise had to offer livestock herders, plus requirements that they "keep track of herders' hours, and pay herders at least twice a month." *Mendoza*, 754 F.3d at 1025. The Announcement contains no similar requirements. The Plaintiffs also rely on *National Family Planning & Reproductive Health Association, Inc. v. Sullivan*, in which the D.C. Circuit held that HHS should have followed notice-and-comment procedures before switching its interpretation of a 1988 regulation to allow doctors to counsel patients on abortion. 979 F.2d 227, 228-29 (D.C.

---

*Clarian Health*, 878 F.3d at 357 (citations and internal quotation marks omitted); *see also Ctr. for Auto Safety, Inc. v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 806 (D.C. Cir. 2006) (applying the same test). These factors support the Government's characterization of the Announcement as a non-legislative rule. On the first line of inquiry, the Announcement imposed no legal rights or obligations, and leaves the final decisionmaker free to exercise discretion. On the second line of inquiry, (1) HHS characterizes the Announcement's challenged criteria as simply part of an intermediate scoring process, by which "[f]ederal staff and an independent review panel . . . assess all eligible applications." 2018 Announcement at 43. (2) The Announcement was not published in the Federal Register or Code of Federal Regulations, (3) and it has no binding effects on private parties or the agency's final decision.

The Plaintiffs point out that HHS has recently begun notice-and comment rulemaking on the "same subject," with potential amendments to 42 C.F.R. § 59.7. Pls.' Opp. 13 n.6 (citing 83 Fed. Reg. 25,502, 25,517 (Jun 1, 2018)). But that rulemaking proposal is different: it proposes turning the factors from 42 C.F.R. § 59.7 into eligibility criteria rather than review criteria, leaving the four statutory criteria in 42 U.S.C. § 300(b) as the basis for competitive evaluation. *See* 83 Fed. Reg. at 25,517 ("Any grant applications that do not clearly address how the proposal will satisfy the requirements of [42 C.F.R. § 59.7] would not proceed to the competitive review process, but would be deemed ineligible for funding"). In any event, this Announcement was not submitted for notice-and-comment, leaving no evidence that it has legal effect, or that HHS thinks it did.

Cir. 1992). But *Sullivan* was a case of clear legislative rulemaking, as HHS reversed its interpretation of a rule that had issued through notice-and-comment. *Id*. at 235 ("the fact that [a] subsequent interpretation runs 180 degrees counter to the plain meaning of the regulation gives us at least some cause to believe that the agency may be seeking to constructively amend the regulation."); *see also Crop Life Am. v. EPA*, 329 F.3d 876, 883 (D.C. Cir. 2003) ("clear and unequivocal language" in a disputed directive created the substantive rule that third-party human studies would be immaterial to regulatory decisionmaking); *McLouth Steel Prod. Corp. v. Thomas*, 838 F.2d 1317, 1321 (D.C. Cir. 1988) ("The agency treated the model [for identifying hazardous waste] as conclusively disposing of certain issues," making the model a legislative rule). Nothing similar occurred here.

Indeed, the Government has conclusively established that the Deputy Assistant Secretary makes the final award decisions and is not bound by panel scoring results. 2018 FOA 15-17; Moskosky Decl. ¶¶ 9-14 (giving four examples of HHS deviating from the results). It appears that no prior announcements issued through notice-and-comment procedures, and the Plaintiffs have not suggested this was improper. *See* Tr. 34-35. Without legal effects that bind either the agency or private parties, the 2018 Announcement does not have ramifications that would require public participation and information-gathering "to safeguard the policies underlying the APA." *Mendoza*, 754 F.3d at 1023. I therefore conclude that the 2018 Announcement is a procedural rule, lacking the force of law, and thus exempt from the APA's requirements for formal rulemaking.

**V.  THE ANNOUNCEMENT SATISFIES TITLE X AND APA LEGAL REQUIREMENTS**

Even if the Plaintiffs' substantive objections were reviewable, the Announcement would survive.  For the reasons that follow, I conclude that the Announcement is fully consistent with Title X and satisfies the arbitrary and capricious standards under the APA.

