UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PLANNED PARENTHOOD OF WISCONSIN, INC., et al, | ) |
| | ) Civil 18-1035 |
| Plaintiffs, | ) |
| v. | ) |
| | ) Washington, D.C. |
| ALEX M. AZAR, II, et al., | ) |
| | ) July 24, 2018 |
| Defendants. | ) |

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE TREVOR N. McFADDEN
UNITED STATES DISTRICT JUDGE

APPEARANCES:

| | |
|---|---|
| FOR PLAINTIFFS PLANNED PARENTHOOD OF WISCONSIN, INC., ET AL: | Paul R.Q. Wolfson, Esq.<br>Ari J. Savitzky, Esq.<br>Leon Tyler Kenworthy, Esq.<br>Emily Jean Nix, Esq. (By telephone)<br>WILMER CUTLER PICKERING HALE & DORR LLP<br>1875 Pennsylvania Ave., NW<br>Washington, DC 20006<br><br>-and-<br><br>Carrie Y. Flaxman, Esq.<br>PLANNED PARENTHOOD FEDERATION OF AMERICA<br>1110 Vermont Avenue, NW<br>Suite 300<br>Washington, DC 20005 |

(Appearances continued on next page)

FOR PLAINTIFF NATIONAL FAMILY PLANNING AND REPRODUCTIVE HEALTH ASSOCIATION:

Jennifer Dalven, Esq. (By telephone)
Ruth Ellen Harlow, Esq.(By telephone)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street
18th Floor
New York, NY 10004

-and-

Arthur B. Spitzer, Esq.
AMERICAN CIVIL LIBERTIES UNION OF THE DISTRICT OF COLUMBIA
915 15th Street, NW
2nd Floor
Washington, DC 20005

For the Defendants:

Alicia M. Hunt, Esq.
Michael Quinn, Esq.
U.S. DEPARTMENT OF JUSTICE
Civil Division
Commercial Litigation Branch
1100 L Street, NW
Washington, DC 20005

Also Present:

Matthew Bowman
Jocelyn Mendelsohn

Court Reporter:

PATRICIA A. KANESHIRO-MILLER, RMR, CRR
U.S. Courthouse, Room 4700A
333 Constitution Avenue, NW
Washington, DC 20001
(202) 354-3243

Proceedings reported by stenotype shorthand.
Transcript produced by computer-aided transcription.

P R O C E E D I N G S

(3:00 p.m.)

THE DEPUTY CLERK: Matter before the Court, Civil Case Number 18-1035, Planned Parenthood of Wisconsin, Inc., et al., versus Alex M. Azar, II, et al.

Counsel, please come forward to identify yourselves for the record.

MR. WOLFSON: Good afternoon, Your Honor. I'm Paul Wolfson, appearing today for the plaintiffs. With me at counsel table are Ari Savitzky, Leon Kenworthy, Arthur Spitzer, and Carrie Flaxman.

THE COURT: Good afternoon, Mr. Wolfson.

Do we have anybody on the phone that we should acknowledge?

MR. WOLFSON: Yes. I believe Jennifer Dalven and Ruth Harlow are on the phone.

THE COURT: Good afternoon, ladies. Can you hear us?

UNIDENTIFIED SPEAKER: Yes, Your Honor.

THE COURT: For the government?

MS. HUNT: Good afternoon. This is Alicia Hunt on behalf of the United States. I'm here with Michael Quinn, also from the Department of Justice, along with Matthew Bowman and Jocelyn Medelsohn from HHS.

THE COURT: Good afternoon, Ms. Hunt.

Mr. Wolfson, I want to give you an opportunity to

respond to the government's opposition. Obviously, you haven't had a chance to do so.

Maybe you could start by helping me think through the right standard here. It seems like there is a bit of a question as to whether I should be considering whether you have shown a substantial question or whether there's kind of in the post-*Winter* landscape we're looking at substantial likelihood of success on the merits and --

MR. WOLFSON: Right --

THE COURT: -- on the other three prongs --

MR. WOLFSON: -- thank you, Your Honor.

Of course, I want to start by saying we recognize the Court has ruled against us in this matter, so my objective is not to reargue all of the points but going directly to that point.

It's true that some Court of Appeals panels have said that it's uncertain post-*Winter* whether there is still sort of a sliding scale or something like that. I think what is clearly not the case is we do not have to show that it is more probable than not that we will prevail on appeal. We don't have to show that it is a 50 percent plus 1 or anything like that. All we have to show is that we have a substantial likelihood of success on the merits, which means we have substantial and serious arguments.

First of all, even in the preliminary injunction

stage, that has always been the case, even in the District Court when you refer to a substantial likelihood of success on the merits. That does not mean more likely than not that you would prevail on appeal. What it means is this is a serious and substantial question that the Court needs to consider.

And I think, as the Court itself recognized, certainly the questions of final agency action and notice-and-comment rulemaking are close and difficult questions that are difficult to resolve. So that is what I would say.

And I think, as the Court of Appeals has observed on various circumstances, that has to be the rule because you have to conform the substantial likelihood of success on the merits with the requirement to go back to the District Court under Rule 8 to ask for a stay or an injunction before you go to the Court of Appeals. And it would seem odd to require you to go back to the District Court and say, I have to prove to you that I will definitely get your ruling overturned. No, I think that that would not make sense. So that's why the Court of Appeals has said that all that the plaintiff has to show is there are serious and substantial questions going to the merits.

THE COURT: Okay. So your view is that you've got kind of a lower burden on the merits than you did initially

looking at the permanent injunction; is that correct?

MR. WOLFSON: I'm not sure it's a lower burden, but I think that even on the preliminary injunction, which of course the Court bypassed and went straight to summary judgment, that all we had to show was sort of significant and substantial arguments on the merits to preserve this. Because the whole point of a preliminary injunction in whatever context is to preserve the status quo so that the plaintiff won't suffer irreparable harm and that the controversy won't essentially become eclipsed by events to allow the Court to make an orderly and fair adjudication of the case.

THE COURT: The government cited *Davis* for the proposition that you don't just need to show serious legal questions are at issue. You would agree with them that your burden is more difficult than that?

MR. WOLFSON: I think we need to show that we have a substantial likelihood of succeeding on the merits. I mean, it is not just this is an interesting question. We have to prove there is significant substance to our position. So I think I disagree with the way the government is characterizing what we're saying. But whatever the formulation, I think the key question is: Do we have a significant and substantial claim on the merits which might lead the Court of Appeals to reverse the District Court? We

don't have to persuade this Court that the Court of Appeals will definitely reverse the District Court or even that it is more likely than not that the Court of Appeals will reverse.

THE COURT: I wonder if you had an opportunity to look at what I'm told is called the majority concurrence there in *Davis* where Judge Kavanaugh, joined by Judge Henderson, say that post-*Winter* the plaintiff needs to show he's likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the absence of equities tip in his favor, and that an injunction is in the public interest; in other words, rejecting the idea that a strong likelihood of success could make up for showing only a possibility rather than a likelihood of irreparable harm.

MR. WOLFSON: So I know that opinion. I think that there are other opinions, including from the past year, that have said that it remains uncertain within the D.C. Circuit whether the D.C. Circuit still operates on what was previously called a sliding scale. I think we don't have to rely on a sliding scale in order to obtain the relief that we are seeking today. I think we have made a sufficiently significant showing of irreparable harm and the same with likelihood of success on the merits. But in neither case, I think, does the plaintiff have to show sort of overwhelming success or more likely than not, is the point. It is enough

that it is a substantial likelihood of success on the merits.

THE COURT: Okay. Do you think I'm bound by that majority concurrence?

MR. WOLFSON: Well, I think the decisions after that have said that it remains uncertain whether there's still a sliding scale, but I don't think we're arguing that there's a sliding scale. I think we're arguing that even if you take each prong on its own -- I don't think we have to rely on a sliding scale. We're saying, even if you take each prong on its own, we have a sufficient showing.

THE COURT: Okay. I will let you address more broadly the government's arguments.

MR. WOLFSON: Thank you.

I would like to address two core issues today. The first is irreparable harm, and the second is our likelihood of success on the merits.

On irreparable harm, the plaintiffs will suffer irreparable harm if the FOA is allowed to go into effect, and the public interest will be harmed, as well. What we will see is a serious disruption of Title X services, as experienced providers, who have long connections to their patients, are denied funding. Those providers will be forced to turn away their patients and will be forced to close health centers, lay off medical staff. And those are not harms that could simply be reversed if we were to prevail at

the end of the case because the facilities are closed down, doctors and other staff are let go, patients disperse, medications expire, leases have to be surrendered. So there is no easy way that you can just sort of call that all back together again if, say, in a few months the Court of Appeals were to say, yes, actually, the plaintiffs are right and the FOA is invalid and the HHS should not have forced -- should not have essentially issued an FOA under which the plaintiffs operate under a disadvantage.

THE COURT: Mr. Wolfson, my understanding is that your clients include like 84 percent of the Title X providers. I mean, surely many of them are going to get funding one way or the other this fall. I imagine the barriers to entry are pretty high in this area. And doesn't that kind of go to the irreparable harm here?

MR. WOLFSON: Well, many of them -- I think that the FOA does put plaintiffs at a significant disadvantage.

First of all, in many states, there is assurance that the state health department will compete for funding. Indeed, in some states' laws, they're required to compete for funding. And many of those state health departments, unlike many of the plaintiffs and their members, are willing to place a meaningful emphasis on abstinence, are in a position to, or able to, emphasize primary care on site and the other things that we have made reference to.

THE COURT: But don't many of your clients actually act as subgrantees, and if they don't now, wouldn't they end up just being subgrantees of states?

MR. WOLFSON: Well, I don't think there is any reason to think that. I mean, the states, for example, Planned Parenthood in some of the states where it operates, the states are actually forbidden from subgranting Planned Parenthood. And since, for example, the Planned Parenthood plaintiffs here do not make a meaningful emphasis on abstinence and are not sort of on-site primary care, it is unlikely that those states would include Planned Parenthood entities as subgrantees. The same is true of the Arizona example, which is a member of NFPRHA. So I don't think there is any reason to think that all of the plaintiffs will simply be fine and will get their grants.

In addition, as the Desilets Declaration shows, even a very small point difference can be dispositive in competition for Title X grants. The grant applications tend to be very well prepared, and they cluster at the high end of the scale. So the difference between winning and losing can be a matter of three or four points. And I do know that the Court observed in its opinion that not all the 35 points of the new scoring mechanism may necessarily go to the issues that we're concerned about. But even so, even if we lose just three or four points because we aren't willing to place

a meaningful emphasis on abstinence or we're not in a position to offer on-site primary care, there is a very strong likelihood that we will lose the competition and be denied a grant. And the effects of being denied a grant will be dramatic and adverse both for the plaintiffs and for the thousands of patients that we serve.

I mean, just to give you one example from the record, Planned Parenthood of Wisconsin currently serves 87 percent of the Title X patients in the state, 31,000 patients, and is likely to face competition from the state. That program will be shut down if HHS awards the grant to another applicant that is willing to emphasize abstinence and is in a position to offer on-site primary care.

THE COURT: Sir, aren't a number of your clients willing to discuss abstinence? I noticed Ms. Harvey's declaration says, "PPGOH healthcare professionals do highlight abstinence as one method for preventing unintended pregnancies." Ms. Thomas' declaration also talks about abstinence. Ms. Galloway said, "To be sure, PPAU staff discuss abstinence with patients as one method of preventing unintended pregnancies and STIs." It seems to me like you all already are doing a lot of these things and that you're probably pretty well situated to meet the grant requirements.

MR. WOLFSON: So I think this goes to the question of what it means to be a meaningful emphasis on abstinence. And

yes, it is -- particularly for adolescents, it is true that it may sometimes be appropriate to discuss abstinence as an option for someone who comes to a Title X center. But when you are talking about an adult healthy woman, for example, which is the sort of paradigmatic patient seeking Title X services who comes because she wants to remain sexually active but wants assistance in controlling the timing and spacing of her children, it is not appropriate as a matter of medical practice or as a matter of respecting the patient and a matter of sort of adhering to the requirements under Title X that the services be acceptable and effective and voluntary. It is not appropriate, or it may not be appropriate in that circumstance for the clinician to say: Okay, I know you have come in asking for an IUD. Could we just stop now and talk about abstinence? Because I would like to discuss with you the benefits of returning to a sexually risk-free lifestyle.

That is a very, very different encounter than the one that the affiants are referring to in their papers, and that is the paradigmatic situation that we're concerned about because it leads to a breakdown in the relationship between the clinician and the patient.

THE COURT: Isn't the government going to tell me that you're kind of creating straw men, that they're not requiring your clients to stuff abstinence down someone's

throat, a healthy adult woman who says, "I don't want to do abstinence"?

MR. WOLFSON: Well, it is HHS that has said that the grantees should explain how they're going to take a meaningful emphasis on abstinence, meaningful emphasis on returning to a sexually risk-free life, which the government has not disputed means abstinence. I would like to address that for a little bit. And also, the FOA is quite clear that it's not just for adolescents, but it is for adults, as well. So I think it is sort of difficult to understand, you know, as a matter of medical justification why that is in there and how that conforms to the statutory requirements that the Title X services be effective and acceptable. And there isn't anything in the administrative record that provides the slightest reason to believe that abstinence is an effective method of family planning for adults. As the government has pointed out, there are studies that talk about the benefits of delaying sort of initial sexual activity. Those studies, when you look at them, they're talking about people who are like 12. They're not talking about, again, what constitutes sort of 92 percent of the people who seek Title X services, which are healthy sexually active women in their twenties.

So I think, as a consequence, there is a high likelihood that other applicants will be able to make a better case than the plaintiffs because they are willing to

do what is necessary to score those points under the eighth criterion.

Again, using Planned Parenthood of Wisconsin just as an example, that means a loss of three and a half million dollars, closing down seven health centers, four of which are in rural areas where there is no alternate provider. And those harms are not just financial. They, of course, mean a significant impairment of Planned Parenthood's institutional mission, of the Title X grantees' institutional mission, but as I said before, it also means sort of the resources are scattered, and there is just no way to sort of bring them back again in a few months if we were to prevail on the merits in the Court of Appeals. Sort of most important, I think, is the effect on the patient population as they lose access to the care on which they depend. I don't think it is sufficient to say that the patients can go elsewhere. Again, we know from Wisconsin experience that doesn't happen, or it is very difficult. When Wisconsin excluded Plant Parenthood from its own healthcare programs in 2011, many of the patients who had been sort of depending on their established relationship where the provider just didn't find care anywhere else, and in some areas, there isn't anywhere else. In rural Wisconsin, rural Utah, there just is no alternative of a family planning provider that certainly has the access to the range of family planning methods that the specialized

network of healthcare providers that have long been at the sort of backbone of the program have been accustomed to providing.

THE COURT: I wonder which way that cuts, though, Mr. Wolfson. Given that your clients are the only show in town in so many places, isn't the government going to be required to -- there is only one grantee available, and we've got to be taking the geographic concerns into account, and that part hasn't changed under the reg.

