**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **PLANNED PARENTHOOD OF WISCONSIN, INC., et al,** | ) | |
| | ) | **Civil 18-1035** |
| **Plaintiffs,** | ) | |
| **v.** | ) | |
| | ) | **Washington, D.C.** |
| **ALEX M. AZAR, II, et al.,** | ) | |
| | ) | **July 25, 2018** |
| **Defendants.** | ) | |

**TRANSCRIPT OF PROCEEDINGS**
**BEFORE THE HONORABLE TREVOR N. McFADDEN**
**UNITED STATES DISTRICT JUDGE**

**APPEARANCES:**

**FOR PLAINTIFFS PLANNED PARENTHOOD OF WISCONSIN, INC., ET AL:**

**Ari J. Savitzky, Esq.**
**Emily Jean Nix, Esq. (By telephone)**
**Sara Schaumburg, Esq. (By telephone)**
**WILMER CUTLER PICKERING HALE & DORR LLP**
**1875 Pennsylvania Ave., NW**
**Washington, DC 20006**

**-and-**

**Carrie Y. Flaxman, Esq.**
**PLANNED PARENTHOOD FEDERATION OF AMERICA**
**1110 Vermont Avenue, NW**
**Suite 300**
**Washington, DC 20005**

**(Appearances continued on next page)**

FOR PLAINTIFF NATIONAL FAMILY PLANNING AND REPRODUCTIVE HEALTH ASSOCIATION:

Jennifer Dalven, Esq. (By telephone)
Ruth Ellen Harlow, Esq.(By telephone)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street
18th Floor
New York, NY 10004

-and-

Arthur B. Spitzer, Esq.
AMERICAN CIVIL LIBERTIES UNION OF THE DISTRICT OF COLUMBIA
915 15th Street, NW
2nd Floor
Washington, DC 20005

For the Defendants:

Alicia M. Hunt, Esq.
Michael Quinn, Esq.
U.S. DEPARTMENT OF JUSTICE
Civil Division
Commercial Litigation Branch
1100 L Street, NW
Washington, DC 20005

Also Present:

Matthew Bowman
Jocelyn Mendelsohn (By telephone)
Jaynie Lilley (By telephone)
Mark McGinnis (By telephone)

Court Reporter:

PATRICIA A. KANESHIRO-MILLER, RMR, CRR
U.S. Courthouse, Room 4700A
333 Constitution Avenue, NW
Washington, DC 20001
(202) 354-3243

Proceedings reported by stenotype shorthand.
Transcript produced by computer-aided transcription.

P R O C E E D I N G S

(3:07 p.m.)

THE DEPUTY CLERK: Civil Case Number 18-1035, Planned Parenthood of Wisconsin, Inc., et al., versus Alex M. Azar, II, et al.

Counsel, please come forward to identify yourselves for the record.

MR. SAVITZKY: Hi, Your Honor. Ari Savitzky of WilmerHale on behalf of the plaintiffs. With me at counsel table are Carrie Flaxman and Art Spitzer. Other colleagues are on the phone.

THE COURT: Good afternoon, Mr. Savitzky. Good afternoon, folks.

MS. HUNT: Alicia Hunt on behalf of the United States, and with me are Michael Quinn and Matthew Bowman.

THE COURT: Good afternoon, Ms. Hunt.

Before I begin, let me reiterate my appreciation to the attorneys on both sides for well-written and advocated motions.

Before me is the plaintiffs' emergency motion for an injunction pending appeal under Federal Rules of Civil Procedure 62(c). They ask for an injunction that would (1) bar the Department of Health and Human Services from using challenged aspects of the 2018 Title X Funding Opportunity Announcement in awarding Title X grants for the

upcoming fiscal year, and (2) order the agency to extend the plaintiffs' grants at current funding levels until the D.C. Circuit renders its decision.

The parties largely agree on the basic facts at issue. This case involves an ongoing grant competition. The plaintiffs asked me to rule that aspects of how the agency plans to review grant applications were unlawful, but on July 16, 2018, I granted summary judgment for the government.

The plaintiffs immediately appealed. The plaintiffs are currently on Title X continuation grants, which will expire on August 31, 2018. The fiscal year 2018 funds in question revert to the U.S. Treasury if not obligated on or before September 30, 2018. The agency has targeted mid-August as the time frame in which it will announce Title X grant awards. In this context, the plaintiffs are concerned about harms that would result if the competitive grant process concludes and the final grant decisions are made while an appeal is still pending.