The Plaintiffs argue that the Announcement's eighth scored criterion "impermissibly adds to [an] exclusive set of criteria:" the four criteria listed in Title X itself, 42 U.S.C. § 300(b), along with seven more criteria in 42 C.F.R. § 59.7.  Pls.' Mot. Summ. J. 17-18.  These eleven factors, the Plaintiffs argue, "constitute the exhaustive list."  *Id*. at 18.  But the Government argues that the "shall take into account" language in 42 U.S.C. § 300(b) contains no limitations on considering additional factors, and that both the statute and the regulations provide for consideration of more factors.  Gov. Mot. Summ. J. 17-26.  For example, the statute explicitly says that "[t]o the extent practical, entities which receive grants or contracts under this subsection shall encourage famil[]y participation in projects," and gives general authority for the Secretary "to make grants . . . to assist in the establishment and operation of voluntary family planning projects which shall offer a broad range of acceptable and effective family planning methods and services (including natural family planning methods, infertility services, and services for adolescents)."  42 U.S.C. § 300(a).  The statute also authorizes grant-making regulations, *id*. § 300a-4, which provide even more license for agency discretion, allowing the Secretary to "award grants for . . . those projects which will *in the Department's judgment best promote the purposes of [Title X]*, taking into account [the seven factors]."  42 C.F.R. § 59.7 (emphasis added).

Neither side's winner-takes-all approach correctly interprets this legal regime.  As explained above in Section III(A), the statute and its implementing regulations provide

significant guidance for the Secretary in awarding Title X grants. At the appropriate time, it would be "standard judicial fare" to evaluate the agency's decisionmaking process to make sure that factors that the agency must "take into account" are in fact considered. *Delta Air Lines, Inc. v. Exp.-Imp. Bank of the U.S.*, 718 F.3d 974, 977 (D.C. Cir. 2013); *see also Huls Am. Inc. v. Browner*, 83 F.3d 445, 450 (D.C. Cir. 1996) (holding "shall take into account the toxicity, reactivity . . . combustibility, or flammability of a substance" could limit "the EPA's discretion to consider only those factors it deems relevant."). But simply because the agency *must* consider certain factors does not mean that it may not consider others. Instead, other factors are forbidden only if they cannot be reconciled with the grant-making factors that the Secretary must consider, or the purposes of Title X. I therefore turn to the Plaintiffs' arguments on this front.

The Plaintiffs contend that among the 16 listed priorities in the eighth factor, four emphases—sexual risk avoidance, primary care, family participation, and partnership with faith-based groups—individually and collectively undermine Title X's commitment to "comprehensive, effective, acceptable, and non-directive family planning programs," by supplanting Title X's goals with a commitment to "narrow, ineffective, unacceptable, and coercive approaches." Pls.' Mot. Summ. J. 30. They emphasize that up to 35% of grant applicants' scores will come from their proposals' ability to satisfy the agency's program priorities and key issues, and argue that this decision renders the agency's management of the Title X program contrary to law. *Id*. at 30-32. They also argue that HHS has barely tried to justify these programmatic shifts, and that they therefore violate the APA's ban on arbitrary and capricious agency action. *Id*. at 32-35. I consider these arguments together, since arbitrary and capricious review incorporates the question of whether the challenged action is contrary to law. 5 U.S.C. § 706(2)(A).

The APA provides that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id*. "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983) (citation omitted). An agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (emphasis in original).

Here, each of the agency's four challenged emphases is at once tamer than the draconian policies the Plaintiffs conjure, and reasonable under Title X's charter and the standards of arbitrary and capricious review. Before diving into each emphasis individually, I begin by noting that the Announcement's eighth scoring factor is worth more than the others (25 out of 100), and along with the fifth factor, up to 35 points reference in some way the agency's program priorities and key issues. But the *challenged* language is only a small portion of the 16 program priorities and key issues that the independent review panel will score. *See* 2018 FOA 9-11, 43-44. The great majority of the agency's priorities are not in dispute, including "improv[ing] the overall health of individuals, couples and families, with priority for . . . low-income families;" "[e]nsuring that all clients are provided services in a voluntary, client-centered, and non-coercive manner;" compliance with state laws on abuse reporting; "ensuring that abortion is not a method

of family planning" under Title X programs; use of performance data and associated metrics; "[e]fficiency and effectiveness in program management;" "accountability for outcomes;" and "meaningful collaboration with subrecipients and documented partners." *Compare id.* at 9-11 *with* Pls.' Mot. Summ. J. 25-32. With this context in mind, I consider the Plaintiffs' specific objections.

*First*, the Plaintiffs object to the Announcement's "meaningful emphasis" on "healthy relationships" and "avoiding sexual risk," 2018 FOA 11, which they consider coded language for "abstinence-only or abstinence-focused sex education." Pls.' Mot. Summ. J. 12-13. They argue that this emphasis ignores the social science research showing the ineffectiveness of prioritizing abstinence as a method of family planning, including for adolescents, and imposes unacceptable family planning methods on patients in a coercive manner, particularly by suggesting abstinence to sexually active adults who consider the approach out of the question. *Id.* at 25-27. But it is the Plaintiffs who ignore Title X and mischaracterize the Announcement language and what HHS intends.