MR. WOLFSON: Well, not necessarily. I mean, I think the problem is the -- first of all -- and here I think it is important to remember that this factor, the sort of new factor H is 25 points, which is so much more substantial than any of the other factors, including sort of local needs, which I think has now been downgraded to 10, and a few others. So what has happened now is that this has become such a dominant factor in the agency's consideration that there is a serious risk that it is going to sort of overwhelm anything else. And even so, I think if the state, for example, were to submit an application that manages to sort of tick the boxes, it is going to come out ahead of the traditional family planning providers that have long offered Title X services.

I can turn now to the likelihood of success on the merits unless the Court has further questions.

THE COURT: I guess maybe just kind of an overall one. Am I right in thinking *League of Women's Voters*, that is kind of your lead case for me here?

MR. WOLFSON: That is certainly the important case on sort of harm to the organizational mission, yes. I think when you think about sort of the other side, which is what would be the practical effect on healthcare if we are denied funding, I would point the Court to I think it is *Planned Parenthood of Wisconsin*, which is from the Seventh Circuit, which is cited in our briefs, which involved the Medicaid case where Planned Parenthood was denied access to Medicaid. And the court in the Seventh Circuit said, yes, of course, if the consequence is having to close down medical facilities and plaintiffs may go without medical care, that is a very important factor on the irreparable harm and public interest point.

THE COURT: On *League of Women Voters*, the court there talks about irreparable harm needing to be certain and great, actual and not theoretical.

Given my obvious belief that it is not certain at this point, kind of nonfinality issue, how do you all win under that prong?

MR. WOLFSON: Well, I think it is a question of language, but I think when you look at sort of all of the decisions where the Court of Appeals has said, for a

preliminary injunction, including a preliminary injunction pending appeal, you don't have to show, you know, that you will in fact prevail. When you look at the whole body of case law, I think the answer is what we have to show is a substantial likelihood of success on the merits, not that we absolutely will prevail.

THE COURT: I hear you, and I don't mean to be quibbling about that. My point is, even if you're right as a legal matter, it seems to me that you all may still get the funds.

MR. WOLFSON: I say on the irreparable harm --

THE COURT: Yes.

MR. WOLFSON: -- I mean, well, if we don't get -- I mean, I would say if we don't get relief, interim relief, I think the Court can be pretty certain that significant numbers of the plaintiffs will not get funding. In other words, I may not be able to show the Court that every single member of NFPRHA will not get funding. But I think given that, for example, many of the plaintiffs here and the plaintiff members are not in a position to offer primary care, for example, on-site primary care, that many of them are not willing to place a meaningful emphasis on abstinence in the way that we think the FOA clearly requires, they're not --

THE COURT: I don't agree with that. Maybe I

misunderstood, but I thought that at the end of the day you all were basically saying the same thing, is that you're saying we do have relationships with primary caregivers and the government said that's sufficient.

MR. WOLFSON: I think we're still disagreeing with the government about -- so the government has said that there is sort of an equal preference. I don't think that is what the agency has said, actually. I think that's what the government has said in its briefs, but I don't think that the agency has said that the preference is equal. That certainly doesn't appear in the FOA, and the FOA is what is given to the review panel to score. They don't get the FAQs, and they don't get other sort of agency interpretations. They certainly don't get the government's briefs. All they get is the application and the FOA. And I think when you look at the FOA, you see it doesn't to me read that the preference, if you will, is equal for whether it is on site or whether it is just being part of a network of primary care.

Looking at the abstinence issue, though, you know, there is no question that many of the plaintiffs will not sort of place a meaningful emphasis on returning to a sexually risk-free lifestyle in the government's language.

I want to address one thing that was in the Court's decision on that question. The Court likened that to natural family planning, which is required under the statute. The

government has not argued that returning to a sexually risk-free lifestyle is encompassed within natural family planning. I don't think it is at all. Natural family planning involves helping the woman or the couple, or the individual or the couple, understand how to sort of control the timing of sexual intercourse so that they can avoid pregnancy.

THE COURT: The "when, not if" question.

MR. WOLFSON: Well, returning to a sexually risk-free lifestyle, I mean the only sort of true risk-free lifestyle is avoiding certain forms of sexual activity altogether. There are methods of reducing, of course, risk of pregnancy and reducing risk of exposure to sexually transmitted infections. And our clients sort of advise their patients about that all the time. They advise patients about condoms, and they advise patients about other forms of reducing risk. But a risk-free lifestyle, like a zero percent risk, that is abstinence, not natural family planning. So I think it is important to distinguish those. And my point is it's definitely not -- it's not within -- it is not anything that is required by the statute itself.

If I could just touch on sort of the final agency action point, which is a threshold issue, the Court concluded that the FOA sort of merely describes how an agency decision will be made and is not a final agency action itself. But

the FOA is an instruction by the agency to agency decision makers that they must take certain factors into account when approving an application. And it represents the definitive position of the agency and has direct and concrete consequences.

Again, I don't think anyone would doubt if the government had -- if HHS had amended its regulation and had said, from now on, you must consider eight factors rather than seven, I don't think anybody would doubt that that is final agency action even though that's not sort of the actual -- that's not the actual issue inside the grant award. I mean what that would be is a definitive instruction to the agency to take into account eight factors. The agencies decision-making is at rest on that question.

THE COURT: Wasn't the issue here, though, whether they are actually the decision makers. My impression is that the DAS is the decision maker, and the FOA does not bind her. I guess that's probably where we part paths.

MR. WOLFSON: Well, the FOA -- the agency -- I would say the agency as a whole has to be bound by the FOA because the FOA is clearly telling the agency, in deciding whether to award a grant, consider this eighth factor, which incorporates the program priorities and key issues, which is quite different from what came before. So it seems that one of two things has to happen. Either the DASPA considers it

herself or the review panel takes it into account and the DASPA sort of accepts that as the consideration by the agency, maybe somebody else, but I think those are the two most likely. It seems like under either of those situations, the agency is considering the eighth factor in deciding whether to award a grant. It binds the agency.

What I don't think the FOA is anticipating is that the review panel says, okay, as you told us, we've considered all eight factors and here is the score. And I don't think the FOA anticipates that the DASPA will then say: Well, thank you very much, review panel, but I'm just going to do something completely different, and I'm just going to consider one factor.

THE COURT: No, the DAS is supposed to consider four factors, and they're four different factors, and they haven't changed; right?

MR. WOLFSON: But if the DAS did that, then it seems to me the agency would not be considering all of the factors. I mean, the regulation says the agency will consider the seven factors. It doesn't say only the review panel considers the seven factors. So the agency must consider the factors. So if the DAS were to say, you know, your rating of the seven factors is all very interesting, but as far as I am concerned, it is completely advisory, and I'm only going to consider one factor or four factors, in that case the DAS

would not be adhering to the regulation.

THE COURT: I don't have that language in front of me, but is the term actually "agency"?

MR. WOLFSON: Let me get it.

So the heading says -- this is 59.7 -- "What Criteria will the Department of Health and Human Services Use," and then it says, "Within the limits, the Secretary may award grants which in the department's judgment best promotes taking into account the seven factors."

THE COURT: Okay.

MR. WOLFSON: So that I think is sort of where I am on that point. So, essentially, what we're saying, of course, is the FOA has the effect of adding an eighth criterion. But the FOA is clearly anticipating that the agency consider the eighth as well as the seven. I didn't understand the government to be arguing that in prior years the DAS ever said or could say, rating panel, thank you very much for your ruling on the seven but I'm just going to just set that at naught and do something else altogether.

The agency's policy guidance is the same. It says these are the criteria that the agency will use. Given that the FOA is essentially sort of, as we see it, basically the agency's instruction to itself to consider the eighth factor, that is final agency action. I think that falls within sort of cases that we have cited like *Appalachian Power* and some

others, *NRDC v. EPA*, where the court has said, when the agency instructs itself to do something, even if it takes the form of guidance, that is final agency action. Unlike in the *National Mining Association* case, which the Court cited in its decision, where the agency in that case was telling the states, here's what we think you ought to do in deciding when to grant a coal mining permit, this is essentially the agency saying this is what we are going to do, what we will do.

I want to address the Court's conclusion that sort of nothing here is binding because participation in a grant application process is voluntary entirely because it's a subsidy. I don't think that can be the complete answer, because if that were right, then it would seem that sort of no criteria for applications of grants or permits would ever be final agency action. If you had a regulation, to use just sort of that example, again if you had a regulation that said, here are the criteria you have to satisfy -- or here are the criteria by which we will evaluate whether you should receive a coal mining permit, and then -- you know, there is no requirement that you apply for a coal mining permit. It is not coercive on anybody outside the agency. But I don't think the government would argue that if the agency said, okay, no more five criteria, now six criteria if you're applying for a coal mining permit, that that wouldn't be final agency action. And so I don't think that the idea that

you don't have to apply for a grant can be dispositive in that context. And I think sort of very similar analysis applies in the question about whether notice-and-comment rulemaking is required. Again, just to take that example, if the agency were to change its substantive criteria from four to five, certainly if it did it in a regulation, everybody would agree that that would require notice-and-comment rulemaking because that is a substantive change in the criteria let's say EPA would use to decide whether you can get a coal mining permit or the Army Corps of Engineers would consider if there are people that are applying for a fill permit, a discharge permit. This is basically the same thing. There are seven criteria that the agency has used for 50 years to decide whether a grant application would be awarded. Now, under our view of the case, the agency has just added an eighth.

The Court observed that on prior occasions the agency had included issues such as abstinence in its program priorities for particular years, and suggested that essentially all the agency was doing here was sort of changing procedurally the way it would consider those matters. But there is a crucial difference, which is never before has the agency elevated any of that to the status of a criterion and equal to or greater than the seven that the agency is required by regulation to consider. That scoring

has sort of a significant substantive effect on the likelihood that an application will be granted.

I know the Court observed it. It seems hard to think that applicants would sort of, quote, ignore these policy priorities in the future, but I can tell the Court that it is certainly the case that even though HHS has sort of placed an emphasis on abstinence in the past, Planned Parenthood has not done that in its grant applications and yet it has received grant awards year after year.

Our understanding is that these have never been used to score grant applications and have never been used to sort of make a dispositive decision whether a grant would be awarded or not.

THE COURT: Like I said, I'm not convinced that it is dispositive.

MR. WOLFSON: I understand.

I think I have gone over our argument on appeal that the abstinence and primary care factors are not supported by the administrative record.

Unless the Court has anything further.

THE COURT: No. Thank you, sir. I will hear from you after I hear from the government. Thank you for your arguments.

Ms. Hunt.

MS. HUNT: May it please the Court, this Court should

deny plaintiffs' motion for an injunction pending appeal. Last week this Court ruled in favor of HHS and upheld the funding announcement. HHS is on track to issue the new Title X awards under its competitive process in mid-August, and the project period will begin on September 1st.

Plaintiffs ask this Court to grant extraordinary and novel relief while they pursue the appeal. They ask the Court to order that HHS be stopped from issuing those new grant awards under its competitive process and, instead, issue to them continuation awards pending the duration of their appeal. But no legal basis exists for plaintiffs to disrupt the orderly and efficient administration of the Title X program. Title X delivers family planning services to the public, and the public would not be served by the relief that plaintiffs request.

THE COURT: Ms. Hunt, what do you think about *Davis* and that majority concurrence? Do you think the plaintiffs need to kind of meet all four criteria, or if I find that they would win under the sliding scale, is that sufficient for them?

MS. HUNT: It appears that *Winter* has abrogated that approach, but I will say that my read of the case law is that courts ordinarily consider that lower standard in the alternative. So here because -- and you would never even reach that lower standard because the lack of irreparable

harm is fatal in and of itself. That prong alone is fatal. So plaintiffs would have to establish the other two, which they cannot do -- again, they have no traction on any of these prongs -- before the Court would even have to reach that lower standard.

THE COURT: Why do you say they can't show irreparable harm? Mr. Wolfson described this potential of centers being closed, people being laid off, particularly in states like Wisconsin or Texas that are going to refuse to do business with his clients if those states get the funds?

MS. HUNT: Right. So, as you pointed out, the harm has to be great, certain, and imminent. And plaintiffs are presuming that they will lose this competitive process. It is very possible that some of these plaintiffs will prevail and succeed in the competitive process and actually be awarded the next round of Title X grant funding. So it is completely speculative that this grant funding would be lost.

THE COURT: So are you relying on the economic -- I forget if it is the economic loss theory or whatever -- generally showing that a company is going to face rough times is not enough to show irreparable harm? Are you relying on that, or are you just relying on the certainty and imminence prong?

MS. HUNT: Correct. Under any of their arguments -- and they make several, including these economic losses -- and

on that one in particular, the case law has established that, yes, it is not just any kind of economic loss, it has to be a great loss, such as going out of business. And again, this is a purely speculative claim, because unlike the cases where there was a certainty of lost funding, here there is only a speculative possibility.

And I would also emphasize that plaintiffs have the burden here where they cannot establish causation. It is not known whether even under a different funding announcement they would receive funding. So, again, that's another requirement here, that it be directly related to the nature of their claims. And again, that's speculative. Even if they don't receive funding, that it is necessarily related to the points in the funding announcement that they challenge.

THE COURT: The *League of Women Voters* case that the plaintiffs rely on, I don't know that there was evidence there that they were going to go out of business or anything. I think they talked about an organization is harmed if actions taken by the government have perceptibly impaired the organization's programs. I mean, haven't they demonstrated that here?

MS. HUNT: No. They have not demonstrated that here, because, again, it really is a presumption that they would lose. The *League of Women Voters* had voting requirements, as I recall, and they were certain and imminent. Here, again,

this competition has not been completed. And so we just don't know that plaintiffs would lose funding as a result.

And again, another difference here is, as this Court explained in its opinion, participation in the Title X program is voluntary, and the opinion discussed *Rust v. Sullivan*. So I think that is a bit of a differentiation here, that the participation at this program is voluntary, so any purported harm by perhaps changing applications and things like that was something that was self-inflicted and a choice by the plaintiffs.

So, for those reasons, the plaintiffs here do not establish -- it is a very high burden -- the likelihood of clear and convincing irreparable harm.

THE COURT: Am I right that *Sherley*, would that kind of be your lead case?

MS. HUNT: Yes.

THE COURT: Okay. And how would you compare the irreparable harm here to the plaintiffs in *Sherley*?

MS. HUNT: So that case involves stem cell research grants, and the D.C. Circuit reversed the lower court's issuance of injunctive relief. And there it found the harm to the plaintiffs was very minimal because it was speculative. So I would say that applies with equal force here.

The D.C. Circuit focused on the agency's ability to

award grants that it deemed to be meritorious and found that to be in the public interest.

And likewise here, it is within the public interest for HHS to be able to administer the Title X program in its orderly and organized fashion. If the Court were to award the relief that plaintiffs seek, there is risk that the program will be thrown into disarray. We don't know how long appellate review could take.

THE COURT: Can you just do another cost extension? I think you did those earlier this year, right? What's wrong with that?

MS. HUNT: So there's two problems with that. The first is that plaintiffs have no legal claim to continuation awards. It is undisputed that their current awards end at the end of August. And so if we're talking about maintaining the status quo pending an appeal, issuing continuation awards does not do that. It gives plaintiffs entirely new legal rights and new awards that they are not entitled to under the statutes, the regulations, or the grant awards themselves.