The familiar four factors applied to requests for a preliminary injunction apply to injunctions pending appeal. I'm looking to the *Washington Metropolitan Area Transit Commission v. Holiday Tours*, 559 F.2d 841, pages 842-43, out of the D.C. Circuit, in 1977. "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer

irreparable harm in the absence of preliminary relief, that the balance of the equities tips in his favor, and that an injunction is in the public interest." That is *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, page 20, from 2008. *Winter* teaches that "a preliminary injunction is an extraordinary remedy never awarded as of right," but only "upon a showing that the plaintiff is entitled to such relief."

Of course, I have already ruled for the government on the merits. I adhere to that decision and incorporate that opinion by reference into my oral ruling today.

But as the D.C. Circuit has explained, "Rules 8 and 18 of the Federal Rules of Appellate Procedure . . . state that motions [for preliminary injunctions pending appeal] . . . 'must ordinarily be made in the first instance' to the district court . . . which issued the challenged order. Prior recourse to the initial decision maker would hardly be required as a general matter if it could properly grant interim relief only on a prediction that it has rendered an erroneous decision. What is fairly contemplated is that tribunals may properly stay their own orders when they have ruled on an admittedly difficult legal question and when the equities of the case suggest that the status quo should be maintained." That's again from the *Washington Metropolitan Area Transit Commission*, 559 F.2d, pages 844-45.

For this reason, plaintiffs need not show that it is more likely than not that my opinion will be reversed on appeal. Instead, if the other factors tip toward an injunction, then "it will ordinarily be enough that the plaintiffs have raised serious questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberative investigation." That is from the same cite, *Washington Metropolitan Area Transit Commission*. The D.C. Circuit has characterized this as a "sliding scale," that allows a strong showing on one factor [to] make up for "a weaker showing on another." That is from *Sherley v. Sebelius*, 644 F.3d 388, page 392, out of the D.C. Circuit in 2011.

There is some dispute about whether the Supreme Court's decision in *Winter* and related cases changed this "sliding scale" approach, requiring "a party moving for a preliminary injunction to meet four independent requirements." That is from *Davis v. Pension Benefits Guaranty Corporation*, 571 F.3d 1288, page 1296, Judge Kavanaugh concurring in the D.C. Circuit, in 2009. As the two concurring judges explained in that case, "under the Supreme Court's precedents, a movant cannot obtain a preliminary injunction without showing both a likelihood of success and a likelihood of irreparable harm, among other

things." I agree with the majority concurrence in *Davis*, as apparently do both parties in this case.

However, D.C. Circuit cases since *Davis* have reaffirmed that the continued viability of the "sliding scale" test is an "open question." And I'm looking there to *Sherley*, 644 F.3d at 398.

Accordingly, I will consider whether plaintiffs have shown an actual likelihood of success on the merits, and if not, I must still decide whether the plaintiffs have raised a serious legal question on the merits such that they could still obtain an injunction pending appeal with a strong showing on the remaining factors. I'm looking to the same page in *Sherley*. In any event, my ruling in this case would be the same under either standard.

First, I turn to the plaintiffs' potential to succeed on the merits. In my decision granting summary judgment for the government, I considered two theories available to the plaintiffs for success on the merits. The first track would involve a finding that the 2018 Funding Opportunity Announcement is a final agency action reviewable under the APA, and that when reviewed for substantive compliance with either Title X legal regime or the APA's ban on arbitrary and capricious action, the announcement failed the test.

A second track would be to find that the 2018 announcement required notice-and-comment rulemaking under

5 U.S.C. 553.

I ruled against plaintiffs on both of these tracks, and each deserve separate consideration in assessing whether the plaintiffs have a likelihood of success on the merits.

On the first track, I find that plaintiffs do not have a likelihood of success on the merits, nor have they raised a substantial question. For the reasons given in my Memorandum Opinion on July 16th, I conclude that the plaintiffs are challenging a nonfinal agency action. "An agency action is final only if it is both 'the consummation of the agency's decision-making process' and a decision by which 'rights or obligations have been determined' or from which 'legal consequences will flow.'" That is from the *National Mining Association v. McCarthy*, 758 F.3d 243, page 250, out of the D.C. Circuit in 2014. The 2018 announcement fails both prongs of the test. Although practically consequential, the announcement describes how an agency decision will be made, and is not a final agency action itself. Three facts confirm this: (1) No grants have yet issued under the 2018 announcement; (2) Title X grant applicants are not legally required to do anything in response to the announced criteria; and (3) the challenged language only governs an intermediate stage in the review process, with results that do not bind the Deputy Assistant Secretary for Population Affairs, who makes the final award

decision.