To begin with, Title X's mention of "natural family planning methods" implicitly requires the agency to "offer" at least one type of selective abstinence as a method of family planning. 42 U.S.C. § 300(a). This requirement includes no exception for adults. *Id.* And the later inclusion of "services for adolescents" suggests, although implicitly, that Title X providers would be wise to include abstinence as part of the program's "broad range" of family planning options. *Id.*

The Announcement's actual language along these lines is quite pedestrian. It encourages grant applicants to "consider[]" the following key issues when "developing the project plan:"

- A meaningful emphasis on education and counseling that communicates the social science research and practical

> application of topics related to healthy relationships, to committed, safe, stable, healthy marriages, and the benefits of avoiding sexual risk or returning to a sexually risk-free status, especially (but not only) when communicating with adolescents;
>
> • Activities for adolescents that do not normalize sexual risk behaviors, but instead clearly communicate the research informed benefits of delaying sex or returning to a sexually risk-free status.

2018 FOA at 11. Fairly read, the agency wants providers to *convey* the social science research on these topics, and expects grant recipients to discuss "healthy relationships" and "the benefits of avoiding sexual risk . . . especially (but not only) when communicating with adolescents." *Id.* The Plaintiffs themselves follow the same pattern. Pls.' Mot. Summ. J. 25 ("Plaintiffs do discuss abstinence with their patients when appropriate and medically effective to do so, particularly as one out of many strategies, and particularly for younger adolescents.").

Sexual risk avoidance, as the agency understands it, is different from abstinence-until-marriage, which the Plaintiffs seem to view as medieval. Gov. Mot. Summ. J. 33 (quoting Admin. Rec. (AR) 125). Instead, it can involve various sexual abstentions, including "avoiding sexual activities that put an individual at risk for unwanted pregnancy, sexually transmitted infections or other associated risks." AR 125. Individuals could avoid sexual risks in this way by limiting their sexual activities, limiting their sexual partners, and/or limiting the timing of when they engage in sex. *See* AR 125. The Plaintiffs' arguments fail to show anything arbitrary or capricious about this nuanced approach.

The Plaintiffs insist that most social science researchers agree that an emphasis on abstinence is ineffective as a method of family planning, including for adolescents, *see* Pls.' Opp. 25-27 (collecting studies), rendering the Government's "meaningful emphasis" goal bereft of a "rational connection between the facts found and the choice made." *Id*. at 25 (quoting *Motor*

*Vehicle Mfrs. Ass'n, Inc.*, 463 U.S. at 43). But this argument inaccurately paints the Government's "meaningful emphasis" discussion with the broad brush of critiques leveled at abstinence-only programs, and embodies an assumption that the "meaningful emphasis" priority must detract from other, "substantially more efficacious . . . methods." *See id*. at 25-27 (characterizing this priority as "an abstinence-only 'emphasis'"). The Announcement merely encourages Title X providers to discuss healthy relationships and sexual risk avoidance, in a nuanced and research-informed way. However unpopular, decisions to choose forms of sexual abstinence have undeniable relevance to family planning, and the administrative record supports the Government's conclusion that a meaningful emphasis on this topic can be part of a well-reasoned approach to Title X programs. *See, e.g.*, AR 887 ("[T]he Centers for Disease Control and Prevention . . . described abstinence as the 'surest way to avoid transmission of sexually transmitted diseases,' and abstinence is obviously an effective method of preventing unwanted pregnancies."). No doubt this is why prior Administrations have often included language encouraging abstinence counseling in their funding announcements. *See, e.g.,* 2003 FOA at 4, 2011 FOA at 7.

The Plaintiffs imagine a scenario in which a Title X provider "advise[s] an unmarried, healthy adult woman who wished to be sexually active and who came to the health center for contraception that she should instead consider abstaining from sex until marriage." *Id*. at 26. They argue that this advice would violate providers' legal obligation to "protect[] the dignity of the individual," and avoid discrimination on the basis of marital status. *See* 42 C.F.R. § 59.5(a)(3)-(4). But the Announcement nowhere requires grant recipients to subject their clients to moral judgment, or to insist on any particular family planning method for unmarried persons. Instead, the Announcement seeks "projects [that] offer a broad range of family planning . . .

services that are *tailored to the unique needs of the individual*."  2018 FOA 9 (program priority #1) (emphasis added).