The second problem with that goes against the equities and the public interest here, which is that continuation award processing takes time. It would be a Herculean task and a very serious administrative burden for the agency to process continuation awards for these plaintiffs.

Now, the reason for it is because that is not simply issuing a piece of paper. That might be the end result, but there is a whole process that takes place before, even for continuation awards, and that is an application process and then a review process and an issuance of an award. And given the time frames here, there is a great risk that there would be a gap in Title X funding, that that process would be so burdensome for the agency that it could not be reasonably accomplished by the end of August when these grants expire.

THE COURT: Are you relying on sovereign immunity regarding continuation funding?

MS. HUNT: Yes. I would like to preserve our sovereign immunity arguments. Plaintiffs have never identified a waiver of sovereign immunity that applies here. The *Bowen* case is very different. That's a statutory mandatory formula case under Medicaid -- or Medicare -- I can't recall exactly -- but I do view that as very different because that is specific relief under the statute; whereas, this is the issuance of basically a new contract with new rights associated. So I would like to preserve our sovereign immunity arguments. I do have an objection to that. But just as importantly, as I pointed out, we're talking here about preserving the status quo pending appeal. And again, such awards don't preserve the status quo. They really do upend it and change the rights of the parties.

THE COURT: You pointed out that the statute I think requires you to obligate the funds by September 1, perhaps?

MS. HUNT: September 30th.

THE COURT: How does that factor in here, if at all? Could I preempt that by ordering the government to continue funding the current grantees?

MS. HUNT: So, I mean, here they're not entitled to any such relief because they have not established that that is in the public interest or that the equities favor that --

THE COURT: I understand the argument. But just on the fact that there's the statute out here, how does that play in, if at all?

MS. HUNT: So, yes, the end of the fiscal year is September 30th. In the ordinary course, if the -- HHS is on track to spend this money, right. So it is not an issue of the agency not wanting to spend it. They are working diligently to accomplish and finish up this competitive process and award in mid-August. But if for some reason the money were not spent in the ordinary course, yes, the funds revert to Treasury on September 30th.

THE COURT: Okay. So maybe you can address just the *League of Women Voters*. There are certainly similarities between this case and that one, just more generally here. Why doesn't *League of Women Voters* control and plaintiffs win?

(Pause)

MS. HUNT: Sorry. I wanted to clarify before I say more on that case.

As we explain in our brief, in that case the Election Assistance Commission permitted individual states to provide proof of citizenship for a federal voter registration form.

Again, our main differentiation from that case is that here the harm claimed by the plaintiffs is so speculative that it does not rise to the level of that very certain harm that was taking place in that case.

THE COURT: Can you talk to the merits? Mr. Wolfson raises various points showing how I may have been in error in my opinion. Why don't those raise substantial questions that would merit an emergency preliminary injunction while he seeks an appeal?

MS. HUNT: Plaintiffs really fail to establish any kind of likelihood of success on the merits. This Court held that the funding announcement was not a final agency action. It examined the very tests that they set forth in their current briefing, *Bennett v. Spear.*

The Court also held that there is no notice-and-comment rulemaking required and that the funding announcement was not arbitrary and capricious.

You know, many of their arguments here relitigate the many issues that we covered in the briefing. The Court's

very thorough opinion addresses each of those claims that they have. The Court has already rejected those claims.

THE COURT: But isn't he right that it is kind of a slightly different standard here and he doesn't have to show kind of a 51 percent, he just has to show that these are substantial questions? My recollection is at least on the notice-and-comment rulemaking point, I said, gee, this is kind of a confusing area of the law and you can kind of find signals going both ways.

MS. HUNT: So, again, as I pointed out, the other prongs are dispositive here because -- irreparable harm alone is dispositive. If the Court does reach this issue, the notice-and-comment rulemaking, I don't read their argument raising anything new before the Court. It is very clear that this was a procedural rule and not a substantive one. They have identified -- it was a really very novel argument that such tweaks in a recommendation process for grant making would require notice-and-comment rulemaking. As this Court pointed out, many policy priorities had been included in past funding announcements without ever requiring notice-and-comment rulemaking.

So this is not like cases -- so the test for this -- you know, the cases that I looked at and that plaintiffs cite talk about a federal circuit split on an important question of law or that there was a recent Supreme

Court decision that was being interpreted. And we don't have any circumstances like that here. Whether something requires notice-and-comment rulemaking doesn't involve any kind of a particularly recent decision that this Court was interpreting.

Plaintiffs certainly disagree and intend to appeal, but I don't think that that makes it a serious question for all of the reasons that the Court identified in its order and opinion.

THE COURT: Okay. What do you say to plaintiffs' reputational harm concerns; that putting aside kind of economic loss that either they're going to lose funding and face significant reputational harm there or they're going to continue, receive funding, but under these newly imposed requirements that they disagree with, and it's going to almost make them purveyors of speech with which they disagree?

MS. HUNT: So, you know, first of all, they still fail to meet their real burden to establish that they face such clear and imminent harm, again for all the reasons we just discussed. Beyond that, this Court held that their concerns and their claims about the funding announcement on the merits of the APA claim, that they've really -- overstates what the funding announcement really says in terms of their concerns. And this Court has already rejected

those arguments. And so, again, for those reasons, they fail to establish any kind of irreparable harm based on reputational injury.

THE COURT: Is HHS bound by what I take to be the government's view that a relationship with a primary healthcare provider is just as preferable as actually being a primary healthcare provider?

MS. HUNT: I think that is absolutely a fair reading of the record here. As I recall, the FAQs explained that explicitly and said that either option was fine. So that is part of the administrative record here.

Again, that was based on the placement of a comma in the funding announcement itself. So I disagree with plaintiffs' reading of the meaning of that comma.

THE COURT: What do you say to Mr. Wolfson's point that you really have an eighth factor here that seems to bind the department, including the DASPA?

MS. HUNT: Again, the Court rightly concluded that those are recommendations being put together by the review panels and that the DASPA has the legal authority to make the final decision based on the regulations themselves, which allow the department and the DASPA to make a decision that best promotes the purposes of Title X.

THE COURT: Do I take into account the potential harm to patients as well as the parties here and the potential

that they may lose their current care providers?

MS. HUNT: Well, I think it is a more broad question than that because it is the -- certainly, the Title X program serves the public. So the interests of the public here is in the orderly and efficient administration of the Title X program. And as the D.C. Circuit said in the *Sherley* case, that includes an interest in allowing the agency to issue the grant awards to recipients that seem meritorious. So we're not talking about -- I mean if a grant is not issued for one area, I mean the geographic distribution is one of the things that HHS looks at in awarding the Title X grants. Presumably, there would be another provider grantee that in HHS's discretion best serves the purposes of that program.

THE COURT: Okay. For instance, say Texas, and I believe their declaration showing that if Texas gets the grant they're not going to do business with many of the current care providers, the current Title X recipients, what do we do about that? I mean, does the government have to find grantees who are going to be able to more broadly provide care, or is there a very real possibility that in much of Texas there is not going to be a care provider?

MS. HUNT: None of that is in the record in terms of establishing any kind of harm of that showing. Certainly whether there might be a competitor doesn't establish causation, which would also be required for irreparable harm.

So even if one of the current plaintiffs lost out on a grant in this competitive cycle, again it is totally speculative at this point as to why that may be. They presume that it would be because of the sexual risk avoidance and other criteria that they have challenged, but there is no evidence or showing of any kind that that is actually what the decision-making process turns out to be. There could be entirely different grounds.

THE COURT: Right. But I guess I'm not worried so much about the competitor getting the grant as nobody getting the grant. Right? Isn't that what they're suggesting, there may be some patients who have no realistic alternative to Mr. Wolfson's clients, and that if Mr. Wolfson's clients don't get the grant, then these patients will have to do without?

MS. HUNT: Well, again, the interest is in the -- the public interest prong here, it does merge with the government's interest, which is the public's interests, serving the public in a Title X program and providing these family planning services to low-income women. And the way that that is met here is for allowing for HHS to proceed with the orderly administration of the Title X program. Again, if this Court were to issue the injunctive relief that plaintiffs request, they are actually asking this Court to, first of all, stop HHS from issuing those awards. So any set

relief could actually create a lapse in patient care. If there is injunctive relief preventing HHS from concluding its competitive program, then patients can certainly be harmed if there are no Title X services at all because the Court has prohibited the agency from proceeding with issuing its awards.

THE COURT: Okay. I understand your position, Ms. Hunt.

Anything else from the government, ma'am?

MS. HUNT: No. Thank you.

THE COURT: Thank you.

Mr. Wolfson.

MR. WOLFSON: Thank you, Your Honor.

I would like to just address the issues about sort of the orderly administration of the program. It seems that what would be disruptive and disorderly would be if the FOA went into effect and then if the Court of Appeals were to rule that the FOA was unlawful, because in that situation, the government would have awarded grants to other people and then those are the grants that would have been awarded illegally and should be awarded elsewhere. What we're asking for is really the preservation of the status quo, which is the current grantees who have an established program up and running for years continue to operate those programs for a few more months until the Court of Appeals is able to issue a

ruling. And we do plan to ask for expedited briefing in the Court of Appeals.

And the government has said it is extremely burdensome for them to operate an application process for continuation funding. But they told the Court that if the Court issued a decision by mid-July that that should be enough time to shift gears, if that's what they had to do so. This is not -- as the Court observed, basically all the current grantees are already operating on continuation funding, so the agency is already familiar with their programs and has already looked at what they propose to do. Essentially, what we're talking about is an extension of the grant term for more months. Of course, there is some application process involved --

THE COURT: I'm sorry. Did you say for four more months or --

MR. WOLFSON: No, for more months. I didn't mean for "four."

THE COURT: No "u".

MR. WOLFSON: No "u", yes.

But what happened was basically all of the current grantees, either the grants were expired or they were terminated and then they were all given continuation funding because the agency hadn't been prepared to issue its FOA. So it's already sort of surveyed the entire universe of grantees

and knows who everybody is. It knows the sort of terms and conditions under which they are implementing their grant proposal, and has already extended them. And what we think would be the most orderly transition would be for the agency to tack on more time to those grant periods.

We're thinking about sort of what is the alternative, right? Let's say the Court were to sort of agree with us that the FOA is unlawful, well, either the agency would do nothing or there would be a lapse in funding, which I think everybody agrees is inappropriate, or the agency would sort of set up a new FOA, but that could not happen I don't think realistically between now and the end of the fiscal year. It seems that the alternative, really, is for the agency to sort of preserve the status quo by adding on a period to the current grant terms until the Court of Appeals is able to issue a ruling. That's sort of the most orderly way to approach it during the period of expedited briefing to the Court of Appeals.

THE COURT: I wanted to get your take on *Sherley.* Presumably, that was an option in *Sherley*, as well. Yet the Court of Appeals there seemed concerned about the other potential grantee applicants who were being prohibited from receiving grants by continuing the status quo.

MR. WOLFSON: So I think if the Court of Appeals is able to issue an expedited ruling -- and there is no reason

to doubt that they can -- the agency should be able to make its final award grants before the end of the fiscal year, which is September 30th. And the awards that it makes, they can be multi-year awards. The funds have to be obligated during this fiscal year, but it is not like everybody has to spend the money by September 30th. So assuming that there is a process by which the appeal gets resolved, the agency should be able to know by the end of the fiscal year to whom it will be awarding grants. I think that's basically the difference.

And on the sort of sovereign immunity issue, we would point the Court to a case that was cited in our brief, *Northwestern Environmental Defense Center v. Bonneville Power Administration*, a Ninth Circuit case, where the Ninth Circuit concluded that as an exercise of its equitable authority in order to preserve the status quo, it would order continuation of the contractual relationship. That does not fall within the exclusion under the APA for an award of money damages. We're not asking for compensation for something that has happened in the past. We're asking for equitable relief, which falls within the Court's authority, as the Supreme Court made clear in *Bowen v. Massachusetts*. It doesn't violate the sovereign immunity for a court to order the government to do something even though that may require an expenditure of funds. That is different from the exclusion

of money damages from the authority of the Court.

THE COURT: And so I'm taking it, similarly, you don't see the statutory September deadline as being of significance here?

MR. WOLFSON: The September 1 deadline is a deadline that the agency has just sort of created for itself. That's the period by which the agency has said it will award grants. That's not imposed by any external source of law. We do agree that the agency should make a decision about obligating funds by October 1, but I think there still is time for that to happen, you know, with an expedited appeal.

THE COURT: Okay.

MR. WOLFSON: Thank you.

THE COURT: I think both parties pointed to relevant cases here in *League of Women Voters* and *Sherley*. *Sherley* clearly has some language and factors that would seem to favor the government. Any other reason that I should not feel like *Sherley* means that you lose here?

MR. WOLFSON: Well, the government has told the Court that if it could -- that if it had a decision by mid-July, it could shift gears and do continuation funding. I mean, now the government says it needs months and months, but that's not what they told the Court, and that's also not what -- that's not sort of consistent, I think, with the experience, which is they have already gone through the round

of continuation funding and they know the facts on the ground. This is going to be a much simpler process than the process that the government went through in February and March. So I think the facts of the case are quite different.

THE COURT: Okay. So you both have given me a lot to think about. I understand the plaintiffs' desire for a quick decision. What I would propose is that we come back tomorrow afternoon, and I will give you an oral ruling at that time.

Would 3:00 work for the parties?

Mr. Wolfson?

MR. WOLFSON: Yes, for the plaintiffs.

THE COURT: And Ms. Hunt?

MS. HUNT: Yes, I could do 3:00 tomorrow.

THE COURT: Okay. I will see you then.

Thank you. Have a good evening.

(Proceedings adjourned at 4:16 p.m.)