At oral argument yesterday, the plaintiffs renewed their claim that the challenged 2018 announcement binds the agency, even if it does not by its terms bind the Deputy Assistant Secretary, who makes final decisions. According to the plaintiffs, the fact that the challenged eighth criteria is baked into intermediate panel scoring, which the DAS will consider, means the agency, including the final decision maker, is now bound to consider an eighth factor not included in Title X's four factors, or even in the seven criteria from 42 C.F.R. 59.7.

But to the extent that the FOA makes the DAS consider the eighth factor indirectly, through her review of the intermediate review panel's scores, the FOA's scored eighth factor is not binding in the same, direct way that 42 C.F.R. 59.7 is.

As I explained in my prior opinion, the case law makes it clear that grant decisions are final when grant decisions are made. To put the point more precisely, short of legally binding actions like the promulgation of a regulation, agency decision-making in the grant context is not final until the agency decides who has won the grants and who has not. And I look to my Memorandum Opinion, 2018 WL 3432718 at *6, for the case law cited there.

The plaintiffs take issue with several aspects of my

ruling, which I will not address in detail. But I did want to briefly address one point. The plaintiffs argue that I was wrong to identify Title X's reference to "natural family planning" in 42 U.S.C. 300(a) as lending support to the announcement's prioritization of a meaningful emphasis on sexual risk avoidance. The announcement's language discussing the "benefits of . . . returning to a sexually risk-free status" refers to complete abstinence, the plaintiffs argue, not the selective abstinence of natural family planning. Plus, they argue, the government has advanced no such argument. But the announcement actually mentions not just "risk-free status," but the "benefits of avoiding sexual risk or returning to a sexually risk-free status," which includes "avoiding sexual activities that put an individual at risk for unwanted pregnancy," among other things. I'm looking to the Administrative Record there at 125. I think that's a pretty broad definition, which could include selective abstinence methods like natural family planning. The fact remains, as I observed in the opinion: Natural family planning is a form of selective abstinence, and so Congress considered at least one form of abstinence to be both acceptable and effective.

Even if I found the announcement were reviewable as a final agency action, the plaintiffs' substantive challenges to the announcement would still not prevail on the merits.

As I explained in my Memorandum Opinion, the announcement is fully consistent with Title X and satisfies the arbitrary and capricious standard under the APA.

As for track two, the applicable legal regime that determines whether an agency action is subject to notice-and-comment rulemaking is itself, as I noted, "quite difficult and confused." I was looking there to the *National Mining Association*, 758 F.3d at 251. But this is not the type of novel issue or close constitutional question that has typically led district courts to stay their rulings in the past, and I doubt the plaintiffs have shown a likelihood of success on the merits of this question, for all of the reasons I laid out in my opinion at pages *9-12. However, the question is not an easy one. Accordingly, I will assume for purposes of this ruling that the plaintiffs have raised a serious legal question on the merits of notice-and-comment.

Turning to the irreparable harm question, the D.C. Circuit "has set a high standard for irreparable injury." That's from the *Chaplaincy of Full Gospel Churches v. England,* 454 F.3d 290, at 297, out of the D.C. Circuit, 2006. "The party seeking a preliminary injunction must make two showings to demonstrate irreparable harm. First, the harm must be 'certain and great,' 'actual and not theoretical,' and so 'imminent that there is a clear and present need for equitable relief to prevent irreparable harm.' Second, the

harm 'must be beyond remediation.'" I'm quoting there from the *League of Women Voters v. Newby*, 838 F.3d 1, pages 7-8, out of the D.C. Circuit in 2016.

Here, the plaintiffs claim "multiple" injuries. First, "their ability to serve clients will be severely and irreparably harmed because the loss of funding means that patients cannot be served, services must be curtailed, and health centers will close."

Second, they argue that even if they win the grants they are seeking, some of the plaintiffs "will now be locked into their altered project plans," damaging their ability to comply with what they've promised, in light of what they perceive as Title X's conflicting goals.

Third, the plaintiffs argue that without an injunction they will lose the ability to compete under fair terms for Title X grants.

Fourth, plaintiffs argue that either through voluntary conformance to the announcement's challenged priorities, or through lost grant funds, their reputation as leading providers of family planning services will be irreparably harmed.