The agency's focus on encouraging grant recipients to place a meaningful emphasis on sexual risk avoidance fits squarely within Title X's mandate to fund "voluntary family planning projects which shall offer *a broad range* of acceptable and effective family planning methods and services (including natural family planning methods . . . and services for adolescents)."  42 U.S.C. § 300(a) (emphasis added).  I conclude that it is not contrary to law, or arbitrary and capricious.

*Second*, the Plaintiffs challenge the Announcement's decision to emphasize "[p]romoting provision of comprehensive primary health care services to make it easier for individuals to receive both primary health care and family planning services preferably in the same location, or through nearby referral providers."  2018 FOA at 10.  The Plaintiffs' chief complaint is what they consider this a preference for on-site primary care, Pls.' Opp. 28, since they already refer patients to primary care providers.  *See* Gov. Mot. Summ. J. 36 n.26.  The parties therefore dispute the import of the comma and the disjunctive "or" in the phrase "in the same location, or through nearby referral providers," with the Plaintiffs contending that the agency will score co-located grant applicants higher than those that use referrals, and the Government contending that both options receive equal preference.[10]  The Plaintiffs also argue that stand-alone Title X providers give the most effective Title X services, but the Government says overall health

---

[10]  In addition to the Announcement text, the Government relies on a clarification in the post-Announcement Frequently Asked Questions clarifying that both options are equally preferable. Gov. Mot. Summ. J. 18 (quoting AR 124 ("it is best for patients to have primary care services provided within the same site or . . . to have robust referral linkages to primary care providers within close proximity to the Title X site.  Either of these options helps promote optimal . . . health outcomes.")).

benefits Title X patients, and would be advanced by primary care options. Given the agency's avowed intention to favor both on-site and referral options equally, and the Plaintiffs' admission that they have no objection to referrals, *see* Pls.' Opp. 28 (citing 42 C.F.R. § 59.5(b)(8)), this issue is much ado about nothing. Funding announcements from 2007 to 2018 all sought some sort of evidence from applicants of their ability to connect clients with broader, comprehensive healthcare options. *See* Gov. Mot. Summ. J. 37, n. 28; 2015 FOA 9, ECF No. 25-15 (listing "[e]vidence of the ability to provide comprehensive primary care services onsite or demonstration of formal robust linkages with comprehensive primary care providers" as a program priority). The obvious reason for this longstanding agency commitment, as HHS explains, is the overall health of Title X patients. Gov. Mot. Summ. J. 36-37. That goal is consistent with Title X's purposes, and I conclude that the Government's decision to continue and score this emphasis is "within the bounds of reasoned decisionmaking required by the APA." *See Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 104 (1983).

*Third*, the Plaintiffs contend that encouraging Title X providers to increase family participation in the family planning decisions of adolescents *and* adults will pressure providers to "push unwanted family involvement" on adult patients, Pls.' Mot. Summ. J. 29, in violation of legal requirements that Title X services be client-centered, respectful of individual dignity, and coercion-free. Pls.' Opp. 30-31 (citing 42 C.F.R. § 59.5). As with their objection to the sexual risk avoidance language, it is the Plaintiffs' policy preferences that sidestep Title X. The statute provides that "[t]o the extent practical, entities which receive grants or contracts under this subsection shall encourage famil[]y participation in projects assisted under this subsection." 42 U.S.C. § 300(a). The statutory language includes no carve-out for adults. Determined not to be thwarted by the plain language of the statute, the Plaintiffs argue that the "practical" limitation

implies that encouraging family participation for adult clients is *impractical*, citing as evidence a requirement in a 2016 appropriations bill that Title X grantees certify only that they "encourage[] family participation in the decision of *minors* to seek family planning services." Pls.' Opp. 30 (quoting the Consolidated Appropriations Act, 2016, Pub. L. No. 114-113 (Dec. 18, 2015) (emphasis added)).

But the Announcement tracks Title X's approach to this question. After quoting the statute's family planning language almost verbatim, the Announcement states that "[t]his requirement applies throughout the program, extending to all individuals, couples and families seeking Title X services, *as practicable*, always being mindful of the health, safety, and best interest of the client." 2018 FOA 8 (emphasis added). The Announcement goes on to detail family involvement as a program priority, just before emphasizing non-coercive, client-centered service as well. The agency thus favors:

- Assuring activities that promote positive family relationships for the purpose of increasing family participation in family planning and healthy decision-making; education and counseling that prioritize optimal health and life outcomes for every individual and couple; and other related health services, contextualizing Title X services within a model that promotes optimal health outcomes for the client[; *and*]

- Ensuring that all clients are provided services in a voluntary, client-centered and non-coercive manner in accordance with Title X regulations.