CERTIFICATE OF OFFICIAL COURT REPORTER

I, Patricia A. Kaneshiro-Miller, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Patricia A. Kaneshiro-Miller July 25, 2018

PATRICIA A. KANESHIRO-MILLER DATE

## /

**/s** [1] - 45:8

## 1

**1** [4] - 4:21, 32:2, 43:5, 43:10
**10** [1] - 15:15
**10004** [1] - 2:4
**1100** [1] - 2:12
**1110** [1] - 1:23
**12** [1] - 13:20
**125** [1] - 2:3
**15th** [1] - 2:7
**18-1035** [2] - 1:5, 3:4
**1875** [1] - 1:19
**18th** [1] - 2:3
**1st** [1] - 26:5

## 2

**20001** [1] - 2:18
**20005** [3] - 1:24, 2:8, 2:13
**20006** [1] - 1:20
**2011** [1] - 14:19
**2018** [2] - 1:8, 45:8
**202** [1] - 2:19
**24** [1] - 1:8
**25** [2] - 15:13, 45:8
**2nd** [1] - 2:8

## 3

**300** [1] - 1:24
**30th** [5] - 32:3, 32:14, 32:20, 42:3, 42:6
**31,000** [1] - 11:9
**333** [1] - 2:18
**35** [1] - 10:22
**354-3243** [1] - 2:19
**3:00** [3] - 3:2, 44:9, 44:13

## 4

**4700A** [1] - 2:17
**4:16** [1] - 44:16

## 5

**50** [2] - 4:21, 24:14
**51** [1] - 34:5
**59.7** [1] - 22:5

## 8

**8** [1] - 5:16
**84** [1] - 9:11
**87** [1] - 11:8

## 9

**915** [1] - 2:7
**92** [1] - 13:21

## A

**ability** [1] - 29:25
**able** [10] - 9:24, 13:24, 17:17, 30:4, 37:19, 39:25, 41:15, 41:25, 42:1, 42:8
**above-entitled** [1] - 45:5
**abrogated** [1] - 26:21
**absence** [2] - 7:9, 7:10
**absolutely** [2] - 17:6, 36:8
**abstinence** [22] - 9:23, 10:10, 11:1, 11:12, 11:15, 11:17, 11:19, 11:20, 11:25, 12:2, 12:15, 12:25, 13:2, 13:5, 13:7, 13:15, 17:22, 18:19, 19:18, 24:18, 25:7, 25:18
**acceptable** [2] - 12:11, 13:13
**accepts** [1] - 21:2
**access** [3] - 14:15, 14:24, 16:11
**accomplish** [1] - 32:17
**accomplished** [1] - 31:9
**account** [6] - 15:8, 20:2, 20:13, 21:1, 22:9, 36:24
**accustomed** [1] - 15:2
**acknowledge** [1] - 3:14
**act** [1] - 10:2
**action** [9] - 5:8, 19:23, 19:25, 20:10, 22:24, 23:3, 23:15, 23:25, 33:18
**actions** [1] - 28:19
**active** [2] - 12:7, 13:22
**activity** [2] - 13:18, 19:11
**actual** [3] - 16:19, 20:11
**added** [1] - 24:16
**adding** [2] - 22:13, 41:14
**addition** [1] - 10:16
**address** [7] - 8:11, 8:14, 13:7, 18:23, 23:9, 32:21, 39:14
**addresses** [1] - 34:1
**adhering** [2] - 12:10, 22:1
**adjourned** [1] - 44:16
**adjudication** [1] - 6:11
**administer** [1] - 30:4
**Administration** [1] - 42:14
**administration** [4] - 26:12, 37:5, 38:22, 39:15
**administrative** [4] - 13:14, 25:19, 30:23, 36:11
**adolescents** [2] - 12:1, 13:9
**adult** [2] - 12:4, 13:1
**adults** [2] - 13:9, 13:16
**adverse** [1] - 11:5
**advise** [3] - 19:14, 19:15, 19:16
**advisory** [1] - 21:24
**affiants** [1] - 12:19
**afternoon** [6] - 3:8, 3:12, 3:17, 3:20, 3:24, 44:8
**agencies** [1] - 20:13
**agency** [57] - 5:8, 18:8, 18:10, 18:13, 19:22, 19:24, 19:25, 20:1, 20:4, 20:10, 20:13, 20:19, 20:20, 20:21, 21:3, 21:5, 21:6, 21:18, 21:19, 21:21, 22:3, 22:15, 22:21, 22:24, 23:2, 23:3, 23:5, 23:7, 23:15, 23:21, 23:22, 23:25, 24:5, 24:13, 24:15, 24:17, 24:20, 24:23, 24:25, 30:24, 31:8, 32:16, 33:18, 37:7, 39:5, 40:10, 40:24, 41:4, 41:8, 41:10, 41:13, 42:1, 42:7, 43:6, 43:7, 43:9
**agency's** [4] - 15:17, 22:20, 22:23, 29:25
**agree** [5] - 6:15, 17:25, 24:7, 41:7, 43:9
**agrees** [1] - 41:10
**ahead** [1] - 15:21
**aided** [1] - 2:21
**al** [4] - 1:4, 1:8, 3:5
**AL** [1] - 1:18
**Alex** [1] - 3:5
**ALEX** [1] - 1:7
**Alicia** [2] - 2:10, 3:20
**allow** [2] - 6:11, 36:22
**allowed** [1] - 8:18
**allowing** [2] - 37:7, 38:21
**almost** [1] - 35:16
**alone** [2] - 27:1, 34:11
**alternate** [1] - 14:6
**alternative** [5] - 14:23, 26:24, 38:12, 41:6, 41:13
**altogether** [2] - 19:11, 22:19
**amended** [1] - 20:7
**AMERICA** [1] - 1:23
**AMERICAN** [2] - 2:2, 2:6
**analysis** [1] - 24:2
**AND** [1] - 2:2
**announcement** [8] - 26:3, 28:9, 28:14, 33:18, 33:23, 35:22, 35:24, 36:13
**announcements** [1] - 34:20
**answer** [2] - 17:4, 23:12
**anticipates** [1] - 21:10
**anticipating** [2] - 21:7, 22:14
**APA** [2] - 35:23, 42:18
**Appalachian** [1] - 22:25
**appeal** [13] - 4:20, 5:4, 17:2, 25:17, 26:1, 26:7, 26:11, 30:16, 31:23, 33:15, 35:6, 42:7, 43:11
**Appeals** [17] - 4:16, 5:12, 5:17, 5:21, 6:25, 7:1, 7:3, 9:5, 14:13, 16:25, 39:17, 39:25, 40:2, 41:15, 41:18, 41:21, 41:24
**appear** [1] - 18:11
**APPEARANCES** [1] - 1:15
**Appearances** [1] - 1:25
**appearing** [1] - 3:9
**appellate** [1] - 30:8
**applicant** [1] - 11:11
**applicants** [3] - 13:24, 25:4, 41:22
**application** [9] - 15:20, 18:15, 20:3,

23:11, 24:14, 25:2, 31:4, 40:4, 40:14
**applications** [5] - 10:18, 23:14, 25:8, 25:11, 29:8
**applies** [3] - 24:3, 29:23, 31:14
**apply** [2] - 23:20, 24:1
**applying** [2] - 23:24, 24:11
**approach** [2] - 26:22, 41:17
**appropriate** [4] - 12:2, 12:8, 12:12, 12:13
**approving** [1] - 20:3
**arbitrary** [1] - 33:23
**area** [3] - 9:14, 34:8, 37:10
**areas** [2] - 14:6, 14:22
**argue** [1] - 23:22
**argued** [1] - 19:1
**arguing** [3] - 8:6, 8:7, 22:16
**argument** [4] - 25:17, 32:10, 34:13, 34:16
**arguments** [9] - 4:24, 6:6, 8:12, 25:23, 27:24, 31:13, 31:21, 33:24, 36:1
**Ari** [2] - 1:17, 3:10
**Arizona** [1] - 10:12
**Army** [1] - 24:10
**Arthur** [2] - 2:6, 3:10
**aside** [1] - 35:11
**assistance** [1] - 12:7
**Assistance** [1] - 33:5
**associated** [1] - 31:20
**Association** [1] - 23:4
**ASSOCIATION** [1] - 2:3
**assuming** [1] - 42:6
**assurance** [1] - 9:18
**August** [4] - 26:4, 30:15, 31:9, 32:18
**authority** [4] - 36:20, 42:15, 42:21, 43:1
**available** [1] - 15:7
**Ave** [1] - 1:19
**Avenue** [2] - 1:23, 2:18
**avoid** [1] - 19:6
**avoidance** [1] - 38:4
**avoiding** [1] - 19:11
**award** [12] - 20:11, 20:22, 21:6, 22:7, 30:1, 30:5, 30:22, 31:5, 32:18, 42:2, 42:18, 43:7
**awarded** [6] - 24:15, 25:13, 27:16, 39:19, 39:20, 39:21
**awarding** [2] - 37:11, 42:9
**awards** [18] - 11:11, 25:9, 26:4, 26:9, 26:10, 30:14, 30:16, 30:18, 30:19, 30:24, 31:4, 31:24, 37:8, 38:25, 39:6, 42:3, 42:4
**Azar** [1] - 3:5
**AZAR** [1] - 1:7

## B

**backbone** [1] - 15:2
**barriers** [1] - 9:14
**based** [3] - 36:2, 36:12, 36:21
**basis** [1] - 26:11
**become** [2] - 6:10, 15:16
**BEFORE** [1] - 1:13
**begin** [1] - 26:5
**behalf** [1] - 3:21
**belief** [1] - 16:20
**benefits** [2] - 12:16, 13:17
**Bennett** [1] - 33:20
**best** [3] - 22:8, 36:23, 37:13
**better** [1] - 13:25
**between** [4] - 10:20, 12:21, 32:23, 41:12
**beyond** [1] - 35:21
**bind** [2] - 20:17, 36:16
**binding** [1] - 23:10
**binds** [1] - 21:6
**bit** [3] - 4:4, 13:8, 29:6
**body** [1] - 17:3
**Bonneville** [1] - 42:13
**bound** [3] - 8:2, 20:20, 36:4
**Bowen** [2] - 31:15, 42:22
**Bowman** [2] - 2:14, 3:23
**boxes** [1] - 15:21
**Branch** [1] - 2:12
**breakdown** [1] - 12:21
**brief** [2] - 33:4, 42:12
**briefing** [4] - 33:20, 33:25, 40:1, 41:17
**briefs** [3] - 16:10, 18:9, 18:14
**bring** [1] - 14:11
**Broad** [1] - 2:3
**broad** [1] - 37:2
**broadly** [2] - 8:12, 37:19
**burden** [7] - 5:25, 6:2, 6:16, 28:8, 29:12, 30:23, 35:19
**burdensome** [2] - 31:8, 40:4
**business** [4] - 27:10, 28:3, 28:17, 37:16
**bypassed** [1] - 6:4

## C

**cannot** [2] - 27:3, 28:8
**capricious** [1] - 33:23
**care** [16] - 9:24, 10:10, 11:2, 11:13, 14:15, 14:21, 16:14, 17:21, 18:18, 25:18, 37:1, 37:17, 37:20, 37:21, 39:1
**caregivers** [1] - 18:3
**Carrie** [2] - 1:22, 3:11
**case** [31] - 4:19, 5:1, 6:12, 7:23, 9:1, 13:25, 16:3, 16:4, 16:11, 17:4, 21:25, 23:4, 23:5, 24:15, 25:6, 26:22, 28:1, 28:15, 29:15, 29:19, 31:15, 31:16, 32:23, 33:3, 33:4, 33:7, 33:10, 37:6, 42:12, 42:14, 44:4
**Case** [1] - 3:4
**cases** [5] - 22:25, 28:4, 34:22, 34:23, 43:15
**causation** [2] - 28:8, 37:25
**cell** [1] - 29:19
**center** [1] - 12:3
**Center** [1] - 42:13
**centers** [3] - 8:24, 14:5, 27:8
**certain** [8] - 16:18, 16:20, 17:15, 19:11, 20:2, 27:12, 28:25, 33:10
**certainly** [12] - 5:8, 14:24, 16:4, 18:10, 18:14, 24:6, 25:6, 32:22, 35:6, 37:3, 37:23, 39:3
**certainty** [2] - 27:22, 28:5
**CERTIFICATE** [1] - 45:1
**certify** [1] - 45:3
**challenge** [1] - 28:14
**challenged** [1] - 38:5
**chance** [1] - 4:2
**change** [3] - 24:5, 24:8, 31:25
**changed** [2] - 15:9, 21:16
**changing** [2] - 24:21, 29:8
**characterizing** [1] - 6:22
**children** [1] - 12:8
**choice** [1] - 29:10
**circuit** [1] - 34:24
**Circuit** [9] - 7:17, 7:18, 16:9, 16:12, 29:20, 29:25, 37:6, 42:14
**circumstance** [1] - 12:13
**circumstances** [2] - 5:13, 35:2
**cite** [1] - 34:24
**cited** [5] - 6:13, 16:10, 22:25, 23:4, 42:12
**citizenship** [1] - 33:6
**Civil** [3] - 1:5, 2:11, 3:3
**CIVIL** [2] - 2:2, 2:6
**claim** [4] - 6:24, 28:4, 30:13, 35:23
**claimed** [1] - 33:8
**claims** [4] - 28:12, 34:1, 34:2, 35:22
**clarify** [1] - 33:2
**clear** [5] - 13:8, 29:13, 34:14, 35:20, 42:22
**clearly** [5] - 4:19, 17:23, 20:21, 22:14, 43:16
**CLERK** [1] - 3:3
**clients** [9] - 9:11, 10:1, 11:14, 12:25, 15:5, 19:14, 27:10, 38:13
**clinician** [2] - 12:13, 12:22
**close** [3] - 5:9, 8:23, 16:13
**closed** [2] - 9:1, 27:8
**closing** [1] - 14:5
**cluster** [1] - 10:19
**coal** [5] - 23:7, 23:19, 23:20, 23:24, 24:10
**coercive** [1] - 23:21
**COLUMBIA** [2] - 1:2, 2:7
**comma** [2] - 36:12, 36:14
**comment** [9] - 5:9, 24:3, 24:7, 33:22, 34:7, 34:13, 34:18, 34:21, 35:3
**Commercial** [1] - 2:12
**Commission** [1] - 33:5
**company** [1] - 27:20
**compare** [1] - 29:17
**compensation** [1] - 42:19