I find that the injuries that the plaintiffs fear are not certain, but rather theoretical and speculative. Further, they are not irreparable in the sense this circuit's case law requires.

The most obvious reason that the plaintiffs fail to show "certain" and non-theoretical injury is because they still may prevail in the ongoing competitive process for these Title X grants. Indeed, based on the fact that the plaintiffs claim to represent over 80 percent of the current grantees, the high barriers to entry in this field, and the fact that in many areas -- according to their declarations -- they are the only available family planning providers, I find it highly likely that many, if not most, of the plaintiffs will continue to receive funding under the new FOA. While that suggests that some plaintiffs will not retain full funding, presumably some turnover occurs in every FOA cycle. As the D.C. Circuit explained in *Sherley*, the outcome of a competitive grant process is "necessarily uncertain," 644 F.3d at 388. Even on the assumption that the challenged announcement "inflict[s] some incremental handicap upon the plaintiffs," as considered in *Sherley*, I have no way of knowing whether the plaintiffs will actually lose grant money, as they fear.

As the government suggests in its brief, *Sherley* is highly instructive in this case. In that decision, the D.C. Circuit vacated a preliminary injunction prohibiting the National Institutes of Health from awarding research grants to projects using certain human embryonic stem cells. In addition to pointing out that the outcome of a grant

competition cannot be predicted in advance, the *Sherley* court also noted that "the hardship a preliminary injunction would impose upon [competitor] researchers, by contrast, would be certain and substantial. That is 644 F.3d at 398. Similar logic applies here, since I cannot know whether plaintiffs will win, but ordering continuation funding would preclude all of the plaintiffs' competitors from being awarded any Title X grants in August, or while the appeal is pending.

The plaintiffs chiefly rely on *League of Women Voters v. Newby*, but that case ultimately supports the government as well. In *League of Women Voters*, the D.C. Circuit granted a preliminary injunction, overruling a district court's denial, requiring the Election Assistance Commission to remove the citizenship-verification requirements of three states from a federal voter registration form pending an adjudication of the merits. Plaintiffs argue that the case supports their arguments for organizational harm. But several aspects of that case cut against the plaintiffs.

First of all, the D.C. Circuit found that the League had "a substantial (perhaps overwhelming) likelihood of success on the merits." That's 838 F.3d at 9. Obviously, I have made no similar finding here.

Second, the irreparable harm standard that *League of Women Voters* lays out is tough to meet. "The party seeking a preliminary injunction must make two showings to demonstrate

irreparable harm," the case says. "First, the harm must be 'certain and great,' 'actual and not theoretical,' and so imminent that there is a clear and present need for equitable relief to prevent irreparable harm.' Second, the harm 'must be beyond remediation.'" That is 838 F.3d, pages 7-8. As I previously discussed moments ago and further discussed in my written opinion, I do not find that the harm alleged here is either certain or great.

Third, *League of Women Voters* explained that even if organizations show some degree of impairment to their programs, they must show that "the defendant's actions 'directly conflict with the organization's mission.'" That is at page 8. Plaintiffs cannot make that showing. As I explain in detail later, they have to a substantial degree already voluntarily incorporated the changes that they protest, undermining their claims that the alleged changes contradict their missions. And the challenged emphases have long been around anyway, in priorities and key issues that grant applicants could not responsibly ignore.

The plaintiffs emphasize that some sort of loss is likely, since they "compose 84 percent of the current Title X grantees." But that fact may actually help the plaintiffs, allowing them to win grants in areas where they provide crucial services. I recognize the possibility that some of the plaintiffs may lose some of their funding, given that

their clients have something approaching a monopoly on the current grant funding, particularly in certain states. As the plaintiffs point out, the eighth scored criterion is linked to up to 35 points, and even though they only challenge bits and pieces of it, a few points can matter a lot. They argue that, and I understand that. But that doesn't make the potential harm certain, great, or non-theoretical, as *League of Women's Voters* requires. The plaintiffs are fundamentally assuming lost grants, which is nothing close to a certainty.

The plaintiffs argue that some state health agencies (such as Wisconsin and Texas) are forbidden by state law from redistributing Title X grants, if won, to Planned Parenthood via sub-grants. But this argument still assumes lost grants to those states, and I cannot make such an assumption at this point.