*Id*. at 10. Just a few paragraphs later, the agency details how family participation efforts should focus on adolescents, "[e]ncouraging participation of families, parents, and/or legal guardians in the decision of minors to seek family planning services; and providing counseling to minors on how to resist attempts to coerce minors into engaging in sexual activities." *Id*. I discern no daylight—and certainly no conflict—between the Announcement and the reasoning of Title X

itself.  Such efforts are not arbitrary and capricious.  By encouraging family participation for all

clients as practical, with a particular focus on minors, HHS is encouraging a family planning

paradigm that involves families, in line with Title X's stated goals.  *See* 42 U.S.C. § 300(a).

*Fourth*, the Plaintiffs challenge the Announcement's encouragement to "cooperat[e]

with community-based and faith-based groups," 2018 FOA 11, contending that HHS thus

"awards points . . . merely for partnering with faith-based organizations, regardless of the

organization's ability to contribute to Title X's aims," and helping applicants who may partner

with "groups that discourage effective family planning, and contraception in particular."  Pls.'

Opp. 31.  Like the other challenged points, this emphasis has often appeared in prior

announcements.  *See, e.g.* 2004 FOA at 4; 2009 FOA at 7.  The Plaintiffs argue that HHS has not

come forward with any evidence that faith-based groups are particularly helpful to Title X goals,

making this emphasis arbitrary and capricious.  Pls.' Opp. 31.  But the Plaintiffs themselves

already partner with faith-based organizations, undermining their suggestion that faith-based

groups are irrelevant to Title X.  *See* Pls.' Mot. Summ. J. 29-30 ("Plaintiffs frequently work with

community-based groups of all kinds, including faith-based groups like local churches, youth

groups, and others.").  And though the Plaintiffs object to other applicants receiving points for

partnering with "groups that oppose Title X's basic mission," this argument presumes facts not

in the record.  *See id*. at 30.[11]  Nothing requires partnership with counter-productive

organizations.  As the Government points out, this alleged injury is hypothetical and speculative,

---

[11]  Along similar lines, 19 states and the District of Columbia contend that the 2018
Announcement will push out well-qualified Title X providers and advantage less-qualified
providers who will undermine the states' public health goals.  Br. of Amici States 14-17, ECF
No. 23.  But these arguments largely assume the merits question of whether the 2018
Announcement is arbitrary and capricious, and in any event only speculate about potential
harms, since HHS may yet award grants to the providers whom the amici states prefer.

rather than actual or imminent, Gov. Mot. Summ. J. 37 (citing *Bennett*, 520 U.S. at 167), an

argument to which the Plaintiffs fail to respond. *See* Pls.' Opp. 31-32. Even if the Plaintiffs

have standing to challenge this point, their own partnerships with faith-based groups illustrate

that such linkages may benefit Title X providers by providing connections to communities in

need of Title X services and strengthening enrollment and awareness programming, among other

benefits. *See* Pls.' Mot. Summ. J. 29-30. The Announcement's low-key encouragement to

partner with community and faith-based organizations is not contrary to law, or arbitrary and

capricious.

I conclude that the Government has shown that the Announcement's challenged priorities

are not arbitrary and capricious, or otherwise contrary to law. Instead, the priorities fit easily

within the Title X scheme, either by directly reinforcing the statute's priorities (avoiding sexual

risk, and encouraging family participation) or by adopting complementary goals (transitions to

primary care, and partnerships with faith-based groups) for which the agency has "good

reasons." *Fox Television Stations*, 556 U.S. at 515.

## VI. CONCLUSION

By challenging a funding announcement before HHS awards any grants, the Plaintiffs ask this Court to intervene before anything of legal effect has occurred. But courts cannot review substantive objections to a non-final agency action, nor can they require formal rulemaking for a change in agency procedure. Even if I reached the merits, the Government's challenged priorities align with Title X's commitment to "voluntary family planning projects . . . offer[ing] a broad range of acceptable and effective family planning methods and services." 42 U.S.C. § 300(a). I therefore will grant the Government's Motion for Summary Judgment. A separate order will issue.

Dated: July 16, 2018

TREVOR N. MCFADDEN
United States District Judge