**compete** [2] - 9:19, 9:20
**competition** [4] - 10:18, 11:3, 11:10, 29:1
**competitive** [7] - 26:4, 26:9, 27:13, 27:15, 32:17, 38:2, 39:3
**competitor** [2] - 37:24, 38:10
**complete** [1] - 23:12
**completed** [1] - 29:1
**completely** [3] - 21:12, 21:24, 27:17
**computer** [1] - 2:21
**computer-aided** [1] - 2:21
**concerned** [4] - 10:24, 12:20, 21:24, 41:21
**concerns** [4] - 15:8, 35:11, 35:22, 35:25
**concluded** [3] - 19:23, 36:18, 42:15
**concluding** [1] - 39:2
**conclusion** [1] - 23:9
**concrete** [1] - 20:4
**concurrence** [3] - 7:5, 8:3, 26:17
**conditions** [1] - 41:2
**condoms** [1] - 19:15
**conform** [1] - 5:14
**conforms** [1] - 13:12
**confusing** [1] - 34:8
**connections** [1] - 8:21
**consequence** [2] - 13:23, 16:13
**consequences** [1] - 20:5
**consider** [14] - 5:6, 20:8, 20:22, 21:13, 21:14, 21:19, 21:21, 21:25, 22:15, 22:23, 24:11, 24:21, 24:25, 26:23
**consideration** [2] - 15:17, 21:2
**considered** [1] - 21:8
**considering** [3] - 4:5, 21:5, 21:18
**considers** [2] - 20:25, 21:21
**consistent** [1] - 43:24
**constitutes** [1] - 13:20
**Constitution** [1] - 2:18
**context** [2] - 6:8, 24:2
**continuation** [13] - 26:10, 30:13, 30:16, 30:22, 30:24, 31:4, 31:11, 40:5, 40:9, 40:23, 42:16, 43:21, 44:1
**continue** [3] - 32:5, 35:14, 39:24
**continued** [1] - 1:25
**continuing** [1] - 41:23
**contract** [1] - 31:19
**contractual** [1] - 42:17
**control** [2] - 19:5, 32:24
**controlling** [1] - 12:7
**controversy** [1] - 6:10
**convinced** [1] - 25:14
**convincing** [1] - 29:13
**core** [1] - 8:14
**Corps** [1] - 24:10
**correct** [3] - 6:1, 27:24, 45:4
**cost** [1] - 30:9
**Counsel** [1] - 3:6
**counsel** [1] - 3:10
**couple** [2] - 19:4, 19:5
**course** [9] - 4:12, 6:4, 14:7, 16:12, 19:12, 22:13, 32:14, 32:19, 40:13
**COURT** [60] - 1:2, 3:12, 3:17, 3:19, 3:24, 4:10, 5:24, 6:13, 7:4, 8:2, 8:11, 9:10, 10:1, 11:14, 12:23, 15:4, 16:1, 16:17, 17:7, 17:12, 17:25, 19:8, 20:15, 21:14, 22:2, 22:10, 25:14, 25:21, 26:16, 27:6, 27:18, 28:15, 29:14, 29:17, 30:9, 31:10, 32:1, 32:4, 32:10, 32:21, 33:11, 34:3, 35:10, 36:4, 36:15, 36:24, 37:14, 38:9, 39:7, 39:11, 40:15, 40:19, 41:19, 43:2, 43:12, 43:14, 44:5, 44:12, 44:14, 45:1
**Court** [74] - 2:17, 3:3, 4:13, 4:16, 5:2, 5:5, 5:7, 5:12, 5:15, 5:17, 5:18, 5:21, 6:4, 6:11, 6:25, 7:1, 7:2, 7:3, 9:5, 10:22, 14:13, 15:25, 16:8, 16:25, 17:15, 17:17, 18:24, 19:23, 23:4, 24:17, 25:3, 25:5, 25:20, 25:25, 26:2, 26:6, 26:8, 27:4, 29:3, 30:5, 33:17, 33:21, 34:2, 34:12, 34:14, 34:18, 35:1, 35:4, 35:8, 35:21, 35:25, 36:18, 38:23, 38:24, 39:4, 39:17, 39:25, 40:2, 40:5, 40:6, 40:8, 41:7, 41:15, 41:18, 41:21, 41:24, 42:12, 42:22, 43:1, 43:19, 43:23
**court** [4] - 16:12, 16:17, 23:1, 42:23
**court's** [1] - 29:20
**Court's** [4] - 18:23, 23:9, 33:25, 42:21
**Courthouse** [1] - 2:17
**courts** [1] - 26:23
**covered** [1] - 33:25
**create** [1] - 39:1
**created** [1] - 43:6
**creating** [1] - 12:24
**criteria** [11] - 22:21, 23:14, 23:17, 23:18, 23:23, 24:5, 24:9, 24:13, 26:18, 38:4
**Criteria** [1] - 22:5
**criterion** [3] - 14:2, 22:14, 24:24
**CRR** [1] - 2:17
**crucial** [1] - 24:22
**current** [11] - 30:14, 32:6, 33:20, 37:1, 37:17, 38:1, 39:23, 40:9, 40:21, 41:15
**CUTLER** [1] - 1:18
**cuts** [1] - 15:4
**cycle** [1] - 38:2

## D

**D.C** [6] - 1:7, 7:17, 7:18, 29:20, 29:25, 37:6
**Dalven** [2] - 2:1, 3:15
**damages** [2] - 42:18, 43:1
**DAS** [6] - 20:17, 21:14, 21:17, 21:22, 21:25, 22:17
**DASPA** [6] - 20:25, 21:2, 21:10, 36:17, 36:20, 36:22
**DATE** [1] - 45:9
**Davis** [3] - 6:13, 7:6, 26:16
**DC** [5] - 1:20, 1:24, 2:8, 2:13, 2:18
**deadline** [3] - 43:3, 43:5
**decide** [2] - 24:9, 24:14
**deciding** [3] - 20:21, 21:6, 23:6
**decision** [17] - 18:24, 19:24, 20:1, 20:14, 20:16, 20:17, 23:5, 25:12, 35:1, 35:4, 36:21, 36:22, 38:7, 40:6, 43:9, 43:20, 44:7
**decision-making** [2] - 20:14, 38:7
**decisions** [2] - 8:4, 16:25
**Declaration** [1] - 10:16
**declaration** [3] - 11:16, 11:18, 37:15
**deemed** [1] - 30:1
**Defendants** [2] - 1:9, 2:10
**Defense** [1] - 42:13
**definitely** [3] - 5:19, 7:2, 19:20
**definitive** [2] - 20:3, 20:12
**delaying** [1] - 13:18
**delivers** [1] - 26:13
**demonstrated** [2] - 28:20, 28:22
**denied** [5] - 8:22, 11:4, 16:7, 16:11
**deny** [1] - 26:1
**DEPARTMENT** [1] - 2:11
**Department** [2] - 3:22, 22:6
**department** [3] - 9:19, 36:17, 36:22
**department's** [1] - 22:8
**departments** [1] - 9:21
**DEPUTY** [1] - 3:3
**described** [1] - 27:7
**describes** [1] - 19:24
**Desilets** [1] - 10:16
**desire** [1] - 44:6
**difference** [5] - 10:17, 10:20, 24:22, 29:3, 42:10
**different** [11] - 12:18, 20:24, 21:12, 21:15, 28:9, 31:15, 31:17, 34:4, 38:8, 42:25, 44:4
**differentiation** [2] - 29:6, 33:7
**difficult** [5] - 5:9, 5:10, 6:16, 13:10, 14:18
**diligently** [1] - 32:17
**direct** [1] - 20:4
**directly** [2] - 4:14, 28:11
**disadvantage** [2] - 9:9, 9:17
**disagree** [5] - 6:21, 35:6, 35:15, 35:17, 36:13
**disagreeing** [1] - 18:5
**disarray** [1] - 30:7
**discharge** [1] - 24:12
**discretion** [1] - 37:13
**discuss** [4] - 11:15, 11:20, 12:2, 12:16
**discussed** [2] - 29:5, 35:21
**disorderly** [1] - 39:16
**disperse** [1] - 9:2
**dispositive** [6] - 10:17, 24:1, 25:12, 25:15, 34:11, 34:12
**disputed** [1] - 13:7
**disrupt** [1] - 26:12
**disruption** [1] - 8:20
**disruptive** [1] - 39:16

**distinguish** [1] - 19:19
**distribution** [1] - 37:10
**District** [5] - 5:1, 5:15, 5:18, 6:25, 7:2
**DISTRICT** [4] - 1:2, 1:2, 1:13, 2:7
**Division** [1] - 2:11
**doctors** [1] - 9:2
**dollars** [1] - 14:5
**dominant** [1] - 15:17
**done** [1] - 25:8
**DORR** [1] - 1:19
**doubt** [3] - 20:6, 20:9, 42:1
**down** [5] - 9:1, 11:11, 12:25, 14:5, 16:13
**downgraded** [1] - 15:15
**dramatic** [1] - 11:5
**duration** [1] - 26:10
**during** [2] - 41:17, 42:5

## E

**easy** [1] - 9:4
**eclipsed** [1] - 6:10
**economic** [5] - 27:18, 27:19, 27:25, 28:2, 35:12
**effect** [6] - 8:18, 14:14, 16:7, 22:13, 25:1, 39:17
**effective** [3] - 12:11, 13:13, 13:15
**effects** [1] - 11:4
**efficient** [2] - 26:12, 37:5
**eight** [3] - 20:8, 20:13, 21:9
**eighth** [8] - 14:1, 20:22, 21:5, 22:13, 22:15, 22:23, 24:16, 36:16
**either** [6] - 20:25, 21:4, 35:12, 36:10, 40:22, 41:8
**Election** [1] - 33:4
**elevated** [1] - 24:23
**Ellen** [1] - 2:1
**elsewhere** [2] - 14:16, 39:21
**emergency** [1] - 33:14
**Emily** [1] - 1:18
**emphasis** [9] - 9:23, 10:9, 11:1, 11:25, 13:5, 17:22, 18:21, 25:7
**emphasize** [3] - 9:24, 11:12, 28:7
**encompassed** [1] - 19:2
**encounter** [1] - 12:18
**end** [12] - 9:1, 10:2, 10:19, 18:1, 30:14, 30:15, 31:2, 31:9, 32:13, 41:12, 42:2, 42:8
**Engineers** [1] - 24:10
**entire** [1] - 40:25
**entirely** [3] - 23:11, 30:17, 38:8
**entities** [1] - 10:12
**entitled** [3] - 30:18, 32:7, 45:5
**entry** [1] - 9:14
**Environmental** [1] - 42:13
**EPA** [2] - 23:1, 24:9
**equal** [5] - 18:7, 18:10, 18:17, 24:24, 29:23
**equitable** [2] - 42:15, 42:20
**equities** [3] - 7:10, 30:21, 32:9
**error** [1] - 33:12
**Esq** [9] - 1:16, 1:17, 1:17, 1:18, 1:22, 2:1, 2:6, 2:10, 2:10
**Esq.(By** [1] - 2:1
**essentially** [7] - 6:10, 9:8, 22:12, 22:22, 23:7, 24:20, 40:12
**establish** [7] - 27:2, 28:8, 29:12, 33:16, 35:19, 36:2, 37:24
**established** [4] - 14:20, 28:1, 32:8, 39:23
**establishing** [1] - 37:23
**et** [4] - 1:4, 1:8, 3:5
**ET** [1] - 1:18
**evaluate** [1] - 23:18
**evening** [1] - 44:15
**events** [1] - 6:10
**evidence** [2] - 28:16, 38:5
**exactly** [1] - 31:17
**examined** [1] - 33:19
**example** [11] - 10:5, 10:8, 10:13, 11:7, 12:4, 14:4, 15:20, 17:19, 17:21, 23:16, 24:4
**excluded** [1] - 14:18
**exclusion** [2] - 42:18, 42:25
**exercise** [1] - 42:15
**exists** [1] - 26:11
**expedited** [4] - 40:1, 41:17, 41:25, 43:11
**expenditure** [1] - 42:25
**experience** [2] - 14:17, 43:25
**experienced** [1] - 8:21
**expire** [2] - 9:3, 31:9
**expired** [1] - 40:22
**explain** [2] - 13:4, 33:4
**explained** [2] - 29:4, 36:9
**explicitly** [1] - 36:10
**exposure** [1] - 19:13
**extended** [1] - 41:3
**extension** [2] - 30:9, 40:12
**external** [1] - 43:8
**extraordinary** [1] - 26:6
**extremely** [1] - 40:3

## F

**face** [4] - 11:10, 27:20, 35:13, 35:19
**facilities** [2] - 9:1, 16:13
**fact** [2] - 17:3, 32:11
**factor** [11] - 15:12, 15:13, 15:17, 16:15, 20:22, 21:5, 21:13, 21:25, 22:23, 32:4, 36:16
**factors** [16] - 15:14, 20:2, 20:8, 20:13, 21:9, 21:15, 21:18, 21:20, 21:21, 21:22, 21:23, 21:25, 22:9, 25:18, 43:16
**facts** [2] - 44:1, 44:4
**fail** [3] - 33:16, 35:19, 36:1
**fair** [2] - 6:11, 36:8
**fall** [2] - 9:13, 42:17
**falls** [2] - 22:24, 42:21
**familiar** [1] - 40:10
**FAMILY** [1] - 2:1
**family** [10] - 13:16, 14:24, 14:25, 15:22, 18:25, 19:2, 19:3, 19:18, 26:13, 38:20
**FAQs** [2] - 18:12, 36:9
**far** [1] - 21:23
**fashion** [1] - 30:5
**fatal** [2] - 27:1
**favor** [4] - 7:10, 26:2, 32:9, 43:17
**February** [1] - 44:3
**federal** [2] - 33:6, 34:24
**FEDERATION** [1] - 1:22
**few** [4] - 9:5, 14:12, 15:15, 39:25
**fill** [1] - 24:11
**final** [11] - 5:8, 19:22, 19:25, 20:10, 22:24, 23:3, 23:15, 23:25, 33:18, 36:21, 42:2
**financial** [1] - 14:7
**fine** [2] - 10:15, 36:10
**finish** [1] - 32:17
**first** [7] - 4:25, 8:15, 9:18, 15:11, 30:13, 35:18, 38:25
**fiscal** [5] - 32:13, 41:12, 42:2, 42:5, 42:8
**five** [2] - 23:23, 24:6
**Flaxman** [2] - 1:22, 3:11
**Floor** [2] - 2:3, 2:8
**FOA** [26] - 8:18, 9:7, 9:8, 9:17, 13:8, 17:23, 18:11, 18:15, 18:16, 19:24, 20:1, 20:17, 20:19, 20:20, 20:21, 21:7, 21:10, 22:13, 22:14, 22:22, 39:16, 39:18, 40:24, 41:8, 41:11
**focused** [1] - 29:25
**FOR** [2] - 1:2, 1:16
**forbidden** [1] - 10:7
**force** [1] - 29:23
**forced** [3] - 8:22, 8:23, 9:7
**foregoing** [1] - 45:4
**forget** [1] - 27:19
**form** [2] - 23:3, 33:6
**forms** [2] - 19:11, 19:16
**formula** [1] - 31:16
**formulation** [1] - 6:23
**forth** [1] - 33:19
**forward** [1] - 3:6
**FOUNDATION** [1] - 2:2
**four** [10] - 10:21, 10:25, 14:5, 21:14, 21:15, 21:25, 24:5, 26:18, 40:15, 40:18
**frames** [1] - 31:6
**free** [7] - 12:17, 13:6, 18:22, 19:2, 19:9, 19:10, 19:17
**front** [1] - 22:2
**funding** [33] - 8:22, 9:13, 9:19, 9:21, 16:8, 17:16, 17:18, 26:3, 27:16, 27:17, 28:5, 28:9, 28:10, 28:13, 28:14, 29:2, 31:7, 31:11, 32:6, 33:18, 33:22, 34:20, 35:12, 35:14, 35:22, 35:24, 36:13, 40:5,

40:10, 40:23, 41:9, 43:21, 44:1
**funds** [7] - 17:10, 27:10, 32:2, 32:19, 42:4, 42:25, 43:10
**future** [1] - 25:5

## G

**Galloway** [1] - 11:19
**gap** [1] - 31:7
**gears** [2] - 40:7, 43:21
**gee** [1] - 34:7
**generally** [2] - 27:20, 32:23
**geographic** [2] - 15:8, 37:10
**given** [8] - 15:5, 16:20, 17:18, 18:11, 22:21, 31:5, 40:23, 44:5
**government** [27] - 3:19, 6:13, 6:21, 12:23, 13:6, 13:16, 15:6, 18:4, 18:6, 18:9, 19:1, 20:7, 22:16, 23:22, 25:22, 28:19, 32:5, 37:18, 39:9, 39:19, 40:3, 42:24, 43:17, 43:19, 43:22, 44:3
**government's** [6] - 4:1, 8:12, 18:14, 18:22, 36:5, 38:18
**grant** [33] - 10:18, 11:4, 11:11, 11:23, 20:11, 20:22, 21:6, 23:7, 23:10, 24:1, 24:14, 25:8, 25:9, 25:11, 25:12, 26:6, 26:9, 27:16, 27:17, 30:19, 34:17, 37:8, 37:9, 37:16, 38:1, 38:10, 38:11, 38:14, 40:13, 41:2, 41:5, 41:15
**granted** [1] - 25:2
**grantee** [3] - 15:7, 37:12, 41:22
**grantees** [7] - 13:4, 32:6, 37:19, 39:23, 40:9, 40:22, 40:25
**grantees'** [1] - 14:9
**grants** [15] - 10:15, 10:18, 22:8, 23:14, 29:20, 30:1, 31:9, 37:11, 39:19, 39:20, 40:22, 41:23, 42:2, 42:9, 43:7
**great** [4] - 16:19, 27:12, 28:3, 31:6
**greater** [1] - 24:24
**ground** [1] - 44:2
**grounds** [1] - 38:8
**guess** [3] - 16:1, 20:18, 38:9
**guidance** [2] - 22:20, 23:3