The plaintiffs' reliance on economic harms also has another weakness. "Monetary loss may constitute irreparable harm only where the loss threatens the very existence of the movant's business." That is from *ConverDyn v. Moniz*, 68 F. Supp. 3d 34, page 46, out of this district in 2014. Most of the plaintiffs will not suffer this level of economic harm, even if they lose Title X funding. I'm looking to the Harvey Declaration, paragraph 38, where she states that Title X funding accounts for 19 percent of her budget; the

Galloway Declaration, at paragraph 46, where Planned Parenthood of Utah has 18 percent of its budget from Title X funding. And I recognize that the Thomas Declaration indicates that over 90 percent of their funding comes from Title X, at paragraphs 17, 46, and 50.

As a comparison, plaintiffs argue that when Wisconsin cut their state level funding by $1 million, resulting in closed family planning clinics, areas of the state were left with no services at all. But that's not a good comparison in this case, where the plaintiffs fear not an overall cut in Title X funding, but a diversion of those funds to competitors. The plaintiffs argue that competitors won't provide the same level of excellence and that HHS may effectively remove access to Title X programs in certain areas, but those harms are ultimately speculative. It is the government's job to decide who is best qualified to provide Title X services, and I have no way of knowing now whether these decisions will be made in a manner detrimental to the program or not.

Neither can the plaintiffs succeed with their arguments of irreparable harm even if they win the grants they seek.

As for an argument that without an injunction they would lose the ability to compete fairly, I reject the premise that the challenged announcement creates an unfair

competition. As I explained in my Memorandum Opinion, the plaintiffs may score full marks on each of the factors that they challenge, and the priorities themselves are compatible with Title X's own priorities.

The plaintiffs also argue that getting locked into grant programs altered by the announcement's priorities could harm their reputation, as they are pressured, so they say, to be insensitive towards plaintiffs who have no interest in abstinence, or adopt any of the challenged agency priorities. But this argument suffers from several defects.

First, there is significant evidence plaintiffs are taking on these changes voluntarily, or have indeed long incorporated them.

Looking to the faith-based factor, Planned Parenthood of Wisconsin states, it "certainly does partner with faith-based organizations to the extent such partnerships advance our mission to provide evidence-based, comprehensive family planning care for our patients." I'm looking to Ms. Atkinson's Declaration, paragraph 42. Similarly, Planned Parenthood of Utah "routinely works with faith-based groups throughout Utah." I'm looking to the Galloway Declaration at paragraph 42. And the Arizona Family Health Partnership and their sub-recipients" have always worked extensively with community-based and some faith-based organizations. That's from Thomas Declaration, paragraph 29.

Turning to abstinence, Planned Parenthood Association of Utah says, "To be sure, their staff discuss abstinence with patients as one method of preventing unintended pregnancies and STIs, when employed properly and consistently." That is from Ms. Galloway's Declaration, paragraph 41.

On primary care, she writes, "We also facilitate access to general primary care and specialized services when indicated. We have good relationships with many primary care providers across the state."

I also note that my prior written opinion rejects the notion that the FOA has prioritized applicants that are primary care providers over applicants with relationships with primary care providers, so I do not find that there is a genuine conflict on this issue at all.

On family involvement, "Planned Parenthood Association of Utah staff also encourage all patients to involve family members in their health decisions where possible," according to Ms. Galloway's Declaration at paragraph 42.

To be fair to the plaintiffs, they are concerned that the announcement will push them to pursue these initiatives further than they are comfortable. But since the underlying priorities are consistent with Title X, that concern still does not rise to the level of a legally cognizable harm to

the plaintiffs' reputation for providing quality Title X services.

The plaintiffs also worry about the additional time and money they will spend to recalibrate their applications and services to win the grants under the new FOA, but the *Sherley* court considered and rejected nearly identical complaints in that case, and I must do the same, and I look to 644 F3d at 398.

Turning to the balance of the equities and the public interest, these two criteria are analyzed as a single criterion when the government is the defendant since the government's interest is synonymous with the public's interest. That is from *Nken v. Holder*, 556 U.S. 418, at page 435, from 2009.

On this issue, the plaintiffs claim that the public interest in a thriving Title X program will be furthered by ordering continuation funding, and that no harms will befall the government, other potential Title X grantees or the public as a result.

At bottom, the harm to the Title X program that the plaintiffs posit is based on the assumption that plaintiffs are better situated to serve the public than any competitor who may win. But it is the job of HHS to make this determination in the first instance, in a detailed and orderly manner." And I'm looking to *Experience Works v.*

*Chao*, 267 F. Supp. 2d 93, page 99, out of this district in 2003.