## H

**HALE** [1] - 1:18
**half** [1] - 14:4
**hard** [1] - 25:3
**Harlow** [2] - 2:1, 3:16
**harm** [30] - 6:9, 7:9, 7:14, 7:22, 8:15, 8:17, 8:18, 9:15, 16:5, 16:15, 16:18, 17:11, 27:1, 27:7, 27:11, 27:21, 29:8, 29:13, 29:18, 29:21, 33:8, 33:10, 34:11, 35:11, 35:13, 35:20, 36:2, 36:24, 37:23, 37:25
**harmed** [3] - 8:19, 28:18, 39:3
**harms** [2] - 8:25, 14:7
**Harvey's** [1] - 11:15
**heading** [1] - 22:5
**HEALTH** [1] - 2:2
**Health** [1] - 22:6
**health** [4] - 8:24, 9:19, 9:21, 14:5
**healthcare** [6] - 11:16, 14:19, 15:1, 16:7, 36:6, 36:7
**healthy** [3] - 12:4, 13:1, 13:22
**hear** [4] - 3:17, 17:7, 25:21, 25:22
**HEARING** [1] - 1:12
**held** [3] - 33:17, 33:21, 35:21
**helping** [2] - 4:3, 19:4
**Henderson** [1] - 7:7
**Herculean** [1] - 30:23
**herself** [1] - 21:1
**HHS** [16] - 3:23, 9:7, 11:11, 13:3, 20:7, 25:6, 26:2, 26:3, 26:8, 30:4, 32:14, 36:4, 37:11, 38:21, 38:25, 39:2
**HHS's** [1] - 37:13
**high** [4] - 9:14, 10:19, 13:23, 29:12
**highlight** [1] - 11:17
**Honor** [4] - 3:8, 3:18, 4:11, 39:13
**HONORABLE** [1] - 1:13
**Human** [1] - 22:6
**Hunt** [2] - 2:10, 3:20
**HUNT** [24] - 3:20, 25:25, 26:21, 27:11, 27:24, 28:22, 29:16, 29:19, 30:12, 31:12, 32:3, 32:7, 32:13, 33:2, 33:16, 34:10, 35:18, 36:8, 36:18, 37:2, 37:22, 38:16, 39:10, 44:13
**hunt** [5] - 3:24, 25:24, 26:16, 39:8, 44:12

## I

**idea** [2] - 7:12, 23:25
**identified** [3] - 31:14, 34:16, 35:8
**identify** [1] - 3:6
**ignore** [1] - 25:4
**II** [2] - 1:7, 3:5
**illegally** [1] - 39:21
**imagine** [1] - 9:13
**imminence** [1] - 27:22
**imminent** [3] - 27:12, 28:25, 35:20
**immunity** [6] - 31:10, 31:13, 31:14, 31:21, 42:11, 42:23
**impaired** [1] - 28:19
**impairment** [1] - 14:8
**implementing** [1] - 41:2
**important** [6] - 14:13, 15:12, 16:4, 16:15, 19:19, 34:25
**importantly** [1] - 31:22
**imposed** [2] - 35:14, 43:8
**impression** [1] - 20:16
**inappropriate** [1] - 41:10
**INC** [2] - 1:4, 1:17
**Inc** [1] - 3:4
**include** [2] - 9:11, 10:11
**included** [2] - 24:18, 34:19
**includes** [1] - 37:7
**including** [5] - 7:16, 15:14, 17:1, 27:25, 36:17
**income** [1] - 38:20
**incorporates** [1] - 20:23
**indeed** [1] - 9:20
**individual** [2] - 19:5, 33:5
**infections** [1] - 19:14
**inflicted** [1] - 29:9
**initial** [1] - 13:18
**injunction** [10] - 4:25, 5:16, 6:1, 6:3, 6:7, 7:11, 17:1, 26:1, 33:14
**injunctive** [3] - 29:21, 38:23, 39:2
**injury** [1] - 36:3
**inside** [1] - 20:11
**instance** [1] - 37:14
**instead** [1] - 26:9
**institutional** [2] - 14:8, 14:9
**instruction** [3] - 20:1, 20:12, 22:23
**instructs** [1] - 23:2
**intend** [1] - 35:6
**intercourse** [1] - 19:6
**interest** [11] - 7:11, 8:19, 16:15, 30:2, 30:3, 30:21, 32:9, 37:7, 38:16, 38:17, 38:18
**interesting** [2] - 6:19, 21:23
**interests** [2] - 37:4, 38:18
**interim** [1] - 17:14
**interpretations** [1] - 18:13
**interpreted** [1] - 35:1
**interpreting** [1] - 35:5
**invalid** [1] - 9:7
**involve** [1] - 35:3
**involved** [2] - 16:10, 40:14
**involves** [2] - 19:4, 29:19
**irreparable** [19] - 6:9, 7:9, 7:14, 7:22, 8:15, 8:17, 8:18, 9:15, 16:15, 16:18, 17:11, 26:25, 27:7, 27:21, 29:13, 29:18, 34:11, 36:2, 37:25
**issuance** [3] - 29:21, 31:5, 31:19
**issue** [17] - 6:15, 16:21, 18:19, 19:23, 20:11, 20:15, 26:3, 26:10, 32:15, 34:12, 37:7, 38:23, 39:25, 40:24, 41:16, 41:25, 42:11
**issued** [3] - 9:8, 37:9, 40:6
**issues** [6] - 8:14, 10:23, 20:23, 24:18, 33:25, 39:14
**issuing** [5] - 26:8, 30:16, 31:2, 38:25, 39:5
**itself** [8] - 5:7, 19:21, 19:25, 22:23, 23:2, 27:1, 36:13, 43:6
**IUD** [1] - 12:14

## J

**Jean** [1] - 1:18
**Jennifer** [2] - 2:1, 3:15
**Jocelyn** [2] - 2:15, 3:23
**joined** [1] - 7:6
**JUDGE** [1] - 1:13
**Judge** [2] - 7:6
**judgment** [2] - 6:5, 22:8

**July** [4] - 1:8, 40:6, 43:20, 45:8
**JUSTICE** [1] - 2:11
**Justice** [1] - 3:22
**justification** [1] - 13:11

## K

**Kaneshiro** [2] - 45:3, 45:8
**KANESHIRO** [2] - 2:17, 45:9
**Kaneshiro-Miller** [2] - 45:3, 45:8
**KANESHIRO-MILLER** [2] - 2:17, 45:9
**Kavanaugh** [1] - 7:6
**Kenworthy** [2] - 1:17, 3:10
**key** [2] - 6:23, 20:23
**kind** [20] - 4:6, 5:25, 9:15, 12:24, 16:1, 16:3, 16:21, 26:18, 28:2, 29:14, 33:17, 34:3, 34:5, 34:8, 35:3, 35:11, 36:2, 37:23, 38:6
**known** [1] - 28:9
**knows** [2] - 41:1

## L

**lack** [1] - 26:25
**ladies** [1] - 3:17
**laid** [1] - 27:8
**landscape** [1] - 4:7
**language** [4] - 16:24, 18:22, 22:2, 43:16
**lapse** [2] - 39:1, 41:9
**last** [1] - 26:2
**law** [6] - 17:4, 26:22, 28:1, 34:8, 34:25, 43:8
**laws** [1] - 9:20
**lay** [1] - 8:24
**lead** [3] - 6:25, 16:3, 29:15
**leads** [1] - 12:21
**League** [7] - 16:2, 16:17, 28:15, 28:24, 32:22, 32:24, 43:15
**leases** [1] - 9:3
**least** [1] - 34:6
**legal** [6] - 6:14, 17:9, 26:11, 30:13, 30:17, 36:20
**Leon** [2] - 1:17, 3:10
**level** [1] - 33:9
**LIBERTIES** [2] - 2:2, 2:6
**life** [1] - 13:6
**lifestyle** [6] - 12:17, 18:22, 19:2, 19:10, 19:17
**likelihood** [17] - 4:8, 4:23, 5:2, 5:14, 6:18, 7:12, 7:14, 7:23, 8:1, 8:15, 11:3, 13:24, 15:24, 17:5, 25:2, 29:12, 33:17
**likely** [7] - 5:3, 7:3, 7:8, 7:25, 11:10, 21:4
**likened** [1] - 18:24
**likewise** [1] - 30:3
**limits** [1] - 22:7
**Litigation** [1] - 2:12
**LLP** [1] - 1:19
**local** [1] - 15:14
**look** [5] - 7:5, 13:19, 16:24, 17:3, 18:15
**looked** [2] - 34:23, 40:11
**looking** [3] - 4:7, 6:1, 18:19
**looks** [1] - 37:11
**lose** [9] - 10:24, 11:3, 14:14, 27:13, 28:24, 29:2, 35:12, 37:1, 43:18
**losing** [1] - 10:20
**loss** [5] - 14:4, 27:19, 28:2, 28:3, 35:12
**losses** [1] - 27:25
**lost** [3] - 27:17, 28:5, 38:1
**low** [1] - 38:20
**low-income** [1] - 38:20
**lower** [6] - 5:25, 6:2, 26:23, 26:25, 27:5, 29:20

## M

**ma'am** [1] - 39:9
**main** [1] - 33:7
**maintaining** [1] - 30:15
**majority** [3] - 7:5, 8:3, 26:17
**maker** [1] - 20:17
**makers** [2] - 20:2, 20:16
**manages** [1] - 15:20
**mandatory** [1] - 31:16
**March** [1] - 44:4
**Massachusetts** [1] - 42:22
**matter** [9] - 3:3, 4:13, 10:21, 12:8, 12:9, 12:10, 13:11, 17:9, 45:5
**matters** [1] - 24:22
**Matthew** [2] - 2:14, 3:22
**McFADDEN** [1] - 1:13
**mean** [20] - 5:3, 6:18, 9:12, 10:5, 11:7, 14:7, 15:10, 17:7, 17:13, 17:14, 19:10, 20:12, 21:19, 28:20, 32:7, 37:9, 37:10, 37:18, 40:17, 43:21
**meaning** [1] - 36:14
**meaningful** [8] - 9:23, 10:9, 11:1, 11:25, 13:5, 17:22, 18:21
**means** [7] - 4:23, 5:4, 11:25, 13:7, 14:4, 14:10, 43:18
**mechanism** [1] - 10:23
**Medelsohn** [1] - 3:23
**Medicaid** [3] - 16:10, 16:11, 31:16
**medical** [5] - 8:24, 12:9, 13:11, 16:13, 16:14
**Medicare** [1] - 31:16
**medications** [1] - 9:3
**meet** [3] - 11:23, 26:18, 35:19
**member** [2] - 10:13, 17:18
**members** [2] - 9:22, 17:20
**men** [1] - 12:24
**Mendelsohn** [1] - 2:15
**merely** [1] - 19:24
**merge** [1] - 38:17
**merit** [1] - 33:14
**meritorious** [2] - 30:1, 37:8
**merits** [19] - 4:8, 4:23, 5:3, 5:15, 5:23, 5:25, 6:6, 6:18, 6:24, 7:8, 7:23, 8:1, 8:16, 14:13, 15:25, 17:5, 33:11, 33:17, 35:23
**met** [1] - 38:21
**method** [3] - 11:17, 11:20, 13:16
**methods** [2] - 14:25, 19:12
**Michael** [2] - 2:10, 3:21
**mid** [4] - 26:4, 32:18, 40:6, 43:20
**mid-August** [2] - 26:4, 32:18
**mid-July** [2] - 40:6, 43:20
**might** [3] - 6:24, 31:2, 37:24
**MILLER** [2] - 2:17, 45:9
**Miller** [2] - 45:3, 45:8
**million** [1] - 14:4
**minimal** [1] - 29:22
**Mining** [1] - 23:4
**mining** [5] - 23:7, 23:19, 23:20, 23:24, 24:10
**mission** [3] - 14:9, 16:5
**misunderstood** [1] - 18:1
**money** [5] - 32:15, 32:19, 42:6, 42:18, 43:1
**months** [8] - 9:5, 14:12, 39:25, 40:13, 40:16, 40:17, 43:22
**most** [4] - 14:13, 21:4, 41:4, 41:16
**MOTION** [1] - 1:12
**motion** [1] - 26:1
**MR** [33] - 3:8, 3:15, 4:9, 4:11, 6:2, 6:17, 7:15, 8:4, 8:13, 9:16, 10:4, 11:24, 13:3, 15:10, 16:4, 16:23, 17:11, 17:13, 18:5, 19:9, 20:19, 21:17, 22:4, 22:11, 25:16, 39:13, 40:17, 40:20, 41:24, 43:5, 43:13, 43:19, 44:11
**MS** [24] - 3:20, 25:25, 26:21, 27:11, 27:24, 28:22, 29:16, 29:19, 30:12, 31:12, 32:3, 32:7, 32:13, 33:2, 33:16, 34:10, 35:18, 36:8, 36:18, 37:2, 37:22, 38:16, 39:10, 44:13
**multi** [1] - 42:4
**multi-year** [1] - 42:4
**must** [3] - 20:2, 20:8, 21:21

## N

**National** [1] - 23:4
**NATIONAL** [1] - 2:1
**natural** [4] - 18:24, 19:2, 19:3, 19:18
**nature** [1] - 28:11
**naught** [1] - 22:19
**necessarily** [3] - 10:23, 15:10, 28:13
**necessary** [1] - 14:1
**need** [3] - 6:14, 6:17, 26:18
**needing** [1] - 16:18
**needs** [4] - 5:5, 7:7, 15:14, 43:22
**network** [2] - 15:1, 18:18
**never** [5] - 24:22, 25:10, 25:11, 26:24, 31:13
**New** [1] - 2:4
**new** [10] - 10:23, 15:12, 26:3, 26:8, 30:17, 30:18, 31:19, 34:14, 41:11
**newly** [1] - 35:14

**next** [2] - 1:25, 27:16
**NFPRHA** [2] - 10:13, 17:18
**Ninth** [2] - 42:14
**Nix** [1] - 1:18
**nobody** [1] - 38:10
**none** [1] - 37:22
**nonfinality** [1] - 16:21
**Northwestern** [1] - 42:13
**nothing** [2] - 23:10, 41:9
**notice** [9] - 5:9, 24:3, 24:7, 33:22, 34:7, 34:13, 34:18, 34:21, 35:3
**notice-and-comment** [9] - 5:9, 24:3, 24:7, 33:22, 34:7, 34:13, 34:18, 34:21, 35:3
**noticed** [1] - 11:15
**novel** [2] - 26:7, 34:16
**NRDC** [1] - 23:1
**Number** [1] - 3:4
**number** [1] - 11:14
**numbers** [1] - 17:16
**NW** [5] - 1:19, 1:23, 2:7, 2:12, 2:18
**NY** [1] - 2:4