As the government points out, the D.C. Circuit's decision in *Sherley* supports the proposition that using an injunction to halt a competitive process creates hardships for competitors, 644 F.3d at 398, where it says, "The hardship a preliminary injunction would impose upon [competitor] researchers, by contrast, would be certain and substantial." So, when plaintiffs argue that this order would merely preserve the status quo, that is not exactly accurate. Instead, the government would be forced to halt a competitive process and instead give funds for an indefinite period likely extending beyond existing grant terms.

I find that the *League of Women Voters* also cuts against the plaintiffs here. That case found that a "preliminary injunction" will not substantially injure other interested parties," 838 F.3d at 12. Not so here, where competitors will effectively be locked out of potential grant funds at least until the D.C. Circuit rules, and likely longer, given the time involved in issuing, reviewing, and awarding grants.

I also disagree with the plaintiffs' suggestion that there would be no harm to others because I would merely be preserving the system that has existed for nearly five decades. As my written opinion explained, FOAs have varied

from year to year, and not surprisingly, new administrations have steered the program in different directions.

Ms. Coleman's Declaration on behalf of the National Family Planning & Reproductive Health Association described a major change initiated in 2009 that involved "an extensive process to update OPA's program guidance," looking to her declaration, paragraphs 39 and 40. These modifications have regularly occurred, no doubt to the benefit or detriment of certain applicants. I'm looking to the Geoffray Declaration, paragraphs 51 to 53. To the extent that the plaintiffs fear they will lose grant money, it must be that their loss would be other applicants' gain; thus, freezing the status quo would be to deny these applicants the funding that they would have otherwise received.

At oral argument yesterday, the plaintiffs cited to *Planned Parenthood of Wisconsin, Inc., v. Van Hollen*, 738 F.3d 786, out of the Seventh Circuit in 2013, in support of the notion that lost clinics and damaged ability to provide healthcare is a very serious harm, and perhaps for the proposition that there is not a "felt sense of urgency" on the government's side of this case. But *Van Hollen* was about lost abortion clinics. This case is about Title X funds potentially being given to other grant competition winners besides the plaintiffs. In addition to the speculative nature of the harm here, the harm to other

potential winners means that there is some felt urgency on the anti-injunction side of the equation. And the existence of other potential winners blunts the force of the health impacts the plaintiffs imagine.

Finally, I do not take lightly the public's interest in HHS administering this program in an orderly fashion. Congress has given HHS -- not the plaintiffs or the courts -- the obligation to administer the requirements and policies of the Title X program. It is the agency's prerogative to figure out which grant recipients are best situated to receive Title X funds within legal limits. The challenged announcement comports with Title X's substantive goals, and it would be out of step with the statute to enjoin a lawful action due to policy disagreements.

In conclusion, to the extent that the preliminary injunction sliding scale is still viable, I find that even if the plaintiffs had made a showing of a substantial question on the merits, this showing is canceled out by the other prongs of the test. In particular, the irreparable harm prong cannot be satisfied even under the *League of Women Voters*. There is no showing that the purported harm is either certain or great. Indeed, according to the plaintiffs' declarations, many of them already do the things they now challenge in the FOA, and they are re-tooling -- if reluctantly -- to ensure their applications meet the new FOA

requirements. These facts are not the stuff of irreparable harm.

I also give significant credence to the fact that there are potential grantees who would be shut out of the grants they would otherwise receive here, which distinguishes this case from the *League of Women's Voters* case and puts it much more in the *Sherley* line of cases.

Ultimately, neither this Court nor the parties know which grantees, if any, will lose funding at the end of this competitive process. Congress assigned to the agency the job of determining who wins grants, in line with the goals of the Title X program. I cannot conclude that the plaintiffs have shown they're entitled to the extraordinary and drastic remedy of a preliminary injunction.

For all these reasons, the plaintiffs' emergency motion for an injunction pending appeal is denied.

Mr. Savitzky, is there anything further from the plaintiffs?

MR. SAVITZKY: No, Your Honor.

THE COURT: Ms. Hunt, anything further from the government?

MS. HUNT: No, Your Honor.

THE COURT: Thank you.

Have a good afternoon.

(Adjourned at 3:40 p.m.)

CERTIFICATE OF OFFICIAL COURT REPORTER

I, Patricia A. Kaneshiro-Miller, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

| | |
|---|---|
| /s/ Patricia A. Kaneshiro-Miller | July 26, 2018 |
| PATRICIA A. KANESHIRO-MILLER | DATE |