## O

**objection** [1] - 31:21
**objective** [1] - 4:13
**obligate** [1] - 32:2
**obligated** [1] - 42:4
**obligating** [1] - 43:9
**observed** [5] - 5:12, 10:22, 24:17, 25:3, 40:8
**obtain** [1] - 7:20
**obvious** [1] - 16:20
**obviously** [1] - 4:1
**occasions** [1] - 24:17
**October** [1] - 43:10
**odd** [1] - 5:17
**OF** [9] - 1:2, 1:4, 1:12, 1:17, 1:22, 2:6, 2:7, 2:11, 45:1
**offer** [3] - 11:2, 11:13, 17:20
**offered** [1] - 15:22
**OFFICIAL** [1] - 45:1
**on-site** [4] - 10:10, 11:2, 11:13, 17:21
**one** [17] - 9:13, 11:7, 11:17, 11:20, 12:18, 15:7, 16:2, 18:23, 20:24, 21:13, 21:25, 28:1, 32:23, 34:15, 37:9, 37:10, 38:1
**operate** [3] - 9:9, 39:24, 40:4
**operates** [2] - 7:18, 10:6
**operating** [1] - 40:9
**opinion** [7] - 7:15, 10:22, 29:4, 29:5, 33:13, 34:1, 35:9
**opinions** [1] - 7:16
**opportunity** [2] - 3:25, 7:4
**opposition** [1] - 4:1
**option** [3] - 12:3, 36:10, 41:20
**oral** [1] - 44:8
**order** [6] - 7:20, 26:8, 35:8, 42:16, 42:23
**ordering** [1] - 32:5
**orderly** [8] - 6:11, 26:12, 30:5, 37:5, 38:22, 39:15, 41:4, 41:16
**ordinarily** [1] - 26:23
**ordinary** [2] - 32:14, 32:19
**organization** [1] - 28:18
**organization's** [1] - 28:20
**organizational** [1] - 16:5
**organized** [1] - 30:5
**ought** [1] - 23:6
**outside** [1] - 23:21
**overall** [1] - 16:1
**overstates** [1] - 35:24
**overturned** [1] - 5:19
**overwhelm** [1] - 15:18
**overwhelming** [1] - 7:24
**own** [3] - 8:8, 8:10, 14:19

## P

**p.m** [2] - 3:2, 44:16
**page** [1] - 1:25
**panel** [6] - 18:12, 21:1, 21:8, 21:11, 21:20, 22:17
**panels** [2] - 4:16, 36:20
**paper** [1] - 31:2
**papers** [1] - 12:19
**paradigmatic** [2] - 12:5, 12:20
**Parenthood** [11] - 3:4, 10:6, 10:8, 10:11, 11:8, 14:3, 14:18, 16:9, 16:11, 25:7
**PARENTHOOD** [3] - 1:4, 1:17, 1:22
**Parenthood's** [1] - 14:8
**part** [4] - 15:9, 18:18, 20:18, 36:11
**participation** [3] - 23:10, 29:4, 29:7
**particular** [2] - 24:19, 28:1
**particularly** [3] - 12:1, 27:8, 35:4
**parties** [4] - 31:25, 36:25, 43:14, 44:9
**past** [4] - 7:16, 25:7, 34:19, 42:20
**paths** [1] - 20:18
**patient** [5] - 12:5, 12:9, 12:22, 14:14, 39:1
**patients** [16] - 8:22, 8:23, 9:2, 11:6, 11:9, 11:20, 14:16, 14:20, 19:14, 19:15, 19:16, 36:25, 38:12, 38:14, 39:3
**Patricia** [2] - 45:3, 45:8
**PATRICIA** [2] - 2:17, 45:9
**Paul** [2] - 1:16, 3:8
**Pause** [1] - 33:1
**pending** [5] - 17:2, 26:1, 26:10, 30:16, 31:23
**Pennsylvania** [1] - 1:19
**people** [5] - 13:19, 13:21, 24:11, 27:8, 39:19
**percent** [6] - 4:21, 9:11, 11:8, 13:21, 19:17, 34:5
**perceptibly** [1] - 28:19
**perhaps** [2] - 29:8, 32:2
**period** [4] - 26:5, 41:14, 41:17, 43:7
**periods** [1] - 41:5
**permanent** [1] - 6:1
**permit** [7] - 23:7, 23:19, 23:20, 23:24, 24:10, 24:12
**permits** [1] - 23:14
**permitted** [1] - 33:5
**persuade** [1] - 7:1
**phone** [2] - 3:13, 3:16
**PICKERING** [1] - 1:18
**piece** [1] - 31:2
**place** [6] - 9:23, 10:25, 17:22, 18:21, 31:3, 33:10
**placed** [1] - 25:6
**placement** [1] - 36:12
**places** [1] - 15:6
**plaintiff** [5] - 5:21, 6:9, 7:7, 7:24, 17:20
**PLAINTIFF** [1] - 2:1
**plaintiffs** [41] - 3:9, 8:17, 9:6, 9:8, 9:17, 9:22, 10:9, 10:14, 11:5, 13:25, 16:14, 17:16, 17:19, 18:20, 26:6, 26:11, 26:15, 26:17, 27:2, 27:12, 27:14, 28:7, 28:16, 29:2, 29:10, 29:11, 29:18, 29:22, 30:6, 30:13, 30:17, 30:25, 31:13, 32:24, 33:8, 33:16, 34:24, 35:6, 38:1, 38:24, 44:11
**Plaintiffs** [1] - 1:5
**PLAINTIFFS** [1] - 1:16
**plaintiffs'** [4] - 26:1, 35:10, 36:14, 44:6
**plan** [1] - 40:1
**Planned** [11] - 3:4, 10:5, 10:7, 10:8, 10:11, 11:8, 14:3, 14:8, 16:8, 16:11, 25:7
**PLANNED** [3] - 1:4, 1:17, 1:22
**PLANNING** [1] - 2:2
**planning** [10] - 13:16, 14:24, 14:25, 15:22, 18:25, 19:3, 19:4, 19:18, 26:13, 38:20
**Plant** [1] - 14:18
**play** [1] - 32:12
**plus** [1] - 4:21
**point** [15] - 4:15, 6:7, 7:25, 10:17, 16:8, 16:16, 16:21, 17:8, 19:19, 19:23, 22:12, 34:7, 36:15, 38:3, 42:12
**pointed** [7] - 13:17, 27:11, 31:22, 32:1, 34:10, 34:19, 43:14
**points** [8] - 4:14, 10:21, 10:22, 10:25, 14:1, 15:13, 28:14, 33:12
**policy** [3] - 22:20, 25:4, 34:19
**population** [1] - 14:14
**position** [7] - 6:20, 9:23, 11:2, 11:12, 17:20, 20:4, 39:7
**possibility** [3] - 7:13, 28:6, 37:20
**possible** [1] - 27:14
**post** [3] - 4:7, 4:17, 7:7
**post-Winter** [3] - 4:7, 4:17, 7:7
**potential** [4] - 27:7, 36:24, 36:25, 41:22
**Power** [2] - 22:25, 42:13

**PPAU** [1] - 11:19
**PPGOH** [1] - 11:16
**practical** [1] - 16:7
**practice** [1] - 12:9
**preempt** [1] - 32:5
**preferable** [1] - 36:6
**preference** [3] - 18:7, 18:10, 18:16
**pregnancies** [2] - 11:18, 11:21
**pregnancy** [2] - 19:7, 19:12
**preliminary** [7] - 4:25, 6:3, 6:7, 7:9, 17:1, 33:14
**prepared** [2] - 10:19, 40:24
**Present** [1] - 2:14
**preservation** [1] - 39:22
**preserve** [7] - 6:6, 6:8, 31:12, 31:20, 31:24, 41:14, 42:16
**preserving** [1] - 31:23
**presumably** [2] - 37:12, 41:20
**presume** [1] - 38:3
**presuming** [1] - 27:13
**presumption** [1] - 28:23
**pretty** [3] - 9:14, 11:23, 17:15
**prevail** [7] - 4:20, 5:4, 8:25, 14:12, 17:3, 17:6, 27:14
**preventing** [3] - 11:17, 11:20, 39:2
**previously** [1] - 7:19
**primary** [11] - 9:24, 10:10, 11:2, 11:13, 17:20, 17:21, 18:3, 18:18, 25:18, 36:5, 36:7
**priorities** [4] - 20:23, 24:19, 25:5, 34:19
**probable** [1] - 4:20
**problem** [2] - 15:11, 30:20
**problems** [1] - 30:12
**procedural** [1] - 34:15
**procedurally** [1] - 24:21
**proceed** [1] - 38:21
**proceeding** [1] - 39:5
**proceedings** [1] - 45:5
**Proceedings** [2] - 2:21, 44:16
**process** [18] - 23:11, 26:4, 26:9, 27:13, 27:15, 30:24, 31:3, 31:4, 31:5, 31:7, 32:18, 34:17, 38:7, 40:4, 40:14, 42:7, 44:2, 44:3
**processing** [1] - 30:22
**produced** [1] - 2:21
**professionals** [1] - 11:16
**program** [17] - 11:10, 15:2, 20:23, 24:18, 26:13, 29:5, 29:7, 30:4, 30:7, 37:3, 37:6, 37:13, 38:19, 38:22, 39:3, 39:15, 39:23
**programs** [4] - 14:19, 28:20, 39:24, 40:11
**prohibited** [2] - 39:5, 41:22
**project** [1] - 26:5
**promotes** [2] - 22:8, 36:23
**prong** [6] - 8:8, 8:9, 16:22, 27:1, 27:23, 38:17
**prongs** [3] - 4:10, 27:4, 34:11
**proof** [1] - 33:6
**proposal** [1] - 41:3
**propose** [2] - 40:11, 44:7
**proposition** [1] - 6:14
**prove** [2] - 5:18, 6:20
**provide** [2] - 33:5, 37:20
**provider** [7] - 14:6, 14:21, 14:24, 36:6, 36:7, 37:12, 37:21
**providers** [7] - 8:21, 8:22, 9:12, 15:1, 15:22, 37:1, 37:17
**provides** [1] - 13:14
**providing** [2] - 15:3, 38:19
**public** [13] - 7:11, 8:19, 16:15, 26:14, 30:2, 30:3, 30:21, 32:9, 37:4, 38:17, 38:19
**public's** [1] - 38:18
**purely** [1] - 28:4
**purported** [1] - 29:8
**purposes** [2] - 36:23, 37:13
**pursue** [1] - 26:7
**purveyors** [1] - 35:16
**put** [2] - 9:17, 36:19
**putting** [1] - 35:11

## Q

**questions** [7] - 5:8, 5:10, 5:22, 6:15, 15:25, 33:13, 34:6
**quibbling** [1] - 17:8
**quick** [1] - 44:6
**Quinn** [2] - 2:10, 3:21
**quite** [3] - 13:8, 20:24, 44:4
**quo** [8] - 6:8, 30:16, 31:23, 31:24, 39:22, 41:14, 41:23, 42:16
**quote** [1] - 25:4

## R

**R.Q** [1] - 1:16
**raise** [1] - 33:13
**raises** [1] - 33:12
**raising** [1] - 34:14
**range** [1] - 14:25
**rather** [2] - 7:13, 20:8
**rating** [2] - 21:22, 22:17
**reach** [3] - 26:25, 27:4, 34:12
**read** [3] - 18:16, 26:22, 34:13
**reading** [2] - 36:8, 36:14
**real** [2] - 35:19, 37:20
**realistic** [1] - 38:12
**realistically** [1] - 41:12
**really** [9] - 28:23, 31:24, 33:16, 34:16, 35:23, 35:24, 36:16, 39:22, 41:13
**reargue** [1] - 4:14
**reason** [7] - 10:4, 10:14, 13:15, 31:1, 32:18, 41:25, 43:17
**reasonably** [1] - 31:8
**reasons** [4] - 29:11, 35:8, 35:20, 36:1
**receive** [4] - 23:19, 28:10, 28:13, 35:14
**received** [1] - 25:9
**receiving** [1] - 41:23
**recent** [2] - 34:25, 35:4
**recipients** [2] - 37:8, 37:17
**recognize** [1] - 4:12
**recognized** [1] - 5:7
**recollection** [1] - 34:6
**recommendation** [1] - 34:17
**recommendations** [1] - 36:19
**record** [8] - 3:7, 11:7, 13:14, 25:19, 36:9, 36:11, 37:22, 45:4
**reducing** [3] - 19:12, 19:13, 19:16
**refer** [1] - 5:2
**reference** [1] - 9:25
**referring** [1] - 12:19
**refuse** [1] - 27:9
**reg** [1] - 15:9
**regarding** [1] - 31:11
**registration** [1] - 33:6
**regulation** [7] - 20:7, 21:19, 22:1, 23:15, 23:16, 24:6, 24:25
**regulations** [2] - 30:19, 36:21
**rejected** [2] - 34:2, 35:25
**rejecting** [1] - 7:12
**related** [2] - 28:11, 28:13
**relationship** [4] - 12:21, 14:21, 36:5, 42:17
**relationships** [1] - 18:3
**relevant** [1] - 43:14
**relief** [14] - 7:9, 7:20, 17:14, 26:7, 26:15, 29:21, 30:6, 31:18, 32:8, 38:23, 39:1, 39:2, 42:20
**relitigate** [1] - 33:24
**rely** [3] - 7:20, 8:8, 28:16
**relying** [4] - 27:18, 27:21, 27:22, 31:10
**remain** [1] - 12:6
**remains** [2] - 7:17, 8:5
**remember** [1] - 15:12
**reported** [1] - 2:21
**REPORTER** [1] - 45:1
**Reporter** [1] - 2:17
**represents** [1] - 20:3
**REPRODUCTIVE** [1] - 2:2
**reputational** [3] - 35:11, 35:13, 36:3
**request** [2] - 26:15, 38:24
**require** [4] - 5:17, 24:7, 34:18, 42:24
**required** [8] - 9:20, 15:7, 18:25, 19:21, 24:4, 24:25, 33:22, 37:25
**requirement** [3] - 5:15, 23:20, 28:11
**requirements** [5] - 11:23, 12:10, 13:12, 28:24, 35:15
**requires** [3] - 17:23, 32:2, 35:2
**requiring** [2] - 12:25, 34:20
**research** [1] - 29:19
**resolve** [1] - 5:10
**resolved** [1] - 42:7
**resources** [1] - 14:10
**respecting** [1] - 12:9
**respond** [1] - 4:1
**rest** [1] - 20:14

**result** [2] - 29:2, 31:2
**returning** [5] - 12:16, 13:6, 18:21, 19:1, 19:9
**reverse** [3] - 6:25, 7:2, 7:3
**reversed** [2] - 8:25, 29:20
**revert** [1] - 32:20
**review** [8] - 18:12, 21:1, 21:8, 21:11, 21:20, 30:8, 31:5, 36:19
**rightly** [1] - 36:18
**rights** [3] - 30:18, 31:20, 31:25
**rise** [1] - 33:9
**risk** [15] - 12:17, 13:6, 15:18, 18:22, 19:2, 19:9, 19:10, 19:12, 19:13, 19:16, 19:17, 30:6, 31:6, 38:4
**risk-free** [7] - 12:17, 13:6, 18:22, 19:2, 19:9, 19:10, 19:17
**RMR** [1] - 2:17
**Room** [1] - 2:17
**rough** [1] - 27:20
**round** [2] - 27:16, 43:25
**rule** [3] - 5:13, 34:15, 39:18
**Rule** [1] - 5:16
**ruled** [2] - 4:13, 26:2
**rulemaking** [9] - 5:9, 24:4, 24:8, 33:22, 34:7, 34:13, 34:18, 34:21, 35:3
**ruling** [6] - 5:19, 22:18, 40:1, 41:16, 41:25, 44:8
**running** [1] - 39:24
**rural** [3] - 14:6, 14:23
**Rust** [1] - 29:5
**Ruth** [2] - 2:1, 3:16

## S

**satisfy** [1] - 23:17
**Savitzky** [2] - 1:17, 3:10
**scale** [8] - 4:18, 7:19, 7:20, 8:6, 8:7, 8:9, 10:20, 26:19
**scattered** [1] - 14:11
**score** [4] - 14:1, 18:12, 21:9, 25:11
**scoring** [2] - 10:23, 24:25
**second** [2] - 8:15, 30:20
**Secretary** [1] - 22:7
**see** [5] - 8:20, 18:16, 22:22, 43:3, 44:14
**seek** [2] - 13:21, 30:6
**seeking** [2] - 7:21, 12:5
**seeks** [1] - 33:15
**seem** [4] - 5:17, 23:13, 37:8, 43:16
**self** [1] - 29:9
**self-inflicted** [1] - 29:9
**sense** [1] - 5:20
**September** [9] - 26:5, 32:2, 32:3, 32:14, 32:20, 42:3, 42:6, 43:3, 43:5
**serious** [8] - 4:24, 5:5, 5:22, 6:14, 8:20, 15:18, 30:23, 35:7
**serve** [1] - 11:6
**served** [1] - 26:14
**serves** [3] - 11:8, 37:4, 37:13
**services** [9] - 8:20, 12:6, 12:11, 13:13, 13:21, 15:23, 26:13, 38:20, 39:4
**Services** [1] - 22:6
**serving** [1] - 38:19
**set** [4] - 22:19, 33:19, 38:25, 41:11
**seven** [10] - 14:5, 20:9, 21:20, 21:21, 21:23, 22:9, 22:15, 22:18, 24:13, 24:24
**Seventh** [2] - 16:9, 16:12
**several** [1] - 27:25
**sexual** [4] - 13:18, 19:6, 19:11, 38:4
**sexually** [8] - 12:6, 12:17, 13:6, 13:22, 18:22, 19:1, 19:9, 19:13
**Sherley** [8] - 29:14, 29:18, 37:6, 41:19, 41:20, 43:15, 43:18
**shift** [2] - 40:7, 43:21
**shorthand** [1] - 2:21
**show** [17] - 4:19, 4:21, 4:22, 5:22, 6:5, 6:14, 6:17, 7:7, 7:24, 15:5, 17:2, 17:4, 17:17, 27:6, 27:21, 34:4, 34:5
**showing** [8] - 7:13, 7:22, 8:10, 27:20, 33:12, 37:15, 37:23, 38:6
**shown** [1] - 4:6
**shows** [1] - 10:16
**shut** [1] - 11:11
**side** [1] - 16:6
**signals** [1] - 34:9
**significance** [1] - 43:4
**significant** [9] - 6:5, 6:20, 6:24, 7:22, 9:17, 14:8, 17:15, 25:1, 35:13
**similar** [1] - 24:2
**similarities** [1] - 32:22
**similarly** [1] - 43:2
**simpler** [1] - 44:2
**simply** [3] - 8:25, 10:14, 31:1
**single** [1] - 17:17
**site** [6] - 9:24, 10:10, 11:2, 11:13, 17:21, 18:17
**situated** [1] - 11:23
**situation** [2] - 12:20, 39:18
**situations** [1] - 21:5
**six** [1] - 23:23
**sliding** [7] - 4:18, 7:19, 7:20, 8:6, 8:7, 8:9, 26:19
**slightest** [1] - 13:15
**slightly** [1] - 34:4
**small** [1] - 10:17
**someone** [1] - 12:3
**sometimes** [1] - 12:2
**sorry** [2] - 33:2, 40:15
**sort** [55] - 4:17, 6:5, 7:24, 9:4, 10:10, 12:5, 12:10, 13:10, 13:18, 13:21, 14:10, 14:11, 14:13, 14:20, 15:2, 15:12, 15:14, 15:18, 15:20, 16:5, 16:6, 16:24, 18:7, 18:13, 18:21, 19:5, 19:10, 19:14, 19:22, 19:24, 20:10, 21:2, 22:11, 22:22, 22:24, 23:9, 23:13, 23:16, 24:2, 24:20, 25:1, 25:4, 25:6, 25:11, 39:14, 40:25, 41:1, 41:6, 41:7, 41:10, 41:13, 41:16, 42:11, 43:6, 43:24
**source** [1] - 43:8
**sovereign** [6] - 31:10, 31:13, 31:14, 31:20, 42:11, 42:23
**spacing** [1] - 12:8
**SPEAKER** [1] - 3:18
**spear** [1] - 33:20
**specialized** [1] - 14:25
**specific** [1] - 31:18
**speculative** [7] - 27:17, 28:4, 28:6, 28:12, 29:23, 33:9, 38:2
**speech** [1] - 35:16
**spend** [3] - 32:15, 32:16, 42:6
**spent** [1] - 32:19
**Spitzer** [2] - 2:6, 3:11
**split** [1] - 34:24
**staff** [3] - 8:24, 9:2, 11:19
**stage** [1] - 5:1
**standard** [5] - 4:4, 26:23, 26:25, 27:5, 34:4
**start** [2] - 4:3, 4:12
**state** [5] - 9:19, 9:21, 11:9, 11:10, 15:19
**States** [1] - 3:21
**STATES** [2] - 1:2, 1:13
**states** [10] - 9:18, 10:3, 10:5, 10:6, 10:7, 10:11, 23:6, 27:9, 27:10, 33:5
**states'** [1] - 9:20
**status** [9] - 6:8, 24:23, 30:16, 31:23, 31:24, 39:22, 41:14, 41:23, 42:16
**statute** [5] - 18:25, 19:21, 31:18, 32:1, 32:11
**statutes** [1] - 30:19
**statutory** [3] - 13:12, 31:15, 43:3
**stay** [1] - 5:16
**stem** [1] - 29:19
**stenotype** [1] - 2:21
**still** [7] - 4:17, 7:18, 8:5, 17:9, 18:5, 35:18, 43:10
**STIs** [1] - 11:21
**stop** [2] - 12:15, 38:25
**stopped** [1] - 26:8
**straight** [1] - 6:4
**straw** [1] - 12:24
**Street** [3] - 2:3, 2:7, 2:12
**strong** [2] - 7:12, 11:3
**studies** [2] - 13:17, 13:18
**stuff** [1] - 12:25
**subgrantees** [3] - 10:2, 10:3, 10:12
**subgranting** [1] - 10:7
**submit** [1] - 15:20
**subsidy** [1] - 23:12
**substance** [1] - 6:20
**substantial** [16] - 4:6, 4:7, 4:22, 4:24, 5:2, 5:5, 5:14, 5:22, 6:6, 6:18, 6:24, 8:1, 15:13, 17:5, 33:13, 34:6
**substantive** [4] - 24:5, 24:8, 25:1, 34:15
**succeed** [2] - 7:8, 27:15
**succeeding** [1] - 6:18

**success** [12] - 4:8, 4:23, 5:2, 5:14, 7:12, 7:23, 7:25, 8:1, 8:16, 15:24, 17:5, 33:17
**suffer** [3] - 6:9, 7:9, 8:17
**sufficient** [4] - 8:10, 14:16, 18:4, 26:19
**sufficiently** [1] - 7:21
**suggested** [1] - 24:19
**suggesting** [1] - 38:11
**Suite** [1] - 1:24
**Sullivan** [1] - 29:6
**summary** [1] - 6:4
**supported** [1] - 25:18
**supposed** [1] - 21:14
**Supreme** [2] - 34:25, 42:21
**surely** [1] - 9:12
**surrendered** [1] - 9:3
**surveyed** [1] - 40:25

## T

**table** [1] - 3:10
**tack** [1] - 41:5
**talks** [2] - 11:18, 16:18
**task** [1] - 30:23
**telephone** [3] - 1:18, 2:1, 2:1
**tend** [1] - 10:18
**term** [2] - 22:3, 40:13
**terminated** [1] - 40:23
**terms** [4] - 35:25, 37:22, 41:1, 41:15
**test** [1] - 34:22
**tests** [1] - 33:19
**Texas** [4] - 27:9, 37:14, 37:15, 37:21
**THE** [62] - 1:2, 1:13, 2:6, 3:3, 3:12, 3:17, 3:19, 3:24, 4:10, 5:24, 6:13, 7:4, 8:2, 8:11, 9:10, 10:1, 11:14, 12:23, 15:4, 16:1, 16:17, 17:7, 17:12, 17:25, 19:8, 20:15, 21:14, 22:2, 22:10, 25:14, 25:21, 26:16, 27:6, 27:18, 28:15, 29:14, 29:17, 30:9, 31:10, 32:1, 32:4, 32:10, 32:21, 33:11, 34:3, 35:10, 36:4, 36:15, 36:24, 37:14, 38:9, 39:7, 39:11, 40:15, 40:19, 41:19, 43:2, 43:12, 43:14, 44:5, 44:12, 44:14
**themselves** [2] - 30:19, 36:21
**theoretical** [1] - 16:19
**theory** [1] - 27:19
**they've** [1] - 35:23
**thinking** [2] - 16:2, 41:6
**Thomas'** [1] - 11:18
**thorough** [1] - 34:1
**thousands** [1] - 11:6
**three** [4] - 4:10, 10:21, 10:25, 14:4
**threshold** [1] - 19:23
**throat** [1] - 13:1
**thrown** [1] - 30:7
**tick** [1] - 15:21
**timing** [2] - 12:7, 19:6
**tip** [1] - 7:10
**Title** [26] - 8:20, 9:11, 10:18, 11:9, 12:3, 12:5, 12:11, 13:13, 13:21, 14:9, 15:23, 26:4, 26:13, 27:16, 29:4, 30:4, 31:7, 36:23, 37:3, 37:5, 37:11, 37:17, 38:19, 38:22, 39:4
**today** [3] - 3:9, 7:21, 8:14
**together** [2] - 9:5, 36:19
**tomorrow** [2] - 44:7, 44:13
**totally** [1] - 38:2
**touch** [1] - 19:22
**town** [1] - 15:6
**track** [2] - 26:3, 32:15
**traction** [1] - 27:3
**traditional** [1] - 15:22
**transcript** [1] - 45:4
**TRANSCRIPT** [1] - 1:12
**Transcript** [1] - 2:21
**transcription** [1] - 2:21
**transition** [1] - 41:4
**transmitted** [1] - 19:13
**Treasury** [1] - 32:20
**TREVOR** [1] - 1:13
**true** [4] - 4:16, 10:12, 12:1, 19:10
**turn** [2] - 8:23, 15:24
**turns** [1] - 38:7
**tweaks** [1] - 34:17
**twenties** [1] - 13:22
**two** [5] - 8:14, 20:25, 21:4, 27:2, 30:12
**Tyler** [1] - 1:17

## U

**u"** [1] - 40:19
**U.S** [2] - 2:11, 2:17
**uncertain** [3] - 4:17, 7:17, 8:5
**under** [21] - 5:16, 9:8, 9:9, 12:10, 14:1, 15:9, 16:22, 18:25, 21:4, 24:15, 26:4, 26:9, 26:19, 27:24, 28:9, 30:18, 31:16, 31:18, 35:14, 41:2, 42:18
**undisputed** [1] - 30:14
**UNIDENTIFIED** [1] - 3:18
**unintended** [2] - 11:17, 11:21
**UNION** [2] - 2:2, 2:6
**United** [1] - 3:21
**UNITED** [2] - 1:2, 1:13
**universe** [1] - 40:25
**unlawful** [2] - 39:18, 41:8
**unless** [2] - 15:25, 25:20
**unlike** [3] - 9:21, 23:3, 28:4
**unlikely** [1] - 10:11
**up** [5] - 7:13, 10:3, 32:17, 39:23, 41:11
**upend** [1] - 31:25
**upheld** [1] - 26:2
**Utah** [1] - 14:23

## V

**various** [2] - 5:13, 33:12
**Vermont** [1] - 1:23
**versus** [1] - 3:5
**view** [4] - 5:24, 24:15, 31:17, 36:5
**violate** [1] - 42:23
**voluntary** [4] - 12:12, 23:11, 29:5, 29:7
**voter** [1] - 33:6
**Voters** [7] - 16:2, 16:17, 28:15, 28:24, 32:22, 32:24, 43:15
**voting** [1] - 28:24

## W

**waiver** [1] - 31:14
**wants** [2] - 12:6, 12:7
**Washington** [6] - 1:7, 1:20, 1:24, 2:8, 2:13, 2:18
**ways** [1] - 34:9
**week** [1] - 26:2
**whereas** [1] - 31:18
**whole** [4] - 6:7, 17:3, 20:20, 31:3
**willing** [6] - 9:22, 10:25, 11:12, 11:15, 13:25, 17:22
**WILMER** [1] - 1:18
**win** [3] - 16:21, 26:19, 32:25
**winning** [1] - 10:20
**Winter** [4] - 4:7, 4:17, 7:7, 26:21
**Wisconsin** [8] - 3:4, 11:8, 14:3, 14:17, 14:18, 14:23, 16:9, 27:9
**WISCONSIN** [2] - 1:4, 1:17
**WOLFSON** [33] - 3:8, 3:15, 4:9, 4:11, 6:2, 6:17, 7:15, 8:4, 8:13, 9:16, 10:4, 11:24, 13:3, 15:10, 16:4, 16:23, 17:11, 17:13, 18:5, 19:9, 20:19, 21:17, 22:4, 22:11, 25:16, 39:13, 40:17, 40:20, 41:24, 43:5, 43:13, 43:19, 44:11
**Wolfson** [10] - 1:16, 3:9, 3:12, 3:25, 9:10, 15:5, 27:7, 33:11, 39:12, 44:10
**Wolfson's** [3] - 36:15, 38:13
**woman** [3] - 12:4, 13:1, 19:4
**Women** [6] - 16:17, 28:15, 28:24, 32:22, 32:24, 43:15
**women** [2] - 13:22, 38:20
**Women's** [1] - 16:2
**wonder** [2] - 7:4, 15:4
**words** [2] - 7:11, 17:17
**worried** [1] - 38:9

## Y

**year** [10] - 7:16, 25:9, 30:10, 32:13, 41:12, 42:2, 42:4, 42:5, 42:8
**years** [4] - 22:16, 24:14, 24:19, 39:24
**York** [1] - 2:4
**yourselves** [1] - 3:6

## Z

**zero** [1] - 19